GREGORY C. LOARIE (CA Bar No. 215859)
gloarie@earthjustice.org
KATRINA A. TOMAS (CA Bar No. 329803)
ktomas@earthjustice.org
EARTHJUSTICE
1 Sansome Street, Suite 1700
San Francisco, California 94104
T: (415) 217-2000 ● F: (415) 217-2040

GABRIEL F. GREIF (CA Bar No. 341537)
ggreif@earthjustice.org
EARTHJUSTICE
707 Wilshire Blvd., Ste. 4300
Los Angeles, CA 90017
T: (415) 217-2000 ● F: (415) 217-2040

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR, *et al.,* <br><br> Defendants. | No.: 2:26-cv-4002-CAS-AS <br><br> **DECLARATION OF CHANCE WILCOX IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: July 27, 2026 <br> Time: 10:00 AM <br> Judge: Hon. Christina A. Snyder |

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## DECLARATION OF CHANCE WILCOX

I, Chance Wilcox, declare as follows:

1. I am a resident of San Bernardino County, California, and I am the California Desert Associate Director for the National Parks Conservation Association (NPCA). I have served in this role since April 2026. Before that, I served as NPCA's California Desert Program Manager from August 2024. I am also a dues-paying member of NPCA. I am of full legal age and make the following statements based on my own personal knowledge. If called to testify, I could and would do so.

**National Parks Conservation Association**

2. NPCA is a 501(c)(3) conservation organization headquartered in Washington, D.C. with over 1.2 million members and supporters across the nation, including about 147,000 in California. NPCA's mission is to protect and enhance America's National Park System for present and future generations. Consistent with that mission, NPCA works to preserve public lands that comprise, or contribute to, the intact cultural and ecological landscapes of the National Park System units. This work includes safeguarding the integrity of undeveloped public lands and preventing destructive impacts of extractive industries on lands with ecological and cultural significance.

3. NPCA has maintained a presence in the California desert for decades. During that time, it has consistently advocated for increased protection of Park Service lands, including in the Mojave National Preserve (the Preserve). To advance these interests, NPCA maintains my field office in the town of Joshua Tree, which oversees the organization's work relating to Park System units in the California desert. NPCA's programmatic work in the California desert includes on-the-ground community and member engagement, federal legislative and administrative advocacy, monitoring and mapping activities, and litigation when necessary.

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**Mojave National Preserve and the Clark Mountains**

4.    As part of its mission, NPCA devotes substantial resources to protecting and restoring Mojave National Preserve, as well as neighboring public lands managed by the National Park Service, such as Death Valley and Joshua Tree National Parks. NPCA also works to preserve neighboring national monuments withdrawn under the Antiquities Act, such as the Castle Mountains, Mojave Trails, and the Avi Kwa Ame National Monuments.

5.    NPCA's longstanding conservation work in the California desert is a key component of our goal of preserving the "Moab to Mojave" conservation corridor, which extends from the Mojave Desert in California to Moab, Utah, the gateway to Arches and Canyonlands National Parks. NPCA has worked for decades to protect this critical corridor, which spans across four states and connects five national parks, and our work to protect Mojave National Preserve is a vital constituent piece of this larger effort. Extensive, continuous stretches of undeveloped landscapes will allow desert ecosystems to adapt to increasingly severe drought and heat because they allow plants and animals to occupy more suitable environments as conditions change.

6.    NPCA's members include cultural resource and archaeology enthusiasts, hikers, mountain bikers, canyoneers, scientists, educators, bird- and wildlife-watchers, and photographers, including those who regularly visit public lands in Mojave National Preserve. NPCA's work to protect and defend the Preserve benefits our members' interests by protecting the area from the disruption and damage caused by mining, development, and other industrial activities. These protections are essential to preserving the Preserve's critical scientific, cultural, ecological, and scenic values. The Preserve's outstanding recreational, scenic, cultural, and ecological resources—including solitude, intact plant and wildlife communities, connectivity benefits, and scenic vistas—are central to both my personal use and NPCA's mission.

7.    NPCA has a particular interest in the Clark Mountains where Colosseum Mine is located. The Clark Mountains are an important link for our landscape

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

connectivity efforts across the Mojave and surrounding desert ecosystems, including our work to protect lands between Death Valley and Mojave National Preserve and our campaign to construct wildlife overcrossings along the Interstate 15 highway to allow migration of bighorn sheep and other sensitive wildlife. NPCA is working on these and other projects alongside allies and gateway communities to establish unbroken wildlife and cultural connectivity across the conservation corridor.

8.    In addition to promoting broader connectivity, the Preserve is also home to many sensitive and endemic species. For instance, the Preserve is premier habitat for the bighorn sheep and the desert tortoise, the latter of which is listed as threatened under the federal Endangered Species Act and endangered under the California Endangered Species Act. Other species, such as the Clark Mountain Agave and Clark's Buckwheat, are found only in the eastern Mojave Desert, not far from Colosseum Mine.

9.    Another key tenet of NPCA's advocacy is that National Park Service lands should be accessible to everyone. The Preserve offers exceptional recreational opportunities for NPCA staff, members, and the public that are hard to find elsewhere. Within the Preserve, the Clark Mountains offer particularly good opportunities for hiking, wildlife observation, photography, and dispersed camping. Many of these parts of the Clarks are accessible primarily through the Colosseum Mine public access road, which leads into Curtis Canyon, where visitors can follow old trails, camp in pine-and-juniper forests, view abandoned homesteads, and enjoy panoramic views of the mountain range. Directly below is a section of the official Park Service map for Mojave National Preserve, available at https://www.nps.gov/npgallery/GetAsset/b6ab9005-96d2-445c-8bec-bbf178fc81c4/proxy/hires?, which depicts the Clark Mountains within the Preserve. For orientation, Colosseum Mine is located just north of the closed loop in the noncontiguous portion of the Preserve, with Colosseum Road bordering the Mine and running through the Preserve.

4

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Another map prepared by the U.S. Geological Survey depicting Colosseum Road running through the Preserve, including into and through Curtis and Kiwisar Canyons, is below and available at https://prd-tnm.s3.amazonaws.com/StagedProducts/Maps/USTopo/PDF/CA/CA_Clark_Mountain_20150306_TM_geo.pdf.

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



10.    I have a strong personal interest in the conservation of Mojave National Preserve, particularly in and around the Clark Mountains. I first visited the Preserve shortly after moving to the California desert in November 2024, and I first visited the Clark Mountains in January 2025. Since then, I have visited the Preserve roughly every other month, both for professional purposes and for personal recreation such as camping, hiking, wildlife observation, and photography.

11.    I am drawn to the Preserve for its solitude, diverse habitats, and wildlife, including desert tortoise and bighorn sheep. In and around Clark Mountain, I have been fortunate to observe Clark agave, Clark's buckwheat, white fir, Joshua trees, desert tortoise, bighorn sheep, mule deer, wild burros, and evening primrose. Viewing and appreciating these features, many of which are unique to or highly rare outside of the Preserve, is deeply meaningful to me.

12.    In my personal capacity, I have hiked many different trails in the Clark Mountains that are primarily accessible via Colosseum Road leading up to Colosseum Mine from Interstate 15 through Ivanpah Valley. For instance, I have visited—and intend to return to—Curtis Canyon, Green's Cabin, and routes toward Clark Mountain peak for wildlife observation and camping. The alternative approach requires an approximately one- to two-hour detour around the range.

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

13. I hope to visit the Clark Mountains in summer 2026 if the Colosseum Mine access road becomes accessible again. During the summer, I regularly seek out the high mountains in and around the Preserve, as they are substantially cooler than the low-lying flat areas of the Mojave Desert. The Clark Mountains are a particularly good place to seek respite from the heat, as their higher-elevation pine-and-juniper forests are exceptional and often 20-30 degrees cooler than at the base of the mountains. I plan to take a day trip to the mountains in July, but if work at the Colosseum Mine continues or the road remains closed, I worry that I may be unable to carry out these plans.

**Colosseum Mine**

14. I visited Colosseum Mine in January 2025, before the Park Service permitted renewed operations at the Mine. Historic mining operations had left a pit in the area, and a narrow, rocky road ran through the mine site. The double-track road was approximately one lane wide and would have been difficult to traverse without four-wheel drive. I appreciated that the terrain made the area feel remote while still allowing access for determined visitors. I was able to drive slowly along the road, take in the scenery, and admire the Mojave yucca and desert springs in the canyon beside the road. Just before the road reached the abandoned pit, I turned onto smaller dirt roads toward notable sites in the area, including Green's Cabin and the trailhead for Clark Mountain Peak, which features views of the range and Amargosa Basin.

15. Directly below are photographs that I took in January 2025 within the Preserve, depicting the access road, Colosseum Road, leading up toward Colosseum Mine before it was widened (Photo 1); dense plant life, including yucca, buckwheat, creosote, and young Joshua trees, taken from the access road (Photo 2); and a bend in the access road leading to the mine pit that was one of my favorite spots in the area for its coral reef-like shrubbery, which is no longer accessible due to barricades and posted signage (Photo 3). I personally took each of these photos, and they accurately depict what I saw.

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



*Photo 1: Colosseum Road facing southeast leading down from the mine in January 2025*



*Photo 2: Plant Life taken from Colosseum Road in January 2025*

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



*Photo 3: Colosseum Road leading up to the mine in January 2025.*

16.    In July 2025, I returned to Colosseum Mine on a camping trip following the Park Service's April 2025 decision authorizing renewed operations at the Mine. Conditions were not noticeably different from my trip there in January 2025 and it did not appear to me that the mining operators had performed any significant road or construction work within the Preserve since my last visit.

17.    Directly below are photographs that I took in July 2025 within the Preserve, featuring the same bend in the access road that I shot in January 2025 (Photo 4); and a photo of juniper woods on the trail from Green's cabin (Photo 5). I personally took each of these photos, and they accurately depict what I saw.

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



*Photo 4: Colosseum Road facing west and leading up to the mine, with Clark Mountain in the Background, in July 2025*



*Photo 5: Juniper Woods near Colosseum Mine in July 2025.*

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

18.     In September 2025, I again visited Colosseum Mine. Although no noticeable work had been performed at the site or on the road leading to the mine, this time I encountered several pickup trucks and contractors in the area immediately surrounding the historic pit. The contractors appeared to be conducting mapping or surveying activities. Although this was my first time encountering other people at the site, the activities I observed appeared to be relatively low-impact and confined to the area immediately surrounding the pit. At that point in time, based on my observations at the site and NPCA's understanding that Dateline had no preexisting U.S. operations, it was unclear whether any significant ground disturbing operations were imminent.

19.     In March 2026, I returned to Colosseum Mine and observed that construction operations had proceeded well beyond what I expected or imagined. Since my prior visit, the Colosseum Road leading up to the mine had undergone heavy grading. A berm had been erected along the side of the road, with piles of earth and vegetation that I estimated to be approximately six feet high. The dense vegetation alongside the road that I had previously admired was now completely gone. New, smaller roads had also been carved into the mountain, and I observed a large, flattened area of earth along the side of the road. I also observed industrial traffic and equipment at the site, such as drills, machinery, trenching, graded storage areas, trucks, and infrastructure.

20.     Directly below are photographs that I took in March 2026 within the Preserve, depicting the widened and developed access road, from about the same vantage as Photo 1 (Photo 6); the berm that had been constructed along the side of the access road (Photo 7); heavy earthmoving equipment near and along the access road leading to the claims (Photos 8 and 9); and the same bend in the road as in Photos 3 and 4 from the opposite side, with the road now substantially widened (Photo 10). I personally took each of these photos, and they accurately depict what I saw.

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



*Photo 6: Colosseum Road leading down from the mine in March 2026*



*Photo 7: Berm along Colosseum Road in March 2026*

12



*Photo 8: Heavy Equipment along Colosseum Road in March 2026*



*Photo 9: Active Development along Colosseum Road leading up to the mine in March 2026*

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



*Photo 10: Grading of Colosseum Road in March 2026.*

21.    I most recently visited the site on May 28, 2026. When I neared the site on Colosseum Road within the Preserve, I observed two large, concrete barricades, one on each side of the road. Each barricade featured a red STOP sign, as well as two other signs—one requiring personal protective equipment to be worn on site and the other stating "DANGER – NO ENTRY." The posted signs and heavy equipment have discouraged me from conducting further site visits.

22.    Directly below are photographs that I took on May 28, 2026 within the Preserve showing the barricades and signage I encountered midway up Colosseum Road leading to the Mine (Photos 11 and 12). I personally took each of these photos, and they accurately depict what I saw.

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



*Photo 11: Barricades Along Colosseum Road within the Preserve in May 2026*



*Photo 12: Barricade on Colosseum Road within the Preserve in May 2026.*

23.     My use and enjoyment of Mojave National Preserve has been and will continue to be irreparably harmed by the development and industrialization of access routes and operations at Colosseum. Continued road widening, bulldozing of vegetation, industrial traffic, dust, noise, and signage deterring entry will diminish my ability to access, enjoy, and study the Clark Mountains within the Preserve, including

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

my ability to reach Curtis Canyon, Green's Cabin, and routes toward Clark Mountain Peak for wildlife observation, photography, and camping.

24. Based on my observations and experience working in the California desert, ground disturbance and vegetation removal in this region are slow to recover, and damage to springs and groundwater-dependent systems can be irreversible. The irreparable environmental harm that I have observed to the Preserve—combined with our limited access to Colosseum Mine—make me confident that NPCA and its members, including me, will suffer further irreparable harm in the absence of an injunction halting further preparatory or operational work at the mine. Continued roadwork, grading and paving, vegetation removal, industrial traffic, and access restrictions in the Colosseum area will further eliminate native desert vegetation and habitat along access corridors; increase dust, noise, and visual intrusions impairing wildlife use and visitor solitude; and disrupt or deter NPCA staff and members from safe and meaningful field access.

25. Should operations proceed while this case is pending, the Preserve will suffer further irreparable injury. I am concerned about the discharge of toxic waste, acids, or heavy metals from leaching or acid mine drainage, additional scarification of the landscape from mining activity, and the negative effects of dust and operational noise from mining operations on wildlife and visitors. This activity will irreparably harm my personal and professional interests in Mojave National Preserve and the Clark Mountains, particularly the lands in the Colosseum Mine area.

**NPCA's FOIA Request**

26. On July 22, 2024, NPCA submitted a Freedom of Information Act (FOIA) request for correspondence between the Park Service and Dateline, and I reviewed responsive documents received in late 2024. Those records included, among other things, Department of Interior documents concerning Colosseum Mine, communications between Dateline and the Park Service, and statements about work occurring without required permits. On February 5, 2025, NPCA submitted a

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

California Public Records Act request for records relating to Colosseum, and I reviewed responsive documents received in February 2025. Those records included, among other things, annual reports submitted on behalf of Colosseum Rare Metals, Inc.—a subsidiary of Dateline—to the California Department of Conservation regarding the status of Colosseum Mine.

27.     Attached as **Exhibit A** is a true and correct copy of the Plan of Operations and approval documentation for Colosseum Mine, including modifications and amendments. NPCA obtained this document from the Park Service in response to NPCA's July 22, 2024 FOIA request, and I reviewed it shortly after receipt.

28.     Attached as **Exhibit B** is a true and correct copy of the 2023 Colosseum Mine Annual Report submitted to the California Department of Conservation on June 28, 2024 by Lilburn Corporation on behalf of Dateline's subsidiary company, Colosseum Rare Metals, Inc. NPCA obtained this document in response to NPCA's February 5, 2025 Public Records Act request, and I reviewed it shortly after receipt.

29.     Attached as **Exhibit C** is a true and correct copy of a June 2023 letter from the Park Service's then-Acting Regional Director, William Shott, to Dawn Rowe, the Third District Supervisor of San Bernardino County, and Kerry Shapiro, who served as counsel for Dateline at that time. Appended thereto is a July 1995 letter from the Park Service's then-Field Director, Stanley Albright, to the operator of Colosseum Mine. NPCA obtained this document from the Park Service in response to NPCA's July 22, 2024 FOIA request, and I reviewed it shortly after receipt.

30.     Attached as **Exhibit D** is a true and correct copy of a June 2022 letter from Michael Gauthier, then-Superintendent of the Mojave National Preserve, to Stephen Baghdadi, Dateline's Managing Director. NPCA obtained this document from the Park Service in response to NPCA's July 22, 2024 FOIA request, and I reviewed it shortly after receipt.

31.     Attached as **Exhibit E** is a true and correct copy of a February 2023 letter from Frank Lands, then-Regional Director of the Park Service, to Kerry Shapiro, who

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

served as counsel for Dateline at that time. NPCA obtained this document from the Park Service in response to NPCA's July 22, 2024 FOIA request, and I reviewed it shortly after receipt.

32.    On April 8, 2025, the Bureau of Land Management issued a press release claiming that operators at the Colosseum Mine can conduct mining operations with no further environmental review or plan of operations. Attached as **Exhibit G** is a true and correct copy of the aforementioned press release, titled "Colosseum Mine in California given go ahead to continue mining operation." I obtained this document directly from the Bureau of Land Management website at the following URL: https://www.blm.gov/announcement/colosseum-mine-california-given-go-ahead-continue-mining-operation.

33.    In response to this press release, on May 5, 2025, NPCA submitted another FOIA request and received letters indicating that previously issued cease-and-desist and permitting directives were withdrawn and acknowledging "valid and existing rights" under prior approvals. I reviewed the responsive records in May 2025.

34.    Attached as **Exhibit F** is a true and correct copy of an April 2025 letter from Jessica Bowron, Acting Director of the Park Service, to Kerry Shapiro, who served as counsel for Dateline at that time. NPCA obtained this document from the Park Service in response to NPCA's May 5, 2025 FOIA request, and I reviewed it shortly after receipt.

35.    Attached as **Exhibit H** is a true and correct copy of an April 2025 letter from Raymond McPadden, then-Superintendent of Mojave National Preserve, to Stephen Baghdadi, Dateline's Managing Director. NPCA obtained this document from the Park Service in response to NPCA's May 5, 2025 FOIA request, and I reviewed it shortly after receipt.

36.    Finally, attached as **Exhibit I** is a true and correct copy of President Donald Trump's weekly policy update for the week of April 25, 2025, posted to his official Truth Social account. I obtained this document directly from President

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Trump's Truth Social account at the following URL:

https://truthsocial.com/@realDonaldTrump/posts/114400040845423536.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Date: 6/17/2026

Chance Wilcox

DECLARATION OF CHANCE WILCOX
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# Exhibit A

**Colosseum Gold Project**
**Bureau of Land Management**
**Plan of Operations**
**and approval documentation**

Section 1 -    Plan of Operations and Reclamation Plan - submitted by Colosseum Gold Properties 1/11/82 approved 2/5/82

Section 2 -    Modification to Plan of Operations for 1983 Exploration Drilling Project at Colosseum Project - submitted by Amselco Exploration 6/24/83 approved 8/4/83

Section 3 -    Second Modification to Reclamation Plan and Plan of Operations for 1984-85 Exploration Drilling Project and the 1984-1985 Geotechnical and Development Work Program - submitted by Amselco Exploration 2/17/84 approved 5/15/84

Section 4 -    Third Modification to Reclamation Plan and Plan of Operations - submitted by Amselco Exploration 7/17/84

Section 5 -    Amendment to Third Modification to Reclamation Plan and Plan of Operations - submitted by Amselco Exploration 12/7/84

Section 6 -    Modification to Plan of Operations 7/2/85

Section 7 -    Bureau of Land Management Decision Record 9/10/85

Section 8 -    Bureau of Land Management Decision Letter 10/31/86 and Decision Letter on Water Wells 10/31/86

Section 9 -    Environmental Assessment 2/5/87

Section 10 -   Bureau of Land Management Decision letter 4/13/87

Note:    There is some confusion over the numbering of the amendments to the Plan of Operations. I was unable to get a clear answer from the BLM.  The submission for the environmental assessment reads as the seventh amendment, however, I believe that the documents included in this volume constitute a complete set.

ERJ 6/24/87

Exhibit A
Page 21

# SECTION 1



# United States Department of the Interior

IN REPLY REFER TO
3809
(C-069.26)
(C-069.28)

BUREAU OF LAND MANAGEMENT
NEEDLES RESOURCE AREA
POST OFFICE BOX 305
NEEDLES, CALIFORNIA 92363-0305
(714) 326-3896

California Gold Properties
Attn: Jim Sharp
312 W. Alturas
Tucson, AZ  85705

FEB 05 1982

Dear Mr. Sharp:

As you recall, a decision on the approval of your plan of operation
as proposed in the final draft submitted to the BLM on January 11, 1982
was delayed as per 43 CFR 3809.1-6(5).  This section states that "the
plan can not be approved until the authorized officer has complied with
section 106 of the National Historic Preservation Act..."

As discussed with you, it was found during a preliminary investigation
of your operating area, that certain aspects of your operations may
adversely effect the Clark Mountain (Ivanpah) Historic Mining District.

This mining district is recognized by the Bureau of Land Management
as a potential National Register District.  As per section 106 of
the National Historic Preservation Act, (as codified in 36 CFR 800)
the Bureau of Land Management is required to consult with the State
Historic Preservation Office (SHPO) on all projects which may adversely
affect a potential National Register site or district.

Attached you will find a copy of the correspondence with the SHPO.
In consultation with the State Historic Preservation Office, it was
found that while implementation of the first phase of your operation
will not adversely effect the Historic District, further information
will be needed before a determination can be made on the effect of the
remainder of the phases upon the National Register District.  In other
words, Phase II through V is still under review by the State Historic
Preservation Office and you may not preceed with these phases.

Prior to making a determination of effect of your project upon a potential
National Register District the SHPO will need to know what archaeological
resources your Phase 2 through 6 will effect.  In order to obtain this
information an archaeological survey of the operating area used in phase
II through V must be completed.  It is also important for you to understand
that your project does not necessarily have to have an adverse effect
upon the historic district if precautions are taken to protect the
historic sites in and around your operating area.  A "No Adverse Effect"
determination however, will need to be proceeded by a "Protection Plan".

Exhibit A
Page 23

The BLM and SHPO will need a protection plan which will describe what precautions and steps the company will take to protect and avoid the cultural resources in the operating area before a "No Adverse Effect" determination can be made.

Please understand that the Phase II through V portion of your operation can not be segmented as was your Phase I operation. Because of the nature of the special situation you are working with in the Clark Mountains, approval has been given for you to proceed only with Phase I of your operation. This has been approved because the BLM in consultation with the SHPO have made a "No Adverse Effect" determination only on phase one of your operation, because steps have already been taken to protect the cultural resources located there by your archaeological consultant, Robert Reynolds. It should also be understood that the attached mitigation measures apply to your Phase I operations and should you request to expand your operations, you will need approval from the Bureau of Land Management before entering into these operations and before implementing mitigation measures described in 6(b-c) on page 24 of your reclamation plan.

If there are any questions or concerns please contact Roger Britton at the address given on the preceeding page.

Sincerely,

Richard E. Crowe
Area Manager

cc: California State Historic
    Preservation Office

Enclosures



California Gold Properties

MITIGATING MEASURES

1.  Roads used for the project will be scarified and revegetated when they are no longer needed for the project.

2.  Leaching pads will be fenced.

3.  At the topsoil removal phase of the project, the area surface protection specialist shall be consulted to determine the proper depth of removal.

4 A.  If any cultural material other than that which has already been recorded or collected should be avoided until the material can be evaluated by a qualified archaeologist.

B.  Prior to disturbing cultural remains (features, structures, artifacts, etc.) which can not be avoided, the operator shall contact the Needles BLM archaeologist to discuss possible alternatives.

C.  If any areas other than those located in or immediately adjacent to the Phase I operating area will be impacted, these areas will be subjected to an intensive cultural resource investigation prior to initiation of the activity.

D.  Prior to entering any other phase of this operation adequate protection/ data recovery plan must be approved by the Bureau of Land Management (as per Section 106 of the National Historic Preservation Act as codified in 36 CFR 800).  This plan may include but is not limited to those items listed in 6(b) through 6(e) of the conditions of approval listed in the reclamation plan.

RECOMMENDATIONS

1.  Wildlife habitat should be created to replace the temporary loss of habitat.  An example would be construction of a small wildlife drinker in the vicinity such as the NW¼,NW¼ of Section 15 (T. 17 N., R. 13 E.), north of Green's Well.

Exhibit A
Page 25

Colosseum
S. B County Reclamation Plan
5043 (17)
PS CPT

```
┌─────────────────────────────┐
│  THE PERMIT AND RECLAMATION  │
│    PLAN FOR THIS MINING      │
│      PROJECT EXPIRES         │
│     JANUARY 14, 1991         │
└─────────────────────────────┘
```

# FINAL

### (PH)SA/81-0057/D937-738N

### RECLAMATION PLAN

### NEW COLOSSEUM MINE

### (82M-001)

### CALIFORNIA GOLD PROPERTIES

### CLARK MOUNTAINS

### CLARK MOUNTAIN MINING DISTRICT
### (North of Mountain Pass)

January 14, 1982

PLANNING COMMISSION

Date of Hearing: 1-14-82

Agenda Item: 2

Exhibit A
Page 26

NOTICE OF RECLAMATION PLAN COMPLETION

Addressed to:   California Division of Mines and Geology
                107 South Broadway, Room 1065
                Los Angeles, CA  90012

Responsible Agency:  Environmental Public Works Agency
                     Planning Department - Special Projects


Project Title   NEW COLOSSEUM MINE


Name of Project Proponent     California Gold Properties
Address of Project Proponent  144 W. Miracle Mile
                              Tuscon, Arizona 85705
Project Location  Approximately seven miles north of Mountain Pass;
parts of Sections 2, 10, 11, 14, 15, 22, 23, 24, 26, 27, T17N,
R 13E, SBBM


Type of Operation  Open Pit and underground mine
Mineral Commodity Recovered   Gold
Operation Quantity 500,000-1,000,000  (Tons/cubic yards) per year.
Estimated Operation Life 10+ years
Estimated Termination Date 1992+
Project Acreage    3560               Acreage to be Reclaimed  600
Maximum Anticipated Depth 750'   Reclamation Time Frame  9      years
Reclaimed to a condition mitigating physical hazards to the public
safety and permitting a return  to a condition of natural productivity.

Effect on Future Mining  none (Resource will be removed to existing
                              economic limits.
Reclamation Plan Expiration Date  January 14, 1991

Reclamation Plan Number: 82M-001

Draft Copy of Reclamation Plan Available at:

                Environmental Public Works Agency
                PLANNING DEPARTMENT - SPECIAL PROJECTS
                1111 East Mill Street, Bldg. 1
                San Bernardino, CA 92415


Contact person Marion Ely II - Special Projects
Telephone (714) 383-1880


By    Marion Ely II

Dated  January 5, 1982


REV. 2-4-81
Exhibit A
Page 27

This and supplemental documents on file with the Special Projects Division of the Planning Department, Environmental Public Works Agency, County of San Bernardino, form the non-proprietary portions of the NEW COLOSSEUM MINE CALIFORNIA GOLD PROPERTIES. This Reclamation Plan, when approved by the San Bernardino County Planning Commission, will comply with the reclamation requirements of both the San Bernardino Development Code, Division 12, Chapter 1 (Surface Mining and Land Reclamation), and the California Surface Mining and Reclamation Act of 1975 (SMARA).

RECLAMATION PLAN

82M-001

NEW COLOSSEUM MINE

CALIFORNIA GOLD PROPERTIES

CAL-PIPE PROJECT

TABLE OF CONTENTS

| CHAPTER | TITLE | PAGE |
|---|---|---|
| I. | Introduction | |
| II. | Location and Environmental Setting | 1 |
| | A.  Location | 1 |
| | B.  Environmental Setting | 2 |
| | C.  Geology | 2 |
| | D.  Ore Deposits | 4 |
| | E.  Zoning and General Plan | 6 |
| | F.  Historic Land Use | 6 |
| III. | Mining Operations | |
| | A.  Mined Lands | 6 |
| | B.  Waste Dumps, Leach Sites, and Basin Processing Areas | 11 |
| | C.  Mill and Vat Extraction Facilities | 12 |
| | D.  Pilot Tests | 12 |
| | E.  Operational Phasing | 13 |
| | F.  Public Health and Safety | 16 |
| | G.  Desert Bighorn Sheep | 17 |
| IV. | Reclamation | |
| | A.  Time Frame | 18 |
| | B.  Reclamation Phasing | 18 |
| | C.  Review Provisions | 19 |
| | D.  Ultimate Conditions | 19 |
| | E.  Potential Health and Safety | 20 |
| V. | Location and Development Plan | |
| | A.  Planning Staff Report | 21 |
| | B.  Recommendations | 22 |
| | C.  Conditions of Approval | 23 |

Exhibit A
Page 29

## I.   INTRODUCTION

The proposed project includes open pit mining, leaching, metals recovery and reclamation procedures at the New Colosseum Mine.  This project includes reopening and daylighting the old underground Colosseum Mine, a presently inactive operation in far northeastern San Bernardino County.  This project will involve ground disturbance of some 200 to 600 acres, and should produce approximately 500,000 to 1,000,000 tons of ore per year, over an estimated 10 year mine life.  Successful subsurface exploration of adjacent areas could result in increases in all of these figures.  This project will economically benefit California Gold Properties, our investors, claim lessors, employ-ees, and the public in general by providing a commodity of demon-strated monetary, industrial, and commercial value.

The gold ores at Colosseum Mine were discovered and first developed in the 1860's.  Subsequent discovery of silver ores west of  Colosseum led to the founding of the town of Ivanpah, at the mouth of Colosseum Gorge, about two miles southeast of the Colosseum Mine.  Some three to four million dollars worth of precious metals were produced from this area in the late 1800's. Tungsten ores were worked a short distance southwest of the Colosseum Mine from the 1930's through the 1950's, and fluorite has been intermittently produced from nearby locations to the south and southwest for the last several decades.

In the 1970's, the Colosseum property was explored using modern methods as a potential  base metals target.  Favorable assays of molybdenum, copper, and other metals led to leasing of some of the older claims by California Gold Properties, and the location of 176 additional claims.  While drilling exploration for base metals has continued, the rapidly escalating price of gold on world markets has made mining of gold increasingly practicable. Hence, California Gold Properties, present holders of the mineral rights at the Colosseum Mine, now proposes to convert the existing but inactive underground workings into a modern open pit operation in order to recover its gold.

Planning Commission approval is sought of the Reclamation Plan along with site approval of the project.

## II.   LOCATION AND ENVIRONMENTAL SETTING

### A.   Location

The Colosseum Mine is located in far northeastern San Bernardino County, in the northeastern Clark Mountains (Clark Mountain Mining District), approximately 7 air miles NNW of the Mountain

1

Pass open pit mine on I-15 (Figure II-1).  The Colosseum property for which this plan is submitted consists of 40 acres of patented mining claims and 3520 acres of unpatented claims in parts of 11 contiguous sections of T.17 N., R.13 E., San Bernardino Baseline and Meridian, (Figure II-2).

Except for the patented claims, the entire Colosseum mine site and most adjoining land is public land administered by the BLM. One state-owned section lies near the property on the south. Numerous other unpatented mining claims exist on adjacent lands, especially to the west.  Some of these are currently being operated, and minerals exploration programs are implemented by other companies and individuals.  These activities occur intermittently throughout the area.  Other activities include livestock grazing and recreational uses, both near the mine and elsewhere in the area.

## B.  Environmental Setting

The Colosseum  Mine lies between 5000 and 6000 feet elevation, at the northern edge of a saddle located in hilly and plateau-like terrain along the north-northeast flank of the Clark Mountains. Because of its location in this saddle, the area to be mined generally cannot be seen from any nearby road or highway, or from any other location outside the immediate vicinity of the mine except from high on the northeast slopes of Clark Mountain itself, and from Mesquite Valley far to the north.  Visual impact will thus be minimal.

The area to be mined is sparsely vegetated, with occasional juniper and pinon trees which may reach 20 feet in height, and a 60 to 80 percent ground cover of low (1 to 2 feet high) shrubs, perennial and annual forbs, and a few grasses.  Soil development is poor.  Climatic data is non-existent, but by analogy with similar nearby areas, an annual temperature range of 10 to 110 degrees F. and average annual precipitation of 5 to 8 inches is estimated.  Precipitation occurs both from winter Pacific storms systems of several days duration and during brief summer thunderstorm activity.  Snow very briefly covers the ground a few times during most winters.  Principal wildlife species are cotton-tails, jackrabbits, mule deer, desert bighorn sheep, rodents, lizards, smakes, quail, chukars and other birds.

## C.  Geology

Gold mineralization at the Colosseum Mine is associated with two rhyolite breccia pipes, both of which intruded upward during Mesozoic time through the regional Precambrian gneissic basement terrain and overlaying Phanerozoic sediments.  Several igneous dikes extend outward from the breccia pipes into the surrounding country rock.  Today, these breccia pipes are topographically expressed as two knobs on the crest of the northeast outliers of the Clark Mountains.

2

Exhibit A
Page 31

FIG. II-1 Vicinity Map,
Colosseum Mine

FIG. II-2, Colosseum Mine

3

Less than a mile west of the mine site is the Clark Mountain Fault, a complex westward-dipping structure with several stages of movement, which now juxtaposes the regional westward-dipping Paleozoic clastic and carbonate stratigraphic sequence on the west against Precambrian crystalline basement exposed to the east. Several additional faults with complex histories lie west of the Clark Mountain Fault.

D.  Ore Deposits

Extensive mapping, drilling exploration, and assays by California Gold Properties have delineated a body (Figure II- 3, 4 & 5) of disseminated gold ore, some 250 by 350 feet across at the surface, narrowing  but still present to a depth of at least 750 feet. This ore body is presently amenable to gold production by open pit mining and heap leach recovery methods.

The gold and associated metals mineralization at the Colosseum Mine is closely associated with the emplacement and present configuration of the Mesozoic breccia pipes. The orebody itself has the shape of a nearly vertical, northeast-southwest elongated trumpet horn which narrows with depth. This orebody is crudely centered on the southwestern breccia pipe.

Extensive silver mineralization has affected the carbonate rocks west of the Clark Mountain Fault, and constitutes the Ivanpah Mining District. Mineralization in the Ivanpah District is probably cogenetic with the mineralization at the Colosseum Mine, and occurred prior to the last major movements along the Clark Mountain Fault.

A complex history of intrusive and brecciation events has been deciphered for the breccia pipes, and the actual gold values present at any one place depend in part on the identity of the particular phase of the intrusion/breccia sequence which is present at each location. These variations in rock type were probably of major significance in determining the course of mining during the early years of the Colosseum Mine, but these differences were probably not understood at that time. Modern economics, however, warrant contemporary recovery by large-scale open-pit techniques, and while the aforementioned variations in gold values with rock type will be important in the day to day operations of the modern mine, they will have little influence on the probably ultimate size and shape of the open pit itself.

Economic gold values are at this time limited to the south-western breccia pipe. Late Cenozoic weathering has resulted in the oxidation of the upper portions of the pipe. Thus, near-surface ores are dominantly oxide associated, but with depth the importance of sulfide ores increases dramatically. Both types of ore will be mined, and the changing ratio of oxide to sulfide ores encountered during pit development will determine the actual timing and development of the various recovery operations and the milling, leaching, and other facilities.

4

Exhibit A
Page 33



FIG. II-3. Colosseum Mine breccia pipes



FIG. II-4.   Ore body cross section D-D:



FIG. II-5.   Ore body cross section 600 feet

5

Exhibit A
Page 34

E.  Zoning and General Plan

The Colosseum Mine and project site is currently zoned DL40 (Desert Living), and in the San Bernardino County General Plan, the project area is presently designated RCN (Rural Conservation).

F.  Historic Land Use

The Colosseum Mine was last operated as a producing gold mine in 1939.  The mine site was inactive through the 1950's and 1960's. Throughout the last decade, exploratory drilling, sampling, mapping, grading and road construction have focussed on the Colosseum Mine area, and activities associated with this exploration have caused some modification of the mine site.

Other mining activities have intermittently taken place on adjacent lands to the west, southwest and south for more than a century.  Of these, the most substantial remnant is a tungsten millsite, including a dwelling, which lies one mile south of the Colosseum Mine.  This dwelling is only intermittently occupied.

Cattle are grazed throughout the northeastern Clark Mountain area, and hunting and infrequent RV and other recreational uses also occur.  Cross-country motorcycle races have periodically used mine area access roads as part of their courses.  The high country and other areas two miles southwest and beyond have been part of the Clark Mountain Wilderness Study Area (WSA), and the entire region is part of the California Desert Conservation (CDCA) Plan of the BLM.

### III.  MINING OPERATIONS

A.  Mined Lands

Actual mine development (Figure III-1), will take place through drilling, blasting, and mechanized removal of the existing knob of rhyolite, and subsequent excavation of a terraced open pit (Figures III-2 & 3).  This pit will be gradually enlarged in area and depth until it reaches a projected maximum size of 1100 by 1700 feet at the rim, and 750 feet in depth (Figure III-4).

Several small buildings, other structures associated with mine operations, parking lots, outdoor equipment storage areas, and possibly a crushing facility will be constructed adjacent to the pit on its southeast side.

Production roadways and haul roads constructed within and near the pit will be built in temporary locations, and will be frequently relocated to accommodate pit expansion and mining.

Access roads between the mine, dump sites, and ore processing areas, and haul roads between the mine area and I-15, will be improved or otherwise developed in permanent locations.  Grading and gravelling of these permanent roads will be necessary, but no paving is anticipated.

Exhibit A
Page 35

## EXPLANATION

- ○ Bottom of West Pipe Pit
- ⬭ Limit of West Pipe Pit
- ⟋ Limit of East Pipe Pit
- ① Location and limits of Heap Leach Pads

| | Area | Capacity |
|---|---|---|
| ① 600 x 1000 x 20b | 16.4A | 660,000 T |
| ② 1800 x 1100 x 20b | 45.3A | 2,200,000 T |
| ③ 900 x 1200 x 20b | 24.8A | 1,200,000 T |
| ④ 600 x 1000 x 20b | 16.4A | 660,000 T |

Note: Tonnage factor = 18 ft.$^3$/ton (crushed rock)

- [C] Primary Crusher
- [RP] Recovery Plant
- [M] Mine Buildings
- [UM] Underground Mine Buildings

- ⬥ Planned for future development
- ⬥ Possible future development (not planned at present)

- 🗑 Waste Dumps

| | Area | Capacity |
|---|---|---|
| ① 800 x 1400 x 240b | 23.7A | 16,800,000 T |
| ② 800 x 1200 x 240b | 22.0A | 14,400,900 T |
| ③ 1000 x 1400 x 180b | 32.1A | 14,000,000 T |

Note: Tonnage factor = 18 ft.$^3$/ton (broken rock)

- ⟋ Underground Mine - Access and Production Decline
- ⟍ Aerial Tram or Conveyor
- 🗑 Tailings Disposal Dumps

| | Area | Capacity |
|---|---|---|
| ① 1400 x 2000 x 26b | 64.3A | 3,640,000 T |
| ② 1400 x 2000 x 26b | 64.3A | 3,640,000 T |
| ③ 1200 x 1100 x 120b | 30.3A | 7,920,000 T |

Note: Tonnage factor = 20 ft.$^3$/ton (milled rock)

- ═══ Access and Haul Roads
- Work Areas, Plant Sites and Access Areas

| | Area |
|---|---|
| Mill Site | 46.3A |
| Area ⓐ | 11.9A |
| Area ⓑ | 40.1A |
| Area ⓒ | 18.1A |

FIG. III-1.  Colosseum Mine

7

Exhibit A
Page 36

Exhibit A
Page 37



LONGITUDINAL SECTION D - D'
Looking "North"

Figure III-2





Limits of West Open Pit

Scale: 1" = 250"

P - 10     FIG. III-4

Both ore and waste will be mined immediately upon initiation of pit excavation. Ore may initially be stockpiled near the mine, if necessary.

