ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

DANIEL LUECKE
daniel.luecke@usdoj.gov
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 598-7863

KATHARINE LAUBACH
katharine.laubach@usdoj.gov
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St. – North Terrace, Ste. 600
Denver, CO 80202
Tel: (202) 353-5765
*Counsel for the United States*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, et al.,<br><br>Federal Defendants. | Case No. 2:26-cv-04002-CAS-AS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: July 27, 2026<br>Time: 10:00 AM<br>Judge: Hon. Christina A. Snyder |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

BACKGROUND ........................................................................................ 2

LEGAL BACKGROUND ........................................................................... 7

    I.     The Mining in the Parks Act ......................................................... 7

    II.    The Mining Law of 1872 .............................................................. 7

    III.   The California Desert Protection Act............................................ 8

LEGAL STANDARD................................................................................. 8

    I.     The Preliminary Injunction Standard ........................................... 8

    II.    Review Under the Administrative Procedure Act......................... 9

ARGUMENT .............................................................................................. 9

    I.     Plaintiff Has Not Shown a Serious Question Going to the Merits, Nor a Likelihood of Success on the Merits................................. 9

          A.    NPS's 2025 Letter is Not a Final Agency Action............ 10

          B.    Plaintiff's Claim Under the Mining in the Parks Act Lacks Merit........................................................................ 11

          C.    Plaintiff Fails to Show that the Explanation for NPS's Recognition of the Plan in the 2025 Letter Violated the APA................................................................................. 16

    II.    Plaintiff Has Not Established Imminent Irreparable Harm........ 18

          A.    Plaintiff's Fourteen-Month Delay in Seeking a Preliminary Injunction Undercuts Their Claims of Irreparable Harm 19

          B.    Plaintiff Does Not Identify Harm that Is Irreparable or Likely ............................................................................. 20

III.   The Balance of Equities and the Public Interest Favor Denying Injunctive Relief .......................................................................... 23

CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Advanced Integrative Med. Sci. Inst., PLLC v. Garland,*
  24 F.4th 1249 (9th Cir. 2022)...................................................................10

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011)............................................................ 9, 24

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ...................................................................................9

*Assurance Wireless USA, L.P. v. Reynolds,*
  100 F.4th 1024 (9th Cir. 2024).................................................................23

*Bair v. Cal. Dep't of Transp.,*
  No. C, 10-04360 WHA, 2011 WL 2650896 (N.D. Cal. July 6, 2011) ...............22

*Bales v. Ruch,*
  522 F. Supp. 150 (E.D. Cal. 1981).............................................................21

*Benisek v. Lamone,*
  585 U.S. 155 (2018) .................................................................................20

*Bennett v. Spear,*
  520 U.S. 154 (1997) .................................................................................10

*BlueRibbon Coal., Inc. v. U.S. Bureau of Land Mgmt.,*
  No. 2:23-CV-923-DAK-JCB, 2024 WL 1197862 (D. Utah Mar. 20, 2024).......21

*Brown v. United States Forest Serv.,*
  465 F. Supp. 3d 1119 (D. Or. 2020)..........................................................21

*Center for Biological Diversity v. Salazar,*
  706 F.3d 1085 (9th Cir. 2013)............................................................ 14, 15

*Centro de Trabajadores Unidos v. Bessent,*
  167 F.4th 1218 (D.C. Cir. 2026) ...............................................................18

*Edge v. City of Everett,*
  929 F.3d 657 (9th Cir. 2019).....................................................................18

*Friends of Animals v. Haaland,*
  997 F.3d 1010 (9th Cir. 2021).....................................................................9

*Friends of Magnuson Park v. U.S. Army Corps of Eng'rs*,
  No. C08-0062RSM, 2008 WL 11343617 (W.D. Wash. Apr. 29, 2008) ............23

*Friends of the Clearwater v. Higgins*,
  472 F. Supp. 3d 859 (D. Idaho 2020).................................................................22

*Friends of the Inyo v. U.S. Forest Serv.*,
  103 F.4th 543 (9th Cir. 2024)..............................................................................7

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015).............................................................................19

*Grand Canyon Tr. v. Provencio*,
  467 F. Supp. 3d 797 (D. Ariz. 2020)............................................................ 12, 13

*Grand Canyon Trust v. Williams*,
  98 F. Supp. 3d 1044 (D. Ariz. 2015).................................................................12

*Graphic Scis., Inc. v. Int'l Mogul Mines Ltd.*,
  397 F. Supp. 112 (D.D.C. 1974) ........................................................................24

*Graves v. Arpaio*,
  623 F.3d 1043 (9th Cir. 2010)...........................................................................10

*Havasupai Tribe v. Provencio*,
  906 F.3d 1155 (9th Cir. 2018)...................................................................... 7, 12

*Helena Hunters & Anglers Ass'n v. Marten*,
  No. CV 19-106-M-DLC), 2019 WL 5069002 (D. Mont. Oct. 9, 2019) ..............19

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................... 17, 18

*Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*,
  73 F.4th 657 (9th Cir. 2023)..............................................................................18

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................................8

*McMaster v. United States*,
  731 F.3d 881 (9th Cir. 2013)..............................................................................12

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011)..............................................................................24

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................16

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
754 F.3d 1031 (D.C. Cir. 2014) ....................................................................18

*Native Ecosystems Council v. Krueger*,
40 F. Supp. 3d 1344 (D. Mont. 2014) ...........................................................22

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
762 F.2d 1374 (9th Cir. 1985) ......................................................................20

*Or. Nat. Res. Council v. Thomas*,
92 F.3d 792 (9th Cir. 1996) ..........................................................................17

