JEFFER MANGELS & MITCHELL LLP
KERRY SHAPIRO (Bar No. 133912)
*kshapiro@jeffer.com*
MICHAEL H. STRUB, JR. (Bar No. 153828)
*MStrub@jeffer.com*
HA CHUNG (Bar No. 332571)
*hchung@jeffer.com*
3 Park Plaza, Suite 1100
Irvine, California 92614-2592
Telephone: (949) 623-7200
Facsimile: (949) 623-7202

HOLLAND & HART LLP
MURRAY FELDMAN (pro hac pending)
*mfeldman@hollandhart.com*
JENNIFER SCHELLER NEUMANN (pro hac pending)
*jsneumann@hollandhart.com*
AMELIA YOWELL (pro hac pending)
*AGYowell@hollandhart.com*
ANDREA J. DRIGGS (Bar No. 223224)
*AJDriggs@hollandhart.com*
800 W. Main Street, Suite 1750
Boise, Idaho 83702
Telephone: (208) 342-5000
Facsimile: (208) 343-8869

Attorneys for DATELINE RESOURCES LTD. and
COLOSSEUM RARE METALS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION,<br><br>     Plaintiff,<br><br>     v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as Acting Director of the National Park Service; KEVIN SCHLUCKEBIER, in his official capacity as Acting Superintendent of Mojave National Preserve,<br><br>     Defendants. | Case No. 2:26-cv-4002-CAS-AS<br><br>**COLOSSEUM RARE METALS, INC. AND DATELINE RESOURCES LTD.'S OPPOSITION TO PLAINTIFF NATIONAL PARKS CONSERVATION ASSOCIATION'S MOTION FOR PRELIMINARY INJUNCTION** |

80688750v1

1

Case No. 2:26-cv-4002-CAS-AS

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................9

II.     ISSUES PRESENTED .......................................................................................9

III.    STATEMENT OF FACTS ...............................................................................10

        A.    The Mine's pre-CDPA rights and BLM-approved Plan of Operations ........................................................................................12

        B.    CRM's activities are within the Approved Plan's scope .....................14

        C.    The Mine operates under comprehensive environmental controls .......15

        D.    NPCA delayed while CRM invested in reliance on Agency recognition .............................................................................................16

        E.    The Mine's national security significance ...........................................17

IV.     STANDARDS OF REVIEW ...........................................................................17

        A.    Preliminary Injunction Standard .........................................................17

        B.    APA Standard ......................................................................................17

V.      ARGUMENT .................................................................................................18

        A.    NPCA IS UNLIKELY TO SUCCEED ON THE MERITS .................18

              1.    The BLM-approved Plan of Operations was preserved by Congress, so the Mining in the Parks Act does not apply ..........18

                    a.    Mining Law Background ......................................................18

                    b.    The CDPA .............................................................................18

              2.    The APA does not authorize NPCA's sweeping requested relief ......................................................................................22

                    a.    The April 2025 letter is not a final agency action ............22

                    b.    NPCA's requested relief is not available under the APA or other authority ...................................................24

        B.    NPCA HAS NOT SHOWN IRREPARABLE HARM .......................26

              1.    CRM's planned operations are in a highly disturbed area .........26

              2.    NPCA's declarants' other suggestions of environmental harm should not be considered ...............................................28

Opposition to NPCA's Preliminary Injunction

3.    NPCA's access allegations do not show irreparable harm.........28

C.    THE BALANCE OF EQUITIES WEIGHS AGAINST AN INJUNCTION .................................................................................30

D.    THE PUBLIC INTEREST WEIGHS DECISIVELY AGAINST AN INJUNCTION .................................................................................31

VI.    CONCLUSION .................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acura of Bellevue v. Reich*,
90 F.3d 1403 (9th Cir. 1996) ...................................................................................23

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ...............................................................................................25

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ...............................................................................................30

*Bennett v. Spear*,
520 U.S. 154 (1997) ...............................................................................................22

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ...................................................................................26

*Center for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .................................................................................21

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) .................................................................................26

*Dahl v. Swift Distrib., Inc.*,
2010 WL 1458957 (C.D. Cal. Apr. 1, 2010) ...........................................................29

*Fed. Trade Comm'n v. Standard Oil Co.*,
449 U.S. 232 (1980) ...............................................................................................23

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) ..................................................................17

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) ...............................................................................................25

*Grand Canyon Tr. v. Williams*,
2015 U.S. Dist. Lexis 67826 (D. Ariz. May 26, 2015) ...........................18,22,29

*Havasupai Tribe v. Provencio*,
906 F.3d 1155 (9th Cir. 2018) .................................................................................21

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................................25

*Holistic Candlers & Consumers Ass'n v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012)............................................................................23

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004)............................................................................22

*Labrador v. Poe*,
    144 S. Ct. 921 (2024) (Gorsuch, J., concurring) ................................................25

*League of Wilderness Defenders v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ..............................................................................31

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ..............................................................................................25

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985).............................................................................29

*Or. Nat. Desert Ass'n v. Bushue*,
    594 F. Supp. 3d 1259 (D. Or. 2022)....................................................................29

*Parker Drilling Mgmt. Servs. v. Newton*,
    587 U.S. 601 (2019) ............................................................................................20

*Protect Our Comtys. Found. v. U.S. Dep't of Agric.*,
    845 F. Supp. 2d 1102 (S.D. Cal. 2012), *aff'd*, 473 F. App'x 790 (9th
    Cir. 2012)............................................................................................................29

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014)........................................................................17,24

*Seven Cnty. Infrastructure Coal. V. Eagle Cnty.*,
    605 U.S. 168 (2025) ............................................................................................17

*South Fork Band Council v. U.S. Department of Interior*,
    588 F.3d 718 (9th Cir. 2009)...............................................................................31

*Southeast Alaska Conservation Council v. U.S. Army Corps of
    Engineers*,
    472 F.3d 1097 (9th Cir. 2006).............................................................................31

Opposition to NPCA's Preliminary Injunction

*Starbucks Corp. v. McKinney*,
 602 U.S. 339 (2024) ...........................................................................................17

*Swanson v. Babbitt*,
 3 F.3d 1348 (9th Cir. 1993) ...............................................................................12

*United States v. Backlund*,
 689 F.3d 986 (9th Cir. 2012) .............................................................................12

*United States v. Oakland Cannabis Buyers' Coop.*,
 532 U.S. 483 (2001) ...........................................................................................31

