JEFFER MANGELS & MITCHELL LLP
KERRY SHAPIRO (Bar No. 133912)
*kshapiro@jeffer.com*
MICHAEL H. STRUB, JR. (Bar No. 153828)
*MStrub@jeffer.com*
HA CHUNG (Bar No. 332571)
*hchung@jeffer.com*
3 Park Plaza, Suite 1100
Irvine, California 92614-2592
Telephone: (949) 623-7200
Facsimile: (949) 623-7202

HOLLAND & HART LLP
MURRAY FELDMAN (pro hac pending)
*mfeldman@hollandhart.com*
JENNIFER SCHELLER NEUMANN (pro hac pending)
*jsneumann@hollandhart.com*
AMELIA YOWELL (pro hac pending)
*AGYowell@hollandhart.com*
ANDREA J. DRIGGS (Bar No. 223224)
*AJDriggs@hollandhart.com*
800 W. Main Street, Suite 1750
Boise, Idaho 83702
Telephone: (208) 342-5000
Facsimile: (208) 343-8869

Attorneys for DATELINE RESOURCES LTD. and
COLOSSEUM RARE METALS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as Acting Director of the National Park Service; KEVIN SCHLUCKEBIER, in his official capacity as Acting Superintendent of Mojave National Preserve, <br><br> Defendants. | Case No. 2:26-cv-4002-CAS-AS <br><br> **DECLARATION OF STEPHEN BAGHDADI IN SUPPORT OF COLOSSEUM RARE METALS, INC. AND DATELINE RESOURCES LIMITED'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

80686750

**DECLARATION OF STEPHEN BAGHDADI**

I, Stephen Baghdadi, declare as follows:

1.     I am the Managing Director of Dateline Resources Limited ("**Dateline**"), the publicly traded parent company of Colosseum Rare Metals, Inc. ("**CRM**"), and a director and authorized representative of CRM. I make the following statements based on my own personal knowledge and on my review of the business records of CRM and Dateline, which are kept in the ordinary course of business, and which I am authorized to access and produce. If called as a witness, I could and would testify competently to the matters stated herein.

2.     In my role at Dateline, and in my capacity as a director and authorized representative of CRM, I am familiar with CRM's ownership, operations, property interests, regulatory files, and correspondence relating to the Colosseum Mine (the "**Mine**"). My duties include reviewing and maintaining company records concerning the acquisition, ownership, permitting, compliance, land-use status, financial assurances, and agency communications associated with the Mine.

3.     The records on which I rely include but are not limited to CRM and Dateline corporate records; transaction documents concerning CRM's acquisition of the Colosseum Mine; title and claim-maintenance files; land-use and reclamation records maintained in the ordinary course of business; financial-assurance instruments and related agency acknowledgements; and correspondence between CRM or its representatives and federal, state, and county agencies regarding the Mine. These are the types of records that CRM and Dateline regularly maintain in connection with the ownership, maintenance, and operation of mining assets.

4.     The records referenced in this declaration were made at or near the time of the events they describe by persons with knowledge of those events, or were received and maintained by CRM and Dateline as part of their regularly conducted business activity. Those records have been kept in the ordinary course of CRM's and Dateline's business, and it is the regular practice of those entities to create, receive,

maintain, and rely upon such records in managing the Mine and related corporate affairs.

### CRM Structure And Mine Ownership

5.     Colosseum Rare Metals, Inc. ("**CRM**") is a Delaware corporation and a wholly owned subsidiary of Dateline Resources Limited ("**Dateline**"), the publicly traded parent company that holds CRM's outstanding equity. CRM is the operating entity responsible for the ownership, permitting, and conduct of activities at the Mine, and CRM holds the direct operational and property interests associated with the Mine. (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026)

6.     The Colosseum Mine ("**Mine**") is located on the northern flank of Clark Mountain at the head of Colosseum Gorge in the historic Clark Mountain Mining District of northeastern San Bernardino County, California, approximately ten miles west of Stateline, Nevada ("**Mining District**"). (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026)

7.     CRM acquired the Colosseum Mine in 2021 from LAC Minerals (USA) LLC. The 2021 conveyance transferred to CRM the patented claims known as Colosseum No. 1 and Colosseum No. 2, together with the unpatented lode mining claims and associated millsites comprising the Mine. The Grant Deed with Reservation of Net Smelter Returns Royalty was made effective as of October 25, 2021, by and between LAC Minerals (USA) LLC, as grantor, and Colosseum Rare Metals Inc., as grantee, and was recorded on October 27, 2021 in the official records of San Bernardino County as Document No. 021-0486459. Attached hereto as **Exhibit A** is a true and correct copy of the Grant Deed with Reservation of Net Smelter Returns Royalty, dated effective October 25, 2021, and recorded October 27, 2021. (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) (04.A Colosseum Mine