Minor land disturbances associated with drilling exploration will likely continue intermittently during all of these operations

It is anticipated that underground mining may be economically feasible after open pit development is terminated. Tentative proposals for such underground operations include a possible 3500 foot declined tunnel which would be driven into the lower part of the orebody from the northeast area (Ref. Figure III-1).

Inasmuch as any proposed underground mining would not begin until after open pit operations have reached their final phases, and since that circumstance is not anticipated for at least 10 years after open pit mining begins, no further consideration is given in this report to any environmental effects or reclamation needs which would be associated with such proposed underground operations. Periodic reviews of this Reclamation Plan are scheduled, so if and when underground mining appears feasible, an amendment to this Plan can be prepared at that time to address those issues.

B.    Waste Dumps, Leach Sites, and Basin Processing Areas

Barren rock excavated during the course of mine development will be deposited in waste dumps north of and adjacent to the mine site. Dump locations will be selected and waste rock will be deposited so as to minimize visual impact and possible contamination of existing drainage channels.

Ore awaiting processing will be stockpiled, either near the crushing facilities or the leach pads. Stockpiles thus may develop either adjacent to the mine or in the south central portions of the basin (Ref. Figure III-1).

Oxide ores will eventually be crushed, then deposited nearby in heaps which will be built on impervious leach "pads", so that gold and other precious metals can be recovered by traditional methods using very low-concentration buffered cyanide solutions. Sulfide ores, after crushing, will have to be milled and concentrated before treatment with cyanide. Milling of sulfide ores and cyanide vat extraction will eventually occur at facilities planned to be constructed near the old Ivanpah townsite. (Ref. Figure III-1).

Leaching of oxide ores will take place in leach "heaps" -- piles of crushed ore which will be placed on carefully prepared "pads" of impervious clay. A relocatable and continuously monitored PVC pipe and sprinkler system will be placed atop the heaps to dispense buffered low-concentration sodium cyanide solutions to the heap surfaces. These cyanide solutions will continuously trickle downward through the ore, reacting with it and dissolving out its gold and other precious metals as they infiltrate through the heaps onto the impervious pads at their bases. These heaps will be systematically built up through time until they reach their maximum design height, probably no more than 100 feet.

11

Exhibit A
Page 40

The impervious pads underlying these leach heaps will be designed to collect the leaching fluids and drain to a common collection point.  Collection drains and a seepage detection system, along the side and/or within the pads will allow continuous monitoring of the subsurface near the pads in order to guard against loss of leachant and potential contamination of groundwater.

Gold will be recovered from the cyanide leachate solutions in recovery vats housed in portable trailer facilities located near those pads which are in operation at any particular time.

All pads will be designed so as to facilitate both heap growth and eventual reclamation.  Areal outlines of the pads and vertical profiles will, where possible, avoid rectilinear forms so that when the heaps are ultimately reclaimed, they will be visually less disruptive.  All subsequent leach pads will be con- structed upstream from the first, thus affording additional safety factors.

Oxide leaching operations will occur simultaneously with mining and crushing, and once full production is achieved all processes will be in operation year round.  Sulfide milling and vat extrac- tion, however, will not begin until sulfide ore production is sufficient to warrant start-up of those operations.

C.  Mill and Vat Extraction Facilities

Milling and extraction of gold and silver from the sulfide ores will take place at a mill complex to be built beyond the mouth of  Colosseum Gorge, near the former town site of Ivanpah. This mill complex will consist of offices, a lab, a grinding facility, a battery of flotation cells, reagent storage facili- ties, a series of vat-leach tanks, an extraction plant, maintenance shops, and a tailings disposal area.

The offices, lab, flotation cells, reagent storage facilities, and maintenance shops will be contained within industrial buildings of a type which can be readily dismantled and salvaged upon completion of mining operations.  the grinding mill and leach tanks will not be enclosed, but may be roofed over to afford shade for mill personnel.  Total acreage estimated for the sulfide milling and extraction facilities is less than 70 acres.

Tailings which result from the sulfide processing will be impounded behind dams, where their volume will unlikely cover more than 120 acres.  The height of the tailings dams will not exceed 25 feet.

D.  Pilot Tests

To better establish optimum leach heap design and operational parameters, ore will first be processed in a series of pilot test heaps.  These test heaps will be built on a pad or pads located

12

in the saddle area close to the mine, and may eventually become incorporated into the first production heap.

These pilot tests will run from six months to one year, and will consist of several small leach heaps, each of which will receive different materials graded by size and using a variety of cyanide leachate treatments.

The rates of gold recovery from these different test heaps will help determine the size and other details of subsequent operational leach heaps. Operational pad designs, as well as the precise details of certain operational procedures are thus uncertain at this time. These pads will, however, be constructed under permit from the Lahontan Regional Water Quality Control Board.

These pilot operations will produce the first gold to be recovered at the new mine. Full operations will not begin until construction of all necessary production facilities have been completed, and the results of the pilot test heaps are proven. Actual materials selected for the operational pads and other operational parameters will depend on results obtained in the pilot tests.

E.   Operational Phasing

The conversion of the existing Colosseum Mine into a modern gold producing operation will be accomplished in five major phases. These different phases will overlap in time, with each succeeding phase increasing in importance as the each preceding phases winds down. Phase initiations and terminations are defined by certain operational milestones designed in this plan.

External factors such as market conditions, regulatory and technological changes beyond the control of the operators may adversely affect operation of the property. If these factors create untenable' conditions, operations may be suspended for an indefinite period of time until favorable conditions warrant renewed operation.

The five phases will generally consist of:  I -- pilot operations and initial pit development ; II -- full operational startup, but with processing only of oxide ores; III -- full operations; IV -- mining and processing only of sulfide ores; V -- reclamation, and at other times as necessary.

Phase I

Mining will begin with blasting and removal of the southwestern rhyolite knob. Oxide ore will be crushed and deposited on the Pilot heaps, while mine waste will be dumped north of the mine site. Some oxide ore will probably be stockpiled. A crushing facility will be established either at the mine or near the first leach pad site. This phase of the project is expected to last 12 months.

Exhibit A
Page 42

Topsoil and substrates will be removed from leach pad sites and moved to temporary soilbank storage sites adjacent to the pads for ultimate replacement during leach pad reclamation. Some of this material will be installed downstream from the heap leach area to provide an emergency catchment area in the unlikely event of escape of leachant from the pad collection ponds during cloudburst precipitation events.

Actual pad construction will entail grading and installation of impermeable materials of sufficent load bearing strength to support the weight of the heap. Pad materials will be carefully laid and compacted where appropriate, then tested to insure impermeability and proper drainage configurations. Berms and other drainage diversions will be constructed around the pads to insure continued leach pad integrity in the event of potentially catastrophic downpours. The pads will be constructed under permit from the Lahontan Regional Water Quality Control Board.

Heap leach fluids pregnant with precious metals will drain into collection ponds to be constructed adjacent to the pads. Gold and other precious metals will be extracted from the pregnant heap leach fluids in an extraction plant located adjacent to the collection ponds.

Initial recovery operations will consist of several small pilot test leach sites to be developed approximately 3/4 mile south of the mine. These test heaps are likely to become incorporated into a single large heap after completion of pilot tests. A small, portable vat recovery facility will be installed adjacent to the test heaps for the duration of the pilot operations.

Several other sets of larger leach pads will later be built farther south in the basin area, two to three miles from the mine. Individual operational pads will vary in size and shape, but none is expected to cover more than 50 acres. During full-scale mine operations, gold will be recovered from the leachants at the Ivanpah facility. Completion of the first operational leach pad will be a critical factor in enabling entry into Phase II of mine operations.

Phase I will end with the completion of all pilot test operations.

Phase II

Phase II will begin with the start of leaching on the first operational heap, and will last about 12 months. It will comprise continued site preparation and construction activities, as well as full scale mining of oxide ores and leaching of same. Additional oxide leach pads will be developed south of the mine, but most new construction work will be at the sulfide processing facilities near Ivanpah townsite. Sulfide ores mined during this phase will be stockpiled for later processing.

Exhibit A
Page 43

Mining will cause the removal of the southwestern knob from the skyline and the beginnings of pit excavation. Waste dumps to the north of the mine will grow to cover about 26 acres. The initial production heap leach site, probably consisting of only one pad, will cover up to 20 acres by the end of this phase of operations.

Sulfide ore stockpiled during this phase in anticipation of mill completion should not exceed 10 acres, and may accumulate both at the mine and the mill site. The mill complex needed for sulfide ore processing will be constructed at Ivanpah during this time, in preparation for the third phases of mining operations. Eventual ore haulage from the mine and from the basin stockpiles to the Ivanpah mill complex will be either by truck, through Colosseum Gorge, or via a belt/tram aerial haulway; this haulway system will have to be constructed between the two main operations areas during Phase II.

Phase II will end upon completion of construction of the Ivanpah mill complex and extraction facilities.

Phase III

Phase III will commence with the start-up of operations at the Ivanpah milling complex for the processing of sulfide gold ores. Oxide ores will continue to be a major source of gold during this phase, but sulfide ore processing will also be substantial.

Phase III will see enlargement of the open pit, possible growth to include the northeastern knob, and construction of additional heap leach pads in the central part of the basin. All significant stages of mining, ore processing, precious metals recovery, and continuing exploration drilling are expected to be in full operation and all will continue operating throughout this phase. Phase III is thus expected to be the most productive period of the Colosseum Mine.

Phase III will come to an end with the depletion of oxide ore reserves, probably some 4 to 7 years after the opening of the mine.

Phase IV

Phase IV will consist dominantly of pit deepening, and extensive milling and processing of sulfide ores at the Ivanpah mill site. This activity will last from three to six years.

The open pit will attain its maximum size during this phase, and exploration drilling should have progressed to the point where detailed consideration can be given to the economic potential for eventual underground mining. The conversion to underground mining, except for possibly some exploration work, will occur outside the timeframe of this Reclamation Plan, such future development work will therefore be considered in subsequent amendments of this Reclamation Plan.

15

Exhibit A
Page 44

Final recovery of heap leach fluids from the oxide leach heaps will occur near the end of this phase, and preparations for heap neutralization and reclamation will have begun. One or more leach heaps may already be undergoing reclamation treatment by the end of this phase.

Phase IV will end with the exhaustion of economically recoverable sulfide ores from within the open pit.

Phase V

Phase V will consist mostly of reclamation and salvage operations. All salvageable structures will be removed at this time, and carefully monitored leach pad and heap neutralization will commence. Some neutralization and heap reclamation will probably already be underway on the oldest heap(s) by this time.

The principal neutralization will probably be accomplished by treatment with calcium hypochlorite, using the same sprinkler distribution system through which the cyanide has been applied to the heaps. During neutralization, however, effluent will be monitored for chemical neutrality.

Once heap neutrality is assured, the sprinkler system will be dismantled, final heap grading and sculpturing will be accomplished where necessary, and the topsoils stored earlier will then be re-applied to cover the heap surfaces. Revegetation will then commence.

Exploration drilling may still be continuing, and if feasible, preparations for underground mining may be underway.


F.   Public Health and Safety

Water needed for mining operations and ore processing will be obtained from wells on-site if possible. Two wells have already been developed a short distance ESE of the pit site. If adequate on-site water resources cannot be developed, other nearby ground-water sources will be utilized. Drinking water will be hauled to the site.

Water will be used for ore processing and milling, in the leaching operations, as well as for dust control and normal industrial and support uses. All water used in the milling circuit will be retained in a zero-discharge operation under permit from the Lahontan Regional Water Quality Control Board.

Potential hazards associated with the use of cyanide solutions will be minimized, inasmuch as the total recovery of the leach solutions is essential to the realization of the necessary economic benefits from this operation.

16

Exhibit A
Page 45

All feasible precautions to control and prevent escape of these solutions are not just environmentally desirable; these cyanide solutions are the carriers of the precious metals which are the sole source of profit in this and similar operations.  Thus, any potential environmental deterioration which might come about due to mismanagement of the cyanide leachants would also represent a loss of gold and other precious metals, and therefore a loss of potential profits.  Thus, all efforts to avoid such losses are already economically imperative, based purely on the princi-ples of the "profit motive".

Stringent security controls will be enforced during all leaching operations as well as during the terminal neutralization of the leach pads.  Only specially trained personnel will operate the cyanide recovery system(s) and they will be made cognizant of all associated hazards and appropriate mitigation procedures. The cyanide processes will be operated under a waste discharge permit from the Lahontan Region, California Water Quality Control Board.

Security measures will include fences with locked gates, placed so as to exclude the public, unauthorized personnel, and most wildlife from entering the leach areas.  Additional fencing will be placed so as to prevent accidental entry into the open pit and other hazardous areas.  Pit slopes will be engineered so as to mitigate any  eventual mass wasting hazards.

G.   Desert Bighorn Sheep

Desert bighorn sheep are found in the Clark Mountains and freely roam the area.  Being surprisingly inquisitive and adaptive by nature, bighorn sheep have been observed here and elsewhere, in and around mining operations.  A local bighorn sheep contingent numbering over 20 individuals, much to the amazement of two drilling crews  operating noisy rigs, watched the operations from a safe distance for a considerable period of time.  In no way giving any signs of nervousness, the sheep eventually became bored and resumed their cross country trek.  Given the fixed location of the mining operations, the mobility,agility and adaptability of bighorn sheep, other than some detouring, they should not be adversely affected by the project operation.  Pro-posed reclamation of the site should enhance their environment and increase their forage.

Exhibit A
Page 46

## IV.   RECLAMATION

### A.   Time Frame

Procedures leading to eventual reclamation will be anticipated in the earliest planning and design stages so they can be incorporated into mining operations wherever possible, and thus optimize equipment and manpower use.

All planned  construction, earth moving, and excavation will be engineered  to facilitate maximum reclamation of building sites, leach pads, waste dumps, and roads to be abandoned.

Actions which anticipate ultimate reclamation needs have already been incorporated into the general plans for each of the first four phases of mining operations.  Phase V of mine operations consists entirely of reclamation procedures.

Projected mine life, from initiation of excavation and pilot tests through termination of open pit and sulfide recovery operations, is approximately ten years.  Heap leach recovery is expected to terminate approximately six months after the final ore applications.  However, since the leach heaps will be used only for oxide ores, and since oxide ores are expected to be depleted one to two years prior to reaching maximum pit depth, no extension of reclamation timing should result from the gold recovery lag in the leach heaps.

Site restoration at the mill complex should take less than three months, and revegetation efforts will be completed in one planting season.  Vagaries of climate in semi-arid regions suggest it is prudent to allow two full years to determine whether revegetation has been successful.  If successful revegetation has not been achieved after five years, it may be concluded that successful restoration is not feasible.  However, that unlikely prospect may be regarded as the "worst case" scenario, and one the Partnership strongly wishes to avoid.

The potential for future mining economics, and the geometric shape of this ore body are such that restoration of the mined area itself is not feasible.  However, pit walls are planned so as to minimize environmental degradation of the area after mining operation have been terminated.

### B.   Reclamation Phasing

Reclamation activities conducted during Phases I and II of mining operations will consist mainly of anticipatory activities.  Site preparation for leach pads and buildings will have included removal  and storage of soils so these sites can ultimately be restored to vegetative productivity.  Waste dumps will be sited and designed to make minimal visual and drainage impact.

19

Exhibit A
Page 47

Test plots will be established to test the efficacy of natural revegetative processes, and efforts will be undertaken to secure sources of seeds of certain native plants.  On-site seedling propagation of pinon and juniper will be considered if attempts to secure commercial supplies of these species fail.  Full reclamation will be attempted  for any roadways or other disturbed sites which may be abandoned during early phases of mine operations.

Initial reclamation of leach heaps may begin during Phase III of operations, based on anticipated termination of leaching in the oldest pad about 3 to 4 years after operations begin.  Otherwise, little reclamation activity will transpire during this phase. However, preparations will be in progress for the initiation of the first major reclamation efforts which will start during the next phase.  Waste dump revegetation by natural processes will be monitored.

During Phase IV all leaching heaps will be in their terminal stages, so reclamation can progress accordingly.

Phase V will consist entirely of reclamation, salvage, demolition and site recovery procedures.  All removable structures will be dissembled, and building sites will be restored to original contours where feasible.  Wherever necessary, erosive potential of the backfill will be considered so as to avoid undue gullying during revegetation.  Active reclamation efforts will cease once all structures have been removed, all grading for site restoration has ceased, and once vegetation can be shown to have become established.  For purposes of this plan, survival of more than 50% of native species in revegetated areas for more than two years will be considered successful.  In all probability natural revegetation will enhance the process and result in a forage increase at least equal to that presently existing.

C.  Review Procedures

Full review of this Reclamation Plan will be undertaken as each phase comes to a close, and modifications may be made where desirable.  Each such review will be done in full cooperation with the San Bernardino County Environmental Public Works Agency, and other offices.  Outside assistance will be sought where in-house review is deemed insufficient.  Additional review is  likely to occur annually, in conjunction with normal fiscal year accounting procedures and audits of the Partnership by independent authorities.

D.  Ultimate Conditions

Reclamation efforts will be directed toward reclamation to a natural state for as much land as practicable.  Where complete restoration proves impracticable, efforts will be directed toward maximum mitigation of environmental hazards and degradation

Exhibit A
Page 48

effects.  Building sites, leach pads, waste dumps and most roads will be graded so as to be visually innocuous, then revegetated with appropriate native plant species (subject to availability of seeds or plant stock) so as to restore animal habitat as much as possible.  Natural revegetation by some native plant species is expected.  With the exception of the pit itself, it is anticipated that within 10 years after the termination of mining, native wildlife will have reoccupied all of the formerly disturbed areas.

E.  Potential Future Land Use

Once reclamation has been completed, camping, picnicking, hunting, and other human recreational activities should then be as desirable and feasible in this area as these activities were before mining began.  Habitat productivity should return to its pre-mining levels allowing a full restoration of wildlife values.  The pit will remain, but its walls will probably inadvertently provide additional habitat for a few native animal species, especially raptors.

20

Exhibit A
Page 49



**COUNTY OF SAN BERNARDINO**
**PLANNING DEPARTMENT**

PLANNING STAFF REPORT
Hearing to be held in the
Planning Commission Chambers
1111 East Mill St., Bldg. 1
San Bernardino, Ca. 92415

HEARING DATE __1-14-82__
AGENDA ITEM NO. __2__
ROUTINE ITEM _____
NON-ROUTINE ITEM __X__
TAPE REF. NO. _____

COMMUNITY: CLARK MOUNTAIN
APPLICANT: CALIFORNIA GOLD PROPERTIES

FILE/INDX: PHSA/81-0057/D0937-738N/
PROPOSAL: SITE APPROVAL TO ALLOW OPEN-PIT
 GOLD MINING & RECLAMATION PLAN ON 40 AC

LOCATION: APPROX 6 1/2 MI W/O ST HWY 15 &
 APPROX 3 3/4 MI N/O INTERSECTION OF ST HWY
 15 & CLARK MTN RD
REP:    SHARP, JAMES

Clark Mountain
Mining District → ■

NEVADA
CALIFORNIA

N

CLARK MTN
RD.

__4__ HEARING NOTICES SENT ON __12-22-81__ REPORT PREPARED BY __M. Ely I__

COMMISSION FIELD INSPECTION BY _____ INSPECTION DATE _____

PARCEL SIZE: __600__ ACRES

TERRAIN: __Mountainous__

VEGETATION: __Pinyon pine & Juniper woodland__

EXISTING LAND USE: __Mining, natural productivity (vacant)__

EXISTING ZONING: __DL-40__

SURROUNDING LAND USE/ZONING:

NORTH: __Mining & natural productivity / DL-40__

EAST: __"      "       "     /     "__

SOUTH: __"      "       "     /     "__

WEST: __"      "       "     /     "__

GENERAL PLAN DESIGNATION __Rural Conservation (RCN)__

| | AGENCY | COMMENT |
|---|---|---|
| CITY SPHERE OF INFLUENCE: | — | N.A. |
| WATER SERVICE: | Well & hauled drinking water | per Environmental Health |
| SEWER SERVICE: | Portable Privy / septic tank | "      "      " |

21

Exhibit A
Page 50

Page Two

ANALYSIS: The proposed project will permit the mining and reclamation of the Colosseum open pit and underground mines and associated milling operations. Although holding 3560 acres in total, a maximum of 600 acres will be disturbed and reclaimed. Desert bighorn sheep will not be adversely affected by the operation. Wilderness suitability will probably not be affected by the project (see 7, below). Environmental considerations and reclamation have been considered along with public safety in the Reclamation Plan (82M-001) and in the attached conditions.

FINDINGS:   SITE APPROVAL

1. The Environmental Review Hearing Officer on 10-13-81 determined that this project would have a non-significant (with Reclamation Plan) effect on the environment.

2. The proposed use is/~~is not~~ consistent with the General Plan because the project is a permitted use within the RCN land use category.

3. The site is/~~is not~~ adequate in size & shape for the proposed use because of the remote location, the acreage involved and its suitability for accomodating site design requirements of the proposed mining operation.

4. The site for the proposed use has/~~does not have~~ adequate access because existing dirt roads maintained by the applicants provide access internal to the site as well as to Interstate 15 (I-15), southeast of the project site.

5. The proposed use ~~will~~/will not have an adverse effect on the use of surrounding property because the adjacent lands are both private and public and are sites of other mining operations. (Much of the public lands are vacant.)

6. The design and layout of the proposed use is/~~is not~~ suitable because it provides a reasonable location for the proposed project and considering the natural constraints, is a logical utilization of the site.

7. (Other) Due to failure to meet the "lack of evidence of man's work substantially unnoticeable", requirement for wilderness, the mining areas will probably be removed from any eventual wilderness designation.

RECOMMENDATION: That the Planning Commission approve the Location and Development Plan for the Colosseum Mine and Reclamation Plan (82M-001), subject to the attached conditions; and adopt the Negative Declaration.

22

Exhibit A
Page 51

CONDITIONS OF APPROVAL

1.  The applicants shall comply with the requirements of Reclamation Plan 82M-001.

2.  This approval shall be effective for nine (9) years, with a termination date of January 14, 1991

3.  If either the mining methods or reclamation procedures change significantly from that discussed in the Reclamation Plan (82M-001), during the permit timeframe, an amendment shall be filed for either and/or the Location and Development Plan and/or the Reclamation Plan, as appropriate, before such changes are effected.

4.  All shafts in excess of six (6) feet in depth within the unsecured portions of the project shall be secured by either fencing, covers, filling or other methods acceptable to the County, and call for a field inspection before June 1, 1982 and deposit an inspection fee of $300 with the Planning Department.

    (a)  Before covering or filling shafts, the shaft bottoms shall be examined to insure that there is nothing (or no one) there.  (This is necessary, due to the fact that some mine shafts have been used for the disposal of unwanted corpses resulting from violent crimes.)  If any such remains are located, the Sheriff's Office shall be notified before completing shaft security.

    (b)  If the shafts are free of such remains, they will not be covered or filled for at least two hours after sunset and no later than midnight, in order to avoid entombing the bats, owls and birds that normally reside in these excavations during the daylight hours.  If bird nests containing eggs or fledglings are discovered, an ornithologist shall be consulted for the best method of moving them to another location.

    (c)  Any nonorganic remains of historic value discovered in such shafts shall be curated into the County musuem. Such materials located on the public lands shall be evaluated and salvaged by the Bureau of Land Management (BLM).

5.  All sections of the underground workings shall be inspected to assure that they are clear of personnel in those areas to be excavated by pit operations.  This inspection shall occur immediately before such excavation or collapse of workings.

23

Exhibit A
Page 52

6. A Historic and Cultural resource salvage program shall be implemented in all areas that will be disturbed by the project, and before such disturbance. The salvage programs for such resources existing on Public Lands shall be conducted or approved by the BLM. Private property historic resource salvage programs shall be conducted by a professional archaeologist coordinating with the Environmental Analysis Section of the Planning Department for those lands to be disturbed. Such programs shall minimally consist of:

(a) A detailed surface investigation of the project site.

(b) A map and collection (excavation if necessary) of all remains described in (a).

(c) Produce a report describing and the extent and complexity of remains within the project area.

(d) Map and described all shafts, adits, tunnels, waste and trash dumps associated with historic mining activity.

(e) Curation of materials to the County musuem.

7. All flammable vegetation shall be removed from around each building site a minimum of 30 feet.

8. All new construction shall comply with applicable sections of the Uniform Fire Code 1979 Edition (County Ordinance No. 2474).

9. The fire protection water system shall be based on NFPA Pamphlet No. 1231, "Water Supplies for Suburban and Rural Fire Fighting".

10. Future building pads shall be elevated a minimum of two (2) feet above natural ground where the potential for overflow damage from existing watercourses exists.

11. Adequate provisions shall be made to intercept and conduct the tributary drainage flows around or through the site in a manner which will not adversely affect adjacent or downstream properties at the time the site is developed.

12. The natural drainage course traversing the site shall not be obstructed so as to cause the diversion of waters to other properties, and shall not be occupied.

13. The applicant shall provide proof of legal access for all new roads.

24

Exhibit A
Page 53

14. The applicant shall comply with the waste discharge requirements of the Lahontan Regional Water Quality Control Board.

15. A valid permit must be obtained from the San Bernardino County Department of Environmental Health Services (DEHS), for any well which may encounter water-bearing strata.

16. Sources of potable water supplies for human comsumption shall meet water quality standards. Water quality analyses indicating compliance shall be submitted to DEHS.

17. Any water system providing water for human consumption is subject to DEHS approval prior to occupancy.

18. Any water system providing water for human consumption shall be operated under permit issued by the DEHS.

19. The water supply shall be approved by the DEHS.

20. The subsurface wastewater disposal system shall be designed in accordance with the requirements of both DEHS and the Department of Building and Safety.

21. Soil testing for the subsurface disposal system shall meet the requirements of the DEHS and the Department of Building and Safety.

22. Minimum distance requirements shall be maintained between potable water wells and sewage disposal systems and other sources of pollution.

23. Sewage disposal systems shall be approved by the DEHS.

24. At the termination of use, all equipment and structures to be abandoned and not salvaged shall be removed from the site unless the County Museum determines them to be of potential historic value.

25. At the termination of use of public lands, all equipment and structures to be abandoned and not salvaged shall be removed from the site unless the BLM determines them to be of some potential historical value that should be retained.

26. The applicant shall ascertain and comply with the requirements of all County, State and Federal Agencies as applicable. These include, but are not limited to, the County Departments of Building and Safety, Environmental Health Services, the Lahontan Regional Water Quality Control Board and the BLM.

Exhibit A
Page 54

# PLANNING DEPARTMЕ.T

1111 East Mill Street, Building 1 · San Bernardino, CA 92415 · (714) 383-1417

**COUNTY OF SAN BERNARDINO**
**ENVIRONMENTAL**
**PUBLIC WORKS AGENCY**

KENNETH C. TOPPING
Planning Director

JOHN M BERNARD
Agency Administrator



James Sharp
1144 W. Miracle Mile
Tucson , Arizona 85705

The enclosed documents mark  the completion
of the permit processing for your mining pro-
ject in San Bernardino County.  To finalize
the process please sign and return to the
County the "NOTICE OF ACTION" form.  You
may sign and keep the other copy for your
files.
Please let me know when you are ready for the inspection.

Thank you for your cooperation in the
processing of your project.

ENVIRONMENTAL PUBLIC WORKS AGENCY
Environmental Analysis Division

Thanks for the sample data & the geology report

Exhibit A
Page 55

In the event a performance bond is required the applicant shall submit a minimum of two (2) bids from licensed contractors for said work and the amount of the cash bond shall be the sum of the highest bid plus ten percent (10%).

NOTE: This action is subject to appeal for a period of fourteen (14) calendar days after receipt of this notice. AN APPEAL WILL SUSPEND THIS ACTION UNTIL SUCH APPEAL IS SETTLED. Said appeal shall be filed with the Clerk to the Board of Supervisors at 175 West 5th Street, San Bernardino, Ca 92415, on forms provided by that office, and accompanied by the required appeal fee.

COUNTY PLANNING COMMISSION

---

THIS APPROVAL IS NOT EFFECTIVE UNTIL ONE (1) COPY OF THIS FORM IS SIGNED AND RETURNED TO THE COUNTY PLANNING DEPARTMENT

## ACCEPTANCE OF CONDITIONS

I am the _Operator/plant owner_ of the property described above. I am aware of and accept all of the conditions set forth herein. It is understood that all of the aforementioned conditions which require the installation of improvements shall be completed in a manner satisfactory to the Planning Department of the County of San Bernardino and shall not be deemed complete until approved and accepted as completed by said Department.

_____
SIGNATURE OF APPLICANT OR AGENT

_0/23/82_
DATE

cc: Bldg & Safety (2), Enforcement

Exhibit A
Page 56

NOTICE OF ACTION

SAN BERNARDINO COUNTY PLANNING COMMISSION
1111 E. Mill Street, Bldg. 1
San Bernardino, California 92415

**PLEASE SIGN AND RETURN THIS COPY**

PROJECT _____
FILE NO. _____

ITEM NO. 2                                       P.C. HEARING 1/14/82

Applicant: California Gold Properties        Index No. FnCA/31-0057/C937-738H

Location: CLARK MOUNTAIN, Approximately 6-1/2 miles West of State Highway
15 and approximately 3-3/4 miles North of intersection of State
Highway 15 and Clark Mountain Road

Proposal: Site Approval to allow Open-Pit Gold Mining and Reclamation Plan
on 40 acres

Staff Planner Marion Ely presents.

PUBLIC COMMENT/TESTIMONY:

The applicant's representative states they are in agreement.

COMMISSION ACTION:

APPROVE the Site Approval to allow Open-Pit Gold Mining and Reclamation Plan
(82M-001), subject to the attached conditions, ADOPT the Negative Declaration
and instruct the secretary to file a Notice of Determination.

MSCU: Jennings/McDonald                    Absent: Easterday

CONDITIONS OF APPROVAL

1.  The applicants shall comply with the requirements of
    Reclamation Plan 82M-001.

2.  This approval shall be effective for nine (9) years, with
    a termination date of January 14, 1991.

3.  If either the mining methods or reclamation procedures
    change significantly from that discussed in the Reclama-
    tion Plan (82M-001), during the permit timeframe, an
    amendment shall be filed for either and/or the Location
    and Development Plan and/or the Reclamation Plan, as
    appropriate, before such changes are effected.

4.  All shafts in excess of six (6) feet in depth within the
    unsecured portions of the project shall be secured by
    either fencing, covers, filling or other methods acceptable
    to the County, and call for a field inspection before
    June 1, 1982 and deposit an inspection fee of $300 with
    the Planning Department.

    (a)  Before covering or filling shafts, the shaft bottoms
         shall be examined to insure that there is nothing
         (or no one) there. (This is necessary, due to the
         fact that some mine shafts have been used for the
         disposal of unwanted corpses resulting from violent
         crimes.) If any such remains are located, the Sheriff's
         Office shall be notified before completing shaft security.

    (b)  If the shafts are free of such remains, they will not
         be covered or filled for at least two hours after
         sunset and no later than midnight, in order to avoid
         entombing the bats, owls and birds that normally reside
         in these excavations during the daylight hours. If
         bird nests containing eggs or fledglings are discovered,
         an ornithologist shall be consulted for the best method
         of moving them to another location.

Exhibit A
Page 57

Page 2

NOTICE OF ACTION (Continued)

SAN BERNARDINO COUNTY PLANNING COMMISSION

(c) Any nonorganic remains of historic value discovered in such shafts shall be curated into the County museum. Such materials located on the public lands shall be evaluated and salvaged by the Bureau of Land Management (BLM).

5. All sections of the underground workings shall be inspected to assure that they are clear of personnel in those areas to be excavated by pit operations. This inspection shall occur immediately before such excavation or collapse of workings.

6. A Historic and Cultural resource salvage program shall be implemented in all areas that will be disturbed by the project, and before such disturbance. The salvage programs for such resources existing on Public Lands shall be conducted or approved by the BLM. Private property historic resource salvage programs shall be conducted by a professional archaeologist coordinating with the Environmental Analysis Section of the Planning Department for those lands to be disturbed. Such programs shall minimally consist of:

(a) A detailed surface investigation of the project site.

(b) A map and collection (excavation if necessary) of all remains described in (a).

(c) Produce a report describing and the extent and complexity of remains within the project area.

(d) Map and described all shafts, adits, tunnels, waste and trash dumps associated with historic mining activity.

(e) Curation of materials to the County museum.

7. All flammable vegetation shall be removed from around each building site a minimum of 30 feet.

8. All new construction shall comply with applicable sections of the Uniform Fire Code 1979 Edition (County Ordinance No. 2474).

9. The fire protection water system shall be based on NFPA Pamphlet No. 1231, "Water Supplies for Suburban and Rural Fire Fighting".

10. Future building pads shall be elevated a minimum of two (2) feet above natural ground where the potential for overflow damage from existing watercourses exists.

11. Adequate provisions shall be made to intercept and conduct the tributary drainage flows around or through the site in a manner which will not adversely affect adjacent or downstream properties at the time the site is developed.

12. The natural drainage course traversing the site shall not be obstructed so as to cause the diversion of waters to other properties, and shall not be occupied.

13. The applicant shall provide proof of legal access for all new roads.

14. The applicant shall comply with the waste discharge requirements of the Lahontan Regional Water Quality Control Board.

15. A valid permit must be obtained from the San Bernardino County Department of Environmental Health Services (DEHS), for any well which may encounter water-bearing strata.

16. Sources of potable water supplies for human consumption shall meet water quality standards. Water quality analyses indicating compliance shall be submitted to DEHS.

Exhibit A
Page 58

Page 2

NOTICE OF ACTION (Continued)

SAN BERNARDINO COUNTY PLANNING COMMISSION

17. Any water system providing water for human consumption is subject to DEHS approval prior to occupancy.

18. Any water system providing water for human consumption shall be operated under permit issued by the DEHS.

19. The water supply shall be approved by the DEHS.

20. The subsurface wastewater disposal system shall be designed in accordance with the requirements of both DEHS and the Department of Building and Safety.

21. Soil testing for the subsurface disposal system shall meet the requirements of the DEHS and the Department of Building and Safety.

22. Minimum distance requirements shall be maintained between potable water wells and sewage disposal systems and other sources of pollution.

23. Sewage disposal systems shall be approved by the DEHS.

24. At the termination of use, all equipment and structures to be abandoned and not salvaged shall be removed from the site unless the County Museum determines them to be of potential historic value.

25. At the termination of use of public lands, all equipment and structures to be abandoned and not salvaged shall be removed from the site unless the BLM determines them to be of some potential historical value that should be retained.

26. The applicant shall ascertain and comply with the requirements of all County, State and Federal Agencies as applicable. These include, but are not limited to, the County Departments of Building and Safety, Environmental Health Services, the Lahontan Regional Water Quality Control Board and the BLM.

In the event a performance bond is required the applicant shall submit a minimum of two (2) bids from licensed contractors for said work and the amount of the cash bond shall be the sum of the highest bid plus ten percent (10%).

NOTE: This action is subject to appeal for a period of fourteen (14) calendar days after receipt of this notice. AN APPEAL WILL SUSPEND THIS ACTION UNTIL SUCH APPEAL IS SETTLED. Said appeal shall be filed with the Clerk to the Board of Supervisors at 175 West 5th Street, San Bernardino, Ca 92415, on forms provided by that office, and accompanied by the required appeal fee.

COUNTY PLANNING COMMISSION

THIS APPROVAL IS NOT EFFECTIVE UNTIL ONE (1) COPY OF THIS FORM IS SIGNED AND RETURNED TO THE COUNTY PLANNING DEPARTMENT

ACCEPTANCE OF CONDITIONS

I am the _Owner_ of the property described above. I am aware of and accept all of the conditions set forth herein. It is understood that all of the aforementioned conditions which require the installation of improvements shall be completed in a manner satisfactory to the Planning Department of the County of San Bernardino and shall not be deemed complete until approved and accepted as completed by said Department.

_____
SIGNATURE OF APPLICANT OR AGENT

_____5/22/82_____
DATE

SEE: Bldg. & Safety (2), Enforcement

California J.E.A.

J.E.W ALTUNAS
TUCSON ARIZONA 1571
601 423 3802

November 6, 1981

Mr. Marion Ely
San Bernardino County Planning Department
1111 East Mill Street, Building I
San Bernardino, California   92415

Dear Mr. Ely:

The attached maps are from the Colosseum Gold Mine, San Bernardino
County, California.  Proposed mining during the 1980's will dis-
turb, if not totally destroy, these workings.  The enclosed maps
and photographs display those structures to be disturbed.

Respectfully submitted,

J. E. Sharp

JES:jvb
Enclosures

Exhibit A
Page 60





#8 - 5685 Level
Ore Chute - Copper sulfate

#9 - 5685 Level
Ore Chute

#6 - 5685 Level
Ore Chute - main ore pass

#7 - 5685 Level
Copper sulfate wall coating

Exhibit A
Page 62

COLOSSEUM MINE
Underground Workings

N

SCALE · 1" = 50
SWARD & OWENS
MAY 1971

Tucson, Arizona  85705

Project:  Cal-Pipe
San Bernardino County, California

COLOSSEUM MINE
Underground Workings

SCALE: 1"=
Sharp & Owen
, May 1971

○  Photo Location

EXPLANATION

▢  Rubble Rock
▢  Igneous Breccia
▢  Felsite
▢  Precambrian Wall Rocks
   (Granite & Gneiss)

# SECTION 2





# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
NEEDLES RESOURCE AREA
641 FRONT STREET, SUITE B
NEEDLES, CALIFORNIA 92363
(619) 326-3896

IN REPLY
REFER TO:

3800
CAMC 28632
(C-069.28)

8/4/83

D. Stafford Johnson
Amselco Minerals Inc.
One Denver Place, Suite 1201
999-18th Street
Denver, Colorado  80202

CERTIFIED MAIL #327-940-314
RETURN RECEIPT REQUESTED

Dear Mr. Johnson:

Your modification of the approved Plan of Operations (sumbitted by California Gold Properties on January 11, 1982) for the Colosseum project has been approved.  Exploratory work as identified in the modified plan of operations may begin at your convenience.

Mitigating measures identified in the approvals of the original plan of operations and Reclamation Plan (82M-001) also apply to the exploration project approved at this time.  In addition to those original mitigating measures, the following measures also apply to this plan of operation:
1) The following designated plant species will have their north side marked in a non-injurious manner and will be transplanted in a non-injurious manner to areas that will not be affected by exploration activities: joshua trees, yuccas, and cacti.  2) The approval of this plan does not authorize the cutting of firewood from public lands.  3) When possible conduct operations and related activities away from surface water, such as springs and streams, maintaining a minimum distance of 200 yards.  4) The "Plan of Operations for the 1983 Exploration Drilling Project at Colosseum Project" (dated June 24, 1983), which is the subject of this approval, must be closely adhered to.
5) Approval of this plan will not now or in the future serve as a determination of the validity of any mining claim to which it may relate.