*Organized Village of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ........................................................................18

*Rayco v. Bernhardt*,
2024 WL 4329006 (C.D. Cal. Jan. 9, 2024) .................................................13

*San Carlos Apache Tribe v. United States Forest Serv.*,
803 F. Supp. 3d 879 (D. Ariz. 2025) ............................................................24

*Taseko Mines Ltd. v. Raging River Cap.*,
185 F. Supp. 3d 87 (D.D.C. 2016) ...............................................................24

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ......................................................................................24

*Tuan Thai v. Ashcroft*,
366 F.3d 790 (9th Cir. 2004) ........................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................. 8, 13, 19, 20

*Zhou v. Lyons*,
813 F. Supp. 3d 1052 (C.D. Cal. 2025) ........................................................10

**Statutes**

16 U.S.C. § 410aaa-41 .........................................................................................3

16 U.S.C. § 410aaa-42 .........................................................................................8

16 U.S.C. § 410aaa-47 ............................................................................... 8, 13, 24

16 U.S.C. § 410aaa-48 .......................................................................... 8, 11, 13, 16

30 U.S.C. § 22 ......................................................................................................7

5 U.S.C. § 704 ....................................................................................................10

v

5 U.S.C. § 706 ................................................................................................9

5 U.S.C. § 706(2)(A) ......................................................................................9

54 U.S.C. § 100731 .........................................................................................7

54 U.S.C. § 100732 .........................................................................................7

Pub. L. No. 94-579, 90 Stat. 2743 (1976) ....................................................12

**Regulations**

36 C.F.R. § 1.5(a) ..........................................................................................21

36 C.F.R. part 9, subpart A ............................................................................7

43 C.F.R. § 3809.1 ..........................................................................................8

43 C.F.R. § 3809.602 ....................................................................................15

**Other Authorities**

103rd Congress S4066 (1994) ......................................................................14

103rd Congress S4115 (1994) ......................................................................14

**INTRODUCTION**

The Colosseum Mine has been producing gold and other metals since the mid-1800s, and in 1985 the Bureau of Land Management (BLM) approved a Plan of Operations and Reclamation Plan (Plan) to develop an open pit mine at the site. That mine produced gold until the early 1990s, after which it ceased production due to changes in the market. However, while reclamation began at the site, the BLM-approved Plan persisted even after the land was withdrawn by Congress under the California Desert Protection Act (CDPA) and designated as the Mojave National Preserve, managed by the National Park Service (NPS). The mine remained dormant for decades, but in 2025 NPS confirmed to the mine's new owner what had long been the case: that the BLM-approved Plan remained in effect.

Plaintiff National Parks Conservation Association now seeks a preliminary injunction to halt operations under the Plan. But such emergency relief is not warranted for multiple reasons. First, Plaintiff is unlikely to succeed on the merits of its Administrative Procedure Act (APA) claim, both because it has failed to challenge a final agency action and because the BLM-approved Plan constitutes a form of "valid existing rights" that the CDPA exempted from regulation under the Mining in the Parks Act (MPA). Second, Plaintiff's delay in bringing this lawsuit and motion undercuts its effort to establish imminent irreparable harm, which, in any event, is unpersuasive. And, finally, the balance of equities and public interest disfavor injunctive relief because operations at Colosseum Mine are legally permissible and could lead to the production of critical minerals that would

promote national security. The Court should thus deny Plaintiff's motion for preliminary injunction.

**BACKGROUND**

The Colosseum Mine is located in the Clark Mountains in San Bernardino County, California, about seven miles north of Mountain Pass near the Nevada border. Decl. of Daniel Luecke, Ex. 1, 1985 Plan of Operations, Modifications, and Related BLM Documents, 10–11.[1] The site has been actively mined on and off since the 1860s. *Id.* at 10. While the mine primarily produces gold and silver, it has also shown potential to produce tungsten, molybdenum, and other metals. *Id.* The Mine was idled during World War II, but activity resumed in the 1960s when the market price of gold increased. *Id.* at 10, 15.

In 1982, California Gold Properties,[2] the then-holder of the patented and unpatented mining claims associated with the Colosseum Mine, initiated a project to establish an open-pit gold mine at the site. Ex. 1 at 10–11. The company submitted the Plan to BLM for a project area of 3,560 acres of public land, though only 600 disturbed acres would require reclamation. *Id.* at 7.

While the Plan estimates timeframes for the different phases of the operation, *id.* at 22–26 it also makes clear that these timeframes are subject to change. Specifically, the Plan states:

---

[1] Hereafter, cited exhibits correspond to the Luecke Declaration unless otherwise indicated. Page numbers correspond to pages of the PDF document.

[2] The Colosseum Mine had multiple changes in ownership over the ensuing decades.

> External factors such as market conditions, regulatory technological changes beyond the control of the operators may adversely affect operation of the property. If these factors create untenable conditions, operations may be suspended for an indefinite period of time until favorable conditions warrant renewed operation.

*Id.* at 22. The reclamation portion of the Plan similarly points to "the potential for future mining economics" as a reason for not restoring the mined pit areas. *Id.* at 27. As such, the Plan describes the life of the project as "10+ years" and the termination date as "1992+." *Id.* at 7.