*W. Watersheds Project v. Salazar*,
 692 F.3d 921 (9th Cir. 2012) .............................................................................31

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ...............................................................................................17

**Statutes**

5 U.S.C. § 702...........................................................................................................25

16 U.S.C. § 410aaa-43 ..............................................................................................18

16 U.S.C. § 410aaa-47 ..............................................................................................19

16 U.S.C. §§ 410aaa-47, -48 .....................................................................................14

16 U.S.C. §§ 410aaa-47 to –49..................................................................................24

16 U.S.C. § 410aaa-49(a) ..........................................................................................20

30 U.S.C. § 22............................................................................................................18

43 U.S.C. § 1714........................................................................................................18

43 U.S.C. § 1732(b)...................................................................................................18

54 U.S.C. § 100732....................................................................................................24

54 U.S.C. § 100735....................................................................................................25

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ..............................................17

JMM | Jeffer Mangels & Mitchell LLP

**Other Authorities**

43 C.F.R. § 3809.11(a) ...............................................................................18

43 C.F.R. § 3809.100(a) .............................................................................18

36 CFR § 9.14(a) .......................................................................................24

JMM | Jeffer Mangels & Mitchell LLP

**Table of Abbreviations and Acronyms**

| | |
|---|---|
| 1982 PoO | The Plan of Operations and Reclamation Plan approved by BLM on February 5, 1982, Baghdadi Decl., Ex. D |
| 1985 PoO | Third Modification and Reclamation Plan and Plan of Operations for the Colosseum Project, Slesarewich Decl., Ex. C |
| 1987 Decision | BLM Environmental Assessment Decision issued in 1987, Slesarewich Decl., Ex. D |
| APA | Administrative Procedure Act |
| April 2025 letter | April 3, 2025 letter from Acting NPS Director Jessica Bowron to Kerry Shapiro, Shapiro Decl., Ex. B. |
| Approved Plan of Operations | 1985 PoO, all prior plans incorporated therein, and the 1987 Decision, collectively |
| ASX | Australian Stock Exchange |
| BLM | Bureau of Land Management |
| CDPA | California Desert Protection Act |
| CRM | Colosseum Rare Metals, Inc. and Dateline Resources Ltd. |
| Dateline | Dateline Resources Ltd. |
| DOI | Department of the Interior |
| EA | Environmental Assessment |
| EIR | Environmental Impact Report |
| EIS | Environmental Impact Statement |
| NPCA | National Parks Conservation Association |
| NPS | National Park Service |
| Preserve | Mojave National Preserve |
| Mine | Colosseum Mine |
| MSHA | Mine Safety and Health Administration |
| PoO | Plan of Operations |
| VER | Valid Existing Rights |

Jeffer Mangels & Mitchell LLP

JMM

80688750v1

8

Case No. 2:26-cv-4002-CAS-AS

Opposition to NPCA's Preliminary Injunction

## I. INTRODUCTION

NPCA's motion seeks to set aside the National Park Service's April 2025 recognition of Colosseum Rare Metals, Inc. and Dateline Resources Ltd.'s (collectively, CRM) valid existing rights to continue work at the Colosseum Mine under the pre-existing 1985 Bureau of Land Management approval for that Mine. Those rights are protected in the 1994 California Desert Protection Act. That Act designated the Mojave National Preserve, and placed the Preserve under the general management of the Park Service, subject to the CDPA's savings provisions.

NPCA fails to clearly establish that the CDPA applies the Mining in the Parks Act to Colosseum's pre-existing approved Plan and ongoing current operations. NPCA also fails to make a clear showing of imminent irreparable harm from the Mine's longstanding and ongoing operations in the limited time before the Court's merits determination. Nor does the balance of harms or the public interest favor an extraordinary preliminary injunction. NPCA's motion should be denied.

## II. ISSUES PRESENTED

NPCA's Motion raises three primary issues:

**1. Merits.** In 1985, BLM approved the Colosseum Mine's Plan of Operations. Subsequently, in 1994, Congress in the CDPA designated the Mine area as part of the Mojave National Preserve, subject to valid existing rights. Senator Feinstein, the CDPA's lead author, explained that "all current mining" within the Preserve was "protected" by the CDPA. Authorized Plan activities have continuously occurred at the Mine since the BLM approval. Has NPCA clearly shown that Colosseum needs yet another new approval from the National Park Service, notwithstanding the prior BLM approval and the CDPA's protections?

**2. Irreparable Harm.** Mine activities in the last four decades are within the disturbance boundary authorized in the existing BLM-approved mine Plan. Current activities are largely on previously disturbed ground. The next 12 to 18 months of

Mine operations would not irreparably harm rare or endemic plants or specialized soil crusts, or restrict wildlife movements or cause habitat fragmentation. Has NPCA clearly shown imminent irreparable harm from the Mine's authorized operations between now and the Court's merits determination?

**3**. **Balance of Harms/Public Interest.** NPCA's requested preliminary injunction would suspend CRM's lawful operations, strand millions of dollars CRM invested in reliance on the BLM Plan approvals and CDPA provisions, and impair the Mine's ongoing compliance with its environmental and reclamation obligations. The public interest favors honoring Congress's CDPA protections for existing mines, and respecting BLM's and the Park Service's determinations that the Mine could continue under the previously approved Plan. Has NPCA clearly shown that the equities tip in its favor and the public interest supports an injunction?

## III.   STATEMENT OF FACTS

The Mine is a gold mining operation and rare earth element exploration project located on Clark Mountain in San Bernardino County, California. It sits on the outer edge of the Mojave National Preserve, in a small non-contiguous "satellite" Preserve area separated from most of the Preserve by I-15. Slesarewich Decl. ¶ 4, Exh. A.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**



The Mine also is a short distance from the Mountain Pass Mine, casinos, a golf course and several large solar farms near Primm, Nevada. Slesarewich Decl. ¶ 5 Exh. B.



Colosseum Rare Metals, Inc. ("CRM") is the Mine operator and a wholly owned subsidiary of Dateline Resources Limited ("Dateline"). Baghdadi Decl. ¶ 5. CRM holds valid existing rights under a 1985 BLM-approved Plan of Operations. In April 2025, the NPS confirmed that the Plan "remains in effect." Shapiro Decl., Ex. B. Every activity CRM has undertaken falls within that approved Plan, on the same footprint, reusing the same infrastructure, and subject to the same enforceable environmental controls that have governed the site for over forty years.