- Title Review (Final).pdf, 2026) (34 Grant Deed with Reservation of Net Smelter Returns Royalty.pdf, 2026) (40.B Colosseum CLUC Index and Exhibits Complete.pdf, 2026)

8.      At the time CRM acquired the Mine, the claims and millsites associated with the Mine were active and in good standing, and the annual BLM and County filings had been made as to the claims comprising the Mine. CRM has maintained current filings with BLM and San Bernardino County with respect to the claims and millsites since the acquisition. Attached hereto as **Exhibit B** is a true and correct copy of the BLM Mineral and Land Records System printout reflecting claim-maintenance records for the Colosseum Mine claims and millsites through August 2025. (Baghdadi Declaration Draft (1).docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) (64 Colosseum Mine - Title Review (Final).pdf, 2026)

### Historic Patents And Claim Ownership

9.      Based on my review of CRM's title, patent, and historical records maintained in the ordinary course of business, the Mine's history reflected an unbroken chain of mining-related ownership, maintenance, and asserted rights from the nineteenth century to the present, spanning more than 160 years. Those records also reflected that gold was first discovered and developed at the Mine in the 1860s on the northern flank of the historic Mining District. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026)

10.      As part of CRM's title and diligence files acquired in connection with its purchase of the Mine, CRM maintained copies of the original United States patents conveying the Colosseum No. 1 and Colosseum No. 2 lode mining claims into private ownership. On March 13, 1897, the United States issued fee patents for those two claims, conveying approximately 40 acres of land into private ownership without any

80686750                                         4

reservation of minerals. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (58 DOI Legal Analysis & Exhibits (3.26.2025).pdf, 2026) Attached hereto as **Exhibit C** is a true and correct copy of the fee patents for the Colosseum No. 1 and Colosseum No. 2 lode mining claims, issued March 13, 1897. (Baghdadi Declaration Draft (1).docx, 2026) (58 DOI Legal Analysis & Exhibits (3.26.2025).pdf, 2026)

11.    My review of CRM's title materials also reflected that the patented land conveyed by those 1897 patents corresponds to the private patented parcels that remain part of the Mine today. CRM's title records and title review materials identified the patented claims as the Colosseum No. 1 and Colosseum No. 2 claims and reflected their continued inclusion within the Mine's asset base. (Baghdadi Declaration Draft (1).docx, 2026) (64 Colosseum Mine - Title Review (Final).pdf, 2026)

12.    Based on the historical records maintained in CRM's files, mining continued at the Mine through the early twentieth century, paused in January 1942 during the nationwide wartime curtailment of non-essential mining, and resumed in the post-war period. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Baghdadi Declaration Draft (1).docx, 2026) (58 DOI Legal Analysis & Exhibits (3.26.2025).pdf, 2026)

13.    CRM's records further reflected that the unpatented mining claims associated with the Mine were located in the 1970s and 1980s and were thereafter maintained continuously. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Baghdadi Declaration Draft (1).docx, 2026) (Baghdadi Declaration Draft (1).docx, 2026) (64 Colosseum Mine - Title Review (Final).pdf, 2026)

### **1982 And 1985 Plan of Operations History**

14.    Based on my review of CRM's regulatory files, on January 11, 1982, a Plan of Operations and Reclamation Plan for the Mine was submitted by California

Gold Properties  to the U.S. Bureau of Land Management ("BLM"), and BLM approved that initial plan on February 5, 1982. The 1982 approval authorized exploration and mining activities on the federal unpatented claims associated with the Mine. Attached hereto as **Exhibit D** is a true and correct copy of the Plan of Operations and Reclamation Plan submitted January 11, 1982 and approved by BLM on February 5, 1982 ("**1982 PoO**"). (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) (PI Opposition — Factual Issue Matrix.docx, 2026) (CRM - Plan of Operations Non-Lapse Position_ Summary of Evidence and Legal Framework.docx, 2026) (12.A Third Modification and Reclamation Plan and Plan of Operations, Colosseum Project.pdf, 2026)

15.     Between 1982 and 1985, BLM approved modifications to the plan. The First Modification application was submitted by Amselco Exploration, Inc.  on June 28, 1983 and approved  by BLM on August 4, 1983. The Second Modification application was submitted by Amselco Exploration, Inc. on February 17, 1984 and approved by BLM on May 15, 1984 for the 1984/1985 exploratory drilling program. On September 10, 1985, BLM approved the Third Modification to Reclamation Plan and Plan of Operations, Colosseum Project ("**1985 PoO**"), application submitted by Amselco Exploration, Inc., following joint BLM/County environmental review. The 1985 PoO became the operative mine plan for the Mine, still in effect today. BLM's approval was memorialized in Decision Record No.  3800-EIS-85-69-1792-1. Attached hereto as **Exhibit E** is a true and correct copy of the 1985 PoO. Attached hereto as **Exhibit F** is a true and correct copy of BLM Decision Record No. 3800-EIS-85-69-1792-1, dated September 10, 1985, which approved the 1985 PoO ("**1985 Decision Record**"). (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) (10.A BLM Decision Record No. 3800-EIS-85-69-1792-1 (Sept. 10, 1985).pdf, 2026)