Amselco should be aware that a "Barstow to Las Vegas" motorcycle race is run on portions of the access route that Amselco has identified for the Colosseum project.  The race is held yearly around the time of the Thanksgiving holiday (November 26th for 1983) and results in portions of the access route for the Colosseum Project being closed for public use.

Exhibit A
Page 66

Your cooperation and submission of a well written plan of operations has been appreciated.  If there are any questions on this approval, please feel free to contact Roger Britton of this office.

Sincerely

Everell G. Hayes
Area Manager, Needles

MODIFICATION
TO
PLAN OF OPERATIONS
FOR 1983 EXPLORATION DRILLING PROJECT
AT COLOSSEUM PROJECT
IN SAN BERNARDINO COUNTY, CALIFORNIA
SUBMITTED BY AMSELCO EXPLORATION INC.

Exhibit A
Page 68

INTRODUCTION

In January 1983, Amselco Exploration Inc. ("Amselco") entered into an agreement with California Gold Properties under which it became the operator with respect to certain activities on patented and unpatented mining claims located in the Clark Mountains approximately nine miles west-southwest of the junction of State Highway 15 and the California/Nevada state line.  A final Plan of Operations was submitted to the U.S. Bureau of Land Management ("BLM") on January 11, 1982 for an open-pit gold mining, heap leaching and milling operation to be conducted in five phases. This largely consisted of Reclamation Plan 82M-001 which was also submitted to San Bernardino County's Planning Commission and Environmental Public Works Agency and Planning Department.  The BLM approved Phase I of the project on February 5, 1982, noting among other mitigating conditions that prior to entering subsequent phases it would be necessary for the operator to submit an adequate protection/data recovery plan for prior approval by the BLM.  San Bernardino County's Planning Commission approved all phases of the project on January 14, 1982.  Both approvals contained numerous mitigating measures to be employed by the operator.

This modification to the above-referenced Plan of Operations is for the purpose of notifying the BLM of the change of operator as required by 43 C.F.R. Section 3809.1-5(c)(1).  It is also submitted for the purpose of clarifying the above-referenced Plan of Operations to ensure that the 1983 exploratory drilling program

is covered by the Plan of Operations and is in general compliance with 43 C.F.R. Section 3809.  The 1983 drilling program will take place in the same general area as the proposed mining project. This area has already been the subject of extensive environmental review and study by the BLM and San Bernardino County.  The 1983 drilling program is a continuation of the activity of the previous operator.  The exploratory drilling will have far less environmental impact than full-scale mining activity.

This Modification to the Plan of Operations incorporates by reference Reclamation Plan 82M-001 previously submitted, including its description and analysis of environmental setting, geology, historic land use, impacts on public health and safety, wildlife and vegetation, reclamation and land use.  Similarly, the environmental analyses performed by the BLM in connection with approval of California Gold Property's final Plan of Operations dated January 11, 1982 (including its consideration of botany, scenic factors and wildlife), the Cultural Resources Mitigation Report submitted by Mr. Robert E. Reynolds, dated January 1982, and the Cultural Resources Reconnaisance Report on "the Clark Mountain Mining District or Colosseum Mine," by R. A. Musser, dated September 1, 1981, are incorporated by reference and made a part of the Plan of Operations.

This Modification to the Plan of Operations will describe the 1983 drilling program along with mitigation measures which the operator proposes.  Though Amselco's operations both on and off the patented claims outlined on the attached maps are described

-2-

for the BLM's information, in accordance with the BLM's surface management regulations this Modification and the Plan of Operations only cover activities not on the patented claims.

OPERATOR

    Corporate Office:

    Amselco Exploration Inc.
    One Denver Place, Suite 1201
    999 - 18th Street
    Denver, Colorado 80202
    Telephone Number:  (303)623-6722
    Attention:  Mr. Desmond P. Kearns

    Operations Office:

    Amselco Exploration Inc.
    17602 North Black Canyon Freeway
    Phoenix, Arizona 85023
    Telephone Number:  (602)863-2969
    Attention:  Mr. Steve Kay

PROPERTY AND MINING CLAIMS INVOLVED

The property involved consists of 176 unpatented lode mining claims situated in Sections 2, 3, 10, 11, 13, 14, 15, 22, 23, 24, 26, 27, Township 17 North, Range 13 East, S.B.M., Clark (Clark Mountain) Mining District, listed below, an unpatented placer mining claim, and two patented lode mining claims.

1.   Unpatented Lode Mining Claims.

| CLAIM NAME | * BOOK | * PAGE | BLM SERIAL NO. |
|---|---|---|---|
| CAL # 1 | 490 | 103 | CA MC 28632 |
| CAL # 2 | 490 | 105 | CA MC 28633 |
| CAL # 3 | 490 | 107 | CA MC 28634 |
| CAL # 4 | 490 | 109 | CA MC 28635 |
| CAL # 5 | 490 | 111 | CA MC 28636 |
| CAL # 6 | 490 | 113 | CA MC 28637 |
| CAL # 7 | 490 | 115 | CA MC 28638 |
| CAL # 8 | 490 | 117 | CA MC 28639 |
| CAL # 9 | 490 | 119 | CA MC 28640 |
| CAL # 10 | 490 | 121 | CA MC 28641 |
| CAL # 11 | 490 | 123 | CA MC 28642 |

-3-

Exhibit A
Page 71

| CLAIM NAME | *BOOK | *PAGE | BLM SERIAL NO. |
|---|---|---|---|
| CAL # 12 | 490 | 125 | CA MC 28643 |
| CAL # 13 | 490 | 127 | CA MC 28644 |
| CAL # 14 | 490 | 129 | CA MC 28645 |
| CAL # 15 | 490 | 131 | CA MC 28646 |
| CAL # 16 | 490 | 133 | CA MC 28647 |
| CAL # 17 | 490 | 971 | CA MC 28648 |
| CAL # 18 | 490 | 972 | CA MC 28649 |
| CAL # 19 | 490 | 135 | CA MC 28650 |
| CAL # 20 | 490 | 137 | CA MC 28651 |
| CAL # 21 | 490 | 139 | CA MC 28652 |
| CAL # 22 | 490 | 141 | CA MC 28653 |
| CAL # 23 | 490 | 143 | CA MC 28654 |
| CAL # 24 | 490 | 145 | CA MC 28655 |
| CAL # 25 | 490 | 147 | CA MC 28656 |
| CAL # 26 | 490 | 149 | CA MC 28657 |
| CAL # 27 | 490 | 151 | CA MC 28658 |
| CAL # 28 | 490 | 153 | CA MC 28659 |
| CAL # 29 | 490 | 155 | CA MC 28660 |
| CAL # 30 | 490 | 157 | CA MC 28661 |
| CAL # 31 | 490 | 159 | CA MC 28662 |
| CAL # 32 | 490 | 161 | CA MC 28663 |
| CAL # 33 | 490 | 973 | CA MC 28664 |
| CAL # 34 | 490 | 974 | CA MC 28665 |
| CAL # 35 | 490 | 975 | CA MC 28666 |
| CAL # 36 | 490 | 976 | CA MC 28667 |
| CAL # 37 | 493 | 491 | CA MC 28668 |
| CAL # 38 | 493 | 492 | CA MC 28669 |
| CAL # 39 | 493 | 493 | CA MC 28670 |
| CAL # 40 | 493 | 597 | CA MC 28671 |
| CAL # 41 | 493 | 495 | CA MC 28672 |
| CAL # 42 | 493 | 496 | CA MC 28673 |
| CAL # 43 | 493 | 497 | CA MC 28674 |
| CAL # 44 | 493 | 498 | CA MC 28675 |
| CAL # 45 | 493 | 499 | CA MC 28676 |
| CAL # 46 | 493 | 500 | CA MC 28677 |
| CAL # 47 | 493 | 501 | CA MC 28678 |
| CAL # 48 | 493 | 502 | CA MC 28679 |
| CAL # 49 | 493 | 503 | CA MC 28680 |
| CAL # 50 | 493 | 504 | CA MC 28681 |
| CAL # 51 | 493 | 505 | CA MC 28682 |
| Amended | 493 | 598 | |
| CAL # 52 | 493 | 506 | CA MC 28683 |
| CAL # 53 | 493 | 507 | CA MC 28684 |
| CAL # 54 | 493 | 508 | CA MC 28685 |
| CAL # 55 | 493 | 584 | CA MC 28686 |
| CAL # 56 | 493 | 585 | CA MC 28687 |
| CAL # 57 | 493 | 586 | CA MC 28688 |

-4-

| CLAIM NAME | *BOOK | *PAGE | BLM SERIAL NO. |
|---|---|---|---|
| CAL # 58 | 493 | 587 | CA MC 28689 |
| CAL # 59 | 493 | 588 | CA MC 28690 |
| CAL # 60 | 493 | 589 | CA MC 28691 |
| CAL # 61 | 493 | 590 | CA MC 28692 |
| CAL # 62 | 493 | 591 | CA MC 28693 |
| CAL # 63 | 493 | 592 | CA MC 28694 |
| CAL # 64 | 493 | 593 | CA MC 28695 |
| CAL # 65 | 493 | 594 | CA MC 28696 |
| CAL # 66 | 493 | 595 | CA MC 28697 |
| CAL # 67 | 8948 | 1180 | CA MC 28698 |
| CAL # 68 | 8948 | 1182 | CA MC 28699 |
| CAL # 69 | 8948 | 1184 | CA MC 28700 |
| CAL # 70 | 494 | 702 | CA MC 28701 |
| CAL # 71 | 8948 | 1186 | CA MC 28702 |
| CAL # 72 | 494 | 703 | CA MC 28703 |
| CAL # 73 | 8948 | 1188 | CA MC 28704 |
| CAL # 74 | 494 | 704 | CA MC 28705 |
| CAL # 75 | 8948 | 1190 | CA MC 28706 |
| CAL # 76 | 494 | 705 | CA MC 28707 |
| CAL # 77 | 8948 | 1192 | CA MC 28708 |
| CAL # 78 | 494 | 706 | CA MC 28709 |
| CAL # 79 | 8948 | 1194 | CA MC 28710 |
| CAL # 80 | 494 | 707 | CA MC 28711 |
| CAL # 81 | 8948 | 1196 | CA MC 28712 |
| CAL # 82 | 494 | 708 | CA MC 28713 |
| CAL # 83 | 8948 | 1198 | CA MC 28714 |
| CAL # 84 | 494 | 709 | CA MC 28715 |
| CAL # 85 | 8948 | 1200 | CA MC 28716 |
| CAL # 86 | 494 | 710 | CA MC 28717 |
| CAL # 87 | 8948 | 1202 | CA MC 28718 |
| CAL # 88 | 494 | 711 | CA MC 28719 |
| CAL # 89 | 8948 | 1204 | CA MC 28720 |
| CAL # 90 | 494 | 712 | CA MC 28721 |
| CAL # 91 | 8948 | 1206 | CA MC 28722 |
| CAL # 92 | 494 | 713 | CA MC 28723 |
| CAL # 93 | 8948 | 1208 | CA MC 28724 |
| CAL # 94 | 494 | 714 | CA MC 28725 |
| CAL # 95 | 8948 | 1210 | CA MC 28726 |
| CAL # 96 | 494 | 715 | CA MC 28727 |
| CAL # 97 | 8948 | 1212 | CA MC 28728 |
| CAL # 98 | 494 | 716 | CA MC 28729 |
| CAL # 99 | 8948 | 1214 | CA MC 28730 |
| CAL # 100 | 493 | 509 | CA MC 28731 |
| CAL # 101 | 493 | 510 | CA MC 28732 |
| CAL # 102 | 493 | 511 | CA MC 28733 |
| CAL # 103 | 493 | 512 | CA MC 28734 |
| CAL # 104 | 493 | 513 | CA MC 28735 |
| CAL # 105 | 493 | 514 | CA MC 28736 |

-5-

Exhibit A
Page 73

| CLAIM NAME | *BOOK | *PAGE | BLM SERIAL NO. |
|---|---|---|---|
| CAL # 106 | 494 | 717 | CA MC 28737 |
| CAL # 107 | 8948 | 1216 | CA MC 28738 |
| CAL # 108 | 494 | 718 | CA MC 28739 |
| CAL # 109 | 8948 | 1218 | CA MC 28740 |
| CAL # 110 | 494 | 719 | CA MC 28741 |
| CAL # 111 | 8948 | 1220 | CA MC 28742 |
| CAL # 112 | 494 | 720 | CA MC 28743 |
| CAL # 113 | 494 | 721 | CA MC 28744 |
| CAL # 114 | 494 | 722 | CA MC 28745 |
| CAL # 115 | 494 | 723 | CA MC 28746 |
| CAL # 116 | 494 | 724 | CA MC 28747 |
| CAL # 117 | 494 | 725 | CA MC 28748 |
| CAL # 118 | 494 | 726 | CA MC 28749 |
| CAL # 119 | 494 | 727 | CA MC 28750 |
| CAL # 120 | 494 | 728 | CA MC 28751 |
| CAL # 121 | 494 | 730 | CA MC 28752 |
| CAL # 122 | 494 | 731 | CA MC 28753 |
| CAL # 123 | 494 | 732 | CA MC 28754 |
| CAL # 124 | 494 | 733 | CA MC 28755 |
| CAL # 125 | 494 | 729 | CA MC 28756 |
| CAL # 126 | 494 | 734 | CA MC 28757 |
| CAL # 127 | 494 | 735 | CA MC 28758 |
| CAL # 128 | 494 | 736 | CA MC 28759 |
| CAL # 129 | 494 | 737 | CA MC 28760 |
| CAL # 130 | 494 | 738 | CA MC 28761 |
| CAL # 131 | 494 | 739 | CA MC 28762 |
| CAL # 132 | 494 | 740 | CA MC 28763 |
| CAL # 133 | 8948 | 1222 | CA MC 28764 |
| CAL # 134 | 8948 | 1224 | CA MC 28765 |
| CAL # 135 | 8948 | 1226 | CA MC 28766 |
| CAL # 136 | 8948 | 1228 | CA MC 28767 |
| CAL # 137 | 8948 | 1230 | CA MC 28768 |
| CAL # 138 | 8948 | 1232 | CA MC 28769 |
| CAL # 139 | 8948 | 1234 | CA MC 28770 |
| CAL # 140 | 8948 | 1236 | CA MC 28771 |
| CAL # 141 | 8948 | 1238 | CA MC 28772 |
| CAL # 142 | 8948 | 1240 | CA MC 28773 |
| CAL # 143 | 8948 | 1242 | CA MC 28774 |
| CAL # 144 | 8948 | 1244 | CA MC 28775 |
| CAL # 145 | 8948 | 1246 | CA MC 28776 |
| CAL # 146 | 8948 | 1248 | CA MC 28777 |
| CAL # 147 | 8948 | 1250 | CA MC 28778 |
| CAL # 148 | 8948 | 1252 | CA MC 28779 |
| CAL # 149 | 8948 | 1254 | CA MC 28780 |
| CAL # 150 | 8948 | 1256 | CA MC 28781 |
| CAL # 151 | 8948 | 1258 | CA MC 28782 |
| CAL # 152 | 8948 | 1260 | CA MC 28783 |
| CAL # 153 | 8948 | 1262 | CA MC 28784 |

Exhibit A
Page 74

-6-

| CLAIM NAME | *BOOK | *PAGE | BLM SERIAL NO. |
|---|---|---|---|
| CAL # 154 | 8948 | 1264 | CA MC 28785 |
| CAL # 155 | 8948 | 1266 | CA MC 28786 |
| CAL # 156 | 8948 | 1268 | CA MC 28787 |
| CAL # 157 | 8948 | 1270 | CA MC 28788 |
| CAL # 158 | 8948 | 1272 | CA MC 28789 |
| CAL # 159 | 8948 | 1274 | CA MC 28790 |
| CAL # 160 | 8948 | 1276 | CA MC 28791 |
| CAL # 161 | 8948 | 1278 | CA MC 28792 |
| CAL # 162 | 8948 | 1280 | CA MC 28793 |
| CAL # 163 | 8948 | 1282 | CA MC 28794 |
| CAL # 164 | 8948 | 1284 | CA MC 28795 |
| CAL # 165 | 8948 | 1286 | CA MC 28796 |
| CAL # 166 | 8948 | 1288 | CA MC 28797 |
| CAL # 167 | 8948 | 1290 | CA MC 28798 |
| CAL # 168 | 8948 | 1292 | CA MC 28799 |
| CAL # 169 | 8948 | 1294 | CA MC 28800 |
| CAL # 170 | 8948 | 1296 | CA MC 28801 |
| CAL # 171 | 8948 | 1298 | CA MC 28802 |
| CAL # 172 | 8948 | 1300 | CA MC 28803 |
| CAL # 173 | 8948 | 1302 | CA MC 28804 |
| CAL # 174 | 8948 | 1304 | CA MC 28805 |
| CAL # 175 | 8948 | 1306 | CA MC 28806 |
| CAL # 176 | 8948 | 1308 | CA MC 28807 |

*San Bernardino County Recorder's Office.

2.  Unpatented Placer Mining Claim.

Cal-Placer No. 1 Unpatented Placer Mining Claim situated in the Southeast Quarter of the Southwest Quarter (SE1/4 SW1/4) of Section 10, Township 17 North, Range 13 East, S.B.M., in the Clark Mountain Mining District, the location notice of which is of record under Entry No. 81-241277 and the Serial No. assigned by the California State Office, Bureau of Land Management to which is CA MC 100908.

3.  Patented Mining Claims.

(a)  The Colosseum No. 1 patented lode mining claim, designated as Lot 43, of United States Mineral Survey No. 2296, situated within the South Half (S1/2) of Section 10, Township 17 North, Range 13 East, S.B.M., more fully described in the United States Patent thereto recorded March 13, 1897 in Book "E" of Patents at Page 309;

(b)  The Colosseum No. 2 patented lode mining claim of the United States Mineral Survey No. 2297, situated in Section 10, Township 17 North, Range 13 East, S.B.M., more fully described in the United States Patent thereto, recorded March 13, 1897 in Book "E" of Patents at Page 305.

<u>DESCRIPTION OF 1983 DRILLING OPERATION</u>

<u>MAP</u>

Attached Maps 1 and 2 show the location of all existing and proposed access routes, existing roads, proposed new sections of roads, and drill sites.

<u>ACCESS</u>

Access to the property is via State Highway 15 through Colosseum Gorge.  Within the proposed mining and drilling program area, there are approximately four miles of fair to poor dirt roads, as shown on Map 2.  Existing roads have been and will be utilized wherever possible.

<u>1983 DRILLING PROGRAM</u>

<u>List of Sites and Drill Holes</u>

<u>Unpatented Claims</u>:

| | |
|---|---|
| Proposed Drill Sites | 25 |
| Proposed Reverse Circulation Holes | 35 |
| Proposed Diamond Holes | 2 |

<u>Patented Claims</u>:

| | |
|---|---|
| Proposed Drill Sites | 28 |
| Proposed Reverse Circulation Holes | 40 |
| Proposed Diamond Holes | 3 underground |

The drilling program generally involves construction of additional spurs or sections of road, leveling of drill sites and excavation of pits using a D-8 Caterpillar and blasting as necessary.  Road building and general site preparation is done by Warren K. Eachus of E & D Construction, 4389 Hobbs Drive, Las Vegas, Nevada 89120.  Any blasting required will be carried out by R. H. Gunn Mine Development, 1414 Industrial Road, Salt Lake City, Utah 84104.  Several planned drill holes will utilize

Exhibit A
Page 76

-8-

existing sites and will deepen existing holes.  These sites will involve no further preparation.  Surface damage will be minimal, and all sites will be cleared of any trash, accidental oil spillage and debris.

The approximately 35 rotary drill holes on unpatented claims will be drilled using reverse circulation equipment (Ingersoll-Rand TH-100 rigs) which drills a 5-1/4 inch diameter hole, under contract from Drilling Services of 9002 S. Harding Drive, Tempe, Arizona 85264.  The entire sample is collected from a cyclone discharge unit.  The sample will be split on site and part will be stored on site in 55-gallon oil drums and part shipped by freight to Phoenix for sample preparation.  Drilling will be dry as far as possible but may require water.  Water which is encountered during drilling is generally lost down the hole during the course of drilling.  No significant aquifers are known or are expected to be encountered on the property.

Diamond drilling will involve coring a minimum 2-inch diameter hole.  Core is stored in boxes and removed from the site.  Diamond drilling utilizes recirculated water from a metal tank located in a 15' by 15' by 6' pit.  These pits are refilled on completion of the drill hole.

The 1983 drilling program will use up to 6 drilling rigs, a maximum of 5 rotary drills, and 1 diamond drill.  A total of approximately four miles of dirt road currently exists on the property, together with approximately 50 drill sites, each averaging 60 feet in diameter.  The 1983 drilling program will involve the construction of approximately 20 additional drill

-9-

Exhibit A

Page 77

sites on the unpatented claims and less than 1 mile of additional road.  The existing roads and drill pads will be used whenever possible.  Drill sites will be a minimum of .04 acres (60 feet by 30 feet), and a maximum of 0.5 acres (150 feet by 150 feet), with the majority being less than 0.1 acre.

Capping of drill holes will be carried out as specified by existing regulations but will not be done until the end of the drilling program to allow re-entering of holes if required for surveying and/or extension purposes.

The work force will be approximately 4 geologists plus some 12 field technicians.  All staff will be based in Las Vegas, Nevada.

EQUIPMENT

| | |
|---|---|
| 9 | Pickup Trucks |
| 1 | Road Grader |
| 1 | D-8 Cat With Ripper |
| 1 | Compressor |
| 2 | Office Trailers |
| 1 | Powder Magazine |
| 1 | Cap Storage |

Total surface disturbance on the unpatented claims from the operation will be approximately 3 acres.

ROADS

Roads will generally be constructed and maintained using a contracted road grader.  Water bars and drain structures will be constructed as deemed necessary to prevent erosion.

-10-

Exhibit A
Page 78

EXPLOSIVES

Powder and caps will be stored in two separate locations on the property in containers and magazines which comply with all applicable explosives storage and safety regulations.

FIRE PROTECTION

Fire extinguishers will be of proper size and location in accordance with the Mine Safety and Health Administration Guidelines.

OILS AND SOLVENT WASTE

All waste oils and solvents will be collected in either 55-gallon drums or other tanks to be removed from the site by a local recycler.

WATER SUPPLY

All water to be used in drilling will be trucked onto the property; none will be pumped from within the property boundary.

-11-

## RECLAMATION PLAN

Because almost all of the drill pads and roads which are part of the 1982 drilling program are located in areas slated for open-pit mining in the near future, no reclamation is proposed for such sites.  In the event that a decision not to mine is made, the roads and drill sites would be reclaimed as provided for in disturbed areas outside of the pit in Reclamation Plan 82M-001 (pp. 18-20).

As mentioned above, all refuse, trash and debris will be removed from the site.  The powder magazine, cap storage facility and office trailers will be removed from the site unless other arrangements have been made with the BLM.

-12-

Exhibit A
Page 80

## DESCRIPTION OF EXISTING ENVIRONMENT

The existing environment in the area of the 1983 drilling program has been thoroughly described in Reclamation Plan 82-001 and the Plan of Operations incorporated by reference and made part of this Plan under "Introduction," above. The salient features of that environment are that: (1) the previous and present land use is exploration and mining activity, including many existing drill holes in the area being drilled; (2) there is low visual impact, since the operation generally cannot be seen from roads; (3) there is sparse vegetation and poor soil in the area and low precipitation, approximately 5 to 8 inches.

Exhibit A
Page 81

IMPACTS

AIR QUALITY

Air quality impacts will be minimal and insignificant.  They consist of vehicle emissions from the equipment listed above, dust from vehicle activity on dirt roads and windblown dust from exposed surfaces.  The 1983 drilling program will comply with all applicable federal, state and local air quality control regulations.

WATER QUALITY

The 1983 drilling program will comply with all federal, state and local water quality laws.  Because the drilling program will not discharge dredged or fill materials below the headwaters of a stream or into a waterway that is part of a surface tributary system connecting interstate waters or traditionally navigable waters, activities affecting local gulches are authorized by nationwide permits under Section 404 of the Clean Water Act and applicable regulations.  Amselco will comply with all of the applicable conditions of such nationwide permits.  No discharge of pollutants into surface or groundwaters is anticipated from the drilling program.

SOLID WASTES

As outlined above and in the Reclamation Plan, all wastes, including refuse, trash and debris will be disposed of in ways which will minimize degradation.  These operations will be in full compliance with federal, state and local laws governing disposal of solid or hazardous waste.

Exhibit A
Page 82

-14-

## WILDLIFE AND VEGETATION

The effect which full-scale mining would have on wildlife and vegetation has been assessed in the documents incorporated by reference above in the "Introduction" by San Bernardino County and the BLM. The 1983 drilling program affects the same area and has and will have far less impact than full-scale mining. Previous analysis concluded that there are no species of protected vegetation in the area which may be affected by the program and that there are no threatened or endangered species of wildlife which may be affected by the program.

## CULTURAL AND PALEONTOLOGICAL RESOURCES

The area which will be affected by Amselco's 1983 drilling program has already been the subject of the two cultural and archaeological resources surveys referenced above in the Introduction, one a very intensive survey of 110 acres by Mr. Robert E. Reynolds and his staff in connection with anticipated full-scale mining and one by BLM Archaeologist R. E. Musser, which covered the entire area affected by the 1983 drilling program at various levels of intensity. Amselco's 1983 drilling program has avoided and will avoid all structures, facilities and sites identified in these studies. Amselco believes that the level of cultural resources review which has been conducted is fully adequate for the conduct of the exploratory drilling activities in its 1983 program, though it fully recognizes that proceeding beyond Phase I of the proposed full-scale mining activity will require the

-15-

Exhibit A
Page 83

"adequate protection/data recovery plan" specified as a mitigation measure by the BLM in its approval of the Plan of Operations for mining.

Amselco employees and those of contractors working for it have been instructed that historical and archaeological resources may not be disturbed or removed from the area.  In the 110 acre area which has been intensively surveyed by Mr. Reynolds, a full range of such resources have already been curated to the County Museum, and no further salvage, removal or other mitigation operations are proposed.

-16-

Exhibit A
Page 84

### ALTERNATIVES

Amselco has considered reasonable and feasible alternatives to its existing and proposed operations.  It has made its proposal based on minimizing environmental degradation and energy use consistent with reasonable economic feasibility.

### ROADS

As explained above in describing the operations, existing roads provide direct access to the exploration area.  Any alternative road access would cause new and unnecessary surface disturbance without any environmental benefit, and would also result in additional dust and energy use.  Access is currently from the south because of the shorter distance involved and related traveling time to and from the site.  No economically reasonable alternative sources of power and water or methods of waste disposal are available, and Amselco has selected such sources and methods to minimize environmental degradation and energy use.  The drilling equipment and methods are standard, conventional methods; alternative drilling equipment or methods would not result in any significant difference in environmental impact.

Amselco would be pleased to provide any additional information or to discuss the contents of this Modification to Plan of Operations.  Please contact the undersigned at the telephone number given for Amselco's Denver, Colorado office if there are any questions or if Amselco can be of any assistance.

Amselco Exploration Inc.

By _____
D. Stafford Johnson

-17-

Exhibit A
Page 85

# SECTION 3



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**

IN REPLY
REFER TO

3800
(C69.28)

NEEDLES RESOURCE AREA
901 THIRD STREET
NEEDLES, CALIFORNIA 92363
(619) 326-3896

Mr. D. Stafford Johnson
Amselco Minerals Inc.                                   **MAY 15 1984**
999 Eighteenth Street Suite 1201
Denver, Colorado  80202-2484

Dear Dave:

I am pleased to inform you that we have approved Amselco's 1984-1985
exploration drilling program, subject to the enclosed stipulations,
as outlined in your letter dated February 17, 1984.  As Roger Britton
discussed with you on May 8, 1984 this approval does not include the
1984-1985 geotechnical and development work programs, as that approval
must wait for the archaeological report that Amselco has contracted to
have performed as well as section 106 compliance as defined in 36 CFR 63.

Enclosed please find two copies of the stipulations for this project.
Please sign one copy and return to this office.  If there are any
questions on this matter, please contact Roger Britton of this office.

Sincerely,

Everell G. Hayes
Area Manager, Needles

Enclosures

## STIPULATIONS

I hereby agree that the following stipulations will be adhered to.  I understand that authorization of my plan of operations is contingent upon these stipulations.

1.   The following disignated plant species will have their north side marked in a non-injurious manner and will be transplanted in a non-injurious to areas that will not be affected by exploration activities: joshua trees, yuccas and cacti.

2.   The approval of this plan does not authorize the cutting of firewood from public lands.

3.   When possible conduct operations and related activities away from surface water, such as springs and streams, maintaining a mimimum distance of 200 yards.

4.   The "Plan of Operations" and reclamation measures discribed in the "Plan of Operations" will be closely adhered too.

5.   All ..ecessary federal state and local permits will be obtained.

6.   Approval of this plan does not serve as a determination of the validity of any mining claim to which it may relate.

7.   Approval of this plan does not authorize the setting up of a personal residence at the site.

8.   If any areas other than those located in or immediately adjacent to the proposed land modicications will be impacted, these areas will be subjected to an intensive cultural resource investigation prior to initiation of the activity.

9.   If cultural material should be encountered during the operation, the area shall be avoided until the material can be evaluated by a qualified archaeologist.


_____          _5/22/84_____
Signature of Operator                     Date

_PROJECT GENERAL MANAGER_____
Title

Exhibit A
Page 88



**AMSELCO MINERALS INC.**

999 Eighteenth Street, Suite 1201
Denver, Colorado 80202-2484
Telephone: (303) 292-6722
Telex: 450069
Facsimile: (303) 298-1294

February 17, 1984

Mr. Roger Britton
Bureau of Land Management
Needles Office
641 Front Street
Needles, CA  92363

Dear Roger:

As I indicated to you earlier this week, please find attached Amselco's formal submittal of its Second Modification to the Plan of Operations and Reclamation Plan for Amselco's Colosseum Project.  This Second Modification is submitted in accordance with 43 CFR 3809.1-7 and is designed to clarify the initital Plan of Operations as First Modified in order to ensure  the inclusion of Amselco's exploratory drilling program for 1984 and early 1985 and Amselco's geotechnical and development work program for that same period.  You will note that this Second Modification includes map appendices which illustrate current land status in the Colosseum Project area and Amselco's proposed geotechnical and development work program.  A map illustrating Amselco's proposed exploratory program, which map will be appended as Appendix B to the Second Modification, will be conveyed to you under separate correspondence from Steve Kay of our Phoenix office.  You should expect receipt of that map early next week.

You will note in this Second Modification that Amselco's proposed 1984-1985 exploration drilling program will affect the same area as our 1983 program.  Our proposed 1984-1985 geotechnical and development work program, however, will affect certain areas not impacted by the Plan of Operations as First Modified. These areas are indicated on those maps and overlays submitted to you earlier this month under correspondence dated February 2, 1984.  We hope that our scheduled March 13 inspection will satisfy your inventory analysis requirements on those areas for purposes of this Second Modification.

In the event Amselco can provide you any further information concerning this Second Modification or any other matter, please let me know.  I look forward to seeing you on March 13.  I am

Sincerely yours,

D. Stafford Johnson, Esq.

DSJ/law

Exhibit A
Page 89



**AMSELCO MINERALS INC.**

999 Eighteenth Street, Suite 1201
Denver, Colorado 80202-2484
Telephone: (303) 292-6722
Telex: 450069
Facsimile: (303) 298-1294

February 17, 1984

Mr. Marion Ely, II
Associate Planner
San Bernardino County Planning Department
385 North Arrowhead Avenue
San Bernardino, CA  92415-0182

Dear Marion:

As I indicated to you earlier this week, Amselco is sub-mitting to the BLM a Second Modification to the Plan of Opera-tions and Reclamation Plan for the new Colosseum Mine located in San Bernardino County.  This Second Modification is being sub-mitted in order to ensure that Amselco's exploratory drilling program and its geotechnical and development program for 1984 and early 1985 are incorporated in the original Plan submitted by Jim Sharp.  It is our further desire that the Reclamation Plan al-ready fully approved by the County of San Bernardino also in-cludes this program.  It is for that purpose that I have attached for your review and use a copy of the Second Modification as sub-mitted to the BLM.  Included with this Second Modification are maps which indicate Amselco's proposed geotechnical and develop-ment work program and land status in the Colosseum Project area. Being sent to you under separate correspondence from Steve Kay of our Phoenix office is a map which will illustrate Amselco's exploratory drilling program in the area.  This map should be included as Appendix B to the enclosed Second Modification.  You should anticipate arrival of this map early next week.

You will note in this Second Modification that all drilling which is planned in the exploration context will occur on lands identical to the lands impacted by Amselco's 1983 drilling pro-gram.  The geotechnical and development work program will impact certain additional areas although this impact will be minimal and indeed would not appear to be a substantial deviation from the operations reviewed as part of the Reclamation Plan as First Modified.  The total affected surface of the proposed geotechni-cal and development work program should be less than two acres.

This information is submitted in order to keep San Bernar-dino County informed of Amselco's activities in the area.  In the event you require any further information, please let me know me. I am

Sincerely yours,

D. Stafford Johnson, Esq.

DSJ/law

Exhibit A
Page 90

SECOND MODIFICATION

TO

RECLAMATION PLAN

AND

PLAN OF OPERATIONS

FOR

1984-1985 EXPLORATION DRILLING PROJECT

AND FOR

1984-1985 GEOTECHNICAL AND DEVELOPMENT WORK PROGRAM

COLOSSEUM PROJECT

SAN BERNARDINO COUNTY, CALIFORNIA

In accordance with 43 CFR 3809.1-7, Amselco Exploration Inc. of 17602 North Black Canyon Highway, Suite 105, Phoenix, Arizona 85023 (Telephone:  602/863-2969), with corporate offices at 999-18th Street, Suite 1201, Denver, Colorado  80202  (Telephone:  303/292-6722), hereby submits this Second Modification to the Reclamation Plan and Plan of Operations first submitted to the U.S. Bureau of Land Management ("BLM") on January 11, 1982 ("Plan of Operations").  The Plan of Operations was for an open-pit gold mining, heap leaching and milling operation to be conducted in five phases.  The BLM approved Phase I of that Plan on February 5, 1982.

The First Modification to the Reclamation Plan and Plan of Operations was for the purpose of notifying the BLM of a change of operator as required by 43 CFR Section 3809.1-1(c)(1).  It was also submitted for the purpose of clarifying the Plan of Operations to ensure that a 1983 exploratory program was covered by that Plan and was in general compliance with 43 CFR Section 3809.  The First Modification was submitted on June 28, 1983, and approved on August 4, 1983.  The Plan of Operations and the First Modification are incorporated by this

1

reference for a description and analysis of environmental setting, geology, historic land use, impacts on public health and safety, wildlife and vegetation, reclamation, land use and for all other purposes.

This Second Modification is for the purpose of further clarifying the above referenced Plan and First Modification to ensure that Amselco's 1984/1985 exploratory drilling program and its 1984/1985 geotechnical and development drilling and excavation program are covered and also are in general compliance with 43 CFR Section 3809. The exploration drilling program is a continuation of the activity described in the Plan and First Modification and affects the same area as the 1983 drilling program described in the First Modification. This area has been the subject of extensive environmental review and study by the BLM and by San Bernardino County. The geotechnical and development drilling and excavation program will impart certain additional areas described below.

This Second Modification incorporates by reference all those analyses described in the Introduction to the First Modification and, in addition, information already submitted to the BLM. This information includes relevant portions of the "California Coal NOI" for Southern Cal Edison's Coal Project, certain air quality information already submitted to the San Bernardino Air Pollution Control District and the draft Clark Mountain ACEC Resource Management Plan.

This Second Modification will describe the 1984/1985 program along with mitigation measures which Amselco proposes. Though Amselco's proposed operations are both on and off the patented claims outlined on the maps attached to the First Modification, in accordance with the BLM Surface Management Regulations, this Second Modification, as did the First Modification and the Plan of Operations, will only cover activities not on patented claims.

Exhibit A
Page 92

2

## I.  OPERATOR

For purposes of this Second Modification, the description of "Operator" on page 3 of the First Modification is incorporated by this reference.

## II.  PROPERTY

For purposes of this Second Modification, the description of "Property" and "Mining Claims" on pages 3-7 of the First Modification are incorporated by this reference.  In addition to the property and mining claims described in that First Modification, Amselco has expanded its property by locating the following unpatented mining claims:

KG Claims #1-93

These claims are illustrated on the Map attached as Appendix "A".

## III.  DESCRIPTION OF 1984 DRILLING OPERATIONS

EXPLORATION DRILLING

The proposed prospecting operations encompassed by this Second Modification involve the drilling of approximately 50,000 feet of exploratory drill holes (approximately 90 holes) (see map attached as Appendix "B").  Of these 90 holes, approximately 12 will be diamond holes.  Approximately 50 holes (44 reverse circulation; 6 diamond) will be on patented claims and approximately 40 (34 reverse circulation; 6 diamond) on unpatented claims.  This drilling program will

Exhibit A
Page 93

3

involve construction of additional spurs or sections of road, leveling of drill sites, excavation of pits using a D-8 Caterpillar and blasting, but only as necessary. Road building and general site preparation will be accomplished by E & D Construction, 4389 Hobbs Drive, Las Vegas, Nevada 89120. Any blasting required will be carried out by R.H. Gunn Mine Development, 1414 Industrial Road, Salt Lake City, Utah 84104. Several planned drill holes will utilize existing sites which will involve no further preparation. Surface damage will be minimal and all sites will be cleared of trash, accidental oil spillage and debris.

The approximately 34 rotary drill holes on unpatented claims will be drilled using reverse circulation equipment, Ingersoll-Rand TH-100 rigs (which drill a 5-1/4' hole), under contract from Drilling Services Inc. of 9002 South Harding Drive, Tempe, Arizona 85264. The samples will be collected from a cyclone discharge unit. The sample will be split on-site and part will be stored on-site in 55 gallon oil drums and part shipped by freight to Phoenix and/or Las Vegas for sample preparation. Drilling will be dry as far as possible but may require water. Water which is encountered during drilling is generally lost down the hole during the course of drilling. No significant acquifers are known or are expected to be encountered on the property.

Diamond drilling will involve coring a minimum 2-inch diameter hole. Core is stored in boxes and removed from the site. Diamond drilling utilizes recirculated water from a metal tank located in a 15' X 15' X 6' pit. These pits are refilled upon completion of the drill hole.

The above described exploratory drilling program will use up to five drilling rigs, a maximum of three rotary drills and two diamond drills. A total of approximately four miles of dirt roads currently exist on the property, together with approximately 80 drill sites, each 60' in diameter. The drilling program will involve the construction of additional drill sites as necessary and less than one mile of additional road. Existing roads and drill pads will be used

Exhibit A
Page 94

4

whenever possible.  Drill sites will be a minimum of .04 acres (60' X 30') and a maximum of 0.5 acres (150' X 150') with the majority being less than 0.1 acre.