BLM approved the full Plan, as amended, on August 26, 1985. *Id.* at 165. In its decision, BLM states that "mining and milling operations would occur for nine years," during which "an anticipated 12 million tons of gold-bearing ore, or 1.4 million tons per year would be produced." *Id.* at 159. It did not specify that those years had to be sequential. *Id.*

As anticipated in the Plan, external factors prevented the Colosseum Mine from producing gold uninterrupted for nine years. An EPA report notes that mining did not begin until 1988 and had ceased by 1992, with milling ending in 1993. Ex. 2, EPA Site Visit Report, 4, 6. Total remaining reserves were estimated at 3.9 million tons of ore in 1990, *id.* at 6, but the then-owner of the mine did not intend to continue mining at that time "due to a variety of economic reasons." *Id.* at 7. However, the mine owner projected that, with "an increase in the price of gold, mining could resume." *Id.* at 26.

In 1994, Congress enacted the CDPA, 16 U.S.C. §§ 410aaa-41 *et seq.*, which created the Mojave National Preserve. The Preserve includes a small northern unit,

which is non-contiguous to the primary portion of the Preserve, the boundaries of which encompass the Colosseum Mine.

On July 14, 1995, the NPS Field Director wrote to the then-owner of the Colosseum Mine stating that the "[BLM] records disclose that you are operating under a BLM approved plan of operations on lands that are now within the Mojave National Preserve, a [NPS] unit." Ex. 3, 1995 NPS Letter, 1. The letter then authorized the mine owner "to continue existing operations until completion of your reclamation, as specified in existing BLM and County[3] approved plans, and in accordance with the closure order of the Lahontan Regional Water Quality Control Board." *Id.* The letter further stated that "this temporary approval shall extend until such time as your reclamation is complete," but it also emphasized that nothing in the letter "change[d] or alter[d], in any way, the existing BLM approved plan under which you are now completing reclamation." *Id.*

In 1999, the then-owner of the Colosseum Mine wrote to NPS to comment on the draft environmental impact statement for management of the Mojave National Preserve. Ex. 4, 1999 LAC Letter to NPS. Specifically, the letter notes that the owner held multiple patented and unpatented mining claims related to the Mine. *Id.* at 1. The letter goes on to state that the CDPA "specifically authorizes mining operations within the Preserve" and that, given the remaining gold reserves,

---

[3] The patented claims associated with the Colosseum Mine are on private land and thus subject to regulation by the County.

4

"it is possible that mining may again be conducted at the Colosseum Mine." *Id.* at 2.

Reclamation activities continued over the ensuing years. In 2000, the owner of the mine wrote to NPS requesting permission to proceed with closure, but NPS expressed concerns about water quality. Ex. 5, 2000 NPS Letter 1. In 2001, NPS wrote to the California Water Quality Control Board that groundwater data at the site had not satisfied the Board's Order No. 6-96-11. Ex. 6, 2001 NPS Letter. NPS therefore requested that the Board postpone any decision regarding Order No. 6-96-11, satisfaction of which was required for mine closure. *Id.* The mine owner thus continued to monitor water quality at the site. *See, e.g.*, Ex. 7, 2009 Evaluation of Monitoring Wells Data; Ex. 8, 2011 Results of Evaluation Monitoring Program.

In 2021, the Dateline Resources / Colosseum Rare Metals, Inc. ("Dateline") acquired the Colosseum Mine. In February 2023, in response to a letter from Dateline regarding its right to conduct operations at the Colosseum Mine, NPS informed Dateline that the 1995 letter authorizing continuation of operations under its existing Plan "was intended to cover a short time period," not "several years." Ex. 9, February 2023 NPS Letter 1. The letter proceeded to "rescind[] the temporary authorization in the 1995 letter" and requested that Dateline submit a new special use permit to perform additional reclamation activities required by the Water Quality Control Board's Order. *Id.* at 2. The letter further directed Dateline to submit a new plan of operations to NPS for review. *Id.*

This letter resulted in a series of additional communications among Dateline, BLM, and NPS. It also prompted letters from San Bernardino County and U.S.

Congressman Jay Obernolte criticizing NPS's failure to acknowledge Dateline's existing Plan. Ex. 10, May 2023, San Bernardino County Letter; Ex. 11, May 2023 Congressman Obernolte Letter. Ultimately, NPS sent Dateline another letter on June 9, 2023, again purporting to describe the 1995 letter, as well as relevant regulations and statutes, which NPS stated required Dateline to submit a new plan of operations. Ex. 12, June 2023, NPS Letter. NPS also indicated that, in order to "help resolve legal questions arising from [Dateline's] activities," NPS was "working to initiate the validity examination of [Dateline's] unpatented mining claims and mill sites as soon as possible." *Id.* at 5.

On November 13, 2023, NPS requested that BLM conduct a mineral validity examination of Dateline's unpatented mining claims and mill sites. Ex. 13, November 2023 BLM Letter. It appears that this process was never completed. Then, in an October 17, 2024, letter, NPS requested that "[BLM] close the 1983 [sic] Plan of Operations for Colosseum Mine," Ex. 14, October 2024 NPS Letter. The letter further explained that, based on the "understanding that the mining portion of the plan is complete," BLM was "in a position to declare that plan null and void," after which Dateline would "be able to establish a new plan of operations with the NPS" if it wished. *Id.* It does not appear that BLM ever acted on NPS's request to "close out" the 1985 plan of operations.

On April 3, 2025, in response to a request from Dateline, NPS Acting Director Jessica Bowron sent a letter to counsel for Dateline stating that "NPS recognizes [Dateline's] valid existing rights as stated in the [BLM-approved Plan], and that these rights remain valid subsequent to passage of the California Desert

6

Protection Act." Ex. 15, April 2025 NPS Letter. Consequently, the letter states that the 1985 Plan "remains in effect" and NPS "does not require a validity examination or further approval of exploration and other activities encompassed by the plan." *Id.*

Over a year later, on April 15, 2026, Plaintiff filed this lawsuit challenging NPS's April 2025 letter. Compl., Dkt. 1. Plaintiff then waited more than two months before filing the instant motion for preliminary injunction on June 23, 2026. Pl.'s Mot. for Prelim. Inj., Dkt. 20; Memo. In Support of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Memo."), Dkt. 20-1.