### A.    The Mine's pre-CDPA rights and BLM-approved Plan of Operations

The Mine has an unbroken chain of mining-related ownership and activity from the 1860s to the present. In 1897, the United States issued fee patents for the Colosseum lode mining claims, conveying 40 acres into private ownership. Baghdadi Decl. ¶ 10, Ex. C. The unpatented mining claims were located in the 1970s and 1980s and have been continuously maintained. Baghdadi Decl. ¶ 13.[1]

In 1982, BLM approved the first Operations and Reclamation Plan for the Mine. Baghdadi Decl. ¶ 14, Ex. D. On September 10, 1985, BLM approved the operative plan at issue here—the Third Modification to Reclamation Plan and Plan of Operations, Colosseum Project (the "1985 PoO")—following an environmental review. Slesarewich Decl., Ex. C; Baghdadi Decl. ¶ 15. The 1985 PoO authorized an open-pit gold mining operation, including mining, milling, and cyanidation for gold and silver extraction, as well as a waste disposal facility and exploration drilling for other minerals. Slesarewich Decl., Ex. C at 19-20; Baghdadi Decl. ¶ 16.

The 1985 PoO contains no fixed expiration date. Section V states that "[p]roduction operations will endure for approximately 12 years thereafter or until

---

[1] "A patented mining claim is one in which the government has passed its title to the claimant." *Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir. 1993). An unpatented claim is a possessory interest in an area for the purpose of mining. *United States v. Backlund*, 689 F.3d 986, 991 (9th Cir. 2012).

exhaustion of economically recoverable deposits," with the 12-year figure a production estimate tied to ore depletion. Slesarewich Decl., Ex. C at 22. Critically, the 1982 PoO (incorporated into the 1985 PoO) expressly recognized that "[e]xternal factors such as market conditions, regulatory and technological changes beyond the control of the operators may adversely affect operation of the property" and that "[i]f these factors create untenable conditions, operations may be suspended for an indefinite period of time until favorable conditions warrant renewed operation." Baghdadi Decl., Ex. D at 20. This provision remains operative today.

In 1987, BLM prepared an Environmental Assessment and issued a decision letter authorizing the Colosseum Mine access road, powerline, and water pipeline (the "1987 EA" and "1987 Decision"). Baghdadi Decl. ¶ 20, Ex. H; Slesarewich Decl., Ex. D. The 1987 Decision amended the operative Plan framework and authorized infrastructure supporting current operations, including access controls, warning signs, safety berms, and fencing. Slesarewich Decl., Ex. D at 2–3. The 1985 PoO, all prior incorporated plans, and the 1987 Decision constitute the "Approved PoO."

Concurrent with the 1985 PoO, San Bernardino County approved Reclamation Plan 85M-02 for the Mine, and in doing so confirmed vested mining rights on the patented land. Baghdadi Decl. ¶ 22. In 2023, the County issued a Certificate of Land Use Compliance to CRM, re-confirming that "mineral resource development" activities on the patented land constitute a legally established conforming use based on the pre-existing vested right. Baghdadi Decl. ¶ 24, Ex. I. The Mine operated as an active gold producer from 1987 on. Baghdadi Decl. ¶ 25. Extraction paused in 1993 because economic conditions no longer supported profitable extraction—exactly the type of market-driven pause anticipated by with the Approved PoO. *Id.*

Since 1993, the Mine has continued as an active mining property. The Mine owners continuously maintained the 80 unpatented mining claims, reclamation and water-quality bonds, and groundwater monitoring; retained site-maintenance crews;

and expressly asserted the intent to resume extraction when economic conditions warranted. Baghdadi Decl. ¶¶ 27–28. Reclamation obligations remain ongoing, and drainage ponds remain lined and operational. Baghdadi Decl. ¶ 28.

In 1994, Congress enacted the CDPA, which generally made Preserve lands unavailable for new mining claims, and provided that this provision was "[s]ubject to valid existing rights." 16 U.S.C. §§ 410aaa-47, -48. The Mine's Approved PoO predates the CDPA by seven years, and thus was a valid existing right possessed by CRM's predecessor. Immediately after the CDPA's passage, in 1995, NPS confirmed that CRM's predecessor had an "existing BLM approved plan" and could proceed under it. Baghdadi Decl., Ex. K at 1. NPS's letter authorized continued operations "as specified in the existing BLM and County approved plans" and stating that the NPS notice did not "change or alter, in any way, the existing BLM approved plan." *Id*. No agency has ever formally terminated, revoked, or superseded the 1985 Plan or the 1987 Decision. CRM acquired the Mine in October 2021, continuing that unbroken chain of mining property ownership and maintenance. Baghdadi Decl. ¶ 33.

**B.  <u>CRM's activities are within the Approved Plan's scope</u>**

The Approved PoO authorizes a mining operation within a disturbance envelope of approximately 600 acres of public and 40 acres of patented land. Baghdadi Decl. ¶ 34. Current disturbance is approximately 377 acres. Slesarewich Decl. ¶ 11. CRM is conducting drilling, roadwork, and other activity within the approved disturbance areas, using the same mining pits and concrete pads used earlier. Slesarewich Decl. ¶¶ 13, 15.

Access road work likewise remains within the approved framework. The Colosseum Mine Road is a historic mine access corridor used for over a century; CRM's roadwork restored it to its previously approved condition. Slesarewich Decl. ¶ 19. Before CRM undertook repairs, the road had fallen into disrepair and become unsafe. *Id.* The road has been restored to 36-feet-wide or less—the width previously

approved—and not widened beyond that limit. Baghdadi Decl., Ex. H, at 4; Slesarewich Decl., Ex. D. The cleared areas are already disturbed. Slesarewich Decl. ¶ 21–23.

The safety features that NPCA characterizes as "barricades" are ordinary mine-site controls expressly contemplated by the Approved PoO, which provides for "access restriction measures in the form of gates, berms and fences to protect the general public." Slesarewich Decl., Ex. C at 44. The berms along Colosseum Mine Road are three feet high, built to MSHA-compliant safety standards, and located within the approved mining area. Slesarewich Decl. ¶ 25. The warning and access-control signage—including STOP signs and "DANGER – NO ENTRY" signs—were installed as mine-safety measures, consistent with the Approved PoO. *Id.* ¶ 26. A 2001 report documented a pickup truck at the bottom of Colosseum Gorge, approximately 800 feet below the access road, where it had gone over the edge due to the deteriorated road surface, highlighting the importance of safety measures and road improvement. *Id.* ¶ 29, Ex. E at 3–4.