80686750

6

16.    The 1985 Decision Record authorized an open-pit gold mining operation, including mining, milling, cyanidation in a closed circuit for gold and silver extraction, and development of a waste disposal facility. The approved project components are located on approximately 600 acres  within the approved PoO, composed of public land and 40 acres of patented land. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) (10.A BLM Decision Record No. 3800-EIS-85-69-1792-1 (Sept. 10, 1985).pdf, 2026)

17.    Page 2 of the 1985 PoO states that "[t]he [1982 PoO], the First Modification and the Second Modification are incorporated by this reference for a description and analysis of environmental setting, geology, historic land use, impacts on public health and safety, wildlife and vegetation, reclamation, land use, and other purposes."

18.    Section III.E of the 1982 PoO expressly recognized that "external factors, including market conditions, regulatory changes, and technological changes beyond the control of the operator, could adversely affect operation of the property, and that if those factors created untenable conditions, operations could be suspended for an indefinite period of time until favorable conditions warranted renewed operation."

19.    The operative 1985 PoO contains no expiration date. Section V of the 1985 PoO states that "production operations will endure for approximately 12 years thereafter or ***until exhaustion of economically recoverable deposits***."  (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) (PI Opposition — Factual Issue Matrix.docx, 2026) (CRM - Plan of Operations Non-Lapse Position_ Summary of Evidence and Legal Framework.docx, 2026)

20.    In April 13, 1987, BLM approved the expanded Colosseum Mine Road,

powerline, and water pipeline ("**1987 Decision**"), and following issuance on February 5, 1987 of an Environmental Assessment ("**1987 EA**"). The application was submitted by Colosseum California, Inc. That 1987 Decision forms part of the approvals governing the supporting infrastructure for mine operations. Attached hereto as **Exhibit G** is a true and correct copy of the 1987 Decision. Attached hereto as **Exhibit H** is a true and correct copy of the 1987 EA. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026)

21.    Based on the regulatory records maintained by CRM and reviewed by me, I refer to the 1985 PoO , the earlier plans incorporated into it, and the 1987 Environmental Assessment amendment collectively as the "**Approved PoO.**" (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026)

### County Reclamation And Vested Rights

22.    Roughly concurrent with the 1985 federal approval history described above, San Bernardino County ("**County**") approved Reclamation Plan 85M-02 ("RecPlan") for both the patented and unpatented portions of the Mine area. Based on my review of CRM's County records, that approved reclamation plan covered the Mine as an open-pit, vat-leach operation and identified an area to be mined and reclaimed of 600 acres. A copy of the Rec Plan is attached as Appendix I to the 1985 PoO. (40.B Colosseum CLUC Index and Exhibits Complete.pdf, 2026)

23.    Based on my review of the County records maintained in CRM's files, the County approved the RecPlan without first requiring a use permit to conduct surface mining operations on the two patented claims on private land. From those records, I understand that the County recognized the patented land as being subject to vested mining rights under state law as reflected by the County's approval of the

reclamation plan absent the need for a use permit. (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026)

24.    In 2023, the County re-confirmed the status of the patented land as having vested mining rights by issuing Certificate of Land Use Compliance for Vested Land Use No. VR 2022-02, dated February 22, 2023 ("**CLUC**") for the patented Colosseum parcels, Assessor Parcel Nos. 0572-161-04 and 0572-161-05. The CLUC states that mineral resource development activities are legally established as a conforming land use based on a pre-existing vested right to access and engage in mineral resources development. The CLUC further states that the subject land use was established about 1883, with subsequent affirmation by the County through the initial reclamation plan approval on January 14, 1982, and the 1985 modification of the reclamation plan. Attached hereto as **Exhibit I** is a true and correct copy of the CLUC. (DOI Legal Analysis & Exhibits (3.26.2025).pdf, 2026) (58 DOI Legal Analysis & Exhibits (3.26.2025).pdf, 2026) (DOI Legal Analysis & Exhibits (3.26.2025).pdf, 2026) (58 DOI Legal Analysis & Exhibits (3.26.2025).pdf, 2026)

### 1993 Pause And Continued Maintenance

25.    The Mine operated as an active gold producer from 1987 until 1993, and CRM's records reflect that more than 344,000 ounces of gold were produced during that period. Extraction paused in 1993 because prevailing economic conditions no longer supported profitable extraction. Based on my review of the Approved PoO and CRM's records, that kind of market-driven pause was consistent with the Approved PoO.