Capping of drill holes will be carried out as specified by existing regulations but will not be done until the end of the drilling program to allow re-entering the holes if required for surveying and/or extension purposes.

The proposed work force will be approximately four geologists plus some twelve field technicians.  All staff will based in Las Vegas, Nevada.

## GEOTECHNICAL AND DEVELOPMENT, DRILLING AND EXCAVATION

In addition to the above described exploration operations, the proposed operations encompassed by this Second Modification involve the drilling of a maximum of 15,000 feet (approximately 54 holes) of core or reverse circulation holes and the digging of a maximum of 100 backhoe pits (3' x 10').  This geotechnical and development work program will be implemented on Tailings Areas A and B, on the leach pad area, on Mill Site Areas A and B, on the Waste Rock Area and on the Mine Development Area, all of which are indicated on the map attached as Appendix C.  A summary of this geotechnical and development work program follows:

### Tailings Area A & B

Maximum of 10 core or reverse circulation holes to bedrock in each area.

Maximum of 10 back-hoe pits in each area.

Exhibit A
Page 95

5

### Leach Pad Area

Maximum of 6 core or reverse circulation holes to bedrock.

Maximum of 20 back-hoe pits.

### Mill Site Area A & B

Maximum of 10 core reverse circulation holes to bedrock in each area.

Maximum of 20 back-hoe pits in each area.

### Waste Rock Area

Maximum of 4 core or reverse circulation holes.

### Mine Development Area

Maximum of 4 core holes.

The above geotechnical and development work program will involve construction of additional spurs or sections of roads and levelling of drill sites, but only as necessary. Any additional road building and general site preparation will be accomplished by E & D Construction, 4389 Hobbs Drive, Las Vegas, Nevada 89120. As most of the drilling will be done by core or reverse circulation techniques, surface damage will be minimal. All sites will be cleared of trash, accidental oil spillage and debris.

All of the described geotechnical and development drilling work will be under contract from Drilling Services Inc. of 9002 South Harding Drive, Tempe, Arizona 85264. Samples will be collected from a cyclone discharge unit and later stored on-site in 55 gallon oil drums with part shipped by freight to Phoenix and/or Las Vegas for sample preparation. Drilling will be dry as far as possible but may require

water.   Water which is encountered during drilling is generally lost down the hole during the course of drilling.  No significant acquifers are known or are expected to be encountered on the property.

The  above  described  geotechnical  and  development  work  program will utilize one drill rig.  The program will involve the construction of additional drill sites only as necessary.  Drill sites will be a minimum of 0.04 acres (60' x 3') and a maximum of 0.5 acres (150' x 150') with the majority being less than 0.1 acre.

Capping of drill holes will be carried out as specified by existing regulations.  No additional work force other than that proposed for the exploration drilling program are contemplated.

All excavation work will be accomplished using a track mounted backhoe.  Overburden will be stockpiled next to each pit.  Topsoil will be separated.  All excavation operations will be complete and all pits backfilled and topsoil replaced within 90 days from the approval date of this Second Modification.

## ACCESS

Access to the property is via state Highway 15 through Colosseum Gorge.   Within the proposed mining and drilling program area, there are approximately four miles of fair to poor dirt roads (see Map 2 attached to First Modification).  Existing roads have been and will be utilized wherever possible.

## EQUIPMENT

| Exploration Drilling | Engineering and Design Drilling and Excavation |
| --- | --- |
| 6 Pick ups | 1 Track mounted back-hoe |
| 2 Sample Trailers | 1 Pick up |
| 1 D-8 Caterpillar | |
| 1 Road Grader | |

Exhibit A
Page 97

AREA OF SURFACE DISTURBANCE

Total surface disturbance on the unpatented claims from all proposed operations will be approximately five acres.

ROADS

Roads will generally be constructed and maintained using a contracted road grader.  Water bars and ground structures will be constructed as deemed necessary to prevent erosion.

EXPLOSIVES

Caps will be stored in two separate locations on the property in containers and magazines which comply with all applicable explosive storage and safety regulations.

FIRE PROTECTION

Fire extinguishers will be of proper size and location in accordance with Mine Safety and Health Administration guidelines.

OILS AND SOLVENT WASTE

All waste oils and solvents will be collected in either 55 gallon drums or other tanks to be removed from the site by a local recycler.

WATER SUPPLY

All water to be used in drilling will be trucked onto the property; none will be pumped from within the property boundary.

Exhibit A
Page 98

### IV.  SCHEDULE OF OPERATIONS

The above described operations will commence upon the approval of this Second Modification and will continue thereafter for approximately twelve months.  No extended periods of non-operation are contemplated.  Activity will be conducted primarily during weekdays and intermittently on weekends.

### V.  EXISTING ENVIRONMENT

The existing environment in the area of the program proposed by this Second Modification  has been thoroughly described in the Plan of Operations and First Modification.  These descriptions and related documents have been incorporated by reference and have been made a part of this Second Modification.

### VI.  IMPACTS

#### AIR QUALITY

Air quality impacts will be minimal and insignificant.  They will consist of vehicle emissions from the equipment listed above, dust from vehicle activity on dirt roads and windblown dust from exposed surfaces.  The work program encompassed by this Second Modification will comply with all applicable federal, state and local air quality control regulations.

#### WATER QUALITY

The work program proposed will comply with all federal, state and local water quality laws.  Because the proposed drilling programs will not discharge dredged or fill materials below the headwaters of a stream or into a waterway that is part of a surface tributary system

9

Exhibit A
Page 99

connecting interstate waters or traditionally navigable waters, activities affecting local gulches are authorized by nationwide permits under Section 404 of the Clean Water Act and applicable regulations. Amselco will comply with all of the applicable conditions of such nationwide permits. No discharge of pollutants into surface or ground waters is anticipated from these drilling programs.

SOLID WASTES

As outlined above and in the Reclamation Plan, all wastes, including refuse, trash and debris will be disposed of in way which will minimize degradation. Amselco's proposed operations will be in full compliance with federal, state and local laws governing disposal of solid or hazardous wastes.

WILDLIFE AND VEGETATION

The effect which full-scale mining would have on wildlife and vegetation has been assessed in the documents incorporated by reference in this Second Modification. The 1984/1985 exploration drilling programs affects the same area and will have far less impact than full-scale mining. Previous analysis concluded that there are no species of protected vegetation in the area which may be affected by the program and that there are no threatened or endangered species of wildlife which may be affected by the program.

Amselco nevertheless recognizes that those additional areas which may be impacted by the geotechnical and development program may require some inventory analyses. We submit that a satisfactory inventory analysis will be accomplished during our scheduled inspection on March 13, 1984.

CULTURAL AND PALEONTOLOGICAL RESOURCES

Most of the area which will be affected by Amselco's 1984/1985 exploration drilling program has already been the subject of the two

cultural and archeological resources surveys referenced earlier.
Amselco believes that the level of cultural resource review which has
been conducted is fully adequate for the conduct of the exploratory
drilling program in its 1984/1985 program, though it fully recognizes
that those additional areas which may be impacted by geotechnical and
development work drilling may require some inventory analysis. Again,
we submit that the scheudled March 13 inspection will satisfactorily
accomplish this task.

## VII.  ENVIRONMENTAL PROTECTION PROGRAM

An environmental protection program will be on-going during all
parts of the proposed drilling activities. This program will incor-
porate all reasonable measures to prevent unnecessary or undue degra-
dation of affected property, including control and strict supervision
of approved vehicle and machinery access; posting and maintenance of
appropriate warning signs; or were necessary to protect the general
public, implementation of access restriction measures in the form of
gates and/or cables, berms, fences and posting of notices; and all
other measures required to ensure compliance with applicable regula-
tions in 36 CFR Chapter I. Amselco will implement programs to ensure
the natural drainage will not be interrupted and that all reasonable
efforts will be made not to harm incumbant wildlife and plant species
or their natural habitat. For safety purposes, no personnel will be
permitted to enter excavations deeper than shoulder level.

## VIII.  RECLAMATION PLAN

Because almost all of the drill pads and roads which are part of
the exploration drilling program are located in areas slated for
open-pit mining in the near future, no reclamation is proposed for

Exhibit A
Page 101

11

such sites.  In the event a decision not to mine is made, the roads and drill sites will be reclaimed as provided for undisburbed areas outside of the pit in Reclamation Plan 82M-001.  In addition, all re-fuse, trash and debris will be removed from the site.  Powder maga-zines, camp storage facility and office trailers will be removed from the site unless other arrangements have been made with the BLM.

Regarding the geotechnical and development program, since all the areas potentially impacted by these activities are located in areas slated for tailings disposal in the near future, no reclamation is proposed for such sites.  Again, in the event a decision not to mine is made, the roads, drill sites and excavations will be reclaimed as provided for undisturbed areas outside of the pit in Reclamation Plan 82M-001.

## IX.  ALTERNATIVES

Amselco has considered reasonable and feasible alternatives to its existing and proposed operations.  It has made its proposal based on minimizing environmental degradation and energy use consistent with reasonable economic feasibility.

Amselco will be please to provide any additional information or to discuss the contents of this Second Modification.  Please contact the undersigned at the telephone number given for Amselco's Denver, Colorado office if there are any questions or if Amselco can be of any assistance.

AMSELCO EXPLORATION INC.

By_____

Exhibit A
Page 102

12



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
NEEDLES RESOURCE AREA
641 FRONT STREET, SUITE B
NEEDLES, CALIFORNIA 92363
(619) 326-3896

IN REPLY
REFER TO:

3800
CAMC 28632
(C-069.28)

D. Stafford Johnson
Amselco Minerals Inc.
One Denver Place, Suite 1201
999-18th Street
Denver, Colorado 80202

CERTIFIED MAIL #327-940-314
RETURN RECEIPT REQUESTED

Dear Mr. Johnson:

Your modification of the approved Plan of Operations (sumbitted by California Gold Properties on January 11, 1982) for the Colosseum project has been approved. Exploratory work as identified in the modified plan of operations may begin at your convenience.

Mitigating measures identified in the approvals of the original plan of operations and Reclamation Plan (82M-001) also apply to the exploration project approved at this time. In addition to those original mitigating measures, the following measures also apply to this plan of operation:
1) The following designated plant species will have their north side marked in a non-injurious manner and will be transplanted in a non-injurious manner to areas that will not be affected by exploration activities: joshua trees, yuccas, and cacti. 2) The approval of this plan does not authorize the cutting of firewood from public lands. 3) When possible conduct operations and related activities away from surface water, such as springs and streams, maintaining a minimum distance of 200 yards. 4) The "Plan of Operations for the 1983 Exploration Drilling Project at Colosseum Project" (dated June 24, 1983), which is the subject of this approval, must be closely adhered to.
5) Approval of this plan will not now or in the future serve as a determination of the validity of any mining claim to which it may relate.

Amselco should be aware that a "Barstow to Las Vegas" motorcycle race is run on portions of the access route that Amselco has identified for the Colosseum project. The race is held yearly around the time of the Thanksgiving holiday (November 26th for 1983) and results in portions of the access route for the Colosseum Project being closed for public use.

Exhibit A
Page 103

Your cooperation and submission of a well written plan of operations has been appreciated. If there are any questions on this approval, please feel free to contact Roger Britton of this office.

Sincerely

Everell G. Hayes
Area Manager, Needles

Exhibit A
Page 104

# SECTION 4

Exhibit A
Page 105

INDEX
THIRD MODIFICATION
TO
RECLAMATION PLAN
AND
PLAN OF OPERATIONS
COLOSSEUM PROJECT
SAN BERNARDINO COUNTY, CALIFORNIA

I.   Operator......................................3

II.  Location of Operations........................4

III. Existing Environment..........................5

     A.  Topography................................5
     B.  Vegetation................................5
     C.  Wildlife..................................5
     D.  Cultural Resources........................6
     E.  Socioeconomic.............................6
     F.  Land Use..................................7
     G.  Minerals and Geology......................7
     H.  Air Quality...............................7
     I.  Hydrology.................................8
     J.  Water Quality.............................8
     K.  Precipitation.............................9
     L.  Recreation................................9
     M.  Noise.....................................9
     N.  Visual Resources.........................10
     O.  Climatology..............................10

IV.  Description of Mining Operations.............12

     A.  Process..................................12
     B.  Infrastructure...........................13
     C.  Equipment................................13

Exhibit A
Page 106

D.   Access Corridor.........................14
E.   Power Transmission Corridor............14
F.   Water Field and Transmission Corridor..14
G.   Communications.........................14

V.   Schedule of Operations......................15

VI.   Alternatives...............................16

A.   Facility Siting Alternatives...........16
     (i)    No Action Alternative...........16
     (ii)   Waste Rock Disposal Site........16
            Alternatives
     (iii)  Tailings Site Alternatives......17
     (iv)   Mill Site Alternatives..........17
     (v)    Leach Site Alternatives........17

B.   Process Alternatives...................18
     (i)    Milling with Flotation..........18
     (ii)   Underground Mining..............18

C.   Access Corridor Alternatives...........19

D.   Power Line Transmission Alternatives...19

E.   Water Field and Transmission...........19
     Alternatives

VII.   Impacts...................................20

A.   Wildlife and Vegetation................20
B.   Cultural Resources.....................20
C.   Socioeconomic..........................20
D.   Land Use...............................21
E.   Air Quality............................21
F.   Water Quality..........................21
G.   Solid Wastes...........................21
H.   Recreation.............................22
I.   Noise..................................22
J.   Visual Resources.......................22

VIII.   Environmental Protection Program.........23

IX.   Reclamation Plan..........................24

Exhibit A
Page 107

INDEX

APPENDICES

Appendix A:  Project Site Map  *(NOT ATTACHED)*

Appendix B:  List of Mining Claims

Appendix C:  Claim Map  *(NOT ATTACHED)*

Appendix D:  Facility Siting Map  *(NOT ATTACHED)*

Appendix E:  Flow Sheet

Appendix F:  Plot Plan of Mill and Crushing Facilities

Appendix G:  Equipment List

Appendix H:  Siting Alternatives  *(NOT ATTACHED)*

Appendix I:  Reclamation Plan  - (attached to Technical

Appendix of DEIR/EIS; other appendices available on request)

THIRD MODIFICATION

TO

RECLAMATION PLAN

AND

PLAN OF OPERATIONS

COLOSSEUM PROJECT

SAN BERNARDINO COUNTY, CALIFORNIA


In accordance with 43 CFR 3809.01-7, Amselco Exploration Inc. of 1050 E. Flamingo Rd., Suite 349, Las Vegas, Nevada 89109 (Telephone:  702/369-2822), with corporate offices at 999-18th Street, Suite 1201, Denver, Colorado 80202 (Telephone: 303/292-6722), hereby submits this Third Modification to the Reclamation Plan and Plan of Operations first submitted to the U.S. Bureau of Land Management ("BLM") and to the San Bernardino County Office of Planning ("County") on January 11, 1982 ("Plan of Operations"). The Plan of Operations was for an open pit gold mining, heap leaching and milling operation to be conducted in five phases. The BLM and the County approved Phase I of that Plan on February 5, 1982 and January 14, 1982, respectively.

The First Modification to the Reclamation Plan and Plan of Operations was for the purpose of notifying the BLM of a change of operator as required by 43 CFR Section 3809.1-1(c)(1). It was also submitted for the purpose of clarifying the Plan of Operations to ensure that a 1983 exploratory program was covered by that Plan and was in general compliance with 43 CFR Section 3809. The First Modification was submitted to the BLM on June 28, 1983, and approved on August 4, 1983.

The Second Modification to the Reclamation Plan and Plan of Operations was for the purpose of further clarifying the above referenced Plan and First Modification to ensure that Amselco's 1984/1985 exploratory drilling program and its 1984/1985 geotechnical and development drilling and excavation program were covered and also were in general compliance with 43 CFR 3809. The Second Modification was submitted to the BLM on February 17, 1984. The 1984/1985 exploratory drilling program was approved on May 15, 1984. The 1984/1985 geotechnical and development drilling and excavation program is currently being reviewed by the BLM.

Exhibit A
Page 109

1

The Plan of Operations, the First Modification and the Second Modification are incorporated by this reference for a description and analysis of environmental setting, geology, historic land use, impacts on public health and safety, wildlife and vegetation, reclamation, land use and for all other purposes. Also incorporated by this reference are those certain environmental analyses performed by the BLM in connection with approval of the Plan of Operations and of the First and Second Modifications (including its consideration of botany, scenic factors and wildlife), the Cultural Resources Mitigation Report dated January, 1982, prepared and submitted by Mr. Robert E. Reynolds, the Cultural Resource Reconnaisance Report on "The Clark Mountain District or Colosseum Mine" dated September 1, 1981, prepared by R. A. Musser, the cultural resource assessments prepared for the BLM by Michael Lerch of the San Bernardino County Museum Association, relevant portions of the Draft Resource Management Plan for the Clark Mountain Area of Critical Environmental Concern and relevant portions of the "California Coal NOI" prepared by Southern Cal Edison (SCE) for the California Energy Commission reviewing SCE's proposed utility plant in the Ivanpah dry lake bed area approximately five miles southeast of the Colosseum area. And finally, Amselco has recently placed a weather station at the mine site which will provide site-specific data concerning wind speed, temperatures and relative humidity. This information will be made available to interested agencies.

The Colosseum area clearly has been and is the subject of extensive environmental and meteorological review by the BLM, by San Bernardino County and by the California Energy Commission.

The salient features of these environment analyses are that (i) the previous and present land use in the Colosseum mine area is exploration and mining activity; (ii) there is sparse vegetation, poor soil and low precipitation in the area; and (iii) there is low visual impact from frequented transportation routes.

This Third Modification is for the purpose of notifying the BLM of a change in project design and location in accordance with the requirements of 43 CFR Section 3809.1-7 (b). Amselco's operations both on and off patented claims will be as described below and as outlined on attached maps. In accordance with the BLM Surface Management Regulations, however, this Third Modification covers only activities not on patented claims.

Exhibit A
Page 110

2

## I.  OPERATOR

Amselco Exploration Inc., as operator, has offices at the addresses stated above.

## II.  LOCATION OF OPERATIONS

The Colosseum project is located approximately 50 miles southwest of Las Vegas, Nevada, approximately 10 miles north of I-15 just after crossing the California State line traveling towards Los Angeles from Las Vegas (see Inserts 1 and 2).  The map attached as Appendix "A" further illustrates the site location as it relates to area topographic features.

The proposed operations will affect those certain unpatented mining claims, patented mining claims and millsites listed in the Plan of Operations as First and Second modified and as supplemented by those, umpatented mining claims listed in Appendix "B".  All of the foregoing claims are illustrated on the map attached as Appendix "C".  The map attached as Appendix "D" illustrates all areas potentially affected by the Colosseum Project.





Exhibit A
Page 114

## III. <u>EXISTING ENVIRONMENT</u>

The existing environment in the area illustrated on the map attached as Appendix "D" has been described in some detail in Chapters I. and II. of the Plan of Operations and in the First and Second Modifications, and has been extensively studied and described by the BLM and by the County in approving Phase I of the Plan of Operations. Insert 3 includes an aerial photo of the area which illustrate topographic and other features of the environment in the area of the proposed operations. Further to those descriptions, following is a more detailed categorical description of the existing environment:

### A.    <u>TOPOGRAPHY</u>

The Colosseum project site is located in the Clark Mountain Range and forms a northeast trending ridge comprising two prominent cones rising to 6,075 feet and 6,142 feet above sea level, respectively. From these cones the land surface falls away steeply towards the northwest and more moderately towards the southeast.

### B.    <u>VEGETATION</u>

The Colosseum mine site (see Appendices "A" and "D") is part of the Inyo Floristic Region which is transitional between the colder Great Basin Desert to the north and the warmer Sonoran Desert to the south (See "Colosseum Mine - Cultural Resource Mitigation", Robert Reynolds; and "Clark Countain ACEC - Resource Management Plan"). The area possesses a relativly rich flora containing many species from the Great Basin and Southwestern Deserts. Principal resources in the area are dominated by the Pinon Juniper scrub community. Species observed include Pinon Pine, Juniper, Desert Willow, Mesquite, Mormon Tea, Freshly Fruited Yucca, Mojave Yucca, Silver Cholla, Beavertail Cactus, Pincushion Cactus and Desert Mallow. In addition, Agave, Penstammen, Desert Mariposa and White Fir have been observed near the area as have numerous seasonal grasses and wildflowers. Also reported in the Clark Mountain area are Oak, Ash, Barberry, Manzanita, Service Berry, Gooseberry, Mountain Mohagony, Mistletoe and Chollas. No federally listed threatened or endangered plants or State of California designated rare or endangered plants exist within the Clark Mountain area.

### C.    <u>WILDLIFE</u>

Wildlife observed in the Clark Mountain area include Spiney Lizard, Chuckawalla, Desert Tortoise, Rattlesnake, Gopher Snake, Golden Eagle, Redtailed Hawk, American Kestrel, Barn Owl, Raven



FIGURE 12.1
COLOSSEUM PROJECT
VIEW LOOKING WEST – SHOWING PROPOSED INFRASTRUCTURE

Desert Sparrow, Wood Rat, Cottontail and Blacktailed Jackrabbit, Coyote, Burro and Cow.  Bighorn Sheep are known in the Clark Mountain area as are numerous other species of reptiles, rodents and birds including the Hepatic Tanager, the Broadtailed Hummingbird, the Flamulated Owl, several species of Vireos and a number of Warblers, (see "Colosseum Mine - Cultural Resource Mitigation", Robert Reynolds; and "Clark Mountain ACEC - Resource Management Plan").

D.    CULTURAL RESOURCES

Archeological resources in the Mojave Desert have been described by Robert Reynolds of the San Bernardino County Museum Association and by Ruth Musser of the BLM as including habitation sites, camp sites, food or tool processing sites, quarry sites, petroglyphs (rock art), intaglios (ground figures), rock align- ments, foot trails and other evidence of human activity dating back in time to at least 20,000 years and possibly as early as 40,000 to 70,000 years from present.

Historical resources in the Mojave Desert include the routes of early Spanish explorers, old government roads and railroad grades, old settlements and mining areas and other evidence of human activity.

Paleontological resources in the Mojave Desert include micro and macro fossils of plants and both vertibrate and invertibrate animals.  Fossils occur in rock formations that date from the pre-Cambrian through the end of the Pleistocene period.

And finally, ethnographic resources in the Mojave Desert include both natural and archeological resources which have been tied culturally to Native American people.

E.    SOCIOECONOMIC

The Colosseum site is located on presently undeveloped land in San Bernardino County.  The communities of Baker (approximat- ely 40 miles from the site) and Nipton (approximately 25 miles from the site) are the closest inhabited areas.  Because there are no communities in the eastern desert of California which are of sufficient size to provide the services and facilities requi- red by the construction and operation employees, the Colosseum Mine will rely in large part on the Las Vegas Valley and the urbanized, central portion of Clark County, Nevada for such services.

The major communities in this urban complex are the incorpo- rated cities of Las Vegas, North Las Vegas and Henderson.  It is one of the most rapidly growing areas in the U.S.A. when measured

by almost any indicator - population, employment, bank deposits, retail sales, construction permits, tourist visitation, etc.  The growing economy of the Las Vegas area is heavily based on tourism, recreation and convention business as evidenced by the fact that nearly two-thirds of the labor force is employed in the trade and service sectors (see "Southern Cal Edison - California Coal NOI").

F.  LAND USE

The primary historic land uses within the proposed project boundaries (see Appendix "D") and surrounding Clark Mountain area have been mine related.  Indeed, much of the proposed mine area is the site of previous underground mining in the 1930's. Tailings, mine buildings and roads, adits, mine workings and related facilities are very much in evidence at the mine site.

Historic transportation routes are also documented as subsidiary to mining-related activities such as milling, residences, spring and water development and the historic town site of Ivanpah approximately three miles southeast of the project boundary at the mouth of the Colosseum Gorge.

G.  MINERALS AND GEOLOGY

The project site is located in the Clark Mountain Mining District in a structurally complex zone of faulted Precambrian and Paleozoic rocks.  Basement rocks in the area consist of Precambrian granitic gneiss and biotite gneiss intruded locally by alaskite and pegmatite dikes of similar age.  Precambrian rocks are exposed as a northwest trending wedge-shaped horst block, bounded by two high angle normal faults, extending between Mesquite Pass to the north and Ivanpah Valley to the south. Exposures of thrust faulted Paleozoic sedimentary rocks occur on the flanks of these faults.  Immediately west of the Colosseum property, the Paleozoic section is represented by the Cambrian Tapeats Quartzite, Bright Angel Shale, and the Cambrian-Devonian Goodsprings Dolomite.

H.  AIR QUALITY

The Colosseum site is located within the Southeast Desert Air Basin portion of San Bernardino County.  EPA has classified the Ivanpah area as unclassifiable or better than national ambient air quality standards for all pollutants (see "Southern Cal Edison - California Coal NOI").

For air contaminants of interest to the Colosseum Project, based on available data, there are no violations of any national or state ambient standards.  Indeed, it is apparent that concen-

Exhibit A
Page 118

7

trations for $SO^2$, $NO^x$, CO and Oxidants should be at natural background levels since there are no major sources located within 50 kilometers of the site. Concentrations of Total Suspended Particulates are clearly due to wind blown dust.

I.  HYDROLOGY

Water for the Colosseum Project will come from either the Ivanpah Valley, the Shadow Valley or the Mesquite Valley Basins, and/or from Section 16 in Township 17 North, Range 13 East, which is located immediately west of the mine site. Insert 4 illustrates the location of the listed Basins as they relate to the mine site.

The Ivanpah Valley is typical of an enclosed ground water basin with a total drainage area of approximately 850 square miles of which about 57% is in California. It occurs in the northeast portion of San Bernardino County with the northern portion of the Basin extending into Nevada.

The Shadow Valley Basin is an irregularly shaped northwesterly trending area of about 271 square miles, located in the northeastern part of San Bernardino County, California, within the Amargosa River Drainage Basin. The Basin is bounded on the north by the Mesquite Mountains, on the east by the Ivanpah, Mescal and Clark Mountains and by the Kingston Range, by Teutonia Peak on the south and by the Shadow Mountains on the west. Interstate 15 traverses the southerly portion of Shadow Valley in a southwest to northeast direction. Numerous graded dirt roads and unimproved dirt roads afford access to most of the valley. An initial evaluation has determined the Shadow Valley Basin as favorable target for a water source.

The Mesquite Valley Basin is located along the California-Nevada Border in the Ivanpah Drainage Basin. The portion of the basin lying in California is situated in the northeast portion of San Bernardino County, and the southeast corner of Inyo County and includes an area of 220 square miles. This roughly oval-shaped area is bordered on the northeast by the Mesquite Mountains and the Kingston Range and on the south by the Clark Mountains.

Interest in Section 16 as a water source is also high due to extensive limestone deposits and to its proximity to the site.

J.  WATER QUALITY

Chemical analyses of ground water from 14 wells and five springs in the Shadow Valley Basin have been studied to determine the chemical character of ground water. These analysis indicate

EXPLANATION

—————➤  Probable direction of ground-water flow: questioned where doubtful

—··——  Valley boundaries

Ⓘ  U.S. Interstate Highway

Ⓘ  U.S. Highway

Ⓢ  Nevada State Highway

— — — —  Unpaved road

●  Weather station

INSERT 4

Exhibit A
Page 120

that the quality of the water is good and that water may be present in sufficient amounts to provide a reliable source of water for operations.

Chemical analyses of 2 wells in the vicinity of the mine site have also been conducted. These analysis indicate that the water in the vicinity of the site is good quality but is present in very small acounts.

The only surface water in the area of the mine site is storm runoff. No continuous streamflow is evident.

K.  PRECIPITATION

Rainfall in the Clark Mountain area during the winter months is produced by migratory storm systems moving eastward from the Pacific ocean. The majority of these storms release most of their moisture on the windward side of the coastal mountain ranges so that rainfall in the desert area is usually very light. When these storms are accompanied by cold air aloft, however, the resulting instability produces considerable convective shower activity throughout the desert region. This type of storm is responsible for most winter precipitation (see "Southern Cal Edison - California Coal NOI").

Summer rainfall in the Clark Mountain area is produced almost entirely by showers and thunderstorms that develop in air of tropical maritime origin. These storms are frequently very intense and produce heavy rainfall over short periods of time.

L.  RECREATON

Most recreation use near the Colosseum Mine pit is centered along Colosseum Gorge road. Although evidence of camping exists, it apparently is not a major activity. Recreation use is primarily centered around day use activities, which are particularly popular during the spring and fall months. These activities include sightseeing at the historic mining camps in the Clark Mountain area, picknicking, photography, botanizing, other forms of nature study and rockhounding. Hiking opportunities are abundant with the focus being the white fir grove on the steep, north-facing slopes of Clark Mountain peak. Hunting of big game and upland gamebirds such as chukar and quail is also very popular. Colosseum Gorge road and another route that skirts to the southeast have been used in part Barstow-to-Las Vegas motorcycle races (see "Clark Mountain ACEC - Resource Management Plan").

M.  NOISE

The Colosseum Mine Site is located in a remote high desert

area.   The prime sources of noise at the site are wind and animal life.   The nearest major sources of noise are highway traffic on Interstate Route 15, AT&SF railroad traffic and domestic and military air traffic.

N.   VISUAL RESOURCES

The Colosseum mine site is located on presently undeveloped land in San Bernardino county in a mountainous, secluded high desert environment.   The site is many miles from any inhabited or well-traveled areas.

The Clark Mountain area, however, has valuable scenic qualities due to its rugged terrain, variety of vegetation and degree of color contrast (see "Clark Mountain ACEC – Resource Management Plan").

O.   Climatology

Temperatures in the Colosseum project area are typical of a high desert environment.   Diurnal temperature ranges are large, up to $30^{\circ}$ to $40^{\circ}$ Fahrenheit, due to the efficient heating and cooling of the land surface under generally clear skies.   No temperature data is currently available for the site, but data recorded in Yucca Grove, California, located 40 km. southwest of the site, and Searchlight, Nevada, located 47 km. east of the site, seem representative.   Since both of the stations are somewhat lower in elevation (Searchlight is 3540 feet while Yucca Grove 3951 feet and Colosseum approximately 6000 feet), expected temperatures at the site have been projected as approximately 10 degrees cooler.   It is evident from the statistics at Searchlight and Yucca Grove that the warmest temperatures will be experienced in July and the coolest in January.   Maximum daytime temperatures at the site will exceed $100^{\circ}$ F. during the summer with low temperatures dropping below freezing in the winter.

The nearest summary of average relative humidity data is for Las Vegas, Nevada.   In the absence of on-site relative humidity information, data recorded at Las Vegas appears the most representative.   From the data it is evident that the winter season experiences the highest relative humidities due in part to the cool temperatures while the summer season experiences the driest conditions due to the excessively high temperatures.   Diurnally, the afternoons are the driest while the early morning hours are somewhat more moist.

Atmospheric stability data indicate that two basic types of inversions occur in southern California:   1)   a radiation inversion commonly occurs at night due to radiational cooling; and 2) an inversion type which is formed as a result of the sinking or

Exhibit A
Page 122

10

subsidence of air associated with the eastern Pacific high pressure cell. The occurrences of the latter conditions have a potential for resulting in increased ground level air quality impacts. Impacts from elevated emission sources would be expected to be minimal during deep ground based inversion conditions.

The low level winds in the vicinity of the mine site are influenced by a combination of factors including large scale synoptic weather patterns and local topographic features. Large scale weather features include the semi-permanent Pacific high pressure cell which creates surface pressure gradients which drive winds from the regions of higher pressure towards regions of lower pressure. At the surface, such large scale wind pattern are then modified by the local topography causing wind channelling and gravity-induced mountain and valley breezes. Mountain breezes are spawned at night from the drainage of cool, dense air down the mountain slopes into the adjacent valleys below while upslope valley breezes result from the increased heating of the air overlaying the mountain slopes during the daytime thus drawing air up from the valleys below (see "Southern Cal Edison - California Coal NOI").

The nearest available upper level wind information is from the Mojave Valley located approximately 85 km. southeast of the site and from Las Vegas, Nevada, located approximately 80 km. to the north. Winds aloft over Las Vegas indicate that the most prevalent wind directions are from the south through southwest with a secondary peak from the northerly directions. This pattern is evident up to nearly 5000'. Upper level wind data from the Mojave Valley indicate prevailing wind directions are northerly or southerly over 90% of the time during the morning and 85% of the time during the afternoon. Wind speeds again are variable.

## IV.    DESCRIPTION OF PROPOSED MINING OPERATIONS

The description of operations hereunder is presented as a modification to the relevant portions of Chapter III. of the Plan of Operations.

Based on information available to date, the proposed mining operations encompassed hereby will most likely consist of the mining of two adjacent but discrete pods of mineralization known as the East Pipe and West Pipe.  Mining will be by conventional, medium scale open-pit methods.  Waste rock material will be dumped in areas surrounding the East and West pipes (see map attached as Appendix "D").

The average depths of the West and East pit will be 630 feet and 560 feet, respectively.  The combined waste to ore ratio of both pits averages 3.2:1 over the mine life.

### A.    PROCESS

The proposed mining operations will involve both milling and heap leach processes. The proposed operations are designed to operate 8 hours per shift, 3 shifts per day, 5 to 7 days per week, 250 to 355 days per year.  Total pit production will average approximately 4.3 to 6 million tons of material per year or about 12,000 to 16,000 tons per day over at least an 11 year mine life.  The mine is planned to supply the mill with from 1 to 1.5 million tons of ore per year at the rate of between 3.5 and 5.5 thousand tons per day.

(i) Milling

Sulfide ore will be transported from the pit by haul trucks and dumped into a loading  pocket ahead of the primary jaw crusher.  The jaw crusher product will be conveyed to a coarse ore stockpile.  Vibrating feeders under the stockpile will reclaim the ore onto a conveyer for transport to the fine crushing plant which will contain cone crushers and vibrating screens.

The fine crushed product will be conveyed to stockpiles or storage bins and from there to rod and ball mills.  A dilute solution of cyanide, water and lime slurry will be added to the crushed product at the mill.  Slurry will then be discharged to a sump and then to a cyclone.  Cyclone underflow will be returned to the ball mill and cyclone overflow will pass to a thickener.

The underflow from the thickener will be pumped to a train of agitated leach tanks where gold will dissolve in a dilute solution of cyanide.  The discharge from the leach tanks will pass to a series of carbon-in-pulp ("CIP") tanks where the dissolved gold will be absorbed onto activated carbon.

Gold will be desorbed from the carbon and recovered from solution by electrowinning onto steel wool cathodes and finally processed in very small propane fired or electric furnaces.  The gold/silver product, known as dore, will be shipped periodically to a custom refinery.

Tailings from the CIP process will be thickened and the thickener overflow discharged via pipeline to the tailings impoundment area.

For an illustration of the above described process, see the flow sheet attached as Appendix "E".

(ii) Heap Leaching

Oxide ore will be hauled directly from the pit and dumped onto leach pads, which will consist of an impermeable plastic liner covered with a protective layer of crushed rock.  Gold bearing solutions from the heap will be processed through the carbon absorption section of the mill and "barren" liquors returned to the heap.  The leaching process is further defined in Parts A., B. and Phases I and II of Part E. of Chapter III. of the Plan of Operations.

Amselco is currently conducting a limited leaching program (pilot plant test) already approved by the BLM and by San Bernardino County.  This feasibility review will help determine whether later implementation of a full-scale leaching operation is warranted.  Any such leaching operation would occur on those sites described in Appendix "D".

B.  INFRASTRUCTURE

A crushing facility, mill facility, a maintenance facility, office buildings, outdoor storage areas and several other support buildings will be constructed.  (See Appendices "D" and "F" for planned siting of all required facilities.)

C.  EQUIPMENT

Amselco will be utilizing the equipment listed in Appendix "G" for its operations.

D.  ACCESS CORRIDOR

Access to the Colosseum area is planned via Interstate 15 and across approximately 13 miles of an existing dirt road used to service the Los Angeles Power District's power line.  Within the proposed area of operations (see Appendix "D"), there are several miles of existing dirt roads which will be utilized for access wherever possible.  Off road vehicle and machinery access will occur only during construction of facilities and only where necessary.  All roads will be planned for minimum required width and will follow natural contours when practicable.  The proposed access route is illustrated on the map attached as Appendix "H".

E.  POWER TRANSMISSION CORRIDOR

Power will be obtained from Southern Californa Edison via a 133KV line passing to the south of the mine site.  A 5 mile transmission line and stepdown substation will be required to bring power to the site.  The maps attached as Appendices "D" and "H" illustrates the approximate location of the corridor through which the power line will run.

F.  WATER FIELD AND TRANSMISSION CORRIDOR

Water for the project is proposed to be obtained from the Shadow Valley, Mesquite or Ivanpah Basins, or from Section 16 as described in Section III. I. of this Third Modification.  A water pipeline will be planned to utilize existing right-of-way corridors whenever possible.

G.  COMMUNICATIONS

A microwave telecommunications system will be utilized to provide necessary communications links.

Exhibit A
Page 126

14

## V.   SCHEDULE OF OPERATIONS

Amselco plans to commence engineering procurement and construction of the above described facilities upon the approval of this Third Modification.  These activities will continue for approximately 18 months.  Production operations will endure for approximately 12 years thereafter or until exhaustion of economically recoverable deposits.  This period excludes any underground mining operations which may occur following pit exhaustion.   No extended periods of nonoperation are contemplated.  This operational scheduling is submitted as an amendment to the Schedule for Operational Phasing discussed in Part E. of Chapter III. of the Plan of Operations.

## VI.   ALTERNATIVES

### A.   FACILITY SITING ALTERNATIVES

In addition to the above described facility siting, Amselco has considered several alternative siting options.  Siting alternatives were reviewed in order to identify the preferred tailings impoundment, waste rock, heap leach and millsites for development of the Colosseum Project.  The selection of sites for study was based on a multi-attribute approach which considered such factors as the unique physiographic area encompassing the Colosseum Project, the history of storm runoff and the need to avoid all streambeds and washes to allow for continued sedimentation and meandering, the historical and archeologic significance of the area, the unique plant species and wildlife encountered in the area and the desirability of utilizing existing access, transmission and utility corridors in order to minimize disruption to land and to scenic values.  Following is a synopsis of the siting alternatives considered:

(i)   No Action Alternative

The no action alternative would leave the site in its present state.  Surface disturbance caused by mineral exploration and historic mining events would remain.  The Project site would remain available for future attempts to develop it as a mine or for any use within the limits of the land use policies that apply to the area.  The Project area is presently zoned Rural Conservation by the San Bernardino County General Plan and would thus also continue to be subject to potential urban expansion and to increasing mineral development pressure.

The no action alternative violates the mining laws of the United States which entitle Amselco to mine on its patented and unpatented mining claims.  The "no action" alternative thus may not be imposed on Amselco.

(ii)   Waste Rock Disposal Site Alternatives

In its feasibility evaluation study, Amselco reviewed 2 waste rock sites.  These sites are identified as W1 and W2 on the map attached as Appendix "H".  Both sites are deemed as preferred sites due to their proximity to the mine site which would lessen visibility concerns and mini-

mize land use and disruption.