## LEGAL BACKGROUND

### I.     The Mining in the Parks Act

The MPA was enacted in 1976 and declared that "all mining in [NPS] units should be conducted so as to prevent or minimize damage to the environment and other values." 54 U.S.C. § 100731. But the statute does not itself regulate mining and instead delegates that duty to the Secretary of the Interior. *Id.* at § 100732. Those regulations are codified in 36 C.F.R. part 9, subpart A.

### II.    The Mining Law of 1872

The Mining Law of 1872 provides that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase." 30 U.S.C. § 22. This provision authorizes U.S. citizens to "prospect, explore, and mine minerals on certain public lands," including BLM lands. *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 548 (9th Cir. 2024) (citing 30 U.S.C. § 22).

7

Once a miner "locates" a mining claim on such land through certain procedures, they obtain a possessory right to the mineral deposit. *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1162 (9th Cir. 2018). BLM may then approve a plan of operations to commence mining under its surface management regulations. 43 C.F.R. § 3809.1 *et seq*.

### III.   The California Desert Protection Act

The CDPA was enacted in 1994 and created the Mojave National Preserve, and NPS unit. 16 U.S.C. § 410aaa-42. Accordingly, public lands on the Preserve were withdrawn, *id.* at § 410aaa-47, and mining claims located therein became subject to regulations applicable to the National Park System, *id.* at § 410aaa-48. However, both of these provisions clarify that "valid existing rights" would be preserved. *Id.* at §§ 410aaa-47, 410aaa-48.

**LEGAL STANDARD**

### I.   The Preliminary Injunction Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The "requirement for substantial proof is much higher" for a motion for a preliminary injunction than it is for a motion for summary judgment. *Id.* "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, *and* [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis

8

added). In the Ninth Circuit, "*serious* questions going to the merits and a hardship balance that tips *sharply* toward the plaintiff can support issuance of a preliminary injunction," though only "so long as the plaintiff also shows that there is a likelihood of irreparable injury, and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (emphasis added). There is no presumption that an injunction automatically follows the violation of an environmental statute. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).

## II.    Review Under the Administrative Procedure Act

To prevail in an APA challenge, a plaintiff must show that an agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In an APA case, the reviewing court "shall decide all relevant questions of law" and "interpret constitutional and statutory provisions." 5 U.S.C. § 706. Review under the APA standard is "deferential and narrow." *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021).

## ARGUMENT

### I.    Plaintiff Has Not Shown a Serious Question Going to the Merits, Nor a Likelihood of Success on the Merits.

Plaintiff fails to meet its burden to demonstrate likelihood of success on the merits for multiple reasons. First, this Court lacks jurisdiction over Plaintiff's lawsuit, which does not challenge a final agency action. Second, Plaintiff's claim under the MPA lacks merit because the CDPA's protection for "valid existing

rights" spares the 1985 Plan from regulation under the MPA. And, finally, Plaintiff's argument under the APA alone also fails because the 2025 NPS letter does not include any findings of fact.[4]

### A.  NPS's 2025 Letter is Not a Final Agency Action.

The Court need not consider Plaintiffs' claim on the merits because the 2025 NPS letter does not constitute a "final agency action" under the APA, 5 U.S.C. § 704. *Zhou v. Lyons*, 813 F. Supp. 3d 1052, 1059 (C.D. Cal. 2025) ("To satisfy the jurisdictional requirement of the APA, a plaintiff must challenge a 'final' agency action.") As explained in *Bennett v. Spear*, for an agency action to be final it must (1) "mark the consummation of the agency's decisionmaking process," and (2) determine "rights or obligations" or otherwise result in "legal consequences." 520 U.S. 154, 178 (1997) (citation modified). In applying this standard, the Ninth Circuit has distinguished between a document that "merely expresses [the agency's] view of what the law requires," which is not a final agency action, and a decision that "puts [the agency's] declared position into action." *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1260 (9th Cir. 2022) (citation modified).

Here, the 2025 NPS letter falls into the former category. By its plain terms, the letter simply recognizes the "valid existing rights" included in the 1985 Plan

---

[4] Although Plaintiff brings additional claims under the CDPA and National Environmental Policy Act in its complaint, Dkt. 1 ¶¶ 81–96, it does not raise them in support of its motion. Arguments regarding these claims are accordingly waived on reply. *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010).

and that the Plan is still "in effect." Ex. 15. While NPS had explained its prior view that Dateline was required to submit a new plan in February and June 2023, Ex.'s. 9 & 12, NPS (through BLM) never actually completed the process of having the 1985 Plan nullified, Ex. 14. Indeed, NPS even recognized in 2024 that nullification of the 1985 Plan was a legal prerequisite for Dateline to "be able to establish a new plan of operations with the NPS." *Id.*; *see also infra* at 15–16 (further explaining why the 1985 remains in effect). Because this process was never completed, NPS's 2025 letter recognizing Dateline's plan did not change the legal landscape. Instead, NPS merely confirmed that Dateline could still engage in "activities encompassed by the [P]lan," which had existed since 1985 and was still in effect.