Exploration work likewise remains confined to the approved footprint and will be concurrently reclaimed. Slesarewich Decl. ¶ 13. Civil earthworks on the process pad are similarly within the Approved PoO's scope. *Id*. ¶ 12.

## C.    The Mine operates under comprehensive environmental controls

The 1987 Decision imposed enforceable mitigation measures for vegetation, dust, erosion, and wildlife that remain in effect.  Slesarewich Decl., Ex. D at 1–4; Slesarewich Decl. ¶ 51-52. No threatened or endangered species were identified at the mine site. Slesarewich Decl., Ex. D at 13.

State and county oversight independently governs water quality and financial assurance. CRM maintains a $735,000 irrevocable letter of credit under Lahontan Board Order No. 6-96-11, and San Bernardino County conducts annual site inspections and maintains a separate reclamation bond. Baghdadi Decl. ¶ 38, Ex. N.

### D.   NPCA delayed while CRM invested in reliance on Agency recognition

On April 3, 2025, Acting NPS Director Jessica Bowron confirmed in writing that NPS "recognizes" CRM's valid existing rights "as stated in" the 1985 BLM-approved Plan as amended, those rights "remain valid" after enactment of the CDPA, and the Approved PoO "remains in effect." Shapiro Decl., Ex. B. The letter stated that a new plan of operations would be required only for a "new mining operation not encompassed within the existing approved Plan"—confirming that current operations required no new NPS approval. *Id*. One week later, on April 10, 2025, the Superintendent of Mojave National Preserve reiterated NPS's recognition. Shapiro Decl., Ex. C.

CRM continued operations in reliance on these determinations. Baghdadi Decl. ¶ 43. By the time NPCA sought to halt the project, since the April 2025 agency recognition, CRM has invested approximately $40 million in exploration, development, site work, civil works, and compliance activities at the Mine, and established $250,000 a month of carrying costs. *Id*. ¶¶ 52, 56.

NPCA, meanwhile, delayed. It waited until April 15, 2026—more than a year after the letter it seeks to challenge—to file its Complaint, and until June 23, 2026, to seek preliminary injunctive relief. *Id*. ¶ 44. CRM's activities at the Colosseum Mine were open, continuous, and publicly disclosed through Dateline's ASX announcements, website, and social media. NPCA acknowledges it observed activity at the site in July and September 2025 and more substantial activity by March 2026. Dkt. 20-1 at 9–11.

### E.      The Mine's national security significance

Colosseum occupies a strategic position: it is located approximately six miles from Mountain Pass, the sole operating rare earth elements mine in the United States. The Colosseum deposit has geologic links to Mountain Pass, indicating the presence of rare earth elements. Slesarewich Decl. ¶ 5; Baghdadi Decl. ¶ 67. The federal government has recognized that domestic rare earth development is crucial to national security. Baghdadi Decl. ¶ 68.

## IV.    STANDARDS OF REVIEW

### A.      Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (reaffirming four-factor test). That standard is heightened where, as here, a plaintiff seeks mandatory relief. A mandatory injunction "goes well beyond simply maintaining the status quo" and is "particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

### B.      APA Standard

NPCA's claims are based on the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Compl. ¶¶ 77, 86, 93. The APA imposes a highly deferential standard of review for agency decisions. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). Under that standard, a reviewing court shall hold unlawful and set aside agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* Even if an agency's decision is made with "less than ideal" clarity, the court must uphold the agency's decision under this standard so long as the agency's rationale can be "reasonably discerned" from the record. *Id.*; *Seven Cnty. Infrastructure Coal. V. Eagle Cnty.,* 605 U.S. 168, 179-80 (2025).

# V.    ARGUMENT

## A.    NPCA IS UNLIKELY TO SUCCEED ON THE MERITS

### 1.    The BLM-approved Plan of Operations was preserved by Congress, so the Mining in the Parks Act does not apply

#### a.    Mining Law Background

The Mining Law of 1872 provides that "[a]ll valuable mineral deposits in lands belonging to the United States" are "free and open to exploration and purchase." 30 U.S.C. § 22. When federal land is "open" to entry, a person may "locate" unpatented mining claims, which grant exclusive possessory interest for mining purposes. *Id.* § 26; *see also* 43 U.S.C. § 1732(b). BLM regulations require operators on BLM-managed public lands to submit a "plan of operations" for approval. 43 C.F.R. § 3809.11(a).

Sometimes lands "open" to the Mining Law become "closed" through a Congressional or administrative withdrawal. *See, e.g.*, 43 U.S.C. § 1714. When that happens, BLM will not approve a new plan of operations without conducting a formal validity determination—a detailed, resource-intensive process to confirm that the miner has identified a deposit valuable enough to extract for profit. 43 C.F.R. § 3809.100(a). However, if an approved plan was in place before the land "closed," BLM allows operations to continue without a validity examination "unless or until there is a material change in the activity." BLM Handbook H-3809-1, §§ 8.1.1.1,https://www.blm.gov/sites/blm.gov/files/H-3809-1.pdf 8.1.5, https://www.blm.gov/sites/blm.gov/files/H-3809-1.pdf; *see also Grand Canyon Tr. v. Williams*, 2015 U.S. Dist. Lexis 67826, *6-7 (D. Ariz. May 26, 2015).

#### b.    The CDPA

In the CDPA, Congress transferred authority over mining operations in the Preserve from BLM to NPS. 16 U.S.C. § 410aaa-43. But Congress grandfathered in rights BLM had already conveyed, providing that operators did not need new

approvals for existing operations. NPCA's motion skips this threshold issue, treating Colosseum as though CRM seeks a new mining project. But under the CDPA, the Mining in the Parks Act and NPS's regulatory authority applies only "subject to valid existing rights."

Before the CDPA, CRM's predecessors held patented mining claims, located and maintained unpatented claims, obtained BLM approval of the Plan, and secured BLM amendments addressing access, power, water, and more. Thus, the question is not what regulatory authority NPS may generally exercise over mining in the Preserve, but whether NPCA is likely to show that NPS's regulatory scheme applies here given Congress's express protection of "valid existing rights" in the CDPA.