26.    At the time production paused, the then-owner retained the unpatented mining claims and mill sites needed for future extraction, and relinquished other previously held unpatented mining claims it did not require. Based on the ownership, title, and maintenance records I have reviewed, the unpatented mining claims, mill sites, and site components necessary to support renewed mining operations were

preserved and maintained rather than abandoned.

27.    Since 1993, the owners of the Mine have continuously maintained the Mine's unpatented mining claims and mill sites  through annual maintenance payments to the BLM and by recording notices of intent to hold with the County. Those same records also reflect continuing maintenance of the Mine's reclamation obligations and associated regulatory requirements. Exhibit B is a copy of the BLM Mineral and Land Records System printout reflecting claim-maintenance records for the Colosseum Mine claims and millsites through August 2025.

28.    The records I review and maintain in the ordinary course further reflect that, after extraction paused, mineral operations continued in multiple ways: (1) the Mine owners have maintained the 80 unpatented mining claims and mill sites by making annual maintenance payments to BLM and recording notices of intent to hold with the County; (2) maintained reclamation plans and reclamation bonds for over 31 years; (3) monitored groundwater quality and maintained water quality and reclamation bonds consistent with NPS and state water board demands; (4) constructed and maintained miles of fencing around the mine areas; (5) retained a site maintenance and security crew to monitor and maintain the site and prepare annual maintenance reports; and (6) expressly asserted to NPS an intent to resume extraction upon favorable economic conditions. Reclamation is not completed, and the drainage ponds remain lined and continuously operational.

29.    CRM's files also reflect written evidence of that continuing intent to resume mining. In January 1999, while the Mine remained in suspension, the predecessor operator,  LAC Minerals (USA) Inc., stated in writing to the National Park Service ("**NPS**") that there was "still a mineral resource at the Colosseum mine" and that "mining may again be conducted." Attached hereto as **Exhibit J** is a true and correct copy of the letter from LAC Minerals (USA) Inc. to the NPS, dated January 6, 1999.

## CDPA Preservation Of Rights

30.     Based on my review of CRM's title and regulatory records, Congress enacted the California Desert Protection Act in 1994 and created the Mojave National Preserve, and the lands within the Preserve were withdrawn subject to valid existing rights. The Mine's Approved PoO predated enactment of the statute by nearly a decade, and CRM's records reflect that the Mine's preexisting rights and operating framework continued to be treated as existing rights after the Preserve was created. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (04.A Colosseum Mine - Title Review (Final).pdf, 2026) (64 Colosseum Mine - Title Review (Final).pdf, 2026)

31.     CRM's records further reflect that, on July 14, 1995, the NPS Pacific West Field Area sent a letter to the then-operator, Colosseum, Inc., stating that BLM records showed the operator was working under a BLM-approved plan of operations on lands that had become part of the Mojave National Preserve. That letter stated that Colosseum, Inc. may continue existing operations until completion of reclamation as specified in existing BLM and County approved plans, and further stated that the notice did not change or alter the existing BLM-approved plan under which reclamation was being completed. Attached hereto as **Exhibit K** is a true and correct copy of the letter from NPS Pacific West Field Area to Colosseum, Inc., dated July 14, 1995.  (20 NPS July 14, 1995 Letter.pdf, 2026)

32.     Based on the same records, I understand that the Mine's operations after 1994 continued within that existing Approved PoO framework during reclamation and monitoring, and ongoing maintenance, rather than under any newly created operational plan. CRM's files reflect continued recognition of the Approved PoO as the governing operational framework during that period. (20 NPS July 14, 1995 Letter.pdf, 2026) (04.A Colosseum Mine - Title Review (Final).pdf, 2026)

**Operations Under the Approved PoO**

33.     CRM acquired the Mine in 2021 with the intent, based in part on then-current economic conditions, to resume mineral extraction under the Approved PoO

that CRM understood remained in effect. (Baghdadi Declaration Draft (1).docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) Beginning in 2021, CRM undertook activities encompassed by the Approved PoO, including access and maintenance work along the historic Colosseum Mine Road right-of-way and exploratory and site-investigation work on the patented land and federal unpatented mining claims. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026)

34.    From my role overseeing CRM's operations, contractors, and related company records, I understand CRM's work since 2021 to be a continuation of long-authorized operations at an existing mine site rather than a new undertaking. (Baghdadi Declaration Draft (1).docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026) CRM has at all times conducted its work at the Mine within the parameters of the existing Approved PoO , which authorizes an open-pit mining operation within an approved disturbance envelope of approximately 600 acres of public land and approximately 40 acres of patented land. (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (10.A BLM Decision Record No. 3800-EIS-85-69-1792-1 (Sept. 10, 1985).pdf, 2026)