(iii) Tailings Impoundment Alternatives

Amselco reviewed 3 tailings impoundment sites. All of these sites are illustrated on the map attached as Appendix "H". The tailings impoundment site review mainly reflected the influence of economic and environmental factors. Although the preferred site (see T1 on Appendix "H") is in an area of high cultural significance, it is centered on pre-cambrian rock which is far more favorable from a water quality perspective than the other sites and would better protect scenic resource by enabling Amselco to concentrate its area of operations. In addition, the area of disturbance will be minimized.

Sites T2 and T3 are not considered favorable due to their proximity to potential ground water sources, to recreation areas and to a wilderness study area and due to the much greater area of disturbance which would result from their selection.

(iii) Millsite Alternatives

Amselco reviewed 4 mill site alternatives, all of which are illustrated on the map attached as Appendix "H".

As is clear from the illustrations, siting of milling facilities is based primarily on topography and proximity to either the mine area or to the tailings impoundment site. Siting is thus dependent on location of tailings. The preferred millsite (M1) is favored due to its proximity to the mine site and to the preferred tailings site. Concentration of facilities in this manner will minimize the visual and other environmental impacts of the project.

The other sites, located west and north of the mine, were eliminated from consideration due to their potential impact on visual and ground water resources and to topographic and other economic factors.

(iv) Leach Site Alternatives

Exhibit A
Page 129

17

Also, as can be seen from the map attached as Appendix "H", Amselco has considered several alternative heap leach sites. Of these sites, leach sites L1 and L2 are the preferred sites due largely to geographic, topographic and environmental considerations. These sites also avoid all of the areas that have been earlier identified as sensitive areas from a wildlife or vegetation perspective.

B.    PROCESS ALTERNATIVES

As stated in Section IV. A. of this Third Modification, Amselco's proposed mining operations will consist of both milling and heap leach processes. Other process alternatives were reviewed for use in lieu of or in parallel with the above described mining operations. These options were reviewed as appropriate to the processing of the different types of ore encountered at the Colosseum Mine site.

(i)    Milling with Flotation

This alternative, which would be implemented in lieu of the previously described milling process, involves the crushing and grinding of ore in a similar manner as described in the milling operation. The finely ground ore slurry would be treated by a flotation process in which the gold would be collected in a flotation concentrate. Minor quantities of xanthate salts and alcohols as reagents would be added during the flotation process. The concentrate would then be leached in a dilute cyanide solution and the gold recovered via the CIP process. Part C. and Phase III of Part E. of Chapter III of the Plan of Operations further describes this process alternative.

Use of this process will be dependent on the type of ore encountered. Amselco's review of this process will be ongoing until commencement of operations.

(ii)    Underground Mining

An ultimate mining method may occur after open pit ore exhaustion is underground mining for potentially deeper ores. This method is further described in Part A. and in Phase IV of Part E. of Chapter III of the Plan of Operations.        Amselco

Exhibit A
Page 130

18

will continue its feasibility review of this method for later use in parallel with its milling and leaching operations.

The above process alternatives were evaluated by the BLM and San Bernardino County during their review of the Plan of Operations.

C.    ACCESS CORRIDOR ALTERNATIVES

Amselco reviewed 2 routes as potential access corridors (see Appendix "H").    Despite being the longest route the preferred route, was selected due to its avoidance of previously identified sites of historic and cultural significance and due to Amselco's ability to utilize existing right-of-way corriders which will result in a minimum of additional environmental disturbance.

D.    POWER TRANSMISSION LINE ALTERNATIVES

The only source alternative available to Amselco is that described in Part E. of Section IV hereof.    Amselco selected this siting alternative in order to avoid previously identified sites of high cultural significance.

E.    WATER FIELD AND TRANSMISSION ALTERNATIVES

Based on current information, the Shadow Valley Basin and Section 16 provide the only reliable sources of water in the vicinity of the mine site.    The Mesquite and Ivanpah Basins will nevertheless continue to be considered in the event further evaluations of the Shadow Valley Basin and Section 16 prove inconclusive.    Use of an existing right-of-way corridor for placement of the pipeline is planned in order to minimize environmental impact.

## VII.   IMPACTS

### A.   WILDLIFE AND VEGETATION

The affect that Amselco's operations will have on wildlife and vegetation has been assessed in documents incorporated by reference above and in the Plan of Operations as First and Second Modified.  Previous analyses concluded that there were no species of protected vegetation in the area which may be affected by Amselco's operations and that there are no threatened or endangered species of wildlife which may be affected by the program.

### B.   CULTURAL RESOURCES

In its approval of Phase I of the Plan of Operations, the only reservations expressed by the BLM concerned the effect of Phases II through V on archeological resources in the mine area. Amselco's mining operations will indeed have far less impact on those areas earlier identified as potential National Register Districts than the activities contemplated by the Plan of Operations as originally submitted and approved.  Siting of the necessary facilities at any of the siting alternatives described above will not impact most of the areas identified by the Needles area archeologist on August 18 and 19, 1981, as sensitive areas. Specifically, Amselco's proposed activities will avoid the area marked as "1B" on the Archeological Reconnaissance Map prepared in conjunction with the BLM'S review of the Plan of Operations. In addition, the remainder of the archeologic sites identified on the Archeological Reconnaissance Map (I.E. 3A-C, 4A-C, 5A-F, 6A-C, 7A-B and 8A-D) will not be impacted.  All of the foregoing were protection measures recommended by the Needles area archeologist in her review of the Plan of Operations.

The only sensitive site which will be impacted by Amselco's operations is the site in Section 15 which has recently been the subject of intensive review by Michael Lerch of the San Bernardino County Museum Association.  Amselco will excavate, catalogue and curate as necessary the resources identified in the foregoing assessment in accordance with the protection/recovery plan which will be prepared and submitted by Michael Lerch in his continuing review of the identified site.

Amselco believes that the level of cultural resource review which has been conducted  and which is currently underway is fully adequate for the conduct of its operations.

### C.   SOCIOECONOMIC

Due to the small size of the operation and to the significant size of the urban complex which will provide potential

employees and services, the Colosseum Project should have only a minimal affect on the employment, income, schools and housing in the area and will not impose significant additional burdens on local services.

D.   LAND USE

Existing San Bernardino County zoning and general plan designations do not prohibit the location of a mine at the proposed site.   In addition, the BLM mining, land use and surface management laws authorize such use.

It is not  expected that the Colosseum Project will result in any significant adverse land use impacts in the Las Vegas urban complex.  Such a complex should be well prepared to accommodate any land use changes resulting from new housing or other facilities which may be constructed because of project-related population.

E.   AIR QUALITY

Air quality impacts contemplated by Amselco's activities will be minimal and insignificant.  They will consist primarily of vehicle emissions from the equipment listed above, dust from vehicle activity on dirt roads, blasting, loading and unloading and wind-blown dust from exposed surfaces and emissions from crushing operations.  Amselco will comply with applicable federal, state and local air quality control regulations.

F.   WATER QUALITY

The activities proposed will also comply with applicable federal, state and local surface and groundwater water quality laws.  Amselco has initiated contact with the Lahontan Regional Water Quality Board for purposes of seeking discharge approval for its proposed activities as a modification of the approval already given by the Board under Board Order No. 6-82-17 for the Phase I operations proposed in the Plan of Operations.  Because Amselco's activities will not discharge trash or fill materials below the headwaters of a stream or into a waterway that is part of a surface tributary system connecting interstate waters or traditionally navigable waters, activities affecting local gulches are authorized by nation-wide permits under Section 404 of the Clean Water Act and applicable regulations.  Amselco will comply with all the applicable conditions of such nation-wide permits.  No discharge of pollutants into surface or ground waters is anticipated from the proposed activities.

G.   SOLID WASTES

All wastes, including refuse, trash and debris will be disposed of in ways which will minimize degradation. Amselco's operations will be in full compliance with federal, state and local laws governing disposal of solid or hazardous wastes.

H.    RECREATION

Since Amselco's proposed operations will avoid primary recreation areas, impact on recreation will be minimal.

I.    NOISE

Construction activities including grading of access roads, erection of structures and the installation of necessary equipment, will cause various levels of noise. Operational activities including noise from crushers, vehicles, blasting, milling and/or removal operations will also produce various levels of noise. Noise created by these operations will be controlled by scheduling major activities in daylight hours whenever possible and by providing employee protection in accordance with the California General Industrial Safety Ordinance and the Occupational Safety and Health Act of 1973. Hearing protection will be provided when work is required in high noise areas.

J.    VISUAL RESOURCES

In the "Clark Mountain ACEC - Resource Management Plan", the BLM recognized that even the developed part of the Clark Mountain ACEC maintained a high degree of scenic quality due to terrain and vegetation cover which effectively screen man's activities, notably mines and access roads. By locating its operations well off of Interstate 15 and by siting facilities in a manner designed to concentrate operations, Amselco will minimize the visual impact of the Project.

Exhibit A
Page 134

22

## VIII.    ENVIRONMENTAL PROTECTION PROGRAM

An environmental protection program will be on-going during all parts of the proposed operations. This program will incorporate all reasonable measures to prevent unnecessary or undue degradation of affected property, including control and strict supervision of approved vehicle and machinery access; posting and maintenance of appropriate warning signs; or where necessary to protect the general public, implementation of access restriction measures in the form of gates and/or cables, berms, fences and posting of notices; and all other measures required to ensure compliance with applicable regulations. See Appendix "I" for discussion of reclamation phasing.

In all other respects, Amselco will conduct its proposed operations in a manner which will prevent unnecessary and undue degradation to disturbed or affected areas.

## IX.   RECLAMATION PLAN

Reclamation of those areas affected by activities described in the Plan of Operations as First, Second and Third Modified will be made in accordance 43 CFR 3809.1-3(d) and in the manner described in Chapter IV of the Plan of Operations as supplemented in relevant part by the Reclamation Plan attached as Appendix "I".   In all other respects, Amselco will comply with all federal, state and local reclamation requirements.

Amselco will be pleased to provide any additional information or to discuss the contents of this Third Modification. Please contact the undersigned at the number given for Amselco's Denver, Colorado office if there are any questions or if Amselco can be of any further assistance.

D. Stafford Johnson, Esq.

Exhibit A
Page 136

24

APPENDIX B

Exhibit A
Page 137

STAKED BY AMSELCO

KG #1 through KG #93 Claims

AMSELCO EXPLORATION INC.

| Claim # | BLM # | County Information |
|---|---|---|
| KG #1 | CA MC 145233 | 84-041919 |
| KG #2 | CA MC 145234 | 84-041920 |
| KG #3 | CA MC 145235 | 84-041921 |
| KG #4 | CA MC 145236 | 84-041922 |
| KG #5 | CA MC 145237 | 84-041923 |
| KG #6 | CA MC 145238 | 84-041924 |
| KG #7 | CA MC 145239 | 84-041925 |
| KG #8 | CA MC 145240 | 84-041926 |
| KG #9 | CA MC 145241 | 84-041927 |
| KG #10 | CA MC 145242 | 84-041928 |
| KG #11 | CA MC 145243 | 84-041929 |
| KG #12 | CA MC 145244 | 84-041930 |
| KG #13 | CA MC 145245 | 84-041931 |
| KG #14 | CA MC 145246 | 84-041932 |
| KG #15 | CA MC 145247 | 84-041933 |
| KG #16 | CA MC 145248 | 84-041934 |
| KG #17 | CA MC 145249 | 84-041935 |
| KG #18 | CA MC 145250 | 84-041936 |
| KG #19 | CA MC 145251 | 84-041937 |
| KG #20 | CA MC 145252 | 84-041938 |
| KG #21 | CA MC 145253 | 84-041939 |
| KG #22 | CA MC 145254 | 84-041940 |
| KG #23 | CA MC 145255 | 84-041941 |
| KG #24 | CA MC 145256 | 84-041942 |
| KG #25 | CA MC 145257 | 84-041943 |
| KG #26 | CA MC 145258 | 84-041944 |
| KG #27 | CA MC 145259 | 84-041945 |
| KG #28 | CA MC 145260 | 84-041946 |
| KG #29 | CA MC 145261 | 84-041947 |
| KG #30 | CA MC 145262 | 84-041948 |
| KG #31 | CA MC 145263 | 84-041949 |
| KG #32 | CA MC 145264 | 84-041950 |
| KG #33 | CA MC 145265 | 84-041951 |
| KG #34 | CA MC 145266 | 84-041952 |
| KG #35 | CA MC 145267 | 84-041953 |
| KG #36 | CA MC 145268 | 84-041954 |
| KG #37 | CA MC 145269 | 84-041955 |
| KG #38 | CA MC 145270 | 84-041956 |
| KG #39 | CA MC 145271 | 84-041957 |
| KG #40 | CA MC 145272 | 84-041958 |
| KG #41 | CA MC 145273 | 84-041959 |
| KG #42 | CA MC 145274 | 84-041960 |
| KG #43 | CA MC 145275 | 84-041961 |
| KG #44 | CA MC 145276 | 84-041962 |

Exhibit A
Page 138

STAKED BY AMSELCO

| Claim Name | BLM # | County Information |
|---|---|---|
| Marsh | Not available | 84-146281 |
| Lillee | Not available | 84-146282 |
| Chappell | Not available | 84-146283 |
| | | |
| Columbia | 36493 | Book 321   Page 494 |
| Columbia No. Two | 36494 | Book 321   Page 529 |
| Columbia No. Three | 36495 | Book 322   Page 362 |
| Columbia No. Four | 36496 | Book 328   Page 138 |
| Cholla | 36492 | Book 485   Page 221 |

Exhibit A
Page 139

| | | |
|---|---|---|
| KG #45 | CA MC 145277 | 84-041963 |
| KG #46 | CA MC 145278 | 84-041964 |
| KG #47 | CA MC 145279 | 84-041965 |
| KG #48 | CA MC 145280 | 84-041966 |
| KG #49 | CA MC 145281 | 84-041967 |
| KG #50 | CA MC 145282 | 84-041968 |
| KG #51 | CA MC 145283 | 84-041969 |
| KG #52 | CA MC 145284 | 84-041970 |
| KG #53 | CA MC 145285 | 84-041971 |
| KG #54 | CA MC 145286 | 84-014972 |
| KG #55 | CA MC 145287 | 84-014973 |
| KG #56 | CA MC 145288 | 84-041974 |
| KG #57 | CA MC 145289 | 84-041975 |
| KG #58 | CA MC 145290 | 84-041976 |
| KG #59 | CA MC 145291 | 84-041977 |
| KG #60 | CA MC 145292 | 84-041978 |
| KG #61 | CA MC 145293 | 84-041979 |
| KG #62 | CA MC 145294 | 84-041980 |
| KG #63 | CA MC 145295 | 84-041981 |
| KG #64 | CA MC 145296 | 84-041982 |
| KG #65 | CA MC 145297 | 84-041983 |
| KG #66 | CA MC 145298 | 84-041984 |
| KG #67 | CA MC 145299 | 84-041985 |
| KG #68 | CA MC 145300 | 84-041986 |
| KG #69 | CA MC 145301 | 84-041987 |
| KG #70 | CA MC 145302 | 84-041988 |
| KG #71 | CA MC 145303 | 84-041989 |
| KG #72 | CA MC 145304 | 84-041990 |
| KG #73 | CA MC 145305 | 84-041991 |
| KG #74 | CA MC 145306 | 84-041992 |
| KG #75 | CA MC 145307 | 84-041993 |
| KG #76 | CA MC 145308 | 84-041994 |
| KG #77 | CA MC 145309 | 84-041995 |
| KG #78 | | 84-041996 |
| KG #79 | | 84-041997 |
| KG #80 | | 84-041998 |
| KG #81 | | 84-041999 |
| KG #82 | | 84-042000 |
| KG #83 | CA MC 145310 | 84-042001 |
| KG #84 | CA MC 145311 | 84-042002 |
| KG #85 | CA MC 145312 | 84-042003 |
| KG #86 | CA MC 145313 | 84-042004 |
| KG #87 | CA MC 145314 | 84-042005 |
| KG #88 | CA MC 145315 | 84-042006 |
| KG #89 | CA MC 145316 | 84-042007 |
| KG #90 | CA MC 145317 | 84-042008 |
| KG #91 | CA MC 145318 | 84-042009 |
| KG #92 | CA MC 145319 | 84-042010 |
| KG #93 | CA MC 145320 | 84-042011 |

2

APPENDIX E

Exhibit A
Page 141

# WHOLE ORE CYANIDATION FLOWSHEET COLOSSEUM PROJECT

Case 2:26-cv-04002-CAS-AS  Document 20-2  Filed 06/23/26  Page 142 of 258  Page ID #:275



APPENDIX F

Exhibit A
Page 143



APPENDIX G

Exhibit A
Page 145

## COLOSSEUM PROJECT

### MOBILE AND MISCELLANEOUS CAPITAL EQUIPMENT LIST

|  | Equipment Req No |
|---|---|
| **Mobile Equipment List** | |
| IR DM-25-SP Drill (6.5-In. Dia.) | 2 |
| 5-TN ANFO Truck | 1 |
| 3/4-TN Powder Truck | 1 |
| Cat 992C Front End Loader (13-CY) | 2 |
| Cat 773B Rear Dump Truck (50-TN) | 5 |
| Cat 824C Wheel Dozer ("S" Blade) | 1 |
| Cat 14G Grader | 1 |
| Cat 772B Prime Mover | 1 |
| 12,000-Gallon Water Wagon | 1 |
| 10-TN Rear Dump Truck (Used) | 1 |
| 800-Gallon Fuel & Lube Truck | 1 |
| OTR Service Truck | 1 |
| D8K Cat Dozer ("S" Blade & Ripper) | 1 |
| 6-TN Forklift | 1 |
| 35-TN Crane | 1 |
| 825 Bobcat (60-In. Bucket) | 1 |
| 3-TN Forklift | 1 |
| 5-TN Freight Truck | 1 |
| Ambulance | 1 |
| 1-TN Flatbed with 400 Amp Welder | 1 |
| 1-TN Mechanics Truck for Pit | 1 |
| 300-Amp Welders Mounted on Trailers | 2 |
| 30-Ft Light Tower Sets | 5 |
| Pit Office Trailer/Lunch Room | 1 |
| 3/4-TN Pickup 4x4 | 13 |
| Chevy Blazer 4x4 | 7 |
| 1-TN Pickup 4x4 With Utility Rack | 4 |
| **Miscellaneous Equipment** | |
| 600-AMP Welder | 1 |
| Steam Cleaner | 1 |
| Vacuum | 1 |
| Fuel & Lube Storage Tanks | LS |
| Fuel, Lube & Tire Shop Equipment | LS |
| Electrical Shop Equipment | LS |
| Piping & Plumbing Shop Equipment | LS |
| Heavy Equip. Repair Shop Equpment | LS |
| Carpenter's Shop Equipment | LS |
| Machine Shop Equipment | LS |
| Fire Fighting Equipment, Portable | LS |
| Mobile Radios - Plus Base Unit | 32 |

Total Initial Capital

Exhibit A
Page 146

APPENDIX I

RECLAMATION PLAN

INTRODUCTION

Presented in the following sections is a reclamation plan for the Colosseum Project operations of Amselco Exploration Inc. The project site is located in the Clark Mountain Range of San Bernardino, California, approximately three miles north of Clark Mountain and two miles south of Keany Pass. The mining operations will be predominatly located in R13E, T17N.

The major elements of the project, and their probable locations include:

1. East and west open-pits in Section 10.

2. Tailings disposal area in Section 15.

3. Millsite generally located in the same sections as the tailings disposal area, or an adjacent section.

4. Haul roads between the open-pits and the millsite, and an access road from the millsite to the tailings disposal area.

5. A tailings pipeline and water return line between the millsite and the tailings disposal area.

6. A water pipeline extending from the millsite to supply pumping wells located in Section 17 and 18 of R12E, T17N.

ENVIRONMENTAL SETTING

The mine site is located on relatively steep slopes of the Clark Mountain Range. The tailings disposal area will be a head of canyon configuration located on shallow alluvial fans of ephemeral streams, or on residual soils weathered from underlying Cambrian and Precambrian rocks. The elevations of the various elements of the project will range approximately 4400 to 5600.

The Colosseum Mine is located in Cambrian and Precambrian rocks. The proposed tailings disposal site located in Section 15 will be founded predominatly on similar geologic materials. However, a thrust fault system at the western boundary of this section separates the Cambrian and Precambrian rocks from a limestone sequence.

The climate at the project site is characterized by annual precipitation of 10 to 12 inches. The semi-arid climate of the site results in a net evaporation of approximately 46 inches. Because of the relatively dry climate, there are no surface waters on the project site, and ephemeral runoff is minimal.

1

Exhibit A
Page 148

There is a diversity of scrub type vegetatioin and minimal grasses.

RECLAMATION PHASING

Preoperation

The initial phase of reclamation will include access restriction measures in the form of gates, berms and fences to protect the general public.  All buildings and other infrastructure will be colored to blend in with the surrounding environment.  Paleontological, archaeological and historical resource mitigation measures will be implemented.  The initial geotechnical and hydrological investigations have been planned to avoid such resources to the fullest extent possible.  These investigations have incorporated the input of BLM and County personnel, particularly as regards the archaeological site that has been located in Section 15.  It is anticipated that the site discovered will be examined and mapped, with artifacts removed by qualified archaeologists and deposited in appropriate institutions.

During construction of the millsite, tailings impoundment and pipeline, access road corridors and salvageable topsoil will be stockpiled for future use in reclamation.  The extent and amount of salvageable topsoil has not yet been determined, but will be addressed in the presently planned geotechnical investigation. It is expected that the most topsoil will be salvaged from the impoundment area, because it intercepts an ephemeral drainage, and receives slope wash from adjacent foothills.  It is noted that the vegetation appears to increase downstream of the Section 15 impoundment site, perhaps because of the change in geologic environment.

Prior to startup, any ephemeral streams situated in a tailings impoundment area may be diverted.  Because of the typically steep topography and minimal vegetation, the diversions will require extensive construction, resulting in a large amount of disturbance to site areas.  The diversion channels will be graded and the sidewalls sloped and armored to minimize erosion.  As an alternative to initial diversion, the tailings dam may be designed to store runoff from the Probable Maximum Flood (PMF) with appropriate residual freeboard above the PMF storage level.  For this alternative approach, diversion channels would be contoured around the edge of the tailings basin during the last part of operating using mine waste rock to construct dikes and channel linings.

Sediment catch basins will be constructed as required. Revegetation would be by natural processes, since precipitation events are typically few.

During Operation

2

After project startup, a program of establishing native vegetation will begin on the downstream slopes of the tailings impoundment, depending on the method of staged construction selected. If, as anticipated, downstream construction is used, reestablishment of native vegetation on the impoundment slopes would not be initiated. Similarly, mine dumps will exist with their natural angle of response, and reclamation of these areas will depend on natural revegetation processes to assure compatability with the local arid environment. Revegetation programs would be ineffectual for a continuously growing waste dump, though the presence of granular materials would enhance the reestablishment of naturally occurring plant species.

Areas that will not be further disturbed, such as access road and pipeline corridors, and millsite areas, will be graded to slopes suitable for revegetation and to prevent excessive erosion due to surface runoff. Sediment retention basins are not planned for these areas, however, swales, berms and other grading features will be incorporated to divert or temporarily retain surface runoff from larger precipitation events. To the extent practical, salvageable topsoil in the corridor areas will be reused in grading. Reseeding with plants indigenous to the high desert area and compatible with the local environment will be accomplished when and where feasible. Water conservation will be a focal issue of plant operations, thus, reestablishment of plant life will rely largely on natural processes.

Postoperation

Postoperation reclamation activities will center on the tailings impoundment and waste dump areas. The downstream slope of the tailings impoundment will be covered with mine waste rock to minimize erosion. The granular characteristic of the rock will provide sites for both moisture and seed entrapment. This, coupled with natural weathering processes, will enhance the natural productivity of indigenous plant life. Reestablishment of compatible vegetation on the waste dump slopes and surface will also be by natural processes.

The top of the tailings impoundment will be covered with mine waste rock, or salvaged topsoil to the extent available, and reseeded with plants indigenous to the existing environment, or that have been successfully established in a similar environment and in similar tailings. The top of the tailings will be graded to direct surface runoff and prevent long-term ponding of precipitation.

Diversion channels constructed upstream of the tailings impoundment, if used during operation, would remain essentially unchanged after cessation of operations. The ephemeral stream presently passing through the Section 16 tailings disposal area would remain diverted, if initially diverted. Reclamation pro-

3

cedures initiated prior to operation and established during operation would not require continuation. Grades and slopes established during these periods would have been confirmed as to applicability and successful operation. Any problems with initial designs would have been corrected and an effective working design established during the operation period.

Pipeline, maintenance road and access road corridors would be regraded to natural contours to the fullest extent practical. Potential effects of erosion due to the surface runoff would be mitigated by use of berms or other low visibility swales and diversions. Natural praocesses would be augmented by selective reseeding to reestablish natural vegetation.

The seepage collection pond downstream of the tailings impoundment would remain in operation for several years following active deposition in the tailings impoundment. This area and the open-pits would require appropriate measures necessary to protect the general public that trespass onto the property. The reclaim pond will be fenced, and remaining access or maintenance roads will have berms placed on them to discourage entrance and minimize opportunity for casual accidents. Berms will also be placed on the waste dumps and the tailings impoundment for the same reason.

## ULTIMATE RECLAMATION AND POTENTIAL LAND USES

The project site will ultimately exhibit two open-pits, a waste dump and a tailings pile. These will not be visible from the major highway (I-15) located northeast of the site because of the intervening Clark Mountain Range. All or part of these project elements will be visible from the south. However, the parts of mine dump and the tailings impoundment visible will blend into the general color of the mountain backdrop once vegetation is reestablished, and as the natural oxidation process continue on the exposed rocks or reseeded topsoil. Both the tailings impoundment and the waste dump will be visible as mesas, but will be revegetated to blend into the natural landscape.

All buildings and equipment in the millsite area will be removed if no other beneficial use is foreseen. All foundations will be removed or covered with mine waste rock or salvaged topsoil. Revegetation by natural processes would be augmented by reseeding and selective contouring, as required. Parking lots, roads and other paved areas, if no other beneficial use is foreseen, would also be covered or removed in order to minimize access and reduce any physical hazards that could impact the general public.

The potential land uses of the project site are very speculative. Adjacent areas have been used primarily for mining. Grazing, farming or other such uses are not foreseen at this time. Most likely, the lands will revert hack to a natural condition determined by factors existing at the time. It is anticipated that

4

the site will return to a state of natural productivity.

The open-pits will remain.  It is not anticipated that a permanent pool of water, either from surface runoff or ground-water, will collect in the pits.  The perimeter of the pit will be graded or berms will be placed to intercept and divert runoff.

In the arid mountain environment, any groundwater infiltrating into the pits will likely be evaporated.  To protect the tres-passing general public from casual accidents, the pits will be fenced and warning signs posted.

The existing wells at the Section 15 site will remain as monitor-ing wells.  During operaton, they will be included in the seepage monitoring program, and could be included in a contingency plan established to mitigate any seepage of contaminated fluids from the impoundment.

5

Exhibit A
Page 152



Exhibit A
Page 153



# SECTION 5



**AMSELCO EXPLORATION INC.**

999 Eighteenth Street, Suite 1201
Denver, Colorado 80202-2484
Telephone: (303) 292-6722
Telex: 450069
Facsimile: (303) 298-1294

December 7, 1984

Roger Britton
Bureau of Land Management
901 3rd Street
Needles, California  92363

Re:  Amendment to "Third Modification to Reclamation Plan
     and Plan of Operations"/Colosseum Project

Dear Roger:

As we have earlier discussed, continuing engineering and geotechnical feasibility studies have resulted in our identifying certain changes in operations described in the Third Modification to the Reclamation Plan and Plan of Operations ("Third Modification") submitted to the Bureau of Land Management ("BLM") on July 17, 1984.  As will be discussed further below, the primary focus of these changes is in the areas of project design, equipment to be utilized in operations, facility siting within the "Area of Impact" (see Appendix "D" to the Third Modification), location of the preferred access road and the project schedule.  You will please note that the project design and facility siting changes will not result in impact beyond the aforementioned "Area of Impact".  The access route proposed in this Amendment is the only significant departure from the operations described in the Third Modification.  All of the foregoing changes have been discussed with EMSI and will be reviewed in the joint federal-state EIS-EIR currently in preparation.

This letter is thus to serve as Amselco's formal submittal of an Amendment to the Third Modification in accordance with the requirements of 43 CFR Section 3809.1-7.  Reference is made to the Plan of Operations, the First Modification, the Second Modification as Amended and the Third Modification for a description of the operator, for the location of operations, for a description of operations other than as amended hereby, for environmental analyses, for alternatives considered, for a discussion of impacts, for a description of environmental and reclamation plans and for all other requirements of 43 CFR Section 3809 et seq.

PROJECT DESIGN

You will recall that under Section IV of the Third Modification, styled "Description of Proposed Mining Operations", Amselco described its mining operations as including both a mil-

Exhibit A
Page 156



ling and heap leach program.  Based on the results of continuing engineering, geotechnical and financial reviews, Amselco now intends to conduct only a milling program.  Amselco will nevertheless continue to study the mining and processing of oxide ore by the heap leach process, as well as underground mining, as alternatives for later use in parallel with the milling operations.

The extent of proposed mining operations contemplated by Amselco under this new scenario will be on the high side of the ranges described in the "Process" subsection under Section IV of the Third Modification.  Amselco's operations are designed to operate 8 hours per shift, 3 shifts per day, 7 days per week, 360 days per year.  Total pit production will average approximately 6.5 million tons of material per year over at least a 9 year mine life.  The mine is planned to supply the mill with from 1 to 1.5 million tons of ore per year at a rate of between 3.5 and 5.5 thousand tons per day.

The ore will be transported from the pit by haul trucks and dumped into a loading pocket ahead of the primary jaw crusher. The jaw crusher product will be conveyed to the fine crushing plant which will contain a cone crusher and vibrating screen. The fine crushed product will be conveyed to a stockpile and from there to rod and ball mills.  A dilute solution of cyanide, water and lime slurry will be added to the crushed product at the mill. Slurry will then be discharged to a sump and thereafter to a cyclone.  Cyclone underflow will be returned to the ball mill and cyclone overflow will pass to a thickener.  The overflow from the thickener will be processed for gold recovery in a series of carbon-in-column ("CIC") tanks.  The underflow from the thickener will be pumped to a train of agitated leach tanks where gold will dissolve in a dilute solution of cyanide.  The discharge from the leach tanks will pass to a series of carbon-in-pulp ("CIP") tanks where the dissolved gold will be absorbed onto activated carbon.

Gold will be desorbed from the carbon and recovered from solution by electrowining onto steel wool cathodes and finally processed in small electric furnaces.  The gold-silver product, known as dore', will be shipped periodically to a custom refinery.

Tailings from the CIP process will be discharged via pipeline to the tailings impoundment area.  A flow sheet attached to this Amendment as Appendix "A" illustrates the process.

## EQUIPMENT

In Subsection C. under Section IV of the Third Modification,

Exhibit A
Page 157



reference is made to Appendix "G" to the Third Modification for a list of equipment to be utilized in operations. Attached to this Amendment as Appendix "B" is an updated equipment list which should replace the list in Appendix "G" to the Third Modification.

## FACILITY SITING WITHIN "AREA OF IMPACT"

As described in the "Infrastructure" subsection under Section IV of the Third Modification, Amselco contemplates a crushing facility, mill facility, maintenance facility, office buildings, outdoor storage areas and several other support buildings as part of its operations. These sites were illustrated in Appendices "D" and "F" to the Third Modification.

Due to changes in project design, Amselco has relocated certain facilities within the same general area as illustrated in the above Appendices. Attached to this Amendment as Appendix "C" is a site plan which illustrates this relocation.

## ACCESS CORRIDOR

The "Access Corridor" subsection under Section IV of the Third Modification proposes access to the Colosseum area via Interstate 15 and across approximately 13 miles of an existing dirt road used to service the Los Angeles Power District's power line ("Power Line Access Route"). This access route is illustrated on the map attached as Appendix "H" to the Third Modification. As an alternative to the Power Line Access Route, Amselco had considered the Colosseum Gorge Access Route (See Appendix "H" to Third Modification). However, based on discussions with the BLM, it became apparent that the Colosseum Gorge Access Route was not a feasible alternative because of potential impacts on historic and cultural resources. In addition, Amselco determined that construction of the Colosseum Gorge Access Route would require substantial blasting through a two-mile long canyon, an extremely difficult if not impossible task. Consequently, the Colosseum Gorge Access Route alternative has been discarded.

Since submittal of the Third Modification, the BLM and the Los Angeles Power District have raised significant objections to the Power Line Access Route. The BLM is concerned about potential adverse impacts to the environment, particularly to Big Horn sheep in the area. The Los Angeles Power District is concerned about the effect of road construction, primarily blasting, on its transmission towers and lines, as well as the effects of dust



from vehicle traffic on power transmission.

Because of these objections, Amselco has studied other alternative access routes. Of those studied, only two routes are considered as feasible:  the "Mountain Pass Access Route" and the "Cima Access Route".  Both of these routes are illustrated on the map attached to this Amendment as Appendix "D".  For the reasons outlined below, Amselco now proposes to gain access by the Mountain Pass Access Route because it is environmentally and economically superior to the Cima Access Route.

The Mountain Pass Access Route entails use of Interstate 15, then construction of a dirt road almost due north to the project site from a point on Appendix "D" marked "Mountain Pass".  The new road will be approximately 7 miles long.  It will be con- structed for the minimum required width and will follow natural contours to the extent practical.  It will avoid all known cul- tural and historic resources and any known sensitive wildlife or plant species.

About 1 1/4 miles of this route unavoidably crosses the eastern end of Wilderness Study Area 227 (portions of Sections 35, 32 and 27).  It is not possible to construct the road to by-pass WSA 227 because the terrain to the east of this area is simply too rugged and environmentally sensitive to construct a road.  However, if Congress ultimately determines to designate WSA 227 as wilderness (which appears unlikely because the BLM has recommended that WSA 227 is not suitable for wilderness designa- tion), Amselco can reclaim the road through the wilderness study area after mining operations have ended so that any evidence of the road is effectively obliterated.

The Cima Access Route involves following Interstate 15 about 8 miles past the Mountain Pass turn-off, then following existing paved roads north about 8 more miles, then turning northeast along the Los Angeles Power Line Corridor about 6 miles, then south to the project site about 5 more miles.  In other words, the Cima Access Route involves going all the way around WSA 227 to gain access to the Colosseum Project.

Although the Mountain Pass Access Route crosses a small portion of WSA 227, Amselco proposes this route rather than the Cima Route for the following reasons:

1.    The Cima Access Route is some 20 miles longer than the Mountain Pass Access Route.  If Amselco is forced to utilize the Cima Route, it will incur $70,000-100,000 per year more in operational costs than if the Mountain Pass Access Route is used.  Over the life of the mine, the additional cost incurred in utilizing the Cima Road Access Route thus approaches $1,000,000.

Exhibit A
Page 159



2.  The Mountain Pass Access Route is adjacent to the proposed power transmission line route.  By confining the access and power corridors to one area, the visual impact of development is minimized.

3.  Since the Mountain Pass Access Route is substantially shorter, it will have less of an air quality impact from exhaust emissions and dust generated by vehicle traffic.  Less fuel will also be consumed by Amselco personnel.

4.  While the Cima Access does not cross into a wilderness study area, it runs along the southern boundry of WSA 225 for 5 miles, the western boundary of WSA 227 for 1/2 mile and the northern boundry of WSA 227 for 2 miles.  Thus, use of the Cima Road will actually have greater visual, noise and air quality impacts on wilderness study areas than construction of the shorter, more direct, Mountain Pass Access Road.

5.  The Cima Access Route could also have an adverse impact on the Los Angeles power line corridor which it follows for 6 miles.

6.  Finally, an indirect advantage to the Mountain Pass Access Route is that it would help solve an access problem for holders of grazing leases.

Amselco recognizes that the BLM is generally required to manage wilderness study areas so as not to impair their suitability for wilderness designation.  43 U.S.C. 1782 (c).  However, an unpaved access road through approximately one mile of the eastern edge of WSA 227 will not impair the suitability of the area for wilderness designation, particularly since the road can be completely reclaimed when production operations have ended (about 10 years from now).

Moreover, the nonimpairment standard is subject to "valid existing rights".  43 U.S.C. 1701 note.  The mining claims which comprise the Colosseum Project include patented claims which granted fee title to Amselco's predecessors in interest, and unpatented claims for which a valid discovery was made prior to the enactment of FLPMA on October 21, 1976.  Accordingly, Amselco qualifies as having valid existing rights.  See Solicitor's Opinion on Valid Existing Rights, 88 I.D. 909 (1981).

Under the Department's "Interim Management Policy and Guidelines for Land Under Wilderness Review", construction of access roads is permitted where the applicant has valid existing rights and "there is no reasonable, less impairing, alternative



access available".    44 Fed. Reg. 72014, 72026 (Dec. 12, 1979). In our view, there is no reasonable, less impairing alternative to the Mountain Pass Access Route.  The Power Line Access Route and the Colosseum Gorge Access Route have previously been objected to for the reasons set forth above.   This leaves only the Cima Access Route as an alternative to the Mountain Pass Access Route.   The Cima Access Route is not a reasonable alternative because it is about 20 miles longer and will cost $1,000,000 more to operate over the life of the mine.  As discussed earlier, it also is not "less impairing".   In fact, even though the Cima Access Route will not extend directly into a wilderness study area, it will nonetheless have a greater environmental impact on wilderness study areas than the Mountain Pass Access Route.

In short, the BLM is not required by the nonimpairment standard to choose a less environmentally preferable access route merely because the Mountain Pass Access Route crosses one mile of a wilderness study area.  Indeed, since the wilderness study area affected by the Mountain Pass Access Route has already been recommended as not suitable for wilderness designation in a document approved by the Riverside and Bakersfield District BLM offices, by the California State BLM office and by the Office of the United States Secretary of Interior (See 1980 CDCA Desert Plan prepared by the Desert Planning Staff of the BLM), it would seem that reasons which might support objecting to approval of the Mountain Pass Access Route on the grounds of its traversing a wilderness study area have been adequately reviewed and addressed.  Responsible management policy thus would clearly justify your approval of the Mountain Pass Access Route as the less environmentally sensitive route.   And finally, it must be re-emphasized that selection of any route other than the Mountain Pass Access Route, in combination with the financial impact of other mitigating conditions, may render the project incapable of full economic development.

Since Amselco has valid existing rights, with the right of reasonable access to exercise such rights, and since the Mountain Pass Access Route can clearly be justified as the less environmentally sensitive route, the BLM thus should permit access via the Mountain Pass Access Route.

## PROJECT SCHEDULE

Amselco plans to commence engineering procurement and construction of the necessary facility upon the approval of the Third Modification as now amended.   These activities will continue for approximately 12 months.  Production operations will endure thereafter for approximately 9 years or until exhaustion of economically recoverable deposits.  This period excludes any



under-gound mining operations which may occur following pit ex-
haustion.  No extended periods of non-operation are contemplated.
Attached to this Amendment as Appendix "E" is a sequence of pit
plans which illustrate the expansion of operations to exhaustion.
The above schedule is submitted as an amendment to Section V of
the Third Modification.

In addition to access route alternatives, Amselco has, for
descriptive purposes, included in Appendix "D" to this Amendment
the water line and power transmission routes described in the
Third Modification.  These routes are identified in Appendix "D"
as the "Water Line Route" and the "Power Transmission Corridor",
respectively.