**B.    Plaintiff's Claim Under the Mining in the Parks Act Lacks Merit.**

Even if the Court has jurisdiction over this case, Plaintiff's APA claim under the MPA nonetheless fails. Plaintiff alleges that NPS has violated its regulations implementing the MPA by allowing Dateline to continue operating instead of requiring a new plan of operations. Pl.'s Memo. 14–15 (citing 36 C.F.R. § 9.9(a) (1977)). But Plaintiff is mistaken because the 1985 Plan provides valid existing rights that, according to the CDPA, is exempt from regulation under the MPA. Specifically, the savings clause in Section 508 of the CDPA states:

> "*Subject to valid existing rights*, all mining claims located within the preserve shall be subject to all applicable laws and regulations applicable to mining within units of the National Park System, including . . . subchapter III of chapter 1007 of Title 54 [i.e., the Mining in the Parks Act.]"

16 § 410aaa-48 (emphasis added).

The term "valid existing rights" when used in this context encompasses the rights provided by an approved plan of operations, as the *Grand Canyon Trust* line of authority illustrates. *Grand Canyon Trust v. Williams* involved a uranium mine that was approved by the U.S. Forest Service in 1986 but went dormant when "uranium prices fell in 1992." 98 F. Supp. 3d 1044, 1049 (D. Ariz. 2015). In 2011, the mine owner alerted the Forest Service that it intended to resume operations, but a few months later the Secretary of the Interior withdrew the land where the mine was located under the Federal Land Policy and Management Act, *id.*, which protects "valid existing rights" in the event of a withdrawal, Pub. L. No. 94-579, § 701(h), 90 Stat. 2743, 2786 (1976). When the plaintiffs challenged the resumption of mining operations, the court held that, because the withdrawal was issued "'subject to valid existing rights[,]' . . . existing mines like the Canyon Mine could continue to operate" without the need for a mineral validity determination or new plan of operations. *Id.* at 1053. While part of the court's holding was overturned, *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1167 (9th Cir. 2018), its ruling on this issue "was not disturbed on appeal." *Grand Canyon Tr. v. Provencio*, 467 F. Supp. 3d 797, 805 (D. Ariz. 2020), *aff'd*, 26 F.4th 815 (9th Cir. 2022). So, when the case returned to the trial court, it held that there was "no legal basis to enjoin mine operations." *Id.*

Here, Congress drafted the CDPA with a specific savings clause that unambiguously applies to approved plans of operations. As the Ninth Circuit noted in *McMaster v. United States*, a "valid existing rights" savings clause "clearly refers" to the requirements described in the proceeding clause that would otherwise

12

extinguish the relevant rights. 731 F.3d 881, 892 (9th Cir. 2013). Section 508 thus preserves "valid existing rights" that would otherwise be extinguished by the requirement that mining claims in the Preserve be subject to all "laws and regulations applicable to mining within units of the National Park System." 16 § 410aaa-48. It is thus the explicit purpose of Section 508 to ensure that existing operations on mining claims continue under the same regulatory regime—which, in this case, is that of BLM. This is consistent with the *Grand Canyon Trust* court's conclusion that an approved plan of operations amounts to a "mining right[] that already existed" at the time of withdrawal. 467 F. Supp. 3d at 805.

It is also consistent with *Rayco v. Bernhardt*, the only case to directly consider the meaning of "valid existing rights" in Section 508. No. 2:21-CV-00512-SVW-GJS, 2024 WL 4329006, at *15–17 (C.D. Cal. Jan. 9, 2024). Although the issue in that case (whether Section 508 protected the right to patent an existing millsite) was different, the court still concluded that Section 508's savings clause "applies to the first half of the section"—i.e., the half that would otherwise subject mining operations to regulation under the MPA. *Id.* at 17. The court found that this interpretation was supported by the *separate* savings clause in Section 507, which applies to the "withdrawal [of lands in the Preserve] from all forms of location, entry, and patent under the United States mining laws." 16 U.S.C. § 410aaa-47. The court concluded that if Section 507's savings clause preserved the "valid existing rights" to obtain a patent, Section 508's savings clause must have a different meaning. 2024 WL 4329006, at *17. Otherwise, the sections would be "redundant" and violate the "fundamental canon of statutory

13

construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.* Congress thus saw fit to include an additional savings clause in Section 508 not to protect the right to *patent* a mining claim, but to *operate* on an unpatented claim under existing regulations.

Legislative history further bears out this intent. Senator Dianne Feinstein of California, the author and sponsor of the CDPA, stated on April 11, 1994, that "[a]ll valid existing mining claims are protected . . ." Congressional Record, 103rd Congress (1993-1994), p. S4066 (April 11, 1994). The next day, Senator Feinstein further clarified: "All active mines are protected. All mines that have been approved to proceed and mine will be able to do so." Congressional Record, 103rd Congress (1993-1994), p. S4115 (April 12, 1994)  Consequently, both the language and legislative history of the CDPA evince Congress's intent to exempt existing operations such as the Colosseum Mine from regulation promulgated under the MPA. *Tuan Thai v. Ashcroft*, 366 F.3d 790, 798 (9th Cir. 2004) ("It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing.").

It is also clear that the 1985 Plan at issue here is still in effect and is therefore spared from regulation under the MPA. In *Center for Biological Diversity v. Salazar*, the Ninth Circuit rejected the argument that a plan of operations becomes "ineffective" simply because mining operations ceased. 706 F.3d 1085, 1091–94 (9th Cir. 2013). The mine at issue was in production under a plan approved by BLM in 1988 until a drop in uranium prices in 1992. *Id.* at 1088. The Court nonetheless held that the operations were permitted to resume in 2009

because, while regulations provided several means for BLM to terminate an existing plan after inactivity, termination was not automatic. *Id.* at 1092. Because BLM took no such termination action in that case, the "plan remain[ed] bounded by its own terms," which did not include closure due to inactivity. *Id.* at 1094.