NPCA acts as if the CDPA extinguished BLM's approval of Colosseum's Plan and preserved only its mining claims. But the statutory phrase "valid existing rights" is not limited to mining claims—it is generally much broader. Its scope depends on the specific statute, the source of the right asserted, and the legal consequences Congress attached. Here, the CDPA's text and structure make clear that Congress intended to protect a broad scope of valid existing rights—including existing, approved BLM plans of operations—when it created the Mojave National Preserve. Indeed, the CDPA's principal author, Senator Feinstein, stated on the Senate floor that "[a]ll active mines are protected. All mines that have been approved to proceed and mine will be able to do so." 140 Cong. Rec. S7049, 7074 (Apr. 12, 1994); *see also id.* at 7022 (April 11, 1994) (statement of Sen. Boxer) (CDPA "allow[s] all existing mining operations to continue").

Congress accomplished this in two interlocking CDPA provisions. Section 507 withdraws the Preserve from future location of claims, but "[s]ubject to valid existing rights." 16 U.S.C. § 410aaa-47. Section 508 separately provides that, "[s]ubject to valid existing rights," mining claims within the Preserve must comply with National Park System mining laws, including the Mining in the Parks Act. 16 U.S.C. § 410aaa-

48. These two provisions must be read together and given separate work to do. *See Parker Drilling Mgmt. Servs. v. Newton*, 587 U.S. 601, 609–10 (2019) (statutory phrases should be read considering overall statutory scheme).

In Section 507, Congress closed the Preserve to new mining claims while preserving all claims and sites located before the CDPA. And here, CRM's unpatented claims and millsites were located before Congress created the Preserve. Title and BLM records show CRM continues to hold and maintain those claims. Baghdadi Decl. ¶¶ 8, 27, Ex. B.

But Congress did not stop there. It added another savings provision in Section 508. That provision addresses which regulatory regime applies to the pre-existing mining claims protected by Section 507. It prospectively subjects new mining authorizations on those claims to NPS regulations and through the VER savings clause and preserves all existing authorizations, like plans of operations, under BLM's regulations. That is precisely the reading NPS reaffirmed in April 2025, recognizing CRM's valid existing rights "as stated in" the 1985 Plan as amended, confirming that the BLM-approved Plan remains in effect, and stating that a new plan under NPS regulations would be required *only* for new activities not encompassed within the existing approved Plan. Shapiro Decl., Ex. B. Section 508 accomplishes the bill author's intent that "[a]ll mines that have been approved to proceed and mine will be able to do so." Indeed, for other withdrawals, existing plans remain in force and no validity determination is required. *Grand Canyon Tr.*, 2015 U.S. Dist. Lexis 67826, *6-7.

Section 509 reinforces this understanding by providing that NPS shall not approve "any plan of operation" before determining the validity of the unpatented mining claims, millsites, and tunnel sites affected by that plan. 16 U.S.C. § 410aaa-49(a). Section 509(a) does not say that pre-CDPA BLM-approved plans must be resubmitted or reapproved after the designation. Nor does it direct—as NPCA seems

to assume—immediate validity examinations for every pre-existing BLM-approved plan of operations or every pre-existing mining claim in the Preserve. Congress knew how to mandate that sort of validity review when it intended to do so. In Section 509(b), Congress singled out specific, exploration-phase only claims held by a different entity and allowed two years of continued exploration and development, then directed a validity determination. *Id*. § 410aaa-49(b). Congress did not use comparable language for the Colosseum Mine or other already approved operations in the Preserve.

In sum, CRM holds patented claims obtained before the Preserve existed; unpatented claims and millsites located and maintained before the CDPA; the 1985 BLM-approved Plan of Operations obtained after environmental review and before the CDPA; and the 1987 BLM access-road, powerline, and water-pipeline amendment. The mine operated under those approvals before the CDPA and continued to do so when ore extraction paused, all while maintaining the ability to resume extractive operations and production. CRM operates the Mine under that same Plan today. Baghdadi Decl. ¶ 15. Any activities outside CRM's existing plan may require additional regulatory review. But the activities NPCA seeks to enjoin are squarely within the existing plan.

NPCA identifies *no* authority supporting its assumption that authorized mining plans automatically lapse when production or extraction pauses. The CDPA does not so provide, and Ninth Circuit authority disagrees. In *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1088, 1092–94 (9th Cir. 2013), the court deferred to BLM's interpretation that an approved plan of operations does not expire simply because active mining temporarily stops, even for seventeen years. Similarly, in *Havasupai Tribe v. Provencio,* 906 F.3d 1155, 1163 (9th Cir. 2018), the Ninth Circuit held that where resumed operation under an existing plan did not require additional government action, the original approval was the relevant major federal action, and renewed

mining did not require a new EIS. *See Grand Canyon Tr. v. Williams*, 2015 U.S. Dist. Lexis 67826, *7 (D. Ariz. May 26, 2015) ("Plaintiffs could not then, and still cannot, point to any statute, regulation, guidance document, or case that requires a VER Determination for a previously-approved plan of operations on withdrawn land.").

The 1985 PoO itself confirms the Plan was not limited to a fixed 12-year term. NPCA relies on Section V's statement that "[p]roduction operations will endure for approximately 12 years thereafter or until exhaustion of economically recoverable deposits." Slesarewich Decl. Ex. C at 22. But that language is a projection tied to ore depletion, not an expiration date. The words "approximately" and "or until exhaustion" confirm this. Nothing in the 1985 PoO establishes a 12-year expiration date.

### 2. The APA does not authorize NPCA's sweeping requested relief

NPCA is also not likely to prevail because: (a) NPCA does not challenge a final agency action, and (b) no authority, including the APA, authorizes the relief NPCA requests.

### a. The April 2025 letter is not a final agency action

An agency action is only final for purposes of judicial review if it (1) marks the consummation of the agency's decision-making process, and (2) is an action by which rights or obligations have been determined or from which legal consequences flow. *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997). The April 2025 letter does not determine any legal rights or obligations and no legal consequences flow from it. It is merely a statement (recognition) of the agency's view of what the law has been since the CDPA's enactment. A letter that "merely expresses [the agency's] view of what the law requires" and "impose[s] no obligations and denie[s] no relief" is not final agency action. *Indep. Equip. Dealers Ass'n v. EPA,* 372 F.3d 420, 427 (D.C. Cir. 2004).