35.    In planning resumed operations, CRM reduced expected gold extraction from approximately 1.1 million ounces to approximately 570,000 ounces in order to remain within that footprint of the Approved PoO. (Baghdadi Declaration Draft (1).docx, 2026) (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Declaration of Stephen Baghdadi in Support of CRM and DTR_s Opposition to Plaintiff_s Motion for Preliminary Injunction.docx, 2026)

36.    I understand that CRM's exploratory work, including drill pads and related temporary access, has been planned and conducted within the Approved PoO

80686750

boundaries and with concurrent reclamation of temporary disturbance areas, such as temporary haul roads.  (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (Baghdadi Declaration Draft (1).docx, 2026) (CRM and DTR's Opp. to Plaintiff's Motion for PI [SoF 7.2.26].docx, 2026) (40.B Colosseum CLUC Index and Exhibits Complete.pdf, 2026)

### Environmental Oversight And Assurances

37.    Based on my review of CRM's regulatory files, the Mine remains subject to active environmental oversight under approvals and obligations that have continued across federal, state, and county levels. In 1985, the BLM and the County completed joint NEPA/CEQA environmental review for the Colosseum Project in the form of a joint EIS/EIR, which included numerous environmental mitigation measures, and in 1987 BLM prepared the supplemental environmental assessment governing the access road, powerline, and water pipeline associated with Mine operations.  The EIR/EIS and supplemental environmental assessment, including related mitigation measures, continue to govern operation of the Mine. Attached hereto as **Exhibit L** is a true and correct copy of the Environmental Impact Report/Environmental Impact Statement, State Clearinghouse No. 84-080-602, dated March 1985.  (10.A BLM Decision Record No. 3800-EIS-85-69-1792-1 (Sept. 10, 1985).pdf, 2026) (12.D BLM Decision Record No. 3800-EIS-85-69-1792-1 [Same as 09].pdf, 2026)

38.    I am familiar with CRM's water-quality and closure obligations at the Mine through my review of CRM's compliance records. When CRM acquired the Mine in 2021, the Lahontan Regional Water Quality Control Board ("Water Board") accepted transfer of Board Order No. 6-96-11 to CRM and accepted an irrevocable letter of credit in the amount of $735,000 as the financial assurance mechanism for closure and post-closure obligations at the Mine. (Baghdadi Declaration Draft (1).docx, 2026) Attached hereto as **Exhibit M** is a true and correct copy of the Water Board letter accepting transfer of Board Order No. 6-96-11 to Colosseum Rare Metals, Inc. and accepting the related financial assurance. (Baghdadi Declaration

Draft (1).docx, 2026) Attached hereto as **Exhibit N** is a true and correct copy of Irrevocable Letter of Credit No. 001, dated September 28, 2021, issued by Gunnison Bank and Trust Company in the amount of $735,000 for the benefit of the Lahontan Regional Water Quality Control Board in connection with the Mine. (Baghdadi Declaration Draft (1).docx, 2026)

39.    I am also familiar from CRM's records with the County's ongoing reclamation oversight of the Mine. The County maintains a separate reclamation bond for the Mine and conducts annual inspections in connection with that reclamation framework. Attached hereto as **Exhibit O** is a true and correct copy of the reclamation bond maintained with the County. (Baghdadi Declaration Draft (1).docx, 2026) (CRM - Plan of Operations Non-Lapse Position_ Summary of Evidence and Legal Framework.docx, 2026) (Baghdadi Declaration Draft (1).docx, 2026) (15.A Colosseum Mine - Title Review (Final).pdf, 2026) (Baghdadi Declaration Draft (1).docx, 2026)

### NPCA Delay And Prejudice

40.    On April 3, 2025, Jessica Bowron, Comptroller, Exercising the Delegated Authority of the Director, NPS, confirmed in writing that the National Park Service recognizes CRM's valid existing rights as stated in the "Third Modification and Reclamation Plan and Plan of Operations, Colosseum Project," approved September 10, 1985 by the Bureau of Land Management, and that those rights remain valid subsequent to passage of the California Desert Protection Act. In that April 3, 2025 letter, the NPS further stated that it does not require a new validity examination or further approval of exploration and other activities encompassed by the existing approved Approved PoO in the absence of CRM submitting a new plan of operations. A true and correct copy of that April 3, 2025 letter is attached hereto as **Exhibit P**.

41.    One week later, the Superintendent of Mojave National Preserve reiterated the NPS's recognition of CRM's valid existing rights and rescinded the prior System Unit Resource Protection Act demand for damages connected to access-

80686750

14

road work at the Colosseum Mine. Attached hereto as **Exhibit Q** is a true and correct copy of that April 10, 2025 letter.

42.　On April 8, 2025, BLM issued a press release stating that "the Department of Interior today recognized the Colosseum Mine in California can continue mining operations under its existing mine plan of operations with the Bureau of Land Management."