You will also note that illustrated on Appendix "D" to this
Amendment are alternative water line and power transmission
routes which have been considered by Amselco.  These alternatives
are labeled as "Water Line Route-A" and "Power Transmission
Corridor-A", respectively.  Although both these alternatives are
considered feasible by Amselco, neither is considered a preferred
route due primarily to environmental factors.  As is evident from
Appendix "D", our preferred "Water Line Route" utilizes an exist-
ing right-of-way corridor and thus will result in far less envir-
onmental impact than "Water Line Route-A".  "Power Transmission
Corridor-A", though again a feasible alternative, is a far in-
ferior alternative since our preferred "Power Transmission
Corridor" will utilize the same route as traversed by our pre-
ferred access route and thereby will minimize impacts.

Finally, for purposes of clarification, please find attached
as Appendix "F" to this Amendment an updated land status map
which should replace Appendix "C" to the Third Modification.

As before, in the event you require any additional infor-
mation concerning these changes, we will be pleased to convey to
you the necessary explanatory information.  I am

                                        Cordially,



                                        D. Stafford Johnson, Esq.


DSJ/mas




Exhibit A
Page 162

Exhibit A
Page 163



APPENDIX B
EQUIPMENT LIST

MINING AND MAINTENANCE EQUIPMENT

| ITEM | NUMBER |
|---|---|
| 6-3/4" drill | 3 |
| sec. drill | 1 |
| 7 yd F.E.L. | 3 |
| 35 ton truck | 13 |
| Track dozer (D-8) | 1 |
| R.T.. dozer (824) | 1 |
| Grader (14-Q) | 1 |
| Water truck (5000 gal) | 1 |
| Light plants | 4 |
| PU trucks | 3 |
| Explosive truck | 1 |
| ANFO truck | 1 |
| Man van | 1 |
| Dewatering pump | 1 |
| | |
| Crane, rough terrain 60 ton | 1 |
| Maintenance service truck | 1 |
| Fork lift 12 ton | 1 |
| Fork lift 3 ton | 1 |
| | |
| Portable welder 600 Amp | 2 |
| Lube truck | 1 |
| Pickups | 7 |
| Flat bed with aux. hoist 5 ton | 1 |
| Backhoe 3/4 cubic yard bkt. | 1 |
| Dump truck 10 cubic yard | 1 |
| Diesel elec. gen. set 250 KW | 1 |
| 45 ton RT 745 crane | 1 |
| 2 ton service truck (mine maintenance) | 1 |
| 12 ton H60XL fork lift | 1 |
| 3 ton H130F fork lift | 2 |
| 600 Amp portable diesel big 40 welders | 2 |
| Lube & top off fuel truck | 1 |
| Tool crib stock | 1 |
| 100 ton press (shop) | 1 |
| Drill press & grinder | 1 |
| Lathe | 1 |
| Vehicles | 6 |
| 5 ton flatbed | 1 |
| Winch (crusher) | |
| 680 case back hoe | 1 |
| Shop air compressor (150 psi, 110 cfm) | 1 |
| Portable air compressor (150 psi, 150 cfm) | 1 |
| 10 yard dump truck | 1 |
| Lube & diesel fuel tank (51,000 gallon total) | 1 |
| Lube pump (shop & transfer fuel dock | 1 |
| Computer terminal | 1 |
| 100 ton press (crusher site) | 1 |
| 600 Amp welders, electrical 480V | 3 |
| Generator set 250 KW | 1 |

Exhibit A
Page 164

Appendix C Site Plan

Appendix E P Plans







Exhibit A
Page 168











Exhibit A
Page 173



# SECTION

# 6

ZO#     9612042                                    8Þ:SI ZO/ZO    CI
                                                                 BLM


AMSELCO
EXPLORATION INC.

999 Eighteenth Street, Suite 1201
Denver, Colorado 80202-2484
Telephone: (303) 292-6722
Telex: 450069
Facsimile: (303) 298-1294

July 2, 1985

Ev Hayes
Bureau Area Manager of Land Management
Needles Resource Area
901 3rd Street
Needles, California  92363

Dear Ev:

Thank you for your correspondence of June 28, 1985.  As you
requested, this letter should clarify Amselco's present position
concerning the access and powerline routes as they affect Wilder-
ness Study Area 227.  In addition, I hope to satisfy your con-
cerns regarding Bill Havert's letter to me of June 17, 1985.

First, as we agreed with the Sierra Club and as summarized
in my letter to Bill Havert of June 14, 1985, in return for the
Sierra Club's agreement not to pursue any further appeals, either
judicial or administrative, of our permit or similar approval
grants, and to coordinate with other groups in their network to
ensure that no further appeals occur, Amselco has agreed to
desist in our efforts to pursue the Mountain Pass route as our
project access and powerline route and to utilize the BLM
preferred route, the Cima Road route, as our access route, and
the BLM's preferred powerline route, in our operations plan.
Thus, since neither the power line route nor the access route
will impact WSA 227, and since Amselco now agrees to utilize the
routes preferred by your office, there does not appear to be a
need to further evaluate the reasonableness of the Mountain Pass
route.

In addition to agreeing to utilize your preferred routes,
Amselco has agreed to work with the Sierra Club, the Bureau of
Land Management and the State of California in implementing
access control measures which may reduce non-project related
traffic into the mine site, to welcome Sierra Club input re-
garding a more specific reclamation plan which we will be dis-
cussing with the BLM midway through the project life, and to work
with the Sierra Club in developing a reasonable offsite mitiga-
tion program which should benefit the East Mojave area, all of
which, of course, will be implemented through your offices.  It
has never been questioned that the BLM has jurisdiction over uses
of property under its management authority and indeed our discus-
sions with the Sierra Club concerning offsite mitigation, recla-
mation and access control were simply designed to reach agreement
concerning a joint position which will be presented to the BLM
for review.  I look forward to our future discussions in this

Exhibit A
Page 176



regard and hope that the letters exchanged between Amselco and the Sierra Club have not led to any misunderstanding.

If you require any further clarification of our position as concerns WSA 227 or any other matter, please let me know at your earliest convenience.  I am

Cordially,

D. Stafford Johnson
Senior Attorney and
Assistant Secretary

cc:  Ed Hastey
     Louise Hall
     Bill Havert

# SECTION

# 7

Exhibit A
Page 178

3800
EIS-85-69-1792-1

DECISION RECORD

AMSELCO COLOSSEUM PROJECT

1.    INTRODUCTION

In July 1984 Amselco Exploration, Inc. applied to the Bureau of
Land Management for approval of a plan of operations (with
amendments in December 1984 and June 1985) for the extraction and
milling of gold ore.  An Environmental Impact Report/Environmental
Impact Statement (EIR/EIS) subsequently was prepared for the county
of San Bernardino and BLM to meet the requirements of the
California Environmental Quality Act (CEQA) and the National
Environmental Policy Act (NEPA).  The environmental review process
ended on August 26, 1985 with the completion of the comment period
on the Final EIR/EIS (no comments were received on the Final
EIR/EIS).  This document represents the decision record for the
EIS/EIR and is intended to meet the requirements of the Code of
Federal Regulations (CFR), Title 40, Part 1505--NEPA and Agency
Decision Making.

The project site is located within San Bernardino County,
California, approximately eight miles west of the Nevada state
border, and approximately 6 miles north of the town of Mountain
Pass, California.  It is located within the Clark Mountain Range in
the California Desert Conservation Area.

Amselco's proposal involves open pit mining of the underground
Colosseum Mine, which has been active intermittently since the
1870's.  Amselco's proposal includes milling, cyanidation in a
closed circuit for gold and silver extraction, and development of a
waste disposal facility.  The proposed life of the project is 11 to
12 years, including 2 years for construction/development.  Mining
and milling operations would occur for 9 years and reclamation for
one year.  During the 9 year operational life of the mine, an
anticipated 12 million tons of gold-bearing ore, or 1.4 million
tons per year would be produced, containing an estimated average of
0.064 ounces of gold per ton.  In addition, approximately 40
million tons of waste rock and some 3 million tons of low grade ore
also would be produced.  The low grade ore would be stockpiled for
possible future processing.  The extracted gold ore would be hauled
approximately onehalf mile to the crusher and milling facilities
where the gold would be recovered and processed in the form of gold
dore bullion for periodic shipment to a custom refinery.

The project components would be located on 600 acres of public land
and 40 acres of patented lands and include mine pits, haul roads,
waste rock dumps, crusher/mill/refinery and shop complex, a
tailings impoundment, an onsite electrical substation, water
storage tanks, suitably fenced areas (refinery and tailings
impoundment), access corridors for vehicles, power transmission
lines, and a water pipeline.  Most of the approximately 200 project
employees would be transported by bus to and from Las Vegas on a
daily basis.

Exhibit A
Page 179

II.    DECISION

BLM approves the proposed plan of operations in conjunction with certain stipulations and mitigation measures developed through the NEPA process (mitigation measures are discussed in section V). This decision applies only to that part of the project located on public lands.  The major decisions on this project are:

1.    Access route: The route identified as "Powerline West" in the EIS/EIR is the approved route (refer to Section 2.6, page 2-48, of the Draft EIS/EIR).  This route runs north from the project site to a Los Angeles Department of Water and Power transmission line road, then west to Excelsior Mine Road, a paved county road which joins Interstate 15 to Las Vegas, Nevada.

2.    Power transmission route: The route identified as BLM's preferred route on page 5-27 of the Draft EIS/EIR and page 1-3 of the Final EIS/EIR is approved.  The powerline is to connect with a substation 2 miles north of Mountain Pass then follows a route north by north west to the project site.

3.    Water line route: The applicant's preferred water line route is the approved route (refer to page 5-27 of the Draft EIS/EIR and page 1-3 of the Final EIS/EIR).  This route would run eastward from a well, located 10 miles west of the project site, to a point where it joins a dirt road (used as an annual motorcycle race course) and continues east to the project access road and on to the project site.  A distribution line is approved to run adjacent to the water line to supply power to the well and pumping stations.

4.    Project component sitings: The "core" components, which include waste rock dumps, mill, shop complex, and tailings disposal site, are approved as negotiated with Amselco during development of the plans of operation and the draft EIS/EIR (see page 1-4 of the Final EIS/EIR and page 2-11 of the Draft EIS/EIR for the general layout of the project).

5.    Operation methods: Methods of operation are approved as proposed in the plans of operations (see section 2.3 of the Draft EIS/EIR for details of proposed operations).

III.    ALTERNATIVES CONSIDERED AND RATIONALE

Five alternatives were considered.

1.    Access routes: Six routes were considered.  These routes are shown in Figure 2.6-1 of the Draft EIS/EIR and figure 1-3 of the Final EIS/EIR.  Of these six routes, two were ruled out early in the review process.  These two routes were eliminated from consideration for reasons of steep grades, engineering costs, and environmental concerns.  One route through Colosseum Gorge would have caused serious impacts to vegetation, scenic, historic, and archaeological resources (BLM is proposing the eventual closeure of this route to

vehicular traffic to protect these resources).  The other route would have traversed extremely steep escarpments by means of switchbacks resulting in considerable expense and visual scarring.

Of the remaining four routes, there was no clear environmental preference.  However, for nonenvironmental reasons (see section IV), Amselco asked that their preferred (and proposed) route, originating at Mountain Pass and passing through Wilderness Study Area 227, be removed from consideration.  BLM accepted this request.  As the remaining three routes involved environmental tradeoffs with no clear environmentally preferred alternative, Amselco was asked to state their preference.  The company chose the route identified as "Powerline West".  This route, therefore, became the approved route.

2.  Water Line Routes: Three water line routes were considered. Two of these routes were similar and considered more environmentally suitable than the selected route.  These two routes were not selected due to excessive operating and construction costs.  An additional consideration was that even though the selected waterline is not environmentally preferred, it is only a temporary impact (life of project). (Refer to sections 4 and 5 of the Draft EIS/EIR for detailed analysis of the water line routes).

3.  Alternate Siting of components (waste rock dumps, refinery, crusher, mill, shop complex, and tailings disposal site): Numerous possible siting of components were considered.  The environmentally preferrable sites were selected and approved.

Eleven tailings impoundment sites were considered.  Eight were dropped for a combination of environmental and economic reasons.  Three of these eight sites involved Wilderness Study Areas and were dropped as reasonable nonwilderness study sites were available.  Of the three sites to which Amselco and the BLM agreed to give serious consideration, two were rejected due to potential impacts to ground water quality in Shadow Valley and due to the pipeline length and costs involved.  The remaining site became the approved site.

Six waste rock dumps were considered.  Two were rejected due to costs based upon haul distances, steep haul grades, and visual impacts.  The remaining four were considered to be environmentally preferable and were approved for use (under the mine plan all four sites will be used).

Five mill sites were considered.  One site was eliminated as it involved using the Colosseum Gorge road which was considered environmentally unacceptable.  One site was eliminated due to travel distances and steep grades.  One site was rejected due to visual impacts and the unacceptable nature of an adjacent tailings impoundment site.  Another site was not selected because of economic and environmental reasons. The selected site permitted a more compact project area and less overall visual disturbance.

Exhibit A
Page 181

The resulting overall approved configuration results in mining, waste rock dumps, mill and tailings being as close together as is consistent with safe and efficient project operations. It also is environmentally preferable (less total area disturbed, less visual impact and less dust and vehicle emissions). These impacts are evaluated in depth in section 5 of the draft EIS/EIR.

Three proposed leach pad sites and an uncrushed ore stockpile site were originally considered. However, they have since been withdrawn from the plan of operations.

4.  Powerline routes: Two alternate powerline routes were considered originally. Environmental differences between the two routes were minor, however, one route had the same nonenvironmental concerns as the Proposed Mountain Pass accesss route through WSA 227 and was withdrawn by Amselco for the same reasons. Therefore, the remaining route was approved (this route was also the agency's preferred route for non-environmental reasons, as discussed in section IV).

5.  No project alternative. This alternative is environmentally preferable. Since the BLM's policy is to promote the development of mineral resources in an environmentally sound manner, this alternative was rejected as being inconsistent with Federal Law and the Bureau's Mineral Policy. (See section IV).

IV.  NONENVIRONMENTAL FACTORS

Nonenvironmental factors given consideration were federal mineral surface management regulations, federal mineral policies, management policies of the East Mojave National Scenic Area, California Desert Conservation Area Plan, federal regulations, and policies for management of wilderness study areas.

"It is the policy of the Department of the Interior to encourage the development of federal mineral resources and reclamation of disturbed lands." Under the various mining laws (e.g. The General Mining Law of 1872) a person has a statutory right, consistent with Departmental regulations (e.g., Code of Federal Regulations, Title 43, Subpart 3809, Surface Management), "...to go upon the unappropriated and unreserved federal lands for the purpose of mineral prospecting, exploration, development, extraction, and other uses reasonably incident thereto. This statutory right carries with it the responsibility to assure that operations include adequate and reasonable measures to prevent undue and unnecessary degradation of the environment and to provide for reasonable reclamation".

The project is within the scope and intent of the California Desert Conservation Area Plan of 1980, as amended. Briefly, this plan required that the CFR, Title 43, 3800 regulations be followed.

Concerns about prevention of impairment of wilderness study areas were addressed in the draft EIS/EIR. The Bureau also identified actions that avoided utilization of wilderness study areas as agency preferred in the EIS/EIR. This issue received a number

Exhibit A
Page 182

of comments from the public and the BLM concluded that the draft EIS/EIR was inadequate and that more information would be required before a decision could be made concerning possible impairment of WSA 227 (this involved the proposed Mountain Pass access route and adjacent powerline). Amselco voiced concerns about possible delays to obtain additional information and possible extensive delays from potential litigation by groups opposed to development within wilderness study areas. Given these concerns, Amselco requested that the access route and powerline route through WSA 227 be withdrawn from further consideration. The BLM accepted the request, resulting in the project being considered under Title 43, CFR, subpart 3809 (Surface Management) rather than Title 43, CFR, subpart 3802 (Exploration and Mining, Wilderness Review Program) regulations. Therefore the wilderness study concerns became a moot issue. The agency's concerns and reasoning are discussed thoroughly in the Final EIS/EIR.

The project is consistent with the Management Philosophy Statement for the East Mojave National Scenic Area. This Statement gave special emphasis to the maintenance of scenic quality of the area; therefore, reduction of visual contrasts became one of the primary considerations during the preparation of the EIS (e.g. compact placement of the project components helped reduce overall scenic impairment).

MITIGATING MEASURES

This section summarizes additional measures that Amselco will be required to take in order to minimize the environmental impact. Measures to minimize the environmental impact that are part of the original plan of operations are not necessarily repeated here (refer to the EIS/EIR for measures described in the plans of operations).

Items that are not within the scope of the federal surface management regulations and items that fall within the jurisdiction of other agencies (e.g. dam safety, hazardous waste, employee safety) are not repeated here. The additional measures are as follows:

Mitigating during operation.

1.    Appropriate warning signs will be posted.

2.    Discussion with local ranchers will be held to determine compensation (if any) for any cattle adversely affected by mine traffic.

3.    An alternate source of water will be provided for the holder of the grazing lease.

4.    Buildings, water pipeline, and other infrastructures will be colored and sited to minimize visual impacts.

5.    A topsoil salvage program will be implemented to remove and stockpile topsoil from the tailings disposal area. This topsoil will be used to cover disturbed areas and provide a seedbed for revegetation attempts.

6.    Existing road beds will be used where possible.

7. An ongoing reclamation plan will be implemented.

8. Spatial concentration of facilities will be implemented to minimize impact on wildlife and habitat.

9. A wildlife water facility will be established at a BLM approved site.

10. The water line will be buried where recommended in order to facilitate movement of desert tortoise.

11. Amselco's offer to provide up to eight hours of helicopter time per year for five years is accepted. The helicopter time is to be used to monitor the local bighorn sheep population.

12. A program will be implemented for bone and tissue biopsies of small mammals and birds to establish baseline lead content; periodic reports will be made to California Department of Fish and Game.

13. There will be strict control of sodium cyanide inventory and other measures as required by the Regional Water Quality Board.

14. An emergency spill prevention plan will be developed as concerns hazardous waste and materials.

15. A closure and post-closure hazardous waste maintenance plan will be implemented.

16. A bond (a joint bond with the Regional Water Quality Board if possible) will be obtained in an amount agreed upon with BLM to cover possible hazardous waste accidents and cleanups.

17. If gullying or rill formation occurs, erosion control devices will be installed and affected slope monitored to assess effectiveness of remedial action.

18. Frequent watering or chemical stabilization of operating surfaces, including ore stockpiles, will be implemented as a dust control measure.

19. Mitigation for cultural resources will be followed as agreed upon by BLM and the State Historic Preservation Officer.

Post-operation mitigations

1. Revegetation of native species will be attempted through reseeding when and where feasible (including tailings impoundment) using salvaged topsoil.

2. Top of tailings will be graded to direct surface runoff and prevent long-term ponding.

3. Pipeline, maintenance road, and access road corridors will be regraded to natural contours to the extent practical.

Exhibit A
Page 184

4.  Buildings and equipment will be removed and foundations and parking lots covered with mine waste rock or salvaged topsoil if no beneficial use for these areas is forseen.

5.  The tops of waste rock, tailings, dumps, and roads will be reclaimed to conform with topography and to encourage natural revegetation.

6.  The seepage collection pond located downstream of the tailings impoundment will remain if permitted by Regional Water Quality Board.

7.  Pits will be fenced and posted with warning signs.

VI.  ENFORCEMENT MEASURES TO BE TAKEN

The project is in an area that is patrolled regulary by BLM rangers who will report any violations or noncompliance that they observe.  The project also will be inspected periodically by BLM compliance officers. If serious violations are found the BLM has the authority to obtain court orders to shut the operations down, if necessary, until violations or noncompliance situations are corrected.  A bond has been required to ensure compliance with hazardous waste measures.  A reclamation bond also will be required if ongoing reclamation measures and other mitigation measures are not observed during the project operation.

_____          _10 Sep 85_
Area Manager, Needles Resource Area                  Date
California Desert District
Bureau of Land Management

Exhibit A
Page 185

# SECTION 8

IN REPLY REFER TO:

## United States Department of the Interior

### BUREAU OF LAND MANAGEMENT

3809
PO-28632
(C-069.24)

NEEDLES RESOURCE AREA
901 THIRD STREET
NEEDLES, CALIFORNIA 92363
(619) 326-3896

CERTIFIED MAIL #138-808-010
RETURN RECEIPT REQUESTED

Desmond P. Kearns
Vice President
Colosseum California, Inc.
1600 Stout Street, Suite 1910
Denver, Colorado  80202

OCT 3 1 1986

Dear Mr. Kearns:

Per your instructions at the meeting your staff had with the Needles Resource Area Staff on October 28, 1986 I am withdrawing consideration of the fourth amendment to the Amselco plan of operations submitted by Bateman Process Services.

I have approved Colosseum California Inc. as the new operator of Amselco's plan of operations for the Colosseum Mine.  This approval is for the original plan of operations for development of the mine and the related three amendments submitted by Amselco.  This approval is subject to certain stipulations, notices, and mitigating measures which are listed below.

MITIGATING MEASURES AND STIPULATIONS

In addition to the procedures described in both the plan of operations and amendments, certain mitigating measures and stipulations apply to the project.  (These measures were discussed with and agreed to by Amselco for which you have also agreed to take responsibility for as the new operator.) The stipulations and mitigating measures are listed in the Decision Record is enclosed.

1.  Item number 16 under "V. MITIGATING MEASURES" is changed to read as follows: Before construction and operations may begin the proper bonds must be obtained.  A surety bond in the amount of $244,140.00 (two hundred fourty four thousand, one hundred fourty dollars) will be obtained with the Bureau of Land Management the beneficiary.  The bond will be released upon completion of adequate reclamation measures and a determination by this agency that this approval letter and your plan of operations has been adhered to.  (Please contact Rob Waiwood at (714) 351-6367 for help on the bond if it is needed).  A cash deposit, a pledge by a commercial bank of a book entry deposit, or a letter of credit will suffice in lieu of a surety bond. Whichever of these methods is used the end result must be the same. The BLM must be guaranteed the funds for reclamation should the operator fail to perform reclamation or go bankrupt.  The bond size

was developed in a meeting with a Mr. David M. Singel of Crosby and Overton ENvironmental Management Inc. who served as your representative. Actual construction may begin once this bond has been obtained.

You may begin actual operations (operations at the millsite and related facilities) once a permit from the Water Quality Board and the associated bond has been obtained. The bond with the Water Quality Board will need to be made a joint bond with the Bureau of Land Management listed as a co-beneficiary.

2.  Item number 19 under "V. MITIGATING MEASURES: is changed to read as follows: The Data Recovery/Protection Plan for cultural resources will be followed as agreed to by BLM, the State Historic Preservation Officer, and the Advisory Council on Historic Preservation. I have enclosed a letter to Amselco dated September 13, 1985 for your reference.

3.  This approval authorizes the construction of the access route identified as the "Powerline West Road" in the final environmental impact statement (EIS-85-69-1792-1). Be aware that you have submitted an amendment which would create a different primary access road. Construction should not begin on the access amendment. The amendment, if approved, will be approved in lieu of the original approval. If major construction has begun on the "Powerline West Road" then we will have no choice but to deny the amendment as undue and unnecessary degradation per the 43 CFR 3809 regulations. As discussed in your meeting with the Needles Resource Area staff on October 28, 1986, minor improvements of existing roads, with the exception of the Colosseum Gorge road, may be made to facilitate construction at the mill site.

4.  This approval authorizes the construction of "Waterline Alternate A" as identified in the final EIS. It is my understanding that Colosseum California inc. intends to submit an amendment for a new waterline. As with the powerline, the amendment will be denied as undue and unnecessary degradation if major construction has started on the approved waterline. The amendment, if approved, will be approved in lieu of the original approval.

5.  This approval authorizes the construction of the powerline identified as BLM's Preferred Powerline Route" in the final EIS. A powerline amendment is under review and it is my understanding that Colosseum California Inc. intends to further modify the proposed amendment. Again, as with the access route, the amendment will be denied as undue and unnecessary degradation if major construction has started on the approved waterline. The amendment, if approved, will be approved in lieu of the original approval.

NOTICES

In addition to the above stipulations, the following notices apply to our approval of your plan of operations.

1.  This approval is not intended to make a statement on the validity or lack of validity of the claims involved.

Exhibit A
Page 188

2.   The operator is required to obtain all necessary state, federal and local permits before beginning operations.

3.   This approval is not intended to cover patented mining claims issued prior to October 21, 1976.

4.   The Needles Resource Area Manager shall be notified upon beginning of operations and at least one month prior to the completion or termination of operations.

5.   The Needles Resource Area Manager shall be notified upon beginning of reclamation measures.

You have the right to appeal this decision ot the California State Director, Bureau of Land Management, in accordance with 43 CFR 3809.4.  If you exercise this right, your appeal, accompanied by a statement of reasons and any arguments you wish to present, which would justify reversal or modification of the decision, must be filed in writing at this office within 30 days after the date of this decision.  This decision will remain in effect during appeal unless a written request for a stay is granted.

Your cooperation with this office has been appreciated.  We are looking forward to a long and cooperative working relationship with California Colosseum Inc.

Sincerely,

Everell G. Hayes
Area Manager, Needles


Enclosure

cc: Mr. Joe Bellandi, County of San Bernardino
     Office of Planning
   Lahontan Water Quality Control Board
   Mr. Robert Sinclair
     Bateman Process Services Ltd.

Exhibit A
Page 189

3800
EIS-85-69-1792-1

## DECISION RECORD

## AMSELCO COLOSSEUM PROJECT

I.    INTRODUCTION

In July 1984 Amselco Exploration, Inc. applied to the Bureau of
Land Management for approval of a plan of operations (with
amendments in December 1984 and June 1985) for the extraction and
milling of gold ore.  An Environmental Impact Report/Environmental
Impact Statement (EIR/EIS) subsequently was prepared for the county
of San Bernardino and BLM to meet the requirements of the
California Environmental Quality Act (CEQA) and the National
Environmental Policy Act (NEPA).  The environmental review process
ended on August 26, 1985 with the completion of the comment period
on the Final EIR/EIS (no comments were received on the Final
EIR/EIS).  This document represents the decision record for the
EIS/EIR and is intended to meet the requirements of the Code of
Federal Regulations (CFR), Title 40, Part 1505--NEPA and Agency
Decision Making.

The project site is located within San Bernardino County,
California, approximately eight miles west of the Nevada state
border, and approximately 6 miles north of the town of Mountain
Pass, California.  It is located within the Clark Mountain Range in
the California Desert Conservation Area.

Amselco's proposal involves open pit mining of the underground
Colosseum Mine, which has been active intermittently since the
1870's.  Amselco's proposal includes milling, cyanidation in a
closed circuit for gold and silver extraction, and development of a
waste disposal facility.  The proposed life of the project is 11 to
12 years, including 2 years for construction/development.  Mining
and milling operations would occur for 9 years and reclamation for
one year.  During the 9 year operational life of the mine, an
anticipated 12 million tons of gold-bearing ore, or 1.4 million
tons per year would be produced, containing an estimated average of
0.064 ounces of gold per ton.  In addition, approximately 40
million tons of waste rock and some 3 million tons of low grade ore
also would be produced.  The low grade ore would be stockpiled for
possible future processing.  The extracted gold ore would be hauled
approximately onehalf mile to the crusher and milling facilities
where the gold would be recovered and processed in the form of gold
dore bullion for periodic shipment to a custom refinery.

The project components would be located on 600 acres of public land
and 40 acres of patented lands and include mine pits, haul roads,
waste rock dumps, crusher/mill/refinery and shop complex, a
tailings impoundment, an onsite electrical substation, water
storage tanks, suitably fenced areas (refinery and tailings
impoundment), access corridors for vehicles, power transmission
lines, and a water pipeline.  Most of the approximately 200 project
employees would be transported by bus to and from Las Vegas on a
daily basis.

Exhibit A
Page 190

II.    DECISION

BLM approves the proposed plan of operations in conjunction with certain stipulations and mitigation measures developed through the NEPA process (mitigation measures are discussed in section V). This decision applies only to that part of the project located on public lands.  The major decisions on this project are:

1.    Access route: The route identified as "Powerline West" in the EIS/EIR is the approved route (refer to Section 2.6, page 2-48, of the Draft EIS/EIR).  This route runs north from the project site to a Los Angeles Department of Water and Power transmission line road, then west to Excelsior Mine Road, a paved county road which joins Interstate 15 to Las Vegas, Nevada.

2.    Power transmission route: The route identified as BLM's preferred route on page 5-27 of the Draft EIS/EIR and page 1-3 of the Final EIS/EIR is approved.  The powerline is to connect with a substation 2 miles north of Mountain Pass then follows a route north by north west to the project site.

3.    Water line route: The applicant's preferred water line route is the approved route (refer to page 5-27 of the Draft EIS/EIR and page 1-3 of the Final EIS/EIR).  This route would run eastward from a well, located 10 miles west of the project site, to a point where it joins a dirt road (used as an annual motorcycle race course) and continues east to the project access road and on to the project site.  A distribution line is approved to run adjacent to the water line to supply power to the well and pumping stations.

4.    Project component sitings: The "core" components, which include waste rock dumps, mill, shop complex, and tailings disposal site, are approved as negotiated with Amselco during development of the plans of operation and the draft EIS/EIR (see page 1-4 of the Final EIS/EIR and page 2-11 of the Draft EIS/EIR for the general layout of the project).

5.    Operation methods: Methods of operation are approved as proposed in the plans of operations (see section 2.3 of the Draft EIS/EIR for details of proposed operations).

III.   ALTERNATIVES CONSIDERED AND RATIONALE

Five alternatives were considered.

1.    Access routes: Six routes were considered.  These routes are shown in Figure 2.6-1 of the Draft EIS/EIR and figure 1-3 of the Final EIS/EIR.  Of these six routes, two were ruled out early in the review process.  These two routes were eliminated from consideration for reasons of steep grades, engineering costs, and environmental concerns.  One route through Colosseum Gorge would have caused serious impacts to vegetation, scenic, historic, and archaeological resources (BLM is proposing the eventual closeure of this route to

vehicular traffic to protect these resources).  The other route would have traversed extremely steep escarpments by means of switchbacks resulting in considerable expense and visual scarring.

Of the remaining four routes, there was no clear environmental preference.  However, for nonenvironmental reasons (see section IV), Amselco asked that their preferred (and proposed) route, originating at Mountain Pass and passing through Wilderness Study Area 227, be removed from consideration.  BLM accepted this request.  As the remaining three routes involved environmental tradeoffs with no clear environmentally preferred alternative, Amselco was asked to state their preference.  The company chose the route identified as "Powerline West".  This route, therefore, became the approved route.

2.  Water Line Routes: Three water line routes were considered.  Two of these routes were similar and considered more environmentally suitable than the selected route.  These two routes were not selected due to excessive operating and construction costs.  An additional consideration was that even though the selected waterline is not environmentally preferred, it is only a temporary impact (life of project).  (Refer to sections 4 and 5 of the Draft EIS/EIR for detailed analysis of the water line routes).

3.  Alternate Siting of components (waste rock dumps, refinery, crusher, mill, shop complex, and tailings disposal site): Numerous possible siting of components were considered.  The environmentally preferrable sites were selected and approved.

Eleven tailings impoundment sites were considered.  Eight were dropped for a combination of environmental and economic reasons.  Three of these eight sites involved Wilderness Study Areas and were dropped as reasonable nonwilderness study sites were available.  Of the three sites to which Amselco and the BLM agreed to give serious consideration, two were rejected due to potential impacts to ground water quality in Shadow Valley and due to the pipeline length and costs involved.  The remaining site became the approved site.

Six waste rock dumps were considered.  Two were rejected due to costs based upon haul distances, steep haul grades, and visual impacts.  The remaining four were considered to be environmentally preferable and were approved for use (under the mine plan all four sites will be used).

Five mill sites were considered.  One site was eliminated as it involved using the Colosseum Gorge road which was considered environmentally unacceptable.  One site was eliminated due to travel distances and steep grades.  One site was rejected due to visual impacts and the unacceptable nature of an adjacent tailings impoundment site.  Another site was not selected because of economic and environmental reasons.  The selected site permitted a more compact project area and less overall visual disturbance.

The resulting overall approved configuration results in mining, waste rock dumps, mill and tailings being as close together as is consistent with safe and efficient project operations. It also is environmentally preferable (less total area disturbed, less visual impact and less dust and vehicle emissions). These impacts are evaluated in depth in section 5 of the draft EIS/EIR.

Three proposed leach pad sites and an uncrushed ore stockpile site were originally considered. However, they have since been withdrawn from the plan of operations.

4.   Powerline routes: Two alternate powerline routes were considered originally. Environmental differences between the two routes were minor, however, one route had the same nonenvironmental concerns as the Proposed Mountain Pass access route through WSA 227 and was withdrawn by Amselco for the same reasons. Therefore, the remaining route was approved (this route was also the agency's preferred route for non-environmental reasons, as discussed in section IV).

5.   No project alternative. This alternative is environmentally preferable. Since the BLM's policy is to promote the development of mineral resources in an environmentally sound manner, this alternative was rejected as being inconsistent with Federal Law and the Bureau's Mineral Policy. (See section IV).

IV.   NONENVIRONMENTAL FACTORS

Nonenvironmental factors given consideration were federal mineral surface management regulations, federal mineral policies, management policies of the East Mojave National Scenic Area, California Desert Conservation Area Plan, federal regulations, and policies for management of wilderness study areas.

"It is the policy of the Department of the Interior to encourage the development of federal mineral resources and reclamation of disturbed lands." Under the various mining laws (e.g. The General Mining Law of 1872) a person has a statutory right, consistent with Departmental regulations (e.g., Code of Federal Regulations, Title 43, Subpart 3809, Surface Management), "...to go upon the unappropriated and unreserved federal lands for the purpose of mineral prospecting, exploration, development, extraction, and other uses reasonably incident thereto. This statutory right carries with it the responsibility to assure that operations include adequate and reasonable measures to prevent undue and unnecessary degradation of the environment and to provide for reasonable reclamation".

The project is within the scope and intent of the California Desert Conservation Area Plan of 1980, as amended. Briefly, this plan required that the CFR, Title 43, 3800 regulations be followed.

Concerns about prevention of impairment of wilderness study areas were addressed in the draft EIS/EIR. The Bureau also identified actions that avoided utilization of wilderness study areas as agency preferred in the EIS/EIR. This issue received a number

of comments from the public and the BLM concluded that the draft EIS/EIR was inadequate and that more information would be required before a decision could be made concerning possible impairment of WSA 227 (this involved the proposed Mountain Pass access route and adjacent powerline). Amselco voiced concerns about possible delays to obtain additional information and possible extensive delays from potential litigation by groups opposed to development within wilderness study areas. Given these concerns, Amselco requested that the access route and powerline route through WSA 227 be withdrawn from further consideration. The BLM accepted the request, resulting in the project being considered under Title 43, CFR, subpart 3809 (Surface Management) rather than Title 43, CFR, subpart 3802 (Exploration and Mining, Wilderness Review Program) regulations. Therefore the wilderness study concerns became a moot issue. The agency's concerns and reasoning are discussed thoroughly in the Final EIS/EIR.

The project is consistent with the Management Philosophy Statement for the East Mojave National Scenic Area. This Statement gave special emphasis to the maintenance of scenic quality of the area; therefore, reduction of visual contrasts became one of the primary considerations during the preparation of the EIS (e.g. compact placement of the project components helped reduce overall scenic impairment).

## V. MITIGATING MEASURES

This section summarizes additional measures that Amselco will be required to take in order to minimize the environmental impact. Measures to minimize the environmental impact that are part of the original plan of operations are not necessarily repeated here (refer to the EIS/EIR for measures described in the plans of operations).

Items that are not within the scope of the federal surface management regulations and items that fall within the jurisdiction of other agencies (e.g. dam safety, hazardous waste, employee safety) are not repeated here. The additional measures are as follows:

Mitigating during operation.

1.    Appropriate warning signs will be posted.

2.    Discussion with local ranchers will be held to determine compensation (if any) for any cattle adversely affected by mine traffic.

3.    An alternate source of water will be provided for the holder of the grazing lease.

4.    Buildings, water pipeline, and other infrastructures will be colored and sited to minimize visual impacts.

5.    A topsoil salvage program will be implemented to remove and stockpile topsoil from the tailings disposal area. This topsoil will be used to cover disturbed areas and provide a seedbed for revegetation attempts.

6.    Existing road beds will be used where possible.

7. An ongoing reclamation plan will be implemented.

8. Spatial concentration of facilities will be implemented to minimize impact on wildlife and habitat.

9. A wildlife water facility will be established at a BLM approved site.

10. The water line will be buried where recommended in order to facilitate movement of desert tortoise.

11. Amselco's offer to provide up to eight hours of helicopter time per year for five years is accepted. The helicopter time is to be used to monitor the local bighorn sheep population.

12. A program will be implemented for bone and tissue biopsies of small mammals and birds to establish baseline lead content; periodic reports will be made to California Department of Fish and Game.

13. There will be strict control of sodium cyanide inventory and other measures as required by the Regional Water Quality Board.

14. An emergency spill prevention plan will be developed as concerns hazardous waste and materials.

15. A closure and post-closure hazardous waste maintenance plan will be implemented.

16. A bond (a joint bond with the Regional Water Quality Board if possible) will be obtained in an amount agreed upon with BLM to cover possible hazardous waste accidents and cleanups.

17. If gullying or rill formation occurs, erosion control devices will be installed and affected slope monitored to assess effectiveness of remedial action.

18. Frequent watering or chemical stabilization of operating surfaces, including ore stockpiles, will be implemented as a dust control measure.

19. Mitigation for cultural resources will be followed as agreed upon by BLM and the State Historic Preservation Officer.

Post-operation mitigations

1. Revegetation of native species will be attempted through reseeding when and where feasible (including tailings impoundment) using salvaged topsoil.

2. Top of tailings will be graded to direct surface runoff and prevent long-term ponding.

3. Pipeline, maintenance road, and access road corridors will be regraded to natural contours to the extent practical.

Exhibit A
Page 195

4.  Buildings and equipment will be removed and foundations and parking lots covered with mine waste rock or salvaged topsoil if no beneficial use for these areas is forseen.

5.  The tops of waste rock, tailings, dumps, and roads will be reclaimed to conform with topography and to encourage natural revegetation.

6.  The seepage collection pond located downstream of the tailings impoundment will remain if permitted by Regional Water Quality Board.

7.  Pits will be fenced and posted with warning signs.

VI.  ENFORCEMENT MEASURES TO BE TAKEN

The project is in an area that is patrolled regulary by BLM rangers who will report any violations or noncompliance that they observe.  The project also will be inspected periodically by BLM compliance officers. If serious violations are found the BLM has the authority to obtain court orders to shut the operations down, if necessary, until violations or noncompliance situations are corrected.  A bond has been required to ensure compliance with hazardous waste measures.  A reclamation bond also will be required if ongoing reclamation measures and other mitigation measures are not observed during the project operation.