The same is true here. As an initial matter, BLM regulations do not mandate termination that a plan of operations be terminated when the relevant land is withdrawn. 43 C.F.R. § 3809.602. Indeed, NPS implicitly acknowledged this in 1995 by stating that the Mine's "existing BLM approved plan" remained in effect. Ex. 3 at 1. NPS even rejected a request by Dateline's predecessor to close the mine in 2001. Ex. 6. And, most importantly, NPS recognized the continued vitality of the 1985 Plan in October 2024 when it requested that BLM "close" it—something BLM never did. Ex. 14. There is accordingly no doubt that the Plan was never terminated by a federal agency.

Nor is Plaintiff correct that "[t]he 1985 Plan did not encompass or contemplate further mining at Colosseum" after the beginning of reclamation. Pl.'s Memo. 15. To the contrary, the 1985 Plan explicitly states that "[e]xternal factors such as market conditions . . . beyond the control of the operators may adversely affect operation of the property" and, if conditions become "untenable," cause "suspen[sion] for an indefinite period of time until favorable conditions warrant renewed operation." Ex. 1 at 22. That is precisely what happened in the early 1990s when the price of gold fell. Ex. 3 at 7, 26. The commencement of reclamation did not trigger some irreversible process toward closure. Ex. 1 at 27

15

(describing how "potential for future mining" required preserving pits during reclamation).

Plaintiff also points to language in the Plan stating that "no extended periods of nonoperation are contemplated," Pl.'s Memo 15 (citing Wilcox Decl., Ex. A at 49, 99, 127, Dkt. 20-2). But no mine operator "contemplates" in advance if and when particular events "beyond the control of the operator," such as market fluctuations, will occur. Ex. 1 at 22. This is why the same paragraphs of the Plan also specify that production will occur "for approximately 9 years *or until exhaustion of economically recoverable deposits*" to clarify that unforeseen factors may impact the timing of production. *Id.* at 107, 141 (emphasis added); *see also id. at 7* (mining will last for *at least* 10 years). If market conditions interrupt continuous production, such as occurred here, the Plan contemplates that mining may continue for such longer periods of time as are needed to exhaust the economically recoverable deposits. In short, because the 1985 Plan remains in effect and is a form of "valid existing rights" under the CDPA, it is not "subject to all applicable . . . regulations" under the MPA. 16 U.S.C. § 410aaa-48. Plaintiff's MPA claim is thus unlikely to succeed.

C.   **Plaintiff Fails to Show that the Explanation for NPS's Recognition of the Plan in the 2025 Letter Violated the APA.**

Finally, Plaintiff's assertion that the 2025 letter "reverses prior [NPS] findings without a reasoned explanation" is unpersuasive because that letter is not based on findings of fact that can be evaluated under a substantive statute. Plaintiff relies on the principle that the APA requires an agency to "examine the relevant

data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). But the Ninth Circuit has made clear that this standard from *State Farm* "turns on what a relevant substantive statute makes 'important.'" *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798–99 (9th Cir. 1996). Where the underlying substantive statute provides no guidepost for agency analysis, "factual errors without law to apply necessarily are harmless." *Id.*

Here, Plaintiff makes no effort to explain how NPS's recognition of Dateline's rights under the 1985 Plan ignored factors that the MPA or CDPA identify as "important." According to Plaintiff, NPS's 2025 letter "does not grapple with its prior findings that Dateline's mining operations fell outside the scope of the Park Service's approvals or the prior 1985 Plan for Colosseum." Pl.'s Memo. 17. But it is unclear what factual findings Plaintiff wants NPS to "grapple with," much less how they relate to any regulatory or statutory guideposts. This is because the 2023 and 2025 communications from NPS to Dateline were not based on factual findings. Instead, as Plaintiff acknowledges, NPS's June 2023 letter "detail[ed] the federal laws and regulations governing mining in Mojave National Preserve." Pl.'s Memo. 9 (citing Wilcox Decl., Ex. C at 230–35). NPS's 2025 letter allowing Dateline to continue operations was similarly based (albeit implicitly) on an interpretation that the CDPA's protections for "valid existing rights" encompass the "plan of operations approved by BLM." Ex. 15 at 1.

17

To the extent Plaintiff argues that NPS erred by not explaining the legal interpretation underlying its 2025 letter, such an argument is no longer viable after *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). "The change-of-position challenge to agency statutory interpretation was rooted in *Chevron*'s view that '[t]here [were] often multiple reasonable interpretations of a statute,' and in *Chevron*'s requirement that courts 'defer to the agency's selection' among them.'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237 (D.C. Cir. 2026) (quoting *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 754 F.3d 1031, 1044 n.7 (D.C. Cir. 2014)). "As applied to agency changes in the interpretation of statutory text, *Loper Bright* upended this foundation for change-of-position challenges," *id.* at 1238, by holding that agencies "agencies have no special competence" with respect to statutory interpretation,'" *id.* (quoting *Loper Bright*, 603 U.S. at 400-01). Consequently, if the Court holds that Section 508 of the CDPA exempts the Plan from regulation under the MPA, the inquiry is over and Plaintiff's APA claim fails. [5]

## II.     Plaintiff Has Not Established Imminent Irreparable Harm.

Because Plaintiff fails to demonstrate likelihood of success on the merits or raise serious questions, the Court "need not consider the other factors" of the

---

[5] Nor would any procedural violation of the APA cause prejudice. "[I]t is the burden of the opponent of the action to demonstrate that an error is prejudicial," *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015), and Plaintiff has provided no explanation of why NPS's lack of explanation had a "bearing on the procedure used or the substance of [the] decision reached." *Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 673 (9th Cir. 2023).

preliminary injunction analysis. *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019). Even so, Plaintiff also does not meet its burden to show that imminent, irreparable harm is not just "possibl[e]," but "*likely*." *Winter*, 555 U.S. at 22.