JMM | Jeffer Mangels & Mitchell LLP

It makes no difference that the agency also declared "invalid and of no force or effect" "[a]ny statement or communication from, or actions taken by, the NPS to the contrary, whether made to the company or any other party," because prior NPS communications did not finally resolve CRM's rights. CRM filed an administrative appeal from the February 8, 2023 letter rescinding the 1995 authorization, Shapiro Decl., Ex. E, and NPS never acted on, or even acknowledged, that appeal. That pending and unresolved administrative posture means the February 2023 letter was never a final NPS position. *See Acura of Bellevue v. Reich,* 90 F.3d 1403, 1407–08 (9th Cir. 1996) (pursuing optional appeal of an agency decision renders that decision non-final because "the initial agency decision may be modified or reversed").

Likewise, the agency's demands for damages from activities in 2022 and 2023 were not final agency actions because they did not determine legal rights or obligations. *Fed. Trade Comm'n v. Standard Oil Co.,* 449 U.S. 232, 243 (1980) (administrative complaint is not final agency action); *Holistic Candlers & Consumers Ass'n v. FDA,* 664 F.3d 940, 944–45 (D.C. Cir. 2012) (warning letter that imposed no legal consequences is not final agency action). Indeed, NPS's October 2024 request that BLM close or declare null the Colosseum Plan of Operations confirms NPS itself understood the Plan had not lapsed by operation of law. Baghdadi Decl., Ex. S. Given the lack of finality of these prior statements, NPCA is wrong—legally and factually— that NPS made a final, operative determination in the April 2025 letter. Dkt. 20-1 at 12–13; *see* Shapiro Decl., Ex. B.

The 1995 NPS letter does not change that analysis. While NPCA emphasizes the temporary-approval language, that letter also authorized continued operations "as specified in the existing BLM and County approved plans" and stated the NPS notice did not "change or alter, in any way, the existing BLM approved plan." Baghdadi Decl. Ex. K at 1.

23

Opposition to NPCA's Preliminary Injunction

NPCA is likewise incorrect that NPS made a broad policy change that required it to provide additional explanation justifying a change. Dkt. 20-1 at 17–18. NPS's view since at least 1995 has been that the 1985 Plan remains in effect and governs activities within its scope. CRM timely appealed the Regional Director's purported repeal of its temporary use authorization that relied on a contrary rationale. *See* 36 CFR § 9.14(a);  Shapiro Decl., Ex. E. While that appeal was pending, the person exercising the authority of the Director of the National Park Service reaffirmed that CRM's valid existing rights were preserved by the CDPA. Shapiro Decl., Ex. B. The National Park Service Director has delegated authority over the Parks. U.S. Dep't of the Interior, 245 Departmental Manual 1.1(A) (2007). And 36 CFR § 9.14(a) provides that the Director would resolve the appeal of the Regional Director's letter. To the extent the April 2025 letter had any legal effect, it was that letter that stated the position of the agency and there was no heightened burden of explanation. The agency's path is reasonably discernible and should be upheld. *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 994.

### b.    NPCA's requested relief is not available under the APA or other authority

NPCA seeks to enforce mining regulations directly against CRM, compel NPS enforcement action, and obtain a court-supervised access-management regime. None of that is available under the APA. Neither the Mining in the Parks Act nor the CDPA contains a citizen suit provision. The Mining in the Parks Act directs the Secretary to regulate activities resulting from mineral rights in National Park units. 54 U.S.C. § 100732. The CDPA likewise imposes Secretary duties, but does not create a private right of action. 16 U.S.C. §§ 410aaa-47 to –49 (withdrawing lands subject to valid existing rights, subjecting claims to NPS mining laws subject to valid existing rights, and directing the Secretary not to approve a plan of operation before making specified determinations).

The APA does not fill that gap. It authorizes review for persons suffering legal wrong because of agency action, 5 U.S.C. § 702, and permits review of final agency action for which there is no other adequate remedy, *id.* § 704. But this supplies a vehicle for reviewing agency action; it does not create substantive duties beyond the underlying statute or transform statutes without citizen-suit provisions into private enforcement schemes. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001); *accord Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002). Congress knew how to create private remedies: the Mining in the Parks Act includes a compensation remedy for certain mining claim holders, but no citizen suit. *See* 54 U.S.C. § 100735; *Sandoval*, 532 U.S. at 290.

That limitation matters. NPCA does not merely seek record review of the April 2025 NPS letter. NPCA asks the Court to set aside the letter, halt all operations, and "monitor and enforce public access rights along Colosseum Road." Dkt. 20-4 at 1–2. The third request is not APA review of final agency action; it is a request for affirmative judicial direction of NPS enforcement and road-management decisions. NPCA cites no authority for such relief, which is particularly improper because agency enforcement decisions are presumptively committed to agency discretion. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Indeed, under the APA, courts may only compel agency action that is legally required; the APA does not authorize broad programmatic supervision of agency management. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 71–72 (2004). The Court should not convert the Mining in the Parks Act or CDPA into private enforcement statutes. If NPCA establishes reviewability, its remedy must be tied to the challenged agency action and tailored to an injury it has actually shown. *See Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring). It cannot obtain an order that sets aside the operative agency recognition,

80688750v1

25

Case No. 2:26-cv-4002-CAS-AS

Opposition to NPCA's Preliminary Injunction

compels NPS enforcement, and halts CRM's activities as though NPCA possessed a freestanding private right to enforce federal mining statutes.

### B. NPCA HAS NOT SHOWN IRREPARABLE HARM

NPCA must show it "is likely to suffer irreparable harm in the absence of preliminary relief," *McKinney*, 602 U.S. 339, 340 (2024), not merely that such harm is "possible." *Winter*, 555 U.S. 7, 22 (2008). "Speculative injury does not . . . warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). NPCA has not shown such harm here. Moreover, there is no presumption of irreparable harm based on alleged environmental injuries. *See Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).

### 1. CRM's planned operations are in a highly disturbed area

NPCA's declarants assert that CRM's operations will cause irreparable harm by presuming CRM is engaging in wholly new operations on undisturbed land. But CRM is operating in the same footprint, in the same open pits, using the same road that the PoO authorized in 1985 and that prior operators used. And some of the disturbance NPCA complains of is revegetated mine waste dumps.