43.　CRM continued to invest capital and conduct operations at the mine in direct reliance on the federal government's April 2025 written recognition that CRM could continue operating under the approved Plan of Operations. CRM's operational planning, staffing, contracting, and capital-allocation decisions during that period were made in reliance on its understanding that the April 2025 recognition confirmed its valid existing rights and that the approved Plan of Operations remained operative and governed the mine.

44.　(Baghdadi Declaration Draft (1).docx, 2026)NPCA did not file its complaint challenging that April 2025 agency action until April 15, 2026. (Baghdadi Declaration Draft (1).docx, 2026) NPCA did not seek emergency preliminary injunctive relief until June 23, 2026. (Baghdadi Declaration Draft (1).docx, 2026) As a result, more than a year passed after the operative April 2025 agency action before NPCA filed suit, and more than fourteen months passed before NPCA sought emergency relief.

45.　Between April 2025 and the time NPCA sought to halt the project, CRM had committed substantial capital and continued operating in reliance on the federal government's written confirmation of CRM's valid existing rights and that the governing operational framework remained in effect.

**OPEN AND CONTINUOUS PUBLIC DISCLOSURE OF CRM'S ACTIVITIES FOLLOWING APRIL 2025 AGENCY RECOGNITION**

(Baghdadi Declaration Draft (1).docx, 2026)

46.　Following the April 2025 agency recognition, CRM's activities at the

80686750　　　　　　　　　15

Colosseum Mine were open, continuous, and publicly disclosed. CRM's parent company, Dateline, an entity listed on the Australian Securities Exchange, published numerous announcements describing CRM's activities at the Mine on a substantially contemporaneous basis. Those announcements were publicly accessible on Dateline's website, through the ASX announcement platform, and through Dateline's social media accounts, including on X (formerly Twitter) and LinkedIn. Any person monitoring the Mine or Dateline's public disclosures, including NPCA, had continuous, publicly available notice of the nature, scope, and progression of CRM's activities during the period between the April 2025 agency recognition and NPCA's June 2026 request for emergency relief.

47.    The disclosures were not general or aspirational. They described specific, ongoing field activities at the Mine site in real time. By way of example, on October 2, 2025, Dateline published an ASX announcement titled "Major Drilling Mobilised to Accelerate Colosseum BFS," reporting that Major Drilling had been mobilised to the Mine site to increase drilling pace in direct support of the Bankable Feasibility Study, with two rigs operating and a third on the way. On October 13, 2025, Dateline published an ASX announcement titled "Colosseum Bankable Feasibility Progress Update," reporting that access road construction was underway and expected to be completed by late October 2025, that long-lead items had been identified for early procurement, and that sonic drilling of tailings dam and stockpiles was commencing. These announcements are representative of the character and specificity of Dateline's public disclosures throughout the relevant period.

48.    Dateline's social media accounts published contemporaneous updates describing on-site activity in similar detail. On October 7, 2025, Dateline posted on X that the CEO was "currently on site at the Colosseum," that "[d]rilling's progressing well, excavations look great, and the feasibility study remains on track." On December 28, 2025, Dateline posted on X that CRM had "locked in water supply and a nearby infrastructure base," including a laydown yard and staging site for

80686750

construction and mining activities, equipment storage, maintenance workshops, and parking for personnel. These posts were publicly accessible and described visible, ongoing physical activity at the Mine site.

49.    A true and correct copy of a compilation of selected Dateline's ASX announcements excerpts and social media posts describing CRM's activities at the Colosseum Mine from April 2025 through May 2026 is attached hereto as **Exhibit R**. That compilation includes excerpts describing, among other things: commencement of site preparations for a rare earth element drilling program; the engagement of GR Engineering Services to lead Bankable Feasibility Study engineering with access road and power studies underway; mobilization of Major Drilling and escalation to multiple active drill rigs at the Mine site; access road construction and completion; procurement of long-lead equipment and identification of early procurement items; sonic drilling of tailings dam and stockpiles; acquisition of a track-mounted diamond drill rig; and the securing of water supply and a nearby infrastructure base for use as a laydown yard, staging site, equipment storage, maintenance workshops, and personnel parking. (Baghdadi Declaration Draft (1).docx, 2026)

### HARM FROM INJUNCTION

50.    The activities CRM announced above were not preliminary or speculative. They were active, capital-intensive operations conducted openly at the Mine site, publicly reported in real time, and visible to any person monitoring the project, including NPCA. It is against that backdrop, an ongoing program of drilling, civil works, contractor mobilization, equipment procurement, and infrastructure development, that the consequences of a preliminary injunction must be assessed. Halting those activities now would not merely freeze a project in place; it would disrupt an active mining program that has already committed substantial capital, engaged specialized personnel and equipment, and secured critical infrastructure positions that cannot simply be held open indefinitely.