_Everill J Hayes_                              _10 Sep 85_
Area Manager, Needles Resource Area                Date
California Desert District
Bureau of Land Management


Exhibit A
Page 196

8143
(C-069 27)

NEEDLES RESOURCE AREA
901 THIRD STREET
NEEDLES, CALIFORNIA 92363
(619) 326-3896

SEP 13 1985

D. Stafford Johnson
AMSELCO Exploration Inc.
Colosseum Project
999 Eighteenth Street, Suite 1201
Denver, Colorado 80202-2484

Dear Mr. Johnson:

Upon collaborative review by the Bureau of Land Management (BLM), State Historic Preservation Officer (SHPO), and Advisory Council on Historic Preservation (ACHP), a determination of no adverse effect has been reached regarding cultural resources subject to impact consequent to approved Colosseum Mine project operations. Implementation of stipulated measures mitigating resource impacts conditions the effect determination.

The Data Recovery/Protection Plan proposed by Michael Lerch and Philip Wilke of Archaeological Research Unit, University of California-Riverside (February, 1985) has been approved, with emendation. The amendments, corresponding to the approved plan of operations, are as follows:

1.  Incorporation of evaluative stages within the research design for 4-SBr-4889 and 4-SBr-5300 are essential, such that data recovery may be successionally refined and cumulatively justified.

2.  Sites designated as subject to direct and indirect impact require updated recordation conforming to standards set forth by SHPO. The Handbook For Completing An Archaeological Site Record DPR 422 A-G and accompanying forms are provided for contractor dissemination.

3.  Sites designated for avoidance require construction monitoring by an archaeologist to assure preservation.

4.  The selected alternate powerline route has not been assessed for cultural resource values and requires inventory and evaluation in accordance with 36 CFR 800 and California Desert District Programatic Memorandum of Agreement (among ACHP, SHPO and BLM).

Exhibit A
Page 197

5.   AMBELCO, Inc. is encouraged to submit documentation of the contractor's proposed time and labor expenditure and budget elements to the Needles Resource Area Archaeologist for evaluation of cost effectiveness.

6.   Undertakings other than those approved by BLM will be subject to supplemental evaluation of cultural resource values.  Any cultural resources encountered consequent to project operations require the immediate attention of the Needles Resource Area Archaeologist, and the integrity of such resources maintained pending subsequent investigation.

A revised table (after Lerch-February 1985: 40-41) summarizing sites effected by approved operations and relevant mitigative measures is provided for your convenience.

BLM extends its appreciation of AMBELCO's patience and cooperation in processing section 106 review of the National Historic Preservation Act. Should any questions arise regarding the determined course of action, please feel free to contact our archaeologist, George Meckfessel.

Sincerely,
(Sgd) Gary L. Ryan
ACTING FOR

Everell G. Hayes
Area Manager, Needles

Enclosures

Meckfessel/do/9 11 85/DJohnson

Exhibit A
Page 198

IN REPLY REFER TO:

# United States Department of the Interior

## BUREAU OF LAND MANAGEMENT

3809
PO-28632
(C-069.24)

NEEDLES RESOURCE AREA
901 THIRD STREET
NEEDLES, CALIFORNIA 92363
(619) 326-3896

CERTIFIED MAIL #138-808-012
RETURN RECEIPT REQUESTED

OCT 3 1 1986

Desmond P. Kearns, Vice President
Colosseum California Inc.
1600 Stout Street, Suite 1910
Denver, Colorado  80202

Dear Mr. Kearns:

Thank you for the meeting with our staff on October 28, 1986 regarding the Colosseum Mine.  I am approving the proposal submitted by the Mark Group to drill exploratory water wells.  As the changes you made in the meeting result in the proposal being an insignificant modification to the plan of operations no environmental analysis is needed.

This approval is for two exploratory wells #2 and #3, as shown on the enclosed maps.  The wells must be drilled in the existing road.  If more wells are needed, we will be able to handle the request promptly if the sites are kept to existing roads and trails and avoid areas of archaeological significance. I have enclosed a map for your use.

The following mitigating measures apply to this approval.

1. All garbage and human waste disposal shall comply with county and state codes.

2. All drill holes will be sealed by plugging the top three feet with cement (or concrete), or the entire hole filled with sand, gravel or drill chips upon abandonment of the hole.

3. If cultural materials should be encountered during operations, the area shall be avoided until the materials can be evaluated by a qualified archaeologist.

4. Vehicle use is restricted to existing routes of travel.

5. Safety precautions will be taken to divert traffic during the operation.

The following notices apply to this approval:

Exhibit A
Page 199

1.  Approval of this amendment will not now or in the future serve as a determination of the ownership or the validity of any mining claim to which it may relate.

2.  The operator shall obtain all necessary county, state and federal permits before any surface disturbance takes place.  Approval of this amendment is contingent upon obtaining the necessary permits.

Sincerely,

Everell G. Hayes
Area Manager, Needles

Enclosures

cc: Robert F. Kaufmann, The Mark Group

Exhibit A
Page 200



GROUNDWATER EXPLORATORY PROGRAM
SAN BERNARDINO COUNTY, CALIFORNIA

THE MARK GROUP
ENGINEERS & GEOLOGISTS

PROJECT NO. 86-2110.10
DRAWING NO.



Exhibit A
Page 202

# SECTION 9

UNITED STATES DEPARTMENT OF INTERIOR

BUREAU OF LAND MANAGEMENT

CALIFORNIA DESERT DISTRICT

NEEDLES RESOURCE AREA

ENVIRONMENTAL ASSESSMENT FACE SHEET

PROPOSED ACTION  Colosseum Mine Access Road, Powerline, and Water Pipeline Routes

LOCATION  Ivanpah Valley and Clark Mountain

EA NUMBER  CA-069-EA7-23                         CASE FILE/SERIAL NUMBER  PO-28632 (7th amendment)

PROJECT LEADER  Roger Alexander                 Natural Resource Specialist
                        NAME                                         TITLE

| PARTICIPATING STAFF | TITLE | INITIALS |
|---|---|---|
| John Bailey | East Mojave Nat'l. Scenic Area Mgr. | |
| George Meckfessel | Archaeologist | |
| Steve Larson | Range Conservationist | |
| Robin Sell | Wildlife Biologist (acting) | |
| Ron Morrison | Realty Specialist | |
| Susan Woods | Wilderness | |
| | | |
| | | |
| | | |

PROJECT LEADER _____
                        SIGNATURE                              DATE

ENVIRONMENTAL COORDINATOR _____
                        SIGNATURE                              DATE

APPROVED BY: AREA MANAGER _____
                        SIGNATURE                              DATE

Exhibit A
Page 204

I.    Purpose and Need for Action

The purpose of the proposed action is to provide for the construction, operation, and maintenance of ancillary facilities (access road, powerline, and water pipeline) for the Colosseum Mine Project operated by Colosseum California, Inc.  The proposed action is needed to provide the operator with environmentally acceptable and cost-effective routes of access for the ancillary facilities pursuant to 43 CFR 3809.

This document will address only those issues and impacts that are specific to the proposed action.  The Colosseum Mine Project was originally analyzed in detail in a joint Environmental Impact Report/Environmental Impact Statement (EIR/EIS) prepared for San Bernardino County and the Bureau of Land Management (BLM) in 1985. Reference will be made to the EIR/EIS throughout this EA and the reader is directed to the EIR/EIS for more detailed information.

The Colosseum Mine Project is an open-pit gold mine located in the Clark Mountain area in northeastern San Bernardino County.  The mine is located in the California Desert Conservation Area (CDCA), the East Mojave National Scenic Area (EMNSA), and the Clark Mountain Area of Critical Environmental Concern (ACEC).

The original operator, Amselco Corporation, proposed routes of access for the road, powerline, and water pipeline that suited their needs. These routes and alternatives were analyzed in detail in Section 2.6 of the Draft EIR/EIS and shown on Figure 2.3-8 of the Draft EIR/EIS.  The preferred routes are shown on Figure 1-2 in the Final EIR/EIS.

Exhibit A
Page 205

Upon completion of the EIR/EIS, Amselco pulled out and the project was shelved until 1986, when a new operator, Colosseum Mining, Inc., took over. Soon thereafter, the present operator, Colosseum California, Inc. acquired the project.

Colosseum California accepted and agreed to the conditions of the EIR/EIS except for the access road, water pipeline, and powerline. Colosseum California believes that the approved route locations were not optimum in terms of socioeconomic factors, safety considerations, cost-effectiveness, and environmental concerns, and therefore, after considerable analysis, submitted the proposed action for approval. At the same time, a Decision of Record was issued to Colosseum California, and preliminary operations have commenced at the mine site with the EIR/EIS approved access route (Powerline West) being utilized on a temporary basis pending approval of the proposed action.

II.    Description of the Proposed Action and Alternatives

This section will deal only with the proposed action. A brief reference will be made to the "No Action" alternative which will direct the reader to the EIR/EIS for a detailed description of the alternatives already analyzed.

A. Proposed Action (Preferred Alternative) - The proposed action involves the routing of three separate facilities (access road, powerline, and water pipeline) into a single "corridor" (as shown on the attached map).

The proposed access road would begin at the Yates Well exit on Interstate-15 five miles south of the California state line. The proposed access road would utilize existing roads for the first 6 1/2 miles west of the interstate, however the existing road would require upgrading and widening from the current 20 feet to 36 feet.

At a point 6 1/2 miles west of the Yates Well exit, the proposed access road would diverge from the existing road and climb to the top of the ridge on the north side of Colosseum Gorge. This segment of the road would traverse previously undisturbed land and continue on or near the ridge crest for 3 miles until it reached the mine location. This segment of the road would be 36 feet wide also, except where additional width is required to accommodate fill material (at drainage crossings only). Each drainage crossing would utilize culverts to maintain existing drainage patterns. Because the proposed access road would utilize the ridge north of Colosseum Gorge, it is shown as the "Colosseum Ridge" road on the attached map.

The proposed "Colosseum Ridge" road would become a permanent addition to BLM's network of roads when mining operations cease, therefore, reclamation of the road will not be required. The road would be built to BLM specifications.

The 36 foot width of the proposed road is necessary to accommodate the water pipeline and powerline within the disturbed area. Twenty-four feet is required for the road itself while 12 feet is required for the water pipeline and powerline.

Exhibit A
Page 207

The water pipeline would originate in Section 2, T. 16 N., R. 14 E., about 1 1/2 miles west of the Yates Well exit. It would proceed north for 1/4 mile to a pumping station 35 ft. by 40 ft. in size. From the pumping station, the water pipeline would be located within the 36 foot wide disturbed area for 4 1/2 miles until it reached the second pumping station, then continue westward for another 1 1/4 miles to the base of the ridge. At that point, the pipeline would proceed straight up the ridge for 1/2 mile to avoid the long hairpin curve on the road. At the top of the ridge, the pipeline would intersect the road and be located within the 36 foot disturbed area for the remaining distance to the mine site.

The water pipeline would be located above ground for the entire distance and would be painted to blend in with the natural surroundings.

The powerline would originate at the existing SCE substation located north of Mountain Pass and would parallel the existing powerline for 4 miles northeast to a point in Section 8, T. 16 N., R. 17 E., where the powerline would split into two lines. One line would continue to parallel the existing powerline for another 2 1/2 miles until it intersected the access road, then turn to the east within the 36 foot wide disturbed area for 1/2 mile where it would end at a substation 35 ft. by 25 ft. in size. This line would supply power to the pumping station at the start of the water pipeline.

The other powerline would proceed north from the split point in Section 8, T. 16 N., R. 17 E., for 1 mile until it intersected the

the access road, then turn west onto the 36 foot wide disturbed area and continue westward for 2 miles to the upper pumping station where a second substation would be located. From the second substation, the powerline would follow the water pipeline to the mine site.

Access to the old Colosseum Gorge road would be cut-off by the new road. This would allow for reclamation of the gorge and eventual restoration of riparian vegetation associated with the springs in the gorge.

The powerline, substations, water pipeline, and pumping stations would be removed when mine operations cease, and appropriate reclamation measures would be taken.

B. No Action Alternative - The no action alternative is viable because the EIR/EIS analyzed a range of alternatives for routing of ancillary facilities and the preferred alternatives were selected. Approval of these preferred alternatives is implied. The no action alternative would therefore be a denial of a plan of operations submitted pursuant to 43 CFR 3809 which are subject only to the prevention of unnecessary or undue degradation.

For detailed analysis and discussion of alternatives to the proposed action, refer to Section 2.6 in the Draft EIR/EIS and Sections 1.0, 3.0, and 4.0 in the Final EIR/EIS.

III. Affected Environment

The reader is directed to Section 4.0 of the Draft EIR/EIS for a

Exhibit A
Page 209

The first 6 1/2 miles of the proposed access road/corridor would traverse fairly important desert tortoise habitat supporting 20-50 tortoise per square mile. The desert tortoise is a BLM sensitive species and is a candidate for listing on the federal threatened or endangered species lost.

The upper 3 miles traverses important deer and desert bighorn (BLM sensitive species) habitat.

The access road/corridor traverses creosote bush scrub, mixed-desert scrub, blackbrush scrub, and pinon-juniper woodland.

The access road/corridor is located within the Clark Mountain grazing allotment, which supports 156 cattle on a year-long basis.

The proposed "Ivanpah Loop" interpretive ORV trail would utilize the first 6 1/2 miles of the proposed access road/corridor and then follow the old Colosseum Gorge road.

The Ivanpah townsite boundary is located 200 meters south and west of the proposed access road/corridor. A Class III intensive cultural resource inventory revealed no cultural resources eligible for inclusion in the National Register of Historic Places located either within or immediately adjacent to the affected area.

Other aspects of the affected environment are adequately described in the EIR/EIS.

Exhibit A
Page 210

IV.  Environmental Consequences

A. Proposed Action (Preferred Alternative)

The proposed action would result in the permanent loss of approximately 30 acres of creosote bush scrub, mixed-desert scrub, blackbrush scrub, and pinon-juniper woodland.  This loss of habitat would result in both direct and indirect impacts to wildlife, especially during the construction phase and during the operating life of the line.  Direct injury/mortality to smaller, less mobile species could result from construction activities and increased traffic.  The desert tortoise would be susceptible to this impact for the first 6 1/2 miles of the proposed access route.  The upper segment of the proposed access route traverses good quality deer and desert bighorn habitat and some disruption of their normal activities is expected to occur, however, this routing proposal avoids the known bighorn migration route that the EIR/EIS preferred access road would cross.

Although the proposed access route would avoid the springs in Colosseum Gorge, it would still be close enough to cause occasional disruptions of wildlife use of the springs.

The presence of a new powerline in the area would increase the possibility of electrocution of raptors, however, modifications to powerpoles can significantly reduce the likelihood of electrocution.

Exhibit A
Page 211

Increased traffic on the access route could result in occasional injury/mortality to livestock in the area.

Users of the proposed "Ivanpah Loop" ORV trail would be inconvenienced during construction of the access route, and would eventually lose the use of Colosseum Gorge road when it is permanently closed off, however, the new access road would be available for public use.

An increase in general recreational use of the area is expected due to the improved access.  This increase in use, while beneficial to recreationists, would eventually result in some adverse impacts to the area in general, which always result from an increase in human use of an area.

The proposed access route/corridor would result in visual impacts, especially where the road climbs the ridge.  This visual impact, while visible from Interstate-15, would not be significant due to distance and topography.  The pumping station and substation nearest to Interstate-15 would be minor intrusions compared to the SCE electrical generating plant currently under construction in Sec. 36, T. 17 N., R. 14 E., (1 mile from the pumping station and substation).

No effects upon cultural properties eligible for inclusion in the National Register of Historic Places is foreseen.  Access to the Ivanpah townsite would be restricted due to the placement of cables and berms on side roads.

Because the Colosseum Gorge road would eventually be closed, restoration of this scenic canyon would be possible.  Spring development and restoration of riparian vegetation is being considered.

The proposed action would not have any effects on threatened or endangered species (plant or animal), nor would it have any effects on wilderness or wilderness study areas beyond those general impacts already discussed in the EIR/EIS.

The following mitigation measures from Section 4.0 of the Final EIR/EIS pertain to the access road, powerline, and water pipeline. These measures were agreed to by the original operator and would be carried over to the current operator, Colosseum California, Inc.:

> Table 4-1, Final EIR/EIS - Mitigation Measures 1, 2, 3, 4, 7, 19, 20, 22, 28, and 30.

The following stipulations would also apply to the proposed action:

- Cable barriers with locks will be located at side roads going to Ivanpah Springs, Ivanpah townsite, and the Colosseum Gorge road to restrict access but still allow for maintenance of range improvements and periodic inspections of the townsite. Earth berms will be located where required to permanently restrict access.

- The Colosseum Gorge road will be scarified from just below the springs down to its intersection with the new access route/corridor to discourage access and aid in natural reclamation.

- Road cuts visible from Interstate-15 will be treated with Eonite to reduce contrasts with the surrounding environment.

- The pipeline will be buried for the first 6 1/2 miles to facilitate movements of desert tortoise.

- Your plan of operations is located within a sensitive archaeological area. Because of the sensitivity and significance of the prehistoric and historic artifacts and/or ruins near your mining claims, you are reminded of your responsibilities to protect these resources. Please refer to 43 CFR 3809.2-2(e)(1-3).

- If cultural materials should be encountered during mining operations, the area shall be avoided until the materials can be evaluated by a qualfied archaeologist.

- If any areas other than those located in or immediately adjacent to the proposed land modifications will be impacted, these areas will be subject to an intensive cultural resource investigation prior to initiation of the activity.

Exhibit A
Page 214

## B. Alternatives

The environmental consequences of alternatives to the proposed action are discussed in detail in Section 5.0 of the Draft Eir/EIS, and will not be repeated in this document.

## C. Comparison of Environmental Consequences

A comparison of impacts associated with the proposed action and those associated with the EIR/EIS preferred routes reveals the following:

- The EIR/EIS preferred access road would involve upgrading of existing roads only, whereas the proposed action would result in 3 miles of new road construction.

- The proposed access road is approximately 26 miles shorter than the EIR/EIS preferred access road, which would result in fuel savings, less travel fatigue to employees which should result in fewer accidents and higher productivity, and less wear and tear on vehicles.

- The proposed access road avoids the known bighorn migration route that the EIR/EIS preferred access road would cross.

- The proposed water source and pipeline would utilize groundwater in the Ivanpah Basin which already supports a number of heavy users (Molycorp, Whiskey Pete's, Nipton, and

eventually SCE's electrical generating plant) whereas the EIR/EIS preferred water pipeline taps the Shadow Valley aquifer, which is very lightly used.

- The proposed action would consolidate the routes for all ancillary facilities (access road, powerline, and water pipeline) into a single access route/corridor whereas the EIR/EIS preferred routes would involve 3 separate routes.

V.    Consultation/Coordination

At present, Colosseum California and BLM are the only organizations that have been involved in the development and analysis of the proposed action.  This EA will be made available for public comment and any comments received will be so noted and addressed prior to issuing any decision.

Exhibit A
Page 216



# SECTION 10



United States Department of the Interior

BUREAU OF LAND MANAGEMENT

IN REPLY REFER TO:
3809
PO-28632
(7th Amnd.)
(C-069.29)

NEEDLES RESOURCE AREA
P. O. BOX 888
NEEDLES, CALIFORNIA  92363
(619) 326-3896

Certified Mail P 138 810 734
Return Receipt Requested

APR 13 1987

Desmond P. Kearns, Vice President
Colosseum California, Inc.
1600 Stout Street, Suite 1910
Denver, Co  80802

Dear Mr. Kearns:

The environmental review of your amendment to the original "Colosseum Mine" plan of operations (PO-28632) has been completed.  Due to the public interest in the Clark Mountain area in general and the original mine proposal specifically, an Environmental Assessment (EA) was prepared to analyze the impacts of the proposed access road, powerline, and pipeline, and the EA was made available for public comment (a copy of the comments and responses is enclosed).  A number of comments expressed concerns about impacts to wildlife, especially the desert tortoise.  As a result of those comments, a meeting was held at the project site to discuss impacts and mitigation.  Colosseum California, Desert Tortoise Council, California Department of Fish and Game, California State Water Resources Control Board, U. S. Fish and Wildlife Service and BLM were represented.  As a result, certain mitigation measures were agreed upon and are incorporated in this document.

A number of alternatives were analyzed in detail in the original plan of operations.

Based upon a review of the environmental assessment, I have determined that the proposed action, with mitigation measures to prevent unnecessary or undue degradation of the public lands, would not result in significant impacts to the human environment and, therefore, an environmental impact statement is not required.

Therefore, the seventh amendment to the original "Colosseum Mine" plan of operations (PO-28632) is approved, subject to certain stipulations and notices.

In addition to the procedures described in the amendment to the original plan of operations, the following mitigation measures apply:

1.    Prior to construction of the facilities (road, powerlines, substations, pumping stations and pipeline), the affected areas will be surveyed by a qualified biologist to locate and mark any and all desert tortoise burrows.  The burrows will be avoided during construction.  A desert tortoise awareness program will be conducted by the biologist to familiarize constructions crews with the necessity of preserving tortoises.

Exhibit A
Page 219

2. During the construction phase, the affected areas will be checked on a daily basis before start-up to remove and relocate any desert tortoise that may have wandered into the area.  An employee of Colosseum, or its contractors, who has been instructed in the proper procedures for handling and moving tortoises will conduct the sweeps.

3. During the operating life of the mine, an employee of Colosseum who has been instructed in the proper procedures for handling and moving desert tortoise will conduct a twice-daily sweep of the road.  The sweeps will be conducted in the morning and evening immediately preceeding shift changes

4. A maximum speed limit of 25 mph will be mandated on the entire access road for the life of the mine. The speed limit will be written into all contracts between Colosseum and its contractors.

5. Speed limit signs and wildlife warning signs will be located along the road. The wildlife signs will warn of desert tortoise for the first 6 1/2 miles and of big game (deer and bighorn sheep) for the last 3 miles.  At a minimum, the signs will be placed at the entrance to the desert tortoise habitat, a point 3 miles west of the first signs, at the bottom of Colosseum Ridge, and at the western end of Colosseum Ridge.  The signs will advise traffic in either direction.

6. In order to minimize habitat destruction within desert tortoise crucial habitat, the 12 foot right-of-way for the pipeline and powerline will not be cleared or leveled. Vehicle use of the 12 foot area will be limited to the amount required to suger holes, set poles, string and tension the wires, and construct the pipeline.

7. The water pipeline will be installed above ground to avoid having to clear and level the surface.  The pipeline will be placed on risers to ensure the proper gradient and allow for unrestricted movement of desert tortoises.  The height from ground to the bottom of the pipeline will vary from 2" to approximately 20", depending on the surface variations.  If the clearance remains less than 8" for a linear distance of more than 20 feet, hand shovel excavation to a depth of 8" for a distance of 3 feet will be required.

8. Wherever the pipeline crosses an existing road, the pipeline will be placed in a culvert and covered with soil to form a ramp over the pipeline.  Warning signs will be placed at the ramps.

9. Colosseum California will fund a study to gather baseline data on the impacts of the access corridor on desert tortoise populations.  The study design will be mutually agreed to by BLM and Colosseum California in consultation with the Desert Tortoise Council, California Department of Fish and Game, and the U. S. Fish and Wildlife Service.  Data gathered from the study will be used to determine impacts to tortoise populations.  If the data indicates the need, additional protective measures to mitigate those impacts will be required.

Exhibit A
Page 220

10. Monitoring of the entire corridor will be an ongoing process conducted by BLM.  If, at any time, unanticipated impacts to wildlife are determined to be occurring, additional mitigation measures will be required.

11. Where required by BLM, protective measures will be taken by Colosseum to prevent rockfall from the road cuts.  These measures may either be fences, barriers, rock mesh wire, or terraces (benches), or a combination of the above.

12. At the point where the Colosseum Ridge road diverges from the old Colosseum Gorge Road, a locking cable barrier will be installed to restrict access.          *BLM could not decide where to locate'*

13. At the point where the old Colosseum Gorge road will be permanently closed, shrubs will be planted to provide screening and aid in reclamation.  The shrubs may either be transplanted from the area impacted by new road construction or purchased from a nursery.  The plants will be watered twice weekly until they are established.

14. Colosseum will provide the equipment and operators to close and reclaim Colosseum Gorge Road as directed by BLM.  In addition,  *cottonwoods ≈ $600 on march 1988*  Colosseum will provide nursery stock (cottonwoods, willows, etc.) as directed by BLM in an amount not to exceed $1000.00.  Gap fencing to restrict livestock access to the gorge will be provided and installed by Colosseum as required by BLM.  Maintenance of gap fences will be the responsibility of Colosseum during the life of the mine, after which BLM will take over maintenance.

15. All above ground facilities will be painted to blend in with the natural surroundings as closely as possible.  The selection of color(s) is subject to BLM approval.

16. The road cuts visible from I-15 will be treated with "Eonite" to reduce their visibility.  The application rates will be determined by the manufacturer.

17. To prevent electrocution of raptors, protective measures will be incorporated into the design of the powerline.  A minimum 60 inch spacing between wires is required, and elevated perches and/or perch guards will be installed.

18. In the interest of public safety and the security of Colosseum's facilities, the access road will be re-routed to the north of the northern-most well.  This will place all of Colosseum's wells and the pumping station and sub-station south of the road.

19. The Record of Decision dated October 31, 1986, which authorized Colosseum to proceed with the original plan of operations, contained provisions approving the EIR/EIS preferred alternatives for the access road, powerline, and pipeline.  That approval is hereby revoked and the new corridor becomes the only authorized access.  Pending completion of the access road, temporary use of other roads may continue, provided no upgrading or improvements are done.

Exhibit A
Page 221

20. If cultural materials should be encountered during mining operations, the area shall be avoided until the materials can be evaluated by a qualified archaeologist.

22. If any areas other than those located in or immediately adjacent to the proposed land modifications will be impacted, these areas will be subject to an intensive cultural resource investigation prior to initiation of the activity.

In addition, the following notices also apply:

1. Approval of this plan of operations is contingent upon the operator obtaining all necessary county, state, and federal permits.

2. Approval of this plan will not now or in the future serve as a determination of the ownership or the validity of any mining claim to which it may relate.

3. Your plan of operations is located within a sensitive archaeological area.  Because of the sensitivity and significance of the prehistoric and historic artifacts and/or ruins near your mining claims, we wish to remind you of your responsibilities to protect these resources. Please refer to 43 CFR 3809.2-2(e)(1-3).

Thank you for your cooperation in this matter.  If you have any questions, please contact either myself or Roger Alexander at the above address.

Sincerely,

Everell G. Hayes
Area Manager, Needles

Enclosures

Exhibit A
Page 222

# Exhibit B



**LILBURN**
CORPORATION

*Strategic Planning & Environmental Services*

June 28, 2024

Department of Conservation
Division of Mine Reclamation
715 P Street, MS 1905
Sacramento, CA 95814

**(Overnight Mail)**

**Subject: Colosseum Mine CA Mine ID #91-36-0026**

To whom it may Concern:

Enclosed is the 2023 Annual Report for Colosseum Mine CA Mine ID #91-36-0026, County of San Bernardino. Please do not hesitate to contact me at 909-890-1818 if we can be of any assistance. Also please copy me at Lilburn Corporation with any related correspondence. Thank you.

Sincerely,

Frank Amendola
Project Manager

cc:     Mr. Frank Jordan, San Bernardino County
        Mr. Kerry Shapiro, JMBM

State of California
DEPARTMENT OF CONSERVATION
**MINING OPERATION  ANNUAL REPORT**
**FOR CALENDAR YEAR 20|23|**
MRRC-2 Page 1

**CA MINE ID#**    91-36-0026

**MINE NAME**    Colosseum Mine

**SMARA Lead Agency**    San Bernardino County

☐ City   ☑ County   ☐ Other

| 1. Company Operating | Mailing Address/P.O. Box No. | Telephone |
|---|---|---|
| Colosseum Rare Metals, Inc. | c/o JMBM, 2 Embarcadero Ctr 5th Flr | (415) 984-9612   Ext. |
| Site Contact Person | City/State/ZIP Code | Email Address |
| Kerry Shapiro | San Francisco, CA 94111 | ks4@jmbm.com |

| 2. Designated Agent's Name (individual must reside in CA) | Mailing Address 2 Embarcadero Ctr 5th Flr | |
|---|---|---|
| Kerry Shapiro - JMBM | Email Address   ks4@jmbm.com | |
| City   San Francisco | Zip Code   94111 | Telephone   (415) 984-9612   Ext. |

**SOME ITEMS BELOW ARE PRECEDED BY A BOX LABELED "N.C."  THIS BOX MAY BE CHECKED ONLY IF THERE ARE NO CHANGES IN THE INFORMATION FROM THE LAST REPORTING YEAR.**
**(NOTE:  IF THIS IS THE FIRST TIME YOU HAVE FILED A REPORT, ALL SECTIONS MUST BE COMPLETED.)**

☑ N.C.

| 3. Owner of Mining Operation | | Telephone   Ext. |
|---|---|---|
| Mailing Address | Email Address | |
| City | State/ZIP Code | Country (If other than U.S.A.) |

Was this operation purchased by you during the Calendar Year?    ☐ Yes. Date of purchase: _____    ☐ No.

Was this operation sold by you during the Calendar Year?    ☐ Yes.   Date of sale:_____    ☐ No.

☑ N.C.

| 4. Landowner | | Assessor's Parcel No.(s) |
|---|---|---|
| Mailing Address | | Telephone   Ext. |
| City/State/ZIP Code | | Country (If other than U.S.A.) |

5. Status of Mining Operation DURING THE CALENDAR YEAR (See form instructions for definitions)    [CHECK 1 ONLY]

☐ Newly permitted; date permitted: _____

☐ Active.

☐ Idle; date operation became idle: _____

If idle, complete the following:

☐ Copy of approved Interim Management Plan is attached.

☐ Interim Management Plan is pending with the Lead Agency; date submitted: _____

☑ Closed with no intent to resume; date mining ceased: 06/30/1993

☐ Closed - reclamation certified complete by the Lead Agency; date of certification: _____

6. Status of Reclamation Activities DURING THE CALENDAR YEAR    [CHECK 1 ONLY]

☐ Reclamation not started.

☑ Reclamation in progress.

☐ Reclamation certified complete by the Lead Agency.

Date reclamation was certified complete: _____

Date financial assurances were released: _____

THIS REPORT MUST BE SENT TO:    **Department of Conservation** (original)    **Lead Agency** (copy)

Exhibit B
Page 225

State of California
DEPARTMENT OF CONSERVATION
**MINING OPERATION ANNUAL REPORT**
**FOR CALENDAR YEAR 20**|2 3|
MRRC-2 Page 2

**CA MINE ID#**   91- 36-0026

---

7. Inspections

  (a) Date of the most recent inspection: 05/31/2023

  (b) Did you receive a copy of the most recent inspection report form (as noted in 7(a) above)? ☐ Yes ☑ No;
    If Yes, attach a copy as required by Public Resources Code 2207(a)(8). If No, explain on page 4.

  (c) Requested date for the next Annual Inspection by the Lead Agency (must be within 12 months of the most recently conducted Annual Inspection):

    Date Requested: _____

---

8(a). Does this site have an approved reclamation plan?

  • IF THIS IS THE FIRST ANNUAL REPORT FILED FOR THIS OPERATION, ATTACH APPROVED RECLAMATION PLAN.

    Number of acres subject to the reclamation plan: 412.00

    ☑ Yes: Approval date of the reclamation plan: 05/23/1985

    ☐ No: Please explain by checking one of the two boxes below, as applies. Otherwise, explain on page 4.

      ☐ Approval pending. Date submitted to the Lead Agency: _____

      ☐ Lead Agency action on initial or amended reclamation plan on appeal with the State Mining and Geology Board.
        Date appeal submitted: _____

8(b). Were there any amendments to the reclamation plan during the Calendar Year?

  • IF ANY AMENDMENTS TO THE RECLAMATION PLAN WERE APPROVED DURING THE CALENDAR YEAR, <u>ATTACH A COPY</u>.

    ☐ Yes: Amendment(s) to the reclamation plan were approved during the Calendar Year. Date approved: _____

    ☑ No.

---

9(a). Was a financial assurance cost estimate approved by the Lead Agency during the Calendar Year?

  ☐ Yes. Date of approval: _____

  ☐ No.  Approval of financial assurance cost estimate pending with the Lead Agency. Date submitted: _____

  ☑ No.  Explain on page 4.

---

9(b). Was a new or updated financial assurance mechanism(s) approved by the Lead Agency and the Department of Conservation during the Calendar Year?

  ☐ Yes. Date of approval: _____

  ☐ No.  Approval pending financial assurance mechanism(s). Date submitted to the Lead Agency: _____

  ☐ No.  Lead Agency action on financial assurance mechanism(s) is on appeal with the State Mining and Geology Board.
    Date appeal submitted: _____

  ☑ No.  Other, explain on page 4.

---

9(c). Complete information below for financial assurance mechanism(s):

| Type (Bond, CD, etc.) | Amount | Date Posted | Date of Annual Review by the Lead Agency | Expiration Date or Renewal Date (if applicable) |
|---|---|---|---|---|
| ████████ | ████████ | ████████ | ████████ | |
| | | | | |

---

☑
N.C.

10. ATTACH NAMED U.S. GEOLOGICAL SURVEY MAP—7.5' OR 15' QUAD—SHOWING BOUNDARIES OF MINING OPERATION.

| Latitude (Decimal Degree) | Longitude (Decimal Degree) | Section—Township—Range—Base Meridian | Quad Name | County |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |

---

THIS REPORT MUST BE SENT TO:   **Department of Conservation** (original)   **Lead Agency** (copy)

Exhibit B
Page 226

State of California
DEPARTMENT OF CONSERVATION
**MINING OPERATION ANNUAL REPORT**
**FOR CALENDAR YEAR 20**`23`
MRRC-2 Page 3

**CA MINE ID#** 91 - 36-0026

| ☑ | 11. Code type(s) of mining operation: _____ | | SEE EXHIBIT A FOR CODE TYPE(S) |
| N.C. | | | |

**12. DISTURBED ACREAGE**  `COMPLETE ENTIRE SECTION`

1. 2.00 — Approximate disturbed acreage on the **Previous Calendar Year**. (This figure should match the figure from item 12, line 5 on your previous Annual Report. If it does not match, explain on page 4.)

2. 0.00 — Approximate acreage disturbed during the **Calendar Year**.

3. 2.00 — **(ADD LINE 1 TO LINE 2)**

4. 0.00 — Approximate disturbed acreage **reclaimed** during the **Calendar Year**.

5. 2.00 — **(SUBTRACT LINE 4 FROM LINE 3)** Approximate **disturbed** acreage remaining on December 31 of the **Calendar Year**.

| ☑ | 13. `CHECK ALL THAT APPLY` |
| N.C. | |
| | ☐ Acres permitted: _____ |
| | ☑ Acres vested (acres disturbed prior to January 1, 1976): 41 _____ |
| | ☐ Acres on federal lands: _____ |

| ☑ | |
| N.C. | 14. Current total assessed value of mining operation as established by County Assessor's Office: $ _____ |

**15. COMMODITIES AND PRODUCTION*** `SEE EXHIBIT B`

*PRODUCTION INFORMATION IS PROPRIETARY AND WILL BE KEPT CONFIDENTIAL PURSUANT TO PUBLIC RESOURCE CODE SECTION 2207(g)

| List All Commodities (from Exhibit B) PRODUCED MINERALS | Category Number (from Exhibit B) | Amount of Production | Short Tons | Troy Ounces | Pounds |
|---|---|---|---|---|---|
| A. **PRIMARY COMMODITY** Gold (Lode) | No. 2 | ███ | ☐ | ☐ | ☐ |
| B. **ALL OTHER COMMODITIES** (include gold and silver produced if not primary commodity) Silver | No. 2 | ███ | ☐ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ |

TOTAL PRODUCTION — CHECK ONE

**16. FEE SCHEDULE** `SEE EXHIBIT C`

USING **BOTH** YOUR CATEGORY NUMBER **AND** TOTAL PRODUCTION FROM 15(A) ABOVE, REFER TO EXHIBIT C TO FIND YOUR CORRESPONDING PRODUCTION RANGE. ENTER YOUR CORRESPONDING PRODUCTION CODE IN 16(A) AND FEE IN 16(B) BELOW.

   A. PRODUCTION CODE ........................................................................   B (Closed -Reclamation Incomplete) _____

   B. REPORTING FEE ........................................................................   $ ███

*(fees calculation continued on next page)*

THIS REPORT MUST BE SENT TO:  Department of Conservation (original)  Lead Agency (copy)

Exhibit B
Page 227

State of California
DEPARTMENT OF CONSERVATION
**MINING OPERATION ANNUAL REPORT**
**FOR CALENDAR YEAR 20** [23]
MRRC-2 Page 4

**CA MINE ID#**  91- 36-0026 _____

**GOLD AND SILVER FEE:**

IF GOLD OR SILVER PRODUCTION IS REPORTED IN SECTION 15(A) OR 15(B), CONTINUE ON TO COMPLETE 16(C) AND (D), BELOW.

C. **GOLD FEE**    ( _____ Ounce(s) of gold) X ($5.00 per ounce) =   $ _____ ___

D. **SILVER FEE**    ( _____ Ounce(s) of silver) X ($0.10 per ounce) =  $ ____ ___

**TOTAL FEES DUE; SUM OF 16(B), (C) AND (D)**        =   $ _____  (Attach one check for total)

17. **SUBMITTED BY**

Name (Please print): **Lilburn Corporation - Frank Amendola**

Mailing Address:  **1905 Business Center Dr.**

City/State/ZIP Code:  **San Bernardino, CA 92408** _____   Telephone Number: **(909) 890-1818**

I certify that the information submitted herein is complete and accurate (failure to submit complete and accurate requisite information may result in an administrative penalty as provided for in Public Resources Code Section 2774.1).

**SIGNATURE OF SUBMITTER** _____   **DATE** 06/28/2024 ____

**TITLE OF SUBMITTER** Consultant _____   **EMAIL ADDRESS** frank@lilburncorp.com ____

Please mail annual report, reporting fee payment, gold and silver fee payment, and required attachments to:

**ATTN: Reporting Unit**
**Department of Conservation**
**Division of Mine Reclamation**
**715 P Street, MS 1905**
**Sacramento, CA  95814**

Please use the space provided to complete any questions that required further explanation. Additional sheets may be attached if more space is needed.

7. At the time of this submittal, the County inspection report had not been issued.

9a/9b. Revised FACE is Pending. However, current bond is up to $ ███ This exceeds the current FACE estimate.

5. Vested mining rights and valid existing rights will be exercised under future economic conditions.

THIS REPORT MUST BE SENT TO:    Department of Conservation (original)    Lead Agency (copy)

Exhibit B
Page 228

# Exhibit C



# United States Department of the Interior

NATIONAL PARK SERVICE
Interior Regions 8, 9, 10, and 12
Interim Office - 909 First Avenue, Suite 500
Seattle, WA  98104

IN REPLY REFER TO:
DRS3.1.03 (PW-RD)

Dawn Rowe
Chair, Third District Supervisor, San Bernardino County Board of Supervisors
385 N Arrowhead Ave
San Bernardino, CA 92415
Supervisor.Rowe@bos.sbcounty.gov

Kerry Shapiro
Partner, Jeffer Mangels Butler & Mitchell LLP
Two Embarcadero Center, 5th Floor
San Francisco, CA 94111
kshapiro@jmbm.com

Dear Ms. Rowe and Mr. Shapiro:

I am writing in response to your respective May 18, 2023, and May 22, 2023, letters, which contained similar arguments and statements. I am very concerned by the letters' incorrect statements regarding the federal laws and regulations that govern mining operations (access, surface disturbance, exploration, drilling, extraction, reclamation, transportation, and use of water, etc.) in National Park System units, including Mojave National Preserve. The National Park Service (NPS) has explained these legal mandates to you, Mr. Shapiro, and to Colosseum Rare Metals, Mine Water, and Oretest (collectively referred to below as "your client" or "CRM") several times during the last year, and so reviewing our earlier letters may be helpful. In addition, below please find, once again. an explanation of the steps needed for CRM to come into compliance with applicable federal laws and regulations.