**A.     Plaintiff's Fourteen-Month Delay in Seeking a Preliminary Injunction Undercuts Their Claims of Irreparable Harm.**

As an initial matter, Plaintiff's delay in bringing this lawsuit and seeking emergency relief is at odds with its assertion of imminent harm. When a plaintiff "waited months to seek an injunction," a court is within its discretion to hold that this delay "undercut[s] [the plaintiff's] claim of irreparable harm." *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015). In this case, Plaintiff waited not months, but well over a year. As far back as its July 2024 FOIA request, Wilcox Decl. ¶ 26, Plaintiff was aware of NPS's correspondence with Dateline and, as a result, the latter's intent to conduct "mining-related operations," such as road maintenance and drilling. Feb. 2023 NPS Letter 1. And Plaintiff no doubt noticed the April 2025 press release recognizing that Dateline could "continue mining operations" at Colosseum. Pl.'s Memo. 9. "Being experienced environmental litigants, Plaintiff[] should have known" by this point that there was an "impending timeline" for the resumption of operations. *Helena Hunters & Anglers Ass'n v. Marten*, No. CV 19-106-M-DLC), 2019 WL 5069002, at *2 (D. Mont. Oct. 9, 2019).

However, instead of filing suit, Plaintiff waited and watched as mining-related activities ramped up from July to September 2025, with contractors, surveyors, and heavy equipment arriving onsite. Wilcox Decl. ¶¶ 16–18. Plaintiff

19

then observed in March 2026 that operations, including some grading and roadside vegetation removal, had unsurprisingly proceeded. *Id.* at ¶ 19. Yet still Plaintiff waited until April 15 to file suit and until June 23 to move for emergency relief. This delay not only "implies a lack of urgency and irreparable harm," but also prevents Plaintiff's motion from achieving a preliminary injunction's basic purpose of preserving the *status quo*, since mining-related activities have already begun. *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Specifically, Dateline has expended meaningful resources to pursue renewed operations. Plaintiff's lack of "reasonable diligence" in seeking an injunction weighs against halting such ongoing operations. *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).

**B.      Plaintiff Does Not Identify Harm that Is Irreparable or Likely.**

In any event, Plaintiff has not identified irreparable harm sufficient to justify the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24. For context, the Mojave Preserve comprises 1,542,776 acres, while the project components for the Colosseum Mine occupy 640 acres, Ex. 1 at 159. The Mine also occupies a pocket of land separate from the main body of the Preserve. Wilcox Decl. at 5. This site has been mined since the 1800s, Ex. 1 at 10, and was extensively mined in the late 80s and early 90s, Ex. 2 at 6, so any activity will generally occur on land that has been disturbed off and on for over a century.

Nor do any of Plaintiff's specific concerns rise to the level of likely, imminent, irreparable harm. Plaintiff complains that Dateline has restricted its ability to "monitor the extent of harm" and "use and enjoy the Preserve" by

20

"block[ing] access to Colosseum Road." Pl.'s Memo. 18, 20. But NPS regulations contemplate that closing an area for safety reasons can be appropriate. *See* 36 C.F.R. § 1.5(a). In any event, as Plaintiff admits, closing a small segment of the roadway leading to the Mine does not actually prevent access to trails in the Clark Mountains, which can be reached via an "alternate approach." Wilcox Decl. ¶ 12

Plaintiff's assertion that closing a road on federal land itself causes irreparable harm is also unsupported by case law. To the contrary, "recreationists do not have a legally cognizable interest in using a particular route on a particular date." *BlueRibbon Coal., Inc. v. U.S. Bureau of Land Mgmt.*, No. 2:23-CV-923-DAK-JCB, 2024 WL 1197862, at *10 (D. Utah Mar. 20, 2024) (closure of 317.2 miles of off-highway vehicle routes did not amount to irreparable harm because the plaintiffs "may still use hundreds of miles of routes"); *see also, e.g., Brown v. United States Forest Serv.*, 465 F. Supp. 3d 1119, 1130 (D. Or. 2020) (plaintiff's "inability to participate in outdoor recreation" due to highway closure was not irreparable harm). The sole case that Plaintiff offers to support its argument concerning road closure, *Bales v. Ruch*, is distinguishable because in that case there was ongoing damage from the miners' "failure to conform to operative and applicable State and local land use requirements." 522 F. Supp. 150, 157 (E.D. Cal. 1981). Indeed, the miners had even "establish[ed] a residence, install[ed] a garden, [and] mov[ed] a number of animals onto the land." *Id.* at 156. No similar activities are taking place here, and, as explained *supra*, Dateline's operations are authorized under its Plan.

Plaintiff also argues that road work, including widening the Colosseum road and creation of "new smaller roads," has damaged vegetation. Pl.'s Memo. 18–19. But the roadwork that Plaintiff identifies has already occurred and therefore cannot be prevented by an injunction. Even if additional roadwork takes place, limited impacts on roadside vegetation do not rise to the level of irreparable harm. *Compare, e.g., Bair v. Cal. Dep't of Transp.*, No. C 10-04360 WHA, 2011 WL 2650896, at *3 (N.D. Cal. July 6, 2011) (irreparable harm where plaintiff showed that widening a stretch of Highway 101 would damage or destroy 108 trees, including some ancient redwoods). Plaintiff provides no case law finding that such limited vegetation removal is sufficient for an injunction, and "abstract environmental harm" is insufficient. *See Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014) ("Logging is not per se sufficient to warrant an injunction, despite the fact that certain trees will be permanently removed from the forest").