The Approved PoO authorized gold extraction and mineral exploration and the current activities are within that authorization and significantly below the disturbance limits. Baghdadi Decl. ¶ 16, 34; Slesarewich Decl., Ex. C at 19–20. CRM has conducted no drilling, access, or other work outside this area. Baghdadi Decl. ¶ 36; Slesarewich Decl. ¶ 13, 15.[2]

NPCA relies heavily on asserted harm from vegetation removal. Dkt. 20-1 at 18–20. But CRM's expert biologist Mari Quillman states that—based on the Mine Plan and her revegetation experience within the Preserve—Mine activities in the next

---

[2] Certain locations depicted in NPCA's photographs lie outside the authorized operations area, including areas roughly three miles to the west of the Mine and west of Green's Cabin, and do not depict the Colosseum Mine project area. Slesarewich Decl. ¶ 49.

12 to 18 months should not cause "irreparable harm to . . . rare and endemic plants" or soils. Quillman Decl. ¶ 22. CRM will use proper topsoil salvage, and revegetation techniques will likely increase recruitment success for plant species. *See id*. ¶¶ 17-21, 27. Next, NPCA relies on photos of disturbance of waste dumps from prior mining that had revegetated and a photo taken well outside of the authorized disturbance area. Slesarewich Decl. ¶¶ 43-47, 49 (comparing annotated photographs). Dust and noise should be within tolerance, given required mitigation. Quillman Decl. ¶¶ 23, 26. The PoO Mitigation Program imposes dust control and revegetation requirements that remain in force. Baghdadi Decl., Ex. F at 24. Any disturbance can be repaired, and NPCA's own photos prove this site successfully revegetated after previous mining. Slesarewich Decl. ¶ 46, 47.

NPCA also asserts harm to vegetation from work on Colosseum Mine Road. Dkt. 20-2 at 11. This is the same road contemplated in the Approved PoO. CRM is making the road usable again, repairing it to no more than the 36-foot width approved in the PoO. Baghdadi Decl., Ex. H at 4; Slesarewich Decl., ¶ 23, Ex. D (with photos of road in 1980s and now). This portion of Colosseum Mine Road was a safety hazard in its former state of disrepair. Slesarewich Decl. ¶ 19.

The PoO also authorizes the safety features NPCA complains of: "access restriction measures in the form of gates, berms and fences to protect the general public." Slesarewich Decl., Ex. C at 44. The berms—which are not more than three feet high—are built to regulatory standards to stop vehicles from going over the edge into Colosseum Gorge. Berms have been present on Colosseum Road since the 1980s. Slesarewich Decl. ¶¶ 23-25 (showing pictures).

## 2. NPCA's declarants' other suggestions of environmental harm should not be considered

The declarations contain other suggestions of environmental harm not raised in NPCA's argument. *See, e.g.,* Dkt. 20-1, Wilcox Decl. ¶¶ 8, 24-25. Those suggestions do not rise to the level of irreparable harm. The Approved PoO imposes meaningful mitigation measures, Slesarewich Decl., Ex. D at 1-4, and before the site goes into full operation, CRM will obtain all additional necessary environmental permits. Slesarewich Decl. ¶ 56. CRM already operates under regulations ensuring groundwater quality, which CRM has bonded. Shapiro Decl. Ex. D.

NPCA's declarants have no evidence of irreparable harm to desert tortoise or bighorn sheep. The natural habitat of the desert tortoise is the Ivanpah Valley floor along the lower access road, not the mine site or the upper road segment at issue. Baghdadi Decl. Ex. L at 117, Quillman Decl. ¶ 25, Slesarewich Decl. ¶ 54. The 1987 decision imposed tortoise mitigation measures, including speed limits, road sweeps, and awareness programs. Slesarewich Decl., Ex. D, at 1-2. These measures remain in force. Slesarewich Decl. ¶ 54. The environmental analysis for the Approved PoO concluded the impact to bighorn sheep would be minor. *See* Quillman Decl. ¶ 23.

## 3. NPCA's access allegations do not show irreparable harm

NPCA asserts that CRM is blocking a public access road, impeding monitoring and recreational visits. Dkt. 20-1 at 20-21. Again, NPCA's argument rests on the false premise that CRM entered undisturbed areas and blocked public access. The Mine already existed, and the signage protects the public. Removing it would cause potential damage and liability issues.

What NPCA refers to as barricades are merely sign posts intended to warn the public of danger per MSHA, not to close public access. Colosseum Mine Road is the operator's authorized access route under the 1987 decision letter. Slesarewich Decl. Ex. D at 3. The signs are inside the unpatented claim areas, deep within the mining-

operation area, noticeably more than halfway up Colosseum Mine Road to the Mine. Slesarewich Decl. ¶ 25, 26. Moreover, this road is a very small part of the 1,542,742 acre preserve.

Regardless, the PoO authorized barriers, including "access restriction measures in the form of gates, berms and fences to protect the general public." Slesarewich Decl., Ex. C at 44. Public access is not denied to Green's Cabin; alternative routes include the western route via Shadow Valley, and CRM can arrange safe escorted access where needed. Slesarewich Decl. ¶ 30. The western route is quicker for some travelers, so Wilcox's claim that closure requires a one to two-hour detour is overstated. *See id*.; Wilcox Decl. ¶ 12 (Dkt. 20-2 at 6). NPCA's claims of irreparable harm are belied by its delay in seeking an injunction.

A delay in seeking a preliminary injunction weighs "against finding that Plaintiffs would suffer irreparable harm." *Protect Our Comtys. Found. v. U.S. Dep't of Agric.*, 845 F. Supp. 2d 1102, 1113 (S.D. Cal. 2012), *aff'd*, 473 F. App'x 790 (9th Cir. 2012); *see also Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Courts have found even short delays "counsel[ ] against a finding of irreparable harm." *See Or. Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1266 (D. Or. 2022) (just under three-month delay); *Dahl v. Swift Distrib., Inc.*, 2010 WL 1458957, at *10-11 (C.D. Cal. Apr. 1, 2010) (eighteen–day delay).

NPCA waited a year to file this complaint and 14 months to seek an injunction. But information about CRM's plans for the site was readily available. DOI publicly announced on April 8, 2025, that the Colosseum Mine could continue operations under the existing Plan. Wilcox Decl. Ex. G, Dkt. 20-2 at 250–51. CRM's activities at the Colosseum Mine were open, continuous, and publicly disclosed through Dateline's ASX announcements, website, and social media accounts, including financial information. Baghdadi Decl. ¶¶ 46-49, Ex. R. Yet NPCA has no reasonable excuse for its delay, which weighs against finding irreparable harm. *Grand Canyon*

Opposition to NPCA's Preliminary Injunction

*Tr. v. Williams*, 2015 U.S. Dist. LEXIS 67826, *15 (D. Ariz. May 26, 2015) (ten-month delay).