51.    The Colosseum Mine is CRM's and Dateline's principal asset and their

only near-term opportunity to generate income. An injunction halting further activity at the Mine would cause direct, substantial, and in many respects irreversible harm to CRM, Dateline, and their shareholders. That harm falls into three categories: operational disruption and loss of sunk investment, loss of critical infrastructure positions and contractual commitments, and financial and shareholder harm.

*Operational Disruption and Sunk Investment*

52.     Since the April 2025 agency recognition, CRM has invested approximately $40 million in exploration, development, site work, civil works, and compliance activities at the Mine. An injunction would halt approved construction and development work associated with the processing facility and related supporting infrastructure while that work is underway, stopping CRM from moving forward on the facilities required to resume planned operations and disrupting procurement, contractor mobilization, scheduling, and project sequencing already put in place.

53.     An injunction would also directly jeopardize CRM's drilling program and the personnel and equipment supporting it. CRM has retained Major Drilling to conduct drilling operations at the. Drill rigs of the type deployed at the Colosseum Mine are specialized, high-demand equipment; they cannot remain idle on site indefinitely. If operations are halted, Major Drilling would be required to demobilize its equipment and redeploy its rigs and crews to other projects.

54.     If CRM is forced to release those crews, it would face significant difficulty reconstituting them. Experienced drill rig crews for the type of reverse circulation and diamond drilling conducted at the Colosseum Mine are in high demand across the mining industry, and there is no assurance that the same crews, or crews of comparable experience and availability, could be secured again on the same timeline or at the same cost. The loss of Major Drilling's mobilized equipment and crews would not be a temporary inconvenience; it would set back the drilling program by months, disrupt the sequencing of the Bankable Feasibility Study, and require CRM to re-mobilize at materially greater expense and on an uncertain schedule.

55.     An injunction would jeopardize the approximately twelve jobs CRM has created in connection with the Mine since the April 2025 agency confirmations. Those positions include supervisors, geologists, drillers, helpers and administrative staff. A work stoppage would require CRM to furlough or terminate all bare 2 or 3 of those employees. As with drill rig crews, specialized mining and geology personnel are not easily rehired on short notice, and the loss of institutional knowledge and project familiarity built by the current team would impose additional costs and delays on any resumption of operations.

56.     Even if operations are stopped, CRM's carrying costs would continue to accrue without corresponding construction progress, operational advancement, or revenue generation.  CRM's overhead associated with the Mine is approximately $250,000 per month. Those costs run regardless of whether any work is being performed.

*Loss of Critical Infrastructure Positions and Contractual Commitments*

57.     An injunction would place at risk business commitments CRM has already made for long-lead items and utility access. CRM has placed deposits on transformers and other long-lead equipment, including SAG and ball mills located at a significant discount to new purchase price, for the processing facility. If activity is halted for an extended period, CRM risks losing the benefit of those deposits and the pricing advantages already secured.

58.     An injunction would also place at risk CRM's position in the Southern California Edison power-service queue. CRM currently holds an application for power and queue position for the Mine. Utility interconnection queues in California are competitive and subject to strict milestone requirements. If CRM's queue position is forfeited or lapses due to an extended halt in project activity, CRM would be required to reapply and would lose the timing advantage it has secured. Reentry into the SCE queue would not restore CRM's current position, and the delay in obtaining power connection services could extend the project timeline by years beyond what

80686750                                    19

would otherwise be required. (2026-07-01 - [23-1] Declaration of Stephen Baghdadi ISO Motion to Intervene.pdf, 2026) (Baghdadi Declaration Draft (1).docx, 2026)

59.     CRM also holds a water contract to support anticipated operations at the Mine, which is anticipated to cost CRM $120,000 per month. If activity is halted for an extended period, CRM risks losing years of availability under that lease without corresponding operational benefit, and risks jeopardizing the lease itself.

60.     Taken together, the operational disruptions described above are not matters that can be paused and later resumed on equivalent terms. Drill rigs will leave the site. Crews will disperse to other projects. Queue positions and lease rights may lapse. Employees and contractors will move on. The harm from an injunction is not limited to the period of the stay itself; it extends to the cost, delay, and uncertainty of attempting to reconstitute an active mining program after an involuntary halt.

*Financial and Shareholder Harm*

61.     CRM has committed approximately $275 million in near-term investment over the following twelve to eighteen months for the processing facility, gold room, crushing circuits, mining equipment, power lines, and related supporting infrastructure needed to resume operations. Since the April 2025 agency recognition, Dateline has raised approximately $78 million in capital in support of the Mine project. Those capital raises were made in reliance on the federal government's written confirmation of CRM's valid existing rights and the governing operational framework remaining in effect.