To be clear, the following description of the NPS-specific laws and regulations does not mean that state and/or county laws and regulations are rendered moot or inapplicable. Mojave National Preserve is a concurrent jurisdiction park, which means that state and county laws apply within park boundaries to the extent that they do not conflict with or frustrate the purposes of federal law, as envisioned by the United States Constitution.

**Submit a proposed plan of operations to the National Park Service which meets the information requirements of 36 C.F.R. Part 9, Subpart A, and describes CRM's intended operations on their patented and unpatented mining claims and millsites, as well as access, within Mojave National Preserve.**

In your letters, you argued that CRM doesn't need to comply with NPS laws and regulations, including the NPS regulation that requires prospective mining operators to submit a proposed plan of operations to the NPS superintendent and obtain approval of that plan of operations from the NPS regional director (see 36

INTERIOR REGION 8 • LOWER COLORADO BASIN*
INTERIOR REGION 9 • COLUMBIA—PACIFIC NORTHWEST*
INTERIOR REGION 10 • CALIFORNIA—GREAT BASIN
INTERIOR REGION 12 • PACIFIC ISLANDS

AMERICAN SAMOA, ARIZONA*, CALIFORNIA, GUAM, HAWAII, IDAHO, MONTANA*,
NEVADA, NORTHERN MARIANA ISLANDS, OREGON, WASHINGTON
*PARTIAL

Exhibit C
Page 230

C.F.R. § 9.9). Your justification for CRM's disregard of federal law is that, in your words, the NPS in 1995 "recognized as valid" the plan of operations that was apparently submitted by Colliseum Inc.[1], CRM's predecessor, in the 1980s for a different mining operation and that was approved at that time by the Bureau of Land Management (BLM).

If you are referring to the July 14, 1995, letter to Colliseum Inc. from NPS Field Director Stanley Albright, please know that this letter temporarily approved Colliseum Inc.'s continuation of reclamation and tailings pond water treatment/monitoring as described in the 1980s BLM-approved plan of operations. This NPS temporary approval applied only to that reclamation and treatment/monitoring. Contrary to your statements, the NPS did not "recognize" or "acknowledge" that the BLM-approved plan of operations would be "valid" into perpetuity in Mojave National Preserve, that it would cover all types of operations in addition to reclamation and tailings pond water treatment, or that it would allow future mining operators at the Colosseum Mine Site, such as CRM, to ignore NPS laws and regulations. Indeed, the NPS would have lacked the authority to make such a sweeping exemption from federal law and regulations. NPS regulations do not describe plans of operation as "valid," "recognized," or "acknowledged;" instead our regulations use the terms "submitted" and "approved." Importantly, the 1995 NPS letter did inform Colliseum Inc. of the applicability of NPS regulations to patented and unpatented mining claims within Mojave National Preserve. In other words, the NPS's position regarding the applicability of NPS laws and regulations to this mine site and any mining operations there has remained consistent for the last 28 years, and we disagree with any statements that the NPS is acting arbitrarily or capriciously in this matter. I have attached the 1995 NPS letter in its entirety below.

The authority for NPS to require a Plan of Operations derives from the General Mining Law of 1872 (R.S. 2319; 30 U.S.C. 21 et seq.); the National Park Service Organic Act of August 25, 1916 (39 Stat. 535, as amended (16 U.S.C. 1 et seq.); and the Mining in the Parks Act of September 28, 1976; 90 Stat. 1342 (16 U.S.C. 1901 et seq.)). The NPS promulgated the regulations at 36 C.F.R. Part 9, Subpart A, in accordance with these laws. The regulations clearly require operators to submit to the NPS a proposed plan of operations to describe their intended operations:

> *"No operations shall be conducted within any unit until a plan of operations has been **submitted by the operator to the Superintendent** and **approved by the Regional Director**. All operations within any unit shall be conducted in accordance with an approved plan of operations" (36 C.F.R. § 9.9) (emphasis added).*

Please note that the wording of this section does not provide an exemption for operators with previous plans of operations that were approved by other agencies. Instead, the NPS consistently requires mining operators in Mojave National Preserve and other park units to submit updated, relevant plans of operation in compliance with this section. For additional context, the NPS also requires oil and gas operators throughout the National Park System to submit plans of operation in compliance with NPS regulations at 36 C.F.R. Part 9, Subpart B, and similarly requires other types of users to submit permit applications under other provisions of 36 C.F.R., such as 36 C.F.R. Parts 2, Part 5, and Part 6. The purpose of a proposed plan of operations is to describe the intended actions, locations, equipment, timing, and other aspects of the proposed operation. Plans of operation serve as a blueprint for the intended operations, and are necessary for visitor, employee, and operator safety; natural and cultural

---

[1] The operator in 1995 was "Colliseum Inc.," although your client's spelling is "Colosseum."

Exhibit C
Page 231

resource protection; and our environmental analysis and compliance requirements. NPS permitting and engineering staff stand ready to assist in preparing this documentation.

CRM's proposed plan of operations that it submits to the NPS must describe their intended activities on **both unpatented and patented claims.** The forty acres of patented land that CRM recently purchased lies entirely within the boundaries of Mojave National Preserve, and thus is governed by the Mining in the Parks Act of 1976 and the NPS regulations at 36 C.F.R.  Specifically, 36 C.F.R. § 9.1 states:

> *"These regulations control **all activities** within units of the National Park System **resulting from the exercise of valid existing mineral rights on patented or unpatented mining claims** without regard to the means or route by which the operator gains access to the claim....These regulations apply to all operations, as defined herein, conducted within the boundaries of any unit of the National Park System." (emphasis added).*

Based on the wording of this section, it is evident that NPS mining laws and regulations do apply on patented claims in park units. Contrary to the footnote in Mr. Shapiro's May 18, 2023, letter, this is not an ambiguous point. Although his footnote mentioned a 1986 document to support his assertions about ambiguity, we are unaware of the provenance, author, purpose, or scope of said document and do not agree with his inference that it justifies CRM's non-compliance. Mr. Shapiro's footnote also referred to Section 508 of the California Desert Protection Act to support his interpretation that the NPS regulations at 36 C.F.R. Part 9, Subpart A, do not apply on patenting mining claims in Mojave National Preserve. This is incorrect. Section 508 reads in relevant part:

> *"Subject to valid existing rights, all mining claims located within the preserve shall be subject to all applicable laws and regulations applicable to mining within units of the National Park System, including the Mining in the Parks Act...." (Pub. L. 103-433)*

This provision is not interpreted so as to exempt "valid existing rights" in Mojave National Preserve from NPS laws and regulations, since that would mean that NPS laws and regulations would apply only to invalid unpatented claims and never to patented claims. Such an interpretation would be nonsensical because it would limit NPS mining regulations to a null set of claims (i.e., claims on which operations would never be permitted because they are invalid). Instead, this provision is logically interpreted to mean "where a property right to a valid claim exists," (i.e., a valid unpatented mining claim or a patented claim), since these are the only mining claims in park units where operations can occur and where NPS laws and regulations would be applied. There is no indication in this law or legislative history that Congress intended to exempt patented mining claims in Mojave National Preserve from the Mining in the Parks Act, the NPS mining claim regulations, and other NPS authorities. Indeed, it is clear that Congress intended to improve the protection of natural and cultural resources in the California Desert parks from the impacts of patenting, not lessen it.

**The NPS will ask the Bureau of Land Management to conduct a validity examination of your client's unpatented mining claims and mill sites.**

Exhibit C
Page 232

From your letters, we infer that there is a perception that the BLM-approved plan of operation conferred "valid existing rights" status on CRM's mining claims, and that the NPS's requirement for a plan of operations has somehow taken away CRM's valid existing rights. Both perceptions are incorrect, and so in the interest of transparency we provide below a brief explanation of mining claim rights and the General Mining Law of 1872 as they work within units of the National Park System.

There are approximately 1,000 mining claims in NPS units, approximately 600 of which are patented claims and 400 of which are unpatented claims. An unpatented mining claim in a park unit entitles the claimant to hold the claim in compliance with applicable laws and regulations and extract locatable minerals in compliance with the laws and regulations specific to the land managing agency along with other applicable state and federal requirements, but it is not considered a valid existing right unless and until BLM undertakes the process and determinations described below.

BLM has the delegated responsibility for conducting validity examinations on unpatented mining claims throughout the United States. Also referred to as mineral examinations, these examinations are highly complex administrative, geologic, engineering, and economic assessments of the locatable minerals on the unpatented claims and likely profitability of a hypothetical mining operation within the boundaries of those claims. The result of the mineral examination is an impartial and peer-reviewed mineral report which determines whether the claims fulfill the requirements of the General Mining Law regarding the discovery of a valuable mineral deposit that a reasonably prudent person would be justified in commercially mining.

The BLM's responsibility for conducting validity examinations on unpatented mining claims also applies in National Park System units. If the BLM mineral report concludes that an unpatented mining claim in a park unit meets all the General Mining Law's requirements, then it deems the claim to be valid. In this case, the unpatented mining claim is now considered to be a valid existing right, although all operations on or related to the exercise of the valid mineral rights on that claim are subject to the Mining in the Parks Act and NPS regulations at 36 C.F.R. Part 9, Subpart A (see 36 C.F.R. § 9.1, which states "These regulations control all activities within units of the National Park System resulting from the exercise of valid existing mineral rights on patented or unpatented mining claims....").

Conversely, the BLM mineral examiners may conclude that an unpatented mining claim is invalid (i.e., that it does not meet the requirements of the General Mining Law). In this situation, the mineral report will recommend that the BLM initiate a mineral contest to declare the claim "null and void." The BLM may also dispute the validity of an unpatented claim if the claimant failed to pay the annual maintenance fee or failed to qualify for a waiver from the fee. If the BLM contest results in a decision that an unpatented claim is invalid, the claimant has 30 days to appeal to the Department of the Interior Office of Hearing and Appeals and a hearing will be held by an administrative law judge. Any party adversely affected by the administrative law judge's decision may appeal to the Department of the Interior Board of Land Appeals (IBLA; 43 CFR § 4.452-9). If the contest, and any subsequent appeal, affirms the BLM's finding that the unpatented claim is not valid under the General Mining Law, then the unpatented claim is not a valid property right; instead, it is null and void. In these instances, the NPS

Exhibit C
Page 233

will not evaluate or approve a proposed plan of operation, since the claim is invalid and has no property right.

The process described above does not apply in the case of patented mining claims. A patented claim, by definition, has already undergone the mineral examination and determination that the claim is "valid," as well as certain documentation requirements and a nominal payment. By patenting a claim, the claimant (now called a "patentee") gains ownership of the minerals and usually the surface estate. The patentee may use the property for mineral or nonmineral purposes, although these uses are still subject to applicable law and regulations.

In short, the determination of whether a claim constitutes a valid existing right is wholly separate from the status of a plan of operation that describes the activities on that claim.

Usually, the NPS asks the BLM to undertake a validity examination of unpatented mining claims in a park unit after receiving a proposed plan of operations for activities on or related to such claims. However, NPS policy states that the NPS may initiate a validity examination at any time. See NPS Management Policies § 8.7.1. In accordance with this policy and to help resolve the legal questions arising from CRM's activities, the NPS is working to initiate the validity examination of CRM's unpatented mining claims and mill sites as soon as possible.

**<u>CRM should cease its current operations and remove its equipment from Mojave National Preserve until it receives NPS approval of its proposed plan of operations and registers its commercial vehicles.</u>**

We hope that the above explanations help you and CRM understand that NPS regulations apply to all the activities that CRM has done and continues to do (access, surface disturbance, exploration, and drilling) in Mojave National Preserve. 36 C.F.R. § 9.2(b) states:

> *Operations.  **All functions, work and activities** in connection with mining on claims, including: prospecting, exploration, surveying, development and extraction; dumping mine wastes and stockpiling ore; transport or processing of mineral commodities; reclamation of the surface disturbed by such activities; and all activities and uses reasonably incident thereto, including construction or **use of roads** or other means of access on National Park System lands, **regardless of whether such activities and uses take place on Federal, State, or private lands.** (emphasis added).*

CRM is currently using a road within the Preserve and is operating an Everdigm drilling rig in the mine. This activity has not been approved by the NPS under the 36 C.F.R. regulations explained above, and therefore CRM is in trespass as described at 36 C.F.R. § 9.16.

> *"**Undertaking any operation within the boundaries of any unit** in violation of this part shall be deemed a trespass against the United States, and the penalty provisions of 36 CFR part 1 are inapplicable to this part." (emphasis added).*

The NPS suggests that it would be helpful for CRM to inform the drillers presently onsite that they may be cited for trespass under 36 C.F.R. § 9.16.

Exhibit C
Page 234

In addition, CRM's vehicles must be registered with the preserve superintendent in accordance with the following section:

*36 CFR § 9.15 Use of roads by commercial vehicles.*

   (a) *After January 26, 1977, no commercial vehicle shall use roads administered by the National Park Service without first being registered with the Superintendent.*

   (c) *Should a commercial vehicle used in operations cause damage to roads or other facilities of the National Park Service, the operator shall be liable for all damages so caused.*

## Conclusion

We hope that the above information is helpful and clarifies the NPS law and regulations that apply to CRM's patented and unpatented mining claims within Mojave National Preserve. We have attempted to be as detailed and thorough as possible.

The natural resource damage caused by CRM on land managed by NPS has been quantified and a demand letter for compensation is forthcoming. This letter will provide CRM with specific information and evidence to establish the nature and extent of the damage and CRM's responsibility.

If you have any questions, please do not hesitate to reach out to Mojave National Preserve's Chief of Science & Resource Stewardship, Debra Hughson (debra_hughson@nps.gov).

Sincerely,

**WILLIAM SHOTT** Digitally signed by WILLIAM SHOTT
Date: 2023.06.09 07:47:02 -07'00'

William Shott,
Acting Regional Director

Enclosure
   Letter to Colliseum Inc. from NPS Field Director Stanley Albright (July 14, 1995)

cc:    Field Solicitor, San Francisco Field Office, Department of the Interior Office of the Solicitor
       Acting Superintendent, Mojave National Preserve
       Chief of Science & Resource Stewardship, Mojave National Preserve
       Principal Deputy Regional Director, National Park Service Interior Regions 8, 9, 10, and 12
       Chief of Energy & Minerals Branch, National Park Service Geologic Resources Division
       Chief of Natural Resources & Science, National Park Service Interior Regions 8, 9, 10, and 12
       External Energy & Minerals Coordinator, National Park Service Interior Regions 8, 9, 10, and 12

Exhibit C
Page 235

ENCLOSURE (original also included)

Colliseum, Inc.
P.O. Box 94078
Las Vegas, Nevada 89193

The California Desert Protection Act of 1994 created the Mojave National Preserve, expanded Death Valley and Joshua Tree National Monuments and redesignated them as national parks.  Bureau of Land Management (BLM) records disclose that you are operating under a BLM approved plan of operations on lands that are now within the Mojave National Preserve, a National Park System unit.

Your operation is nearing the completion of reclamation and beginning of the monitoring phase.

I. TEMPORARY APPROVAL
This letter constitutes authorization from the National Park Service (NPS) to continue existing operations until the completion of your reclamation, as specified in existing BLM and County approved plans, and in accordance with the closure order of the Lahontan Regional Water Quality Control Board.

The 9A regulations govern operations on patented and unpatented mining claims (including mill sites) in the National Park System.  Section 9.10(g) permits the Regional Director to approve, on a temporary basis, and under certain conditions, the continuation of existing operations.  Because your operation is nearing its final phase, this temporary approval shall extend until such time as your reclamation is complete.

This notice does not change or alter, in any way, the existing BLM approved plan under which you are now completing reclamation.

II. NPS EVALUATION OF YOUR OPERATION DURING TEMPORARY APPROVAL
During the period between today and completion of reclamation, the NPS, in close collaboration with the BLM, will implement the BLM approved plan that governs your existing operation.  The NPS, again in close collaboration with the BLM and San Bernardino County, will certify that reclamation is completed in accordance with your existing plan.

III. OBTAINING NPS AUTHORIZATION AFTER RECLAMATION IS COMPLETE
For the monitoring phase of your operation, that extends over several years, the NPS will require a new proposed plan of operations.  Upon submission of a proposed new plan, to cover monitoring of the reclamation, the NPS will calculate a new bond amount and require that a bond be posted with the NPS when the plan is approved.  At that time, other agencies, at their discretion, may release or adjust the bonds that you have posted with them.

Carefully review the plan of operations you submitted to the BLM for monitoring and simply update and submit it to the NPS.  It is very likely that such a plan will satisfy NPS regulatory requirements.

Please do so by December 31, 1995.

Exhibit C
Page 236

If you have any questions regarding how to proceed with your existing mining operation, please contact the Superintendent of the Mojave National Preserve.

We look forward to assuring an orderly transition period governing mining on the new National Park System lands in the California Desert.  I hope that this grant of temporary approval for your existing operations gives us both time to become familiar with each other, and allows you to proceed with your reclamation work in an uninterrupted fashion.

Stan Albright
Regional Director, Western Region

bcc:
Field SOL (Mihan)
DEVA (Superintendent)
MOJA (Superintendent)
JOTR (Superintendent)
California Desert District (District Manager)
San Bernardino County Planning Department (Andrew Rush)

Exhibit C
Page 237



# United States Department of the Interior

### NATIONAL PARK SERVICE
Pacific West Field Area
600 Harrison Street, Suite 600
San Francisco, California 94107-1372

IN REPLY REFER TO:

L3023 (PWFA)

JUL 14 1995

Colliseum, Inc.
P.O. Box 94078
Las Vegas, Nevada 89193

Dear Operator:

The California Desert Protection Act of 1994 created the Mojave National Preserve, expanded Death Valley and Joshua Tree National Monuments and redesignated them as national parks. Bureau of Land Management (BLM) records disclose that you are operating under a BLM approved plan of operations on lands that are now within the Mojave National Preserve, a National Park System unit. Your operation is nearing the completion of reclamation and beginning of the monitoring phase.

## I.    TEMPORARY APPROVAL

This letter constitutes authorization from the National Park Service (NPS) to continue existing operations until the completion of your reclamation, as specified in existing BLM and County approved plans, and in accordance with the closure order of the Lahontan Regional Water Quality Control Board.

The 9A regulations govern operations on patented and unpatented mining claims (including mill sites) in the National Park System. Section 9.10(g) permits the Regional Director to approve, on a temporary basis, and under certain conditions, the continuation of existing operations. Because your operation is nearing its final phase, this temporary approval shall extend until such time as your reclamation is complete.

This notice does not change or alter, in any way, the existing BLM approved plan under which you are now completing reclamation.

## II.   NPS EVALUATION OF YOUR OPERATION DURING TEMPORARY APPROVAL

During the period between today and completion of reclamation, the NPS, in close collaboration with the BLM, will implement the BLM approved plan that governs your existing operation. The NPS, again in close collaboration with the BLM and San

Exhibit C
Page 238

Bernardino County, will determine whether that reclamation is completed in accordance with your existing plan.

III.   OBTAINING NPS AUTHORIZATION AFTER RECLAMATION IS COMPLETE

For the monitoring phase of your operation, that extends over several years, the NPS will require a new proposed plan of operations. Upon submission of a proposed new plan, to cover monitoring of the reclamation, the NPS will calculate a new bond amount and require that a bond be posted with the NPS when the plan is approved. At that time, other agencies, at their discretion, may release or adjust the bonds that you have posted with them.

Carefully review the plan of operations you submitted to the BLM for monitoring and simply update and submit it to the NPS. It is very likely that such a plan will satisfy NPS regulatory requirements. Please do so by December 31, 1995.

If you have any questions regarding how to proceed with your existing mining operation, please contact the Superintendent of the Mojave National Preserve.

We look forward to assuring an orderly transition period governing mining on the new National Park System lands in the California Desert. I hope that this grant of temporary approval for your existing operations gives us both time to become familiar with each other, and allows you to proceed with your reclamation work in an uninterrupted fashion.

Sincerely,

/s/ Stanley T. Albright

Stanley T. Albright
Field Director, Pacific West Area

Enclosure

bcc:
Field Solicitor (Mr. Mihan) w/o enc.
DEVA (Superintendent), w/o enc.
MOJA (Superintendent), w/o enc.
JOTR (Superintendent), w/o enc.
BLM, CA Desert District (District Manager), 6221 Box Springs Blvd.
   Riverside, CA. 92507, w/o enc.
San Bernardino County Planning Department (Andrew Rush), Third Floor,
   385 N. Arrowhead Ave. San Bernadino, CA 92415, w/o enc.

Exhibit C
Page 239

# Exhibit D



# United States Department of the Interior

NATIONAL PARK SERVICE
Mojave National Preserve
Castle Mountains National Monument
2701 Barstow Rd.
Barstow, CA 92311



IN REPLY REFER TO:
L3031a (1.A.1 Permanent)

ELECTRONIC TRANSMISSION

June 6, 2022

Colosseum Rare Metals Inc.
502 S. Wisconsin St.
Gunnison CO 81230.

Attn: Stephen Baghdadi

Dear Mr. Baghdadi:

A review of the California Regional Water Quality Control Board, Lahontan Region website shows that responsibility for Board Order No. 6-96-11 transferred to you, representing Colosseum Rare Metals Inc., on October 28, 2021. In an accompanying letter, Thomas A. Henry with Day Carter & Murphy LLP, stated that Colosseum Rare Metals Inc. had acquired "certain patented mining claims, unpatented mining claims, and millsite claims situated in San Bernardino County, California, from LAC Minerals (USA) LLC." Two of the referenced assessor's parcel numbers that include the patented mining claims at Colosseum Mine, 0572-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 and 0572-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 however, are shown as currently owned by Colosseum Inc. and Barrick Gold of North America Inc. since 1992.

On May 2, 2022, Mojave National Preserve Ranger, Janet McDaniel, contacted *retest* International LLC, Core & RC Drilling in the process of demobilizing drilling equipment from the site. A few minutes later we received a phone call from David Clare with the Tucson office of *retest* International LLC. Mr. Clare informed us that he had been working at Colosseum Mine for about a month and had brought a drill rig onsite. McDaniel's photos show equipment associated with drilling and a backhoe working on the road. On the same day at 11:50AM PDT we received a call from you, Stephen Baghdadi, Managing Director of Fossil Creek Mines LLC, informing us that you had been advised by legal counsel that you didn't need to contact the National Park Service if activities onsite were not causing ground disturbance. We informed you that no activities could be conducted on Mojave National Preserve without a permit from the National Park Service (NPS).

Exhibit D
Page 241

On May 13, 2022, we inspected the site and found unpermitted road maintenance had been performed along approximately 6-miles of road to the mine site on both NPS and Bureau of Land Management land. In several places a heavy earthmoving equipment had been driven off the road causing vegetation damage. Large, perennial shrubs had been uprooted and pushed aside. Just below the edge of the mine pit on NPS land we found an area that had been recently bladed, leveled, and the vegetation removed. We are currently assessing the resource damage caused by these activities under the System Unit Resources Protection Act, 54 U.S.C. 100721 *et seq.* Colosseum Rare Metals, Inc. could be held responsible for these damages. Press releases issued by Colosseum Rare Metals, Inc. May 4 and May 12, 2022, claim your company had recently completed a drilling program at Colosseum Mine consisting of five holes totaling 2200-feet.

NPS regulations at 36 CFR Part 9, Subpart A (9A regulations) govern all operations on patented and unpatented mining claims (including mill sites) in the National Park System. Access to your claim and transportation of equipment or ore are the only circumstances under which you may use lands or waters within a National Park System unit that are not within your claim boundary. If access to your claim is other than by pack animal or foot, you must first obtain NPS approval before accessing your claim. NPS approval is contingent on (1) your submission of a plan of operations that details any and all work you propose to do in connection with mining on your claim and (2) an NPS determination that your plan is in conformance with the approval standards set forth at 36 CFR §9.10. You are advised to cease and desist activities in Mojave National Preserve until your plan of operations has been approved by the NPS.

California Regional Water Quality Control Board Order No. 6-96-11 identifies the National Park Service (Administrator of Public Lands) as secondarily responsible for discharges from the mine site and would become primarily responsible for cleanup and abatement should you fail to meet the requirements of the order. The Board Order requires you to comply with the Monitoring and Reporting Program No. 96-11. You must apply for and receive a Special Use Permit (SUP) from Mojave National Preserve to access the site and fulfill these obligations. Contact Matt Caire (760-221-4740, Matthew_Caire@nps.gov) to initiate the SUP application process. This permit is exclusively for the activities required to comply with the Board Order. The SUP will include stipulations that you notify Mojave National Preserve one business week in advance of any onsite activities, including a complete description of planned activities, and copy the NPS on all communications with the California Regional Water Quality Control Board. No other actions or access to the site will be permitted until a plan of operations has been submitted and approved.

Conduct of operations in Mojave National Preserve beyond those specifically authorized in the SUP is a trespass against the United States and enforcement actions may be taken.

U.S. Department of the Interior          Page 2 of 3

Exhibit D

Page 242

If you have any questions, please do not hesitate to contact Dr. Debra Hughson, 760-221-9010 or debra_hughson@nps.gov.

Sincerely,

**MICHAEL GAUTHIER**

Digitally signed by
MICHAEL GAUTHIER
Date: 2022.06.06 11:27:19
-07'00'

Mike Gauthier
Superintendent
Mojave National Preserve
Castle Mountains National Monument

cc:
PWRO (Rozzell)
SOL (Glasgow)
Geologic Resources Division (Brunner)
BLM (Ahrens)

Exhibit D
Page 243

# Exhibit E



# United States Department of the Interior

NATIONAL PARK SERVICE
Interior Regions 8, 9, 10, and 12
333 Bush Street, Suite 500
San Francisco, CA 94104-2828

IN REPLY REFER TO:
1.A.1 (PW-RD)

Jeffer Mangels Butler & Mitchell LLP
Two Embarcadero Center, 5th Floor
San Francisco, CA 94111-3813
kshapiro@jmbm.com

Dear Mr. Shapiro:

This letter is in response to your letter dated November 21, 2022, to Mojave National Preserve Superintendent Mike Gauthier. The temporary authorization granted in the 1995 letter from National Park Service (NPS) Pacific West Area Field Director Albright was intended to cover a short time period; as the letter mentioned, the operation was nearing completion of reclamation and initiating the monitoring phase. The temporary authorization was not intended to cover several years or to be extended indefinitely, as the letter clarifies:

> "For the monitoring phase of your operation, that extends over several years, the NPS will require a new proposed plan of operations."

The temporary authorization granted in 1995 was exclusively for the completion of reclamation and closure in accordance with the Bureau of Land Management (BLM) plan of operations and the order from the Lahontan Regional Water Quality Control Board. In the summer of 2022 your client, Colosseum Rare Metals, Inc., Dateline Resources Limited (CRM) brought heavy equipment onto NPS land, performed unauthorized roadwork, created a new unauthorized disturbance by removing vegetation from an area of approximately one acre of NPS land, and conducted exploratory drilling activities. A report submitted to Lahontan Regional Water Quality Control Board by your client's contractor, MineWater LLC, dated July 21, 2022, states:

> "MineWater LLC personnel are overseeing a drilling and sampling program about the Colosseum Mine site, to collect water and rock samples for analysis for sulfate isotopes (34-delta-S and 18-delta-O) and other information about the environmental quality of the Site. Drilling in this phase of the work was only conducted on fee land owned by Colosseum Rare Metals (CRM)."

All mining-related operations within the boundaries of NPS land, whether conducted on patented or unpatented claims, fall under 36 C.F.R. Part 9, Subpart A. The activities described in the MineWater report are not part of any approved plan of operations or closure order. The road work and vegetation clearing associated with the drilling program were performed on NPS land without

INTERIOR REGION 8 ● LOWER COLORADO BASIN*
INTERIOR REGION 9 ● COLUMBIA—PACIFIC NORTHWEST*
INTERIOR REGION 10 ● CALIFORNIA—GREAT BASIN
INTERIOR REGION 12 ● PACIFIC ISLANDS

Exhibit E
Page 245

AMERICAN SAMOA, ARIZONA*, CALIFORNIA, GUAM, HAWAII, IDAHO, MONTANA*,
NEVADA, NORTHERN MARIANA ISLANDS, OREGON, WASHINGTON
*PARTIAL

proper authorization and, therefore, in violation of NPS regulations. The use of the language "this phase" in the report suggests additional work is planned.

This letter rescinds the temporary authorization granted in the 1995 letter from Field Director Albright. At your earliest opportunity relative to your receipt of this letter via email, please advise CRM to immediately submit a special use permit (SUP) application, a copy of the Water Board Order, and a copy of the original approved Reclamation Plan to the Preserve for review. The SUP application will be limited to the activities required by the Board Order only. Further, CRM must immediately cease and desist any other activities within the boundaries of Mojave National Preserve (the Preserve) that constitute "operations" as defined by the NPS at 36 C.F.R. Section 9.2(b).

Lastly, please advise CRM to submit a proposed plan of operations (Plan) to Acting Superintendent Ed W. Clark for review. This Plan must describe CRM's intended long-term reclamation, closure, and monitoring activities on the CRM mining claims within the Preserve. The NPS will not review the proposed Plan until we determine that the proposed Plan is complete and that the proposed operations described therein will comply with the requirements of NPS regulations at 36 C.F.R. Part 9, Subpart A; NPS regulations at 36 C.F.R. Part 6; and all other applicable Federal, state, and local laws.

NPS staff is available to work closely with CRM. If you have any questions, please do not hesitate to call Debra Hughson, Mojave National Preserve Chief of Science and Resource Stewardship, at 760-252-6105 or 760-221-9010.

Sincerely,

*Frank Lands*

FRANK LANDS
2023.02.08
11:43:21 -08'00'

Frank Lands
Regional Director

cc:
External Energy & Minerals Coordinator, Interior Regions 8, 9, 10, and 12
Karen Glasgow, Field Solicitor, San Francisco Field Office, DOI Office of the Solicitor
Branch Chief, Energy & Minerals, NRSS Geologic Resources Division, National Park Service
AML Program Coordinator, NRSS Geologic Resources Division, National Park Service
Eric Lord, Water Rights Specialist, Water Resources Division, Water Rights Branch, National Park Service
Tyler Gilkerson, Hydrogeologist, Water Resources Division, National Park Service
Acting Superintendent, Mojave National Preserve
Needles Field Manager, California Needles Field Office, Bureau of Land Management
Michael Smith, Geologist, California State Office, Bureau of Land Management

Exhibit E
Page 246

# Exhibit F



# United States Department of the Interior

NATIONAL PARK SERVICE
1849 C Street, NW
Washington, DC 20240

Mr. Kerry Shapiro
Chairman, Natural Resources & Mining Group
Jeffer Mangels Butler & Mitchell LLP | JMBM
Two Embarcadero Center, 5th Floor
San Francisco, CA  94111

Dear Mr. Shapiro:

This letter is in response to your letter dated January 30, 2025, to Secretary of the Interior Doug Burgum regarding your client Colosseum Rare Metals, Inc., and its mining interests within Mojave National Preserve. This letter supersedes and replaces any other letter or communication you may have received in reply.

The National Park Service (NPS) recognizes your client's valid existing rights as stated in the "Third Modification and Reclamation Plan and Plan of Operations, Colosseum Project," (Plan), approved September 10, 1985, by the Bureau of Land Management (BLM) in Decision Record 3800-EIS-85-69-1792-1 and as subsequently amended, and that these rights remain valid subsequent to passage of the California Desert Protection Act.

Consistent with this continued recognition of the valid existing rights of your client, the plan of operations approved by BLM remains in effect. Also consistent with this recognition, the NPS does not require a validity examination or further approval of exploration and other activities encompassed by the plan in the absence of your client submitting a new plan of operations, which would only be required for a new mining operation not encompassed within the existing, approved plan. Any statement or communication from, or actions taken by, the NPS to the contrary, whether made to the company or any other party, are invalid and of no force or effect.

Thank you for your letter and please feel free to respond with any additional questions.

Sincerely,

JESSICA BOWRON
Digitally signed by JESSICA BOWRON
Date: 2025.04 03 16:40:27 -04'00'

Jessica Bowron
Comptroller, Exercising the Delegated Authority of the
 Director, National Park Service

Exhibit F
Page 248

# Exhibit G



An official website of the United States government  Here's how you know

U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT**

Home > Info > Announcements > Colosseum Mine in California given go ahead to continue mining operation

## < All Public Input & Actions

# Colosseum Mine in California given go ahead to continue mining operation

**National Office** | **California**

**Media Contact**
BLM_Press@blm.gov
BLM_Press@blm.gov

**BLM Office:**

April 8, 2025

The Department of the Interior today recognized the Colosseum Mine in California can continue mining operations under its existing mine plan of operations with the Bureau of Land Management.

Earlier this year, President Donald J. Trump issued an executive order to make the United States the leading producer and processor of non-fuel minerals, including rare earth minerals. The resumption of mining at Colosseum Mine, America's second rare earth elements mine, supports efforts to bolster America's capacity to produce the critical materials needed to manufacture the technologies to power our future. For too long, the United States has depended on foreign adversaries like China for rare earth elements for technologies that are vital to our national security. By recognizing the

Exhibit G
Page 250

mine's continued right to extract and explore rare earth elements, Interior continues to support industries that boost the nation's economy and protect national security.

*The BLM manages about 245 million acres of public land located primarily in 12 western states, including Alaska, on behalf of the American people. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. Our mission is to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations.*

## Was this page helpful?

O  Yes

O  No

Privacy Notice

An official form of the United States government. Provided by Touchpoints



U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT**

| About BLM | Website Disclaimers |
| Careers | Feedback |
| Contact Us | Report Misconduct |
| Maps | Office of Civil Rights |
| Information Center | |

  

blm.gov

**An official website of the Department of the Interior**

| | |
|---|---|
| About DOI.gov | Agency financial reports |
| Accessibility statement | Disclaimer |
| FOIA requests | Privacy policy |
| No FEAR Act data | Vulnerability disclosure policy |
| Office of the Inspector General | Cummings Act notices |
| Budget & performance reports | |

Looking for U.S. government information and services?  **Visit USA.gov**

# Exhibit H



## United States Department of the Interior

NATIONAL PARK SERVICE
Mojave National Preserve
2701 Barstow Rd.
Barstow, CA 92311



IN REPLY REFER TO:
DRS3.1.03 (MOJA-SRS)

Dear Mr. Baghdadi,

The National Park Service recognizes your company's valid existing rights as stated in the "Third Modification and Reclamation Plan and Plan of Operations, Colosseum Project," ("Plan"), approved September 10, 1985, by BLM in Decision Record 3800-EIS-85-69-1792-1 and as subsequently amended, and that these rights remain valid subsequent to passage of the California Desert Protection Act.

Consistent with this continued recognition of the valid existing rights, the plan of operations approved by BLM remains in effect. This plan allows for roadwork, specifically, "access roads between the mine, dump sites, and ore processing areas, and haul roads between the mine area and I-15, will be improved or otherwise developed in permanent locations; grading and gravelling these permanent roads will be necessary but no paving is anticipated."

Therefore, Mojave National Preserve is rescinding the July 21, 2023 SURPA letter and demand for damages as outlined in the letter (correspondence DRS3.1.03 (MOJA-SRS)) connected to unauthorized roadwork and movement of heavy equipment along the access road leading to the Colosseum Mine site.

Thank you and please feel free to respond with any additional questions.

Sincerely,

RAYMOND MCPADDEN
Digitally signed by RAYMOND MCPADDEN
Date: 2025.04.14 12:30:04 -07'00'

Ray McPadden
Superintendent

Exhibit H
Page 254

# Exhibit I



THE WHITE HOUSE

## Weekly Policy Achievements

### Energy

- Army Corps of Engineers has authorized 312 project permits covered by Executive Orders during this Administration.
- The Department of the Interior proposed a rule that will remove Endangered Species Act barriers.
- Issued final action to open the Resolution Copper Mine for business. This site can satisfy roughly 25% of U.S. copper demand annually.
- The Colosseum Mine, America's second rare earths mine, has been approved after years of stalled permitting.
- 10 mineral production projects have been added to the transparency permitting dashboard for expedited permitting.
- Calculations of the invented "social cost of carbon" will be removed from Federal permitting decisions.
- The Department of the Interior expedited approval of two coal mines which will produce 26 million tons of Federal coal and support 500 full-time jobs.
- The Department of the Interior is adopting emergency procedures that will enable the agency to permit energy projects within 28 days.
- The Department of the Interior is now allowing commingling in the Gulf of America which enables existing offshore rigs to drill deeper. This will increase oil production immediately by 10% of 100,000 barrels a day to start, and major oil producers can start taking advantage of this today.

### Radical Gender Ideology and DEI

- The Department of Justice filed lawsuit against the State of Maine for blatant Title IX violations as the state continues to allow males to compete in female K-12 sports.
- The Department of Health and Human Services established new portal for internal hospital complaints on chemical and surgical mutilation of minors.

Exhibit I
Page 256



THE WHITE HOUSE

- The Department of Health and Human Services sent a letter to State Medicaid Directors reminding that it is unlawful to use Federal funds for procedures that result in sterilization of minors.
- The Department of Justice is assisting Louisiana in efforts to overturn Supreme Court precedent so the State can issue the death penalty for child rapists.

## Education

- The Department of Energy announced that it will limit financial support of "indirect costs" of research funding (i.e., the portion that goes to University overhead), generating over $405 million in annual cost savings and halting inefficient spending by colleges and universities.
- The Department of Education revoked Biden-issued "waiver" to California and Oregon universities to provide services to illegal aliens.
- Froze $20 million in grants to University of Maine.
- Opened Title IX investigations into University of Maryland and Wagner College for hosting USA Fencing competitions involving men in women's events.
- The Department of Justice forced six Illinois universities that receive DOJ funding (Northwestern, University of Chicago, Loyola, University of Illinois, NIEU, and Adler) to end a scholarship program that discriminated against white students.

## Agriculture

- Since February 26th, the wholesale price for a dozen of eggs has decreased $4.81. The price is less than half of what it was at its recent peak, and $3 less than what it was at the end of the Biden Administration.
- Developed the Emergency Commodity Assistance Program (ECAP), disbursing more than $6B of economic assistance to farmers in one month's time.

Exhibit I
Page 257



THE WHITE HOUSE

## International Relations

- Finalizing a Presidential Memorandum to shut down remittances sent by illegal aliens outside of the United States.
- Efforts are underway to negotiate an economic package with Saudi Arabia that could secure $1 trillion+ investment in the U.S.

## Technology

- The Department of Energy identified 16 Federal sites across the country to be used for data center and AI infrastructure development

Exhibit I
Page 258