Plaintiff then argues that mining activity, in the form of dust and noise, could harm the surrounding natural environment by disturbing wildlife and vegetation, Pl.'s Memo. 19-20, but Plaintiff must offer more than speculation under the *Winters* standard. In *Friends of the Clearwater v. Higgins*, for example, the court found no likelihood of imminent irreparable harm from the approval of "road construction and timber harvest activities" because of "how speculative Plaintiffs claims of harm [were] with regard to grizzly bears and lynx." 472 F. Supp. 3d 859, 875-76 (D. Idaho 2020), *aff'd*, 847 F. App'x 394 (9th Cir. 2021). Here, irreparable harm is similarly speculative because Dateline is only permitted

22

to operate under its existing Plan on a site that has already been subject to mining for decades. Nor has Plaintiff demonstrated that "full-scale extraction" is imminent, Pl.'s Memo. 19, as the 1985 Plan also authorizes smaller-scale exploration activities. Ex 1 at 24–25 (describing exploratory drilling throughout mining phases). And, if and when extraction does occur, the two pits used for gold mining in the 80s and 90s were maintained after mining ceased. Ex. 1 at 27; Ex. 2 at 26.Plaintiff thus hasn't shown that irreparable harm to the "fragile desert ecosystem" is imminent. Pl.'s Memo. 19.

Finally, although Plaintiff asserts that any harms will not be "easily repaired once they occur," *id.* at 20, prior disturbance at Colosseum Mine was mitigated after mining ceased and the site remains subject to a reclamation plan. Ex. 1 at 29–30 (summarizing reclamation). In determining whether to grant a preliminary injunction, courts have considered mitigation plans in the context of the irreparable injury analysis. *See, e.g., Friends of Magnuson Park v. U.S. Army Corps of Eng'rs*, No. C08-0062RSM, 2008 WL 11343617, at *10 (W.D. Wash. Apr. 29, 2008). As the Plan explains, reclamation should return "recreational activities" and "[h]abitat productivity" to "pre-mining levels." Ex. 1 at 30. For all these reasons, Plaintiff's showing on irreparable harm falls short.

### III. The Balance of Equities and the Public Interest Favor Denying Injunctive Relief.

Given Plaintiff's failure on the other elements, the Court need not consider the public interest and balance of equities, which "merge" when the government is

23

a party. *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). Nonetheless, these factors also strongly favor denying Plaintiff's motion.

First, for purposes of a preliminary injunction, the "uniform" and "effective operation" of federal law is in the public interest. *Taseko Mines Ltd. v. Raging River Cap.*, 185 F. Supp. 3d 87, 94 (D.D.C. 2016); *Graphic Scis., Inc. v. Int'l Mogul Mines Ltd.*, 397 F. Supp. 112, 128 (D.D.C. 1974). And the government is always "likely to suffer irreparable harm" when courts enter "injunctions that likely exceed the authority conferred" to them. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025). Here, for reasons explained *supra*, the 1985 Plan provides "valid existing rights" that Congress intended to exempt from additional regulation under the MPA. *See* 16 U.S.C. § 410aaa-47. Because the 1985 Plan remains in effect, any injunction of operations would interfere with Congress's scheme to allow existing mines within the Preserve to continue operating under prior authorizations.

Second, a preliminary injunction is not in the public interest, as it would interfere with the property rights of the Mine operator, Dateline. *See Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 257 (3d Cir. 2011), *as amended* (Mar. 7, 2012). Relatedly, a disruption of such rights would ultimately have a negative effect on the local economy. *Cottrell*, 632 F.3d at 1138 ("The effect on the health of the local economy is a proper consideration in the public interest analysis"). The Colosseum Mine employed nearly 100 people when it was operating in 1992, Ex. 2 at 6, but a lengthy injunction could derail investment in the project and prevent recapturing those economic benefits.

24

Finally, an injunction would be against the public interest insofar as additional exploration at the Colosseum Mine may demonstrate the potential to mine for rare earth elements in the future. *See San Carlos Apache Tribe v. United States Forest Serv.*, 803 F. Supp. 3d 879, 956 (D. Ariz. 2025), *aff'd*, 170 F.4th 879 (9th Cir. 2026), 172 F.4th 641 (9th Cir. 2026) (declining to enjoin copper mine that would "promot[e] critical national security interests"). As Congressman Obernolte stated in his 2023 letter to NPS, there is a "national security crisis surrounding our nation's limited access to rare earth elements," and there are "strong indications of rare earth elements at Colosseum Mine," which is mere miles from the only operational rare earths mine in the country. Ex. 11 at 2. An injunction that stopped exploration would also cut off any possibility of potentially establishing another rare earths mine in the future, which would be against the public interest.

## CONCLUSION

For the above reasons, the Court should deny Plaintiff's request for a preliminary injunction.

DATED: July 6, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

/s/ Daniel Luecke
DANIEL LUECKE
daniel.luecke@usdoj.gov
U.S. Department of Justice

25

Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 598-7863

KATE LAUBACH (CO Bar No. 42694)
katharine.laubach@usdoj.gov
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street – North Terrace, Ste. 600
Denver, CO 80202
Tel: (202) 353-5765

*Counsel for the United States*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Federal Defendants, certifies that this brief contains 6,980 words, which:

  X   complies with the word limit of L.R. 11-6.1.


                              */s/ Daniel Luecke*
                                Daniel Luecke