### C.    THE BALANCE OF EQUITIES WEIGHS AGAINST AN INJUNCTION

Courts "must balance the competing claims of injury." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 542 (1987). NPCA cites *Amoco* to suggest the balance usually favors environmental protection, but that case rejected any such presumption and reversed a preliminary injunction where plaintiffs had not shown probable environmental harm and the company would lose $70 million without chance of recovery. *Id.* at 545. So too here.

The Mine is CRM's and Dateline's principal asset. Baghdadi Decl. ¶ 51. An injunction would cause direct, substantial, and irreversible harm to CRM, Dateline, and their shareholders. *Id.* NPCA's delay causes substantial prejudice to CRM including: operational disruption and loss of investment, loss of critical infrastructure positions and contractual commitments, and financial and shareholder harm. *Id.* Since the April 2025 NPS letter, CRM has invested approximately $40 million in exploration, development, site work, civil works, and compliance activities, employed approximately twelve people, and contracted with approximately six contractors, all in reliance on the federal government's written confirmation of CRM's valid existing rights. Baghdadi Decl. ¶¶ 52-60. Those sunk costs are not recoverable: drill rigs will leave the site, crews will disperse, queue positions and lease rights may lapse, and deposits on long-lead equipment, CRM's position in the Southern California Edison power-service queue, and a water contract costing approximately $120,000 per month could be lost permanently, while CRM's overhead of approximately $250,000 per month continues. *Id.* That harm extends to Dateline's approximately 16,529 shareholders, the majority of whom are smaller retail investors who have already suffered an approximately 65% decline in investment value since this litigation began,

and who provided approximately $78 million in capital since April 2025, with approximately $275 million in near-term development commitments now at risk. Baghdadi Decl. ¶¶ 61-62.

CRM's harms, along with the public interest described below, strongly outweigh the minimal environmental harm that NPCA has alleged. *See W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (affirming denial of environmental group's preliminary injunction motion, considering "the possible damage to project funding, jobs, and the state and national renewable energy goals that would result from an injunction halting project construction").

These facts contrast with the cases NPCA cites. *See* Dkt. 20-1 at 19. In *South Fork Band Council v. U.S. Department of Interior*, 588 F.3d 718, 728 (9th Cir. 2009), the court focused principally on employment loss, which in that circumstance it found "may for the most part be temporary." In *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014), the economic harm was also limited to "loss of jobs and loss of government revenue."[3] Here, the economic damage is not limited to employment loss. Moreover, in those cases, plaintiffs had evidence of strong likelihood of permanent environmental harm, which NPCA has not shown.

### D. THE PUBLIC INTEREST WEIGHS DECISIVELY AGAINST AN INJUNCTION

When weighing the public interest, Congress's "order of priorities" controls. *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497–98 (2001). Here, Congress provided express statutory protections for valid existing mining rights in the CDPA through savings clauses enacted against a background understanding that mining claims are constitutionally protected property interests. *See* 54 U.S.C.

---

[3] In *Southeast Alaska Conservation Council v. U.S. Army Corps of Engineers*, 472 F.3d 1097, 1101 (9th Cir. 2006), the court found delay would not significantly reduce future economic benefit from the mine but did not explain why.

§ 100735. An injunction that nullifies those congressionally preserved rights before merits adjudication would not serve the public.

The public interest favors stability in agency decision-making, respect for approved plans of operations, and orderly administration of federal mining law. NPS's April 2025 letter reflected the agency's understanding of the scope of pre-CDPA rights. Enjoining action consistent with those rights before record review would undermine agency authority, disrupt legitimate reliance interests, and signal that approved mining entitlements can be suspended by preliminary motion before the administrative record is compiled.

Moreover, the public has a compelling interest in domestic rare earth elements, irreplaceable to national defense, advanced manufacturing, and clean energy. The federal government has pursued domestic rare earth development as a national security priority for over fifteen years, driven by near-total dependence on China. Mountain Pass is the only active rare earth mine in the United States. Colosseum sits six miles from Mountain Pass's processing infrastructure, making it the only domestic rare earth deposit not requiring a new processing facility, historically a prohibitive barrier to domestic rare earth development. Baghdadi Decl. ¶¶ 64-68. Secretary Burgum has recognized Colosseum as "America's second rare earth mine." Shapiro Decl. ¶ 8, Ex. F.  Enjoining this exploration program is contrary to the public interest.

Finally, an injunction is unnecessary to protect the environmental interests NPCA invokes. A comprehensive regulatory framework already safeguards them—state, county, and federal controls for water quality, wildlife, and reclamation remain fully in force. *See* Slesarewich Decl. ¶ 55-56. The public's interests are secure without the extraordinary relief NPCA seeks.

## VI.    CONCLUSION

NPCA's Motion for Preliminary Injunction should be denied.

DATED: July 6, 2026                    JEFFER MANGELS & MITCHELL LLP
                                       KERRY SHAPIRO
                                       MICHAEL H. STRUB, JR.


                                       By:    _/s/ Michael H. Strub, Jr._
                                                  MICHAEL H. STRUB, JR.


DATED: July 6, 2026                    HOLLAND & HART LLP
                                       MURRAY FELDMAN
                                       JENNIFER SCHELLER NEUMANN
                                       AMELIA YOWELL
                                       ANDREA J. DRIGGS


                                       By:    _/s/ Murray Feldman_
                                                  MURRAY FELDMAN

                                       Attorneys for Proposed Intervenor-
                                       Defendants Dateline Resources Ltd. and
                                       Colosseum Rare Metals, Inc.

JMM | Jeffer Mangels & Mitchell LLP

80688750v1

33

Case No. 2:26-cv-4002-CAS-AS

Opposition to NPCA's Preliminary Injunction

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Dateline Resources Ltd. and Colosseum Rare Metals, Inc. certifies that this brief contains 6,992 words, which complies with the word limit of L.R. 11-6.1.

DATED: July 6, 2026

JEFFER MANGELS & MITCHELL LLP
KERRY SHAPIRO
MICHAEL H. STRUB, JR.

By: _/s/ Michael H. Strub, Jr._
MICHAEL H. STRUB, JR.