62.     The shareholder harm would be widespread and disproportionately impact smaller, retail investors. As of July 2026, Dateline had 6,242 registered shareholders on its share register. Based on the number of shares held through U.S. custodian nominee accounts and the average retail shareholding, Dateline estimates that those nominee accounts represent approximately 10,287 beneficial U.S. shareholders, for a total of approximately 16,529 shareholders, the ***majority of whom are smaller, retail investors***. Since this litigation began, every Dateline shareholder

has suffered an approximately 65% decline in the value of their investment. For the average retail shareholder, holding approximately 130,883 shares, that equates to a decline in investment value from approximately $36,647 to approximately $12,827, representing a loss of approximately $23,821 per retail investor.

63.    A preliminary injunction halting all further progress for twelve to eighteen months would dramatically impair confidence in the project and in Dateline's ability to finance completion of the Mine's development program. The Colosseum Mine is CRM's and Dateline's only asset capable of producing a return for shareholders within the next one and a half to two years, and the Company has no other sources of potential income. In my judgment, the harm from halting an active mining project under these circumstances would be direct, substantial, and not compensable by any bond or undertaking that NPCA could reasonably provide.

## NATIONAL SECURITY AND CRITICAL MINERALS SIGNIFICANCE OF THE COLOSSEUM MINE

64.    The significance of the Mine extends beyond its status as a permitted gold mining operation with valid existing rights. The Approved PoO authorizes an open-pit gold mining operation and, separately, ***exploration drilling*** for other minerals, including rare earths, as an authorized activity within the approved disturbance envelope. The Mine sits within a geologic province that United States Geologic Survey have identified as bearing rare earth element potential, and its development, including the exploration and drilling work currently underway, carries implications for domestic supply chains that the federal government has characterized as a national security priority.

65.    Rare earth elements are a group of seventeen metallic elements that are essential inputs in the manufacture of technologies critical to national defense and the broader economy. They are used in the permanent magnets that power electric motors in fighter jets, guided missiles, submarines, radar systems, and unmanned aerial vehicles. They are also essential to the production of electric vehicles, wind turbines,

advanced semiconductors, and medical imaging equipment. There is no practical substitute for rare earth elements in most of these applications.

66.    The United States' dependence on foreign sources for rare earth elements, and in particular on China, which controls an estimated majority of global rare earth mining and processing capacity, has been identified by the federal government as a strategic vulnerability. China has demonstrated a willingness to restrict rare earth exports as a geopolitical tool, and the absence of a domestic supply chain creates a single point of failure for defense and advanced manufacturing industries.

67.    The United States currently has no meaningful domestic capacity to mine or process rare earth elements at scale, with one exception: the Mountain Pass mine in San Bernardino County, California, operated by MP Materials, is the only active rare earth mine in the United States. The Mine sits within the same rare earth element-bearing geologic province as Mountain Pass, and the proximity of Mountain Pass's existing processing infrastructure (six miles away) is directly relevant to the Mine's potential as a domestic rare earth feed source. CRM's current exploration and drilling program is designed in part to evaluate and delineate the rare earth element potential of the Colosseum deposit. If that potential is confirmed through the ongoing drilling program, the Mine could become one of only two sites in the United States with the geological endowment, existing rights, and proximity to processing infrastructure necessary to contribute meaningfully to domestic rare earth production. MP Materials and CRM are, to my knowledge, the only two entities currently positioned to affect the near-term domestic rare earth production profile.

68.    An injunction halting CRM's activities at the Mine would not merely pause routine site work. It would delay the only active exploration and development program at a previously mined, federally recognized site positioned to support a domestic rare earth supply chain, a priority the federal government has pursued consistently across several administrations for more than fifteen years. The

Department of Energy identified rare earth elements as critical to national security and clean energy as early as 2010 and 2011; the former Trump Administration formalized the critical minerals framework through Executive Order Nos. 13817 (2017) and 13953 (2020); the Biden Administration expanded that framework through Executive Order No. 14017 (Feb. 24, 2021), which directed a government-wide review of supply-chain vulnerabilities specifically including rare earth elements; and the current Administration has further accelerated domestic mineral development through Executive Order Nos. 14154 and 14241 and the DOI's 2025 Critical Minerals List. Halting CRM's exploration and development program at this juncture would set back the only near-term domestic development effort at a site geologically positioned to complement Mountain Pass.

69.    Additionally, on October 17, 2024, Ron Nuckles, Field Manager of the Bureau of Land Management Needles Field Office, received a letter from Raymond McPadden, Superintendent of Mojave National Preserve, requesting that BLM close the 1983 Plan of Operations for the Colosseum Mine on the ground that "the mining portion of the plan is complete." That letter was subsequently forwarded to me by Mr. Nuckles on March 7, 2025 by email. A true and correct copy of the October 17, 2024 letter from Superintendent McPadden to Mr. Nuckles is attached hereto as **Exhibit S**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 6th day of July, 2026, at Greece.

_____
Stephen Baghdadi

80686750                                                        23