JEFFER MANGELS & MITCHELL LLP
KERRY SHAPIRO (Bar No. 133912)
*kshapiro@jeffer.com*
MICHAEL H. STRUB, JR. (Bar No. 153828)
*MStrub@jeffer.com*
HA CHUNG (Bar No. 332571)
*hchung@jeffer.com*
3 Park Plaza, Suite 1100
Irvine, California 92614-2592
Telephone: (949) 623-7200
Facsimile: (949) 623-7202

HOLLAND & HART LLP
MURRAY FELDMAN (pro hac pending)
*mfeldman@hollandhart.com*
JENNIFER SCHELLER NEUMANN (pro hac pending)
*jsneumann@hollandhart.com*
AMELIA YOWELL (pro hac pending)
*AGYowell@hollandhart.com*
ANDREA J. DRIGGS (Bar No. 223224)
*AJDriggs@hollandhart.com*
800 W. Main Street, Suite 1750
Boise, Idaho 83702
Telephone: (208) 342-5000
Facsimile: (208) 343-8869

Attorneys for DATELINE RESOURCES LTD. and
COLOSSEUM RARE METALS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION,<br><br>            Plaintiff,<br><br>      v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as Acting Director of the National Park Service; KEVIN SCHLUCKEBIER, in his official capacity as Acting Superintendent of Mojave National Preserve,<br><br>            Defendants. | Case No. 2:26-cv-4002-CAS-AS<br><br>**DECLARATION OF SIMON SLESAREWICH IN SUPPORT OF OPPOSITION OF DATELINE RESOURCES LIMITED AND COLOSSEUM RARE METALS, INC. TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

80688035

## DECLARATION OF SIMON SLESAREWICH

I, Simon Slesarewich, declare as follows:

1. I am the Chief Operating Officer ("COO") of Dateline Resources Limited ("Dateline"), a publicly traded company incorporated in Australia. Dateline is the publicly traded parent company of Colosseum Rare Metals, Inc. ("CRM"), the operating entity at the Colosseum Mine ("Mine") located on the northern flank of Clark Mountain in San Bernardino County, California.

2. In my capacity as COO for Dateline, my responsibilities include overseeing CRM's planning and development of the Mine, including; day-to-day field and mine operations, project execution and construction, environmental compliance and reclamation, permitting and regulatory affairs, contractor and vendor management, and health and safety.

3. I make this declaration based on my own personal knowledge, my direct involvement in and oversight of CRM's operations at the Colosseum Mine, my review of operational records, site inspection reports, and photographic documentation maintained in the ordinary course of CRM's and Dateline's business, and my personal site visits to the Mine. If called as a witness, I could and would testify competently to the matters stated herein.

## MINE SITE LOCATION AND SURROUNDING LAND USES

4. The Mine site is located within a small portion of the Mojave National Preserve relatively close to its outer boundary, in proximity to a number of large industrial and commercial uses. Attached hereto as **Exhibit A** is a true and correct copy of a map depicting the Mine in the Mojave National Preserve.

5. The area immediately surrounding the Mine is not remote or isolated from industrial and commercial development. The Ivanpah Solar Electric Generating System, one of the largest concentrating solar power facilities in the world, is located at the base of Clark Mountain in Ivanpah Valley, adjacent to the Mountain Pass mine corridor along the I-15 corridor. The Stateline Solar Farm is located in Ivanpah Valley

near the California-Nevada border, approximately 0.5 mile west of Interstate 15 and roughly two miles south of Primm, Nevada. The Primm resort complex, which includes Whiskey Pete's, Primm Valley Resort & Casino, and Buffalo Bill's, sits at the California-Nevada state line on Interstate 15, approximately ten miles east of the Mine, whilst the Primm Valley Golf Course is adjacent to the I15 and the Ivanpah Solar Electric Generating System. The Mountain Pass Mine, the sole operating rare earth elements mine and the only rare earth processing facility in the United States, is located approximately six miles south of the Colosseum Mine along the same I-15 corridor. Attached hereto as **Exhibit B** is a true and correct copy of an aerial photo depicting the surrounding land uses and regional context of the Mine.

## CURRENT DISTURBANCE REMAINS WITHIN THE AUTHORIZED PLAN AREA

6.       As part of my oversight of CRM's operations, I have undertaken a detailed review of the historical records for the Mine, including all of the various plans of operation, reclamation plans, and entitlement and environmental impact analysis documents that previously have been prepared in connection with the Mine.

7.       Based on my review of these historical records, I understand the Bureau of Land Management ("BLM") 1985 Plan of Operations ("**1985 PoO**"), the earlier plans incorporated therein, and the 1987 BLM Decision Letter ("**1987 Decision**") authorizing the access road, powerline, and water pipeline, collectively referred to as the "**Approved PoO**," continue to govern operations at the Mine. The Approved PoO authorizes a disturbance envelope of approximately 600 acres of public land plus approximately 40 acres of patented land.

8.       Based on my operational oversight and review of site conditions and records, every activity CRM has undertaken since 2021 has been conducted within the disturbance boundary authorized previously in the Approved PoO, and the site's current area of disturbance remains well below the authorized limit.

9.       Attached hereto as **Exhibit C** is a true and correct copy of the Third

80688035

3

Modification and Reclamation Plan and Plan of Operations for the Colosseum Project ("1985 PoO"), which I understand to be the operative plan for the Mine.

10.    Attached hereto as **Exhibit D** is a true and correct copy of the BLM Decision Letter issued in April 13, 1987.

11.    As of July 2026, the majority of the current disturbance at the Mine is on ground previously disturbed by mining operations at the Mine, and has been kept within the approved PoO footprint, and the disturbance associated with the current activities total approximately 377 acres.

12.    Current civil earthworks on the process pad area consist of bulk grading and screening of previously mined material stockpiled on the existing process pad, an industrialized surface that has been part of the mine's operational footprint since the 1987-1993 mining campaign.

13.    Exploration, drilling, roadwork, and other operational activities have been conducted by CRM since it acquired the Mine within the areas allowed for disturbance under the Approved PoO, consisting of limited-footprint drilling and sampling. Drill pads for these exploratory activities sit within the approved disturbance area, and temporary access roads for drilling is short-term. Disturbed drill areas and temporary access roads are concurrently reclaimed, including replacement of topsoil over drill pads and related work areas. These concurrent reclamation measures are part of CRM's standard operational practice at the Mine site.

14.    Having reviewed the historical records regarding the prior mining activities at the Mine, including the equipment used, and participated closely in the design and development of the current operations, it is my understanding that the equipment used in current operations is and will be more efficient and environmentally protective than the 1980s-1990s configuration, will use less water, and will provide better drainage and operational controls than equipment previously used at the Mine site.

80688035

4

15.     Among the various site facilities that have continued in use from the 1980s-1990s operation, several of the more prominent structures from the original mining campaign are being reused in current operations. These include the reclaim tunnel and chamber, the large concrete pads, all of which remain on site and are incorporated into the current operational plan. See below for photos of the concrete pads and reclaim tunnel and chamber. The reuse of these substantial, pre-existing structures further demonstrates that current work is a continuation of the operation authorized under the Approved PoO.



**Concrete Pads**



**Reclaim Tunnel and Chamber**

80688035                                                     5

16.     All current Mine-related work is within the geographic area and scope of activities authorized under the Approved PoO. No drilling, access, or works have been conducted outside the patented or unpatented mining claims. The smaller roads and flattened areas along the side of the Colosseum Mine Road are not new roads or new disturbance. Based on my direct oversight of CRM's operations, they are legacy, previously disturbed, or approved features being reestablished. The only minor new access created was for limited-footprint drilling and sampling within the Approved PoO boundaries.

17.     Contrary to NPCA's declarant James Andre, access to the limestone cliffs of Clark Mountain remains available, but well-removed from the Mine site. Based on my personal knowledge, the area can be reached from either the Colosseum Mine Road or, alternatively, from the west via Shadow Valley, and CRM can arrange safe access with advance notice through the operating area.

18.     Based on my operational oversight, I can describe the plan of activities for the next eighteen months of the current campaign, all of which begins on previously disturbed ground. The planned activities are anticipated to consist of civil and construction works required to comply with MSHA regulations and the Approved PoO, in furtherance of the same industrial mineral extraction and processing operation that was commenced at the Mine in the 1980s-1990s.

## ACCESS ROAD RESTORATION AND SAFETY

19.     The Colosseum Mine Road is a historic mine access corridor that has served the Mine site since the late 1800s. It is the sole access route to the Colosseum Mine. Before CRM undertook repair work, the road had fallen into serious disrepair and had become unsafe to travel.

20.     Road repair activities included rock removal; grading and smoothing; watering to bind the surface and ongoing dust suppression; installation of PoO-consistent signage; removal of the old water pipeline; construction of safety berms (required by MSHA); and enforcement of 25 mph speed limits.

80688035

6

21.     Colosseum Mine Road has been restored to a width of 36 feet or less, which is the width previously approved for that corridor under Section II.A of the 1987 Environmental Assessment, and has not been widened beyond that limit. On the flat areas the road is 36 feet. It pinches and swells as it climbs the mountain but is never greater than 36 feet. The cleared areas associated with that work are not new corridors; they are legacy disturbed areas and access features being reestablished for continued mine use.

22.     There is no dense vegetation along the Colosseum Mine Road. Nothing in the photographic record or my personal observations supports the assertion that dense vegetation was present along the road prior to CRM's repair work. The road corridor has been a disturbed, industrial access route since the 1980s. No vegetation along the Colosseum Mine Road has been cleared beyond restoring the original approved width.  See below for two photographs of Colosseum Mine Road showing the lack of vegetation on or near the road in the area of the Mine site. The first photograph shows Colosseum Mine Road during operations in the 1980s-90s.  The



Colosseum Mine access road looking up the hill

1980's

Current

second photograph, dated July 1, 2026 shows the current state of the road in roughly the same location.

23.     In addition, another set of photographs of Colosseum Mine Road taken during the 1980s and 1990s mining campaign, and current photographs taken from the same vantage points are presented below. A comparison of those photographs demonstrates that berms, power poles, and other road-related infrastructure were present along Colosseum Mine Road during the original operation. The current road work has not significantly widened or modified the road beyond its prior developed condition. In fact, the area surrounding Colosseum Mine Road appears to have more vegetation than before.



24.     Tire punctures occurred on multiple occasions on the road before repairs were completed. The road was a definite safety hazard in its former, deteriorated condition.

25.     The berms along Colosseum Mine Road are safety berms required by and consistent with the Approved PoO, and are constructed in accordance with Mine

Safety and Health Administration ("MSHA") standards under 30 C.F.R. §§ 56/57.9300 and 56/57.9301. The berms are a maximum of 3 feet in height with a flat top sized to prevent a vehicle from going over the edge into Colosseum Gorge. There are no six-foot berms along Colosseum Mine Road, notwithstanding statements in the Declaration of Chance Wilcox. Berms have been present on Colosseum Mine Road since the 1980s (see Exhibit C, 1985 PoO); CRM has merely reestablished them to ensure safe travel on the access road.

26.     The warning and access-control signage, including stop signs and "Danger — No Entry" signs, are only located within the approved Mine area on the unpatented mining claims and were installed as mine-safety measures for an active Mine site consistent with MSHA requirements. The "Danger — No Entry" barriers and signage are intended to warn the public of danger and of Personal Protective Equipment ("PPE"), such as hard hats, steel-toed boots, etc., requirements per MSHA, not to close public access. The Colosseum Mine Road was never closed to the public.

27.     To be clear about what NPCA and its declarant characterize as "barricades": the features observed on the ground are sign posts located at the relevant access points, not barricades that would physically prevent access. They are located within the unpatented mining claims, deep within the mining-operation area, and beyond the peak area (not halfway up as NPCA claims) of Colosseum Mine Road and near to operations. The no-entry signage was posted in anticipation of activation of the Mine ID on June 1, 2026, consistent with Section VIII of the 1984 PoO and MSHA requirements for an active mine site. Paragraph 30, below, describes a map showing where the sign posts are located, along with the Wilcox Declaration photo.

28.     The travel time up the access road has decreased from approximately 60 minutes to approximately 15 minutes following road repairs, which actually improves access to the area compared to the prior deteriorated condition.

29.     The road repairs and safety features described above are essential to protect human health and safety. A 2001 internal claim maintenance inspection report

prepared on behalf of CRM's predecessor documented a Ford F-150 pickup truck lying on its side at the bottom of Colosseum Gorge, approximately 800 feet below the access road, where it had gone over the edge from the deteriorated road surface. The inspector noted that the vehicle appeared to have been pushed off the Colosseum access road, with approximately 800 feet of elevation difference from the road to the bottom of the gorge. The vehicle had no license plates and showed signs of having rolled over sideways. The inspector contacted the California Highway Patrol regarding the vehicle. This incident illustrates the serious safety consequences of allowing the road to remain in a deteriorated condition. Attached hereto as **<u>Exhibit E</u>** is a true and correct copy of the internal Claim Inspection and Maintenance Report, dated March 2001, prepared on behalf of CRM's predecessor LAC Minerals (USA) Inc., and which is part of a series of such annual maintenance reports that were maintained, at a minimum, from 1996-2005.

30. Contrary to NPCA's assertions in the Wilcox Declaration ¶9, public access to Green's Cabin and the western Clark Mountain area is not being denied. Alternative routes consists of a western route via Shadow Valley. CRM can arrange safe escorted access through the mining site where needed and with reasonable notice. The western route is in fact a quicker way to Green's Cabin and western Clark Mountain for persons traveling from the south or west. Below, the map depicts in yellow an alternate western route to Green's Cabin, showing that an alternative

80688035

10

western route is feasible.



*Photo 11: Barricades Along Colosseum Road within the Preserve in May 2026*

## A PREVIOUSLY INDUSTRIALIZED LANDSCAPE

31.     The Mine site is not a pristine natural landscape. It is a previously industrialized area that was extensively disturbed during the 1987-1993 mining campaign and has since undergone substantial natural revegetation and reclamation. What appears today in places as desert vegetation is, in substantial part, regrowth over a historic industrial footprint. I have personally observed this condition during my multiple site visits to the Mine.

32.     The areas now under current development that were disturbed during the 1987-1993 mining campaign, include the access road (Colosseum Mine Road), the staging area, the tailings dam and sediment pond area, the waste-rock pile areas, multiple concrete process pads, and the two mining pits. Many of those previously disturbed areas later revegetated through natural recovery and reclamation efforts over the decades following the suspension of active mining in 1993.

33.    Several features that NPCA and its declarant describe as natural landforms are, in fact, engineered mine structures. The waste rock piles are man-made features created by depositing excavated material from the mine pits. The tailings dam is a man-made engineered structure constructed to contain processed mine tailings. I have personally observed and am familiar with these structures from my site visits and review of operational records.

34.    There is limited vegetation in the mining pit, except those near the pumps at the base of the pit, most of which are reeds. I have personally observed this condition during my site visits.

<strong><u>THE PHOTOGRAPHIC RECORD</u></strong>

35.    I personally prepared a set of annotated photographs for this litigation to demonstrate that the restart activities have not caused, and will not cause, irreparable harm and that some of the features identified by the Plaintiff as natural terrain are in fact revegetated historic mine waste and tailings management facilities. The photographs below consist of two categories: (a) before-and-after, same-vantage-point comparisons between the 1980s period and the present, and (b) annotated versions of photographs submitted by NPCA's declarant Chance Wilcox. Taken together, these materials (1) show that the areas at issue were disturbed during the prior mining campaign, and rather than being irreparably damaged have since substantially revegetated, and (2) they correct the NPCA declarant's misidentification of revegetated historic mine waste as natural terrain. It also shows that some of the photos in the Wilcox Declaration are of areas completely unrelated and far away from the Mine.

36.    I personally prepared these comparisons and annotations by selecting historical photographs from the Mine's photographic archive, took present-day photographs of the Mine site using the same or similar camera position and direction to achieve an "apples-to-apples" comparison, added graphics to certain present-day photographs to identify engineered mine structures such as the historic mine waste

piles and the tailings dam, and logged the approximate GPS coordinates and compass facing for each pair.

37.    **Location Map**: First I compiled a map identifying the locations of the vantage points for the photos below, by number. The black line boundaries describe the mining claim boundaries on the Mine site. As seen below, the satellite image depicts the disturbed area of the Mine due to its differing rock color from the surrounding areas.

## A. Historical and Current Photographs Showing Revegetation

38.    **Location 1 (Tailings dam area, view northwest)**: The photographs clearly show regrowth below the clearing line. The tailings dam wall and water collection area are visible as engineered structures. The current photograph shows significant revegetation of the areas below the clearing line.



Tailings dam wall

View north west across tailings dam to wall. Photos clearly show regrowth below the clearing line

Location 1

Clearing line

Tailings dam with water collection

39. **Location 2 (Mine site at commencement of operations):** The 1980s photograph shows the mine site at the commencement of operations. The current photograph from the same position shows significant revegetation of the same areas.



40.    **Location 3 (Initial operating Colosseum Mine vs. current):** The 1980s photograph shows the clearing for ROM (Run-of-Mine), crusher, and water tank areas. The current photograph from the same position shows significant revegetation of the same areas that were previously cleared.

41.    **Location 4 (Operating Colosseum Mine vs. current):** The 1980s photograph shows the mine at full operation. The current photograph shows the access road, waste dump, mine workshops, and ROM area, with revegetation visible on the waste dumps.  Note the 3 large concrete pads below the access road (red arrow) in the current photo, which will be re-used for building facilities.  Areas surrounding the pads have been recently cleared .



Operating Colosseum Mine

Current Colosseum Mine

42.    **Location 5  (revegetated waste dumps)**: The photos shows various revegetated waste dumps, demonstrating the extent of natural recovery on these previously disturbed waste dump areas. This also demonstrates that it is hard to distinguish man-made and natural features in the site.







Location 5

## B. Annotated Opposing Photographs (Wilcox Declaration and Los Angeles Times)

43.    The second category of annotated photographs and diagrams consist of annotated versions of the NPCA declarant's own photographs, based on my personal, firsthand knowledge of the Mine site. Those annotations are my own, and they make the following points:

44.     **Location 6 (Pit access road looking southwest)**: The photographs taken by Chance Wilcox below (marked by Wilcox as Photo 3 and Photo 10 in his declaration) show the Mine pit access road with revegetated waste dumps on either side. Wilcox uses two photos taken from two different vantage points and directions in proximate areas (Location 6) make a "before" (January 2025) and "after" (March 2026) comparison of the area. That comparison is not valid. The different views in the two photos mean that these two photos do not show an accurate comparison. Notably, at no point in his declaration does Wilcox provide a matched pair of photographs taken from the same location and facing the same direction across two points in time to demonstrate that new disturbance has occurred.



*Photo 3: Colosseum Road leading up to the mine in January 2025.*



*Photo 10: Grading of Colosseum Road in March 2026.*

80688035                                    19

45.     By presenting Photo 3 and Photo 10 together as a comparative sequence, Wilcox implies that the area transitioned from natural, vegetated terrain to graded and stripped ground as a result of current operations. That characterization is incorrect. As my annotated photographs show, the area depicted in Photo 3 was already disturbed during the 1980s mining campaign and consists of revegetated mine waste dumps, not undisturbed native desert. The vegetation Wilcox observed in January 2025 had grown over previously engineered mine waste, a condition that is inconsistent with any claim that current operations converted natural terrain to disturbed ground.

46.     Wilcox's Photos 3 and 10 both show waste dump areas adjacent to the most historically and currently active part of the Mine, that have since been revegetated. The below annotated photographs show where Wilcox's photos were taken in the context of the historical 1980s to 1990s operation and also the current operation.



Operating Colosseum Mine 1980s



47.    Beyond the methodological deficiencies in Wilcox's photographic comparisons, his own photographs affirmatively demonstrate that the features he identifies as natural desert terrain warranting protection are, in fact, engineered mine waste dumps that have revegetated over time. Wilcox's misidentification of these structures as natural landforms calls into question the reliability of his site observations and the conclusions he draws from them throughout his declaration.

48.    Similar misidentification appears in the photograph in a Los Angeles Times article featuring Mr. Wilcox. I am aware of a Los Angeles Times article dated February 28, 2025 featuring Mr. Wilcox, in which a photograph that was taken in order to depict the area as pristine or natural was actually taken at or near the tailings dam. The area shown is in fact a tailings dam, an engineered mine structure, not a natural landform, as reflected in the annotated photo below. The article excerpt below

The Clark Mountains in San Bernardino County hold a wealth of rare plants, ecologists say. (Myung J. Chun/Los Angeles Times)

also contains a quote from Declarant James Andre, who also submitted a declaration in support of NPCA's motion, explaining that the area (i.e. area of the tailings dam and revegetated waste dump) is one of the "most botanically important areas."

49.    In addition, one of Mr. Wilcox's photographs, labeled Photo 5, was taken well away from the active mine to the west. I have verified and mapped the approximate locations of Mr. Wilcox's photos through GPS verification locations in the map below. I have reviewed a photo taken on July 2026 very near the same location Mr. Wilcox took his Photo 5, as depicted below, to verify the location.






*Photo 5: Juniper Woods near Colosseum Mine in July 2025.*


Photo taken near to Chance Wilcox Photo 5. Location indicated by star marker above

**ENVIRONMENTAL AND RECLAMATION MEASURES ON THE GROUND**

50.    The reclamation and mitigation program I oversee originates in the Approved PoO and remains operative under my direction. For vegetation, the program requires that we salvage and stockpile topsoil from disturbed areas to build a

reclamation seedbed, reseed with native species where feasible, and regrade the road and pipeline corridors to natural contours. For dust and erosion control, we are required to water or chemically stabilize operating surfaces, install erosion-control devices if gullying or rill formation occurs, and conduct ongoing monitoring of affected slopes. For the desert bighorn sheep, wildlife warning signage is posted along the road.

51.     During the course of current project implementation, dust and erosion control measures are being implemented at the Colosseum Mine site. Those measures include water-spray dust suppression using water carts, posted speed limits, and erosion-control berms. No erosion or runoff incidents have occurred since these measures were established.

52.     The 1985 Environmental Impact Report/Environmental Impact Statement states that "No rare, threatened or endangered wildlife species will be affected by the proposed expansion of the Colosseum mine pits" and that "No federally listed threatened or endangered plants or State of California designated rare or endangered plants exist within the Clark Mountain area." The 1985 PoO likewise reaffirmed that "there are no species of protected vegetation in the area which may be affected by the program and that there are no threatened or endangered species of wildlife which may be affected by the program." The 1987 Environmental Assessment further confirmed that "The proposed action would not have any effects on threatened or endangered" species at the mine site." Attached hereto as **Exhibit F** is a true and correct copy of the Environmental Impact Report/Environmental Impact Statement, State Clearinghouse No. 84-080-602, dated March 1985. Attached hereto as **Exhibit G** is a true and correct copy of the BLM Environmental Assessment issued in 1987.

53.     The 1985 EIR/EIS found any impact to the bighorn sheep from the operation to be minor, given the herd's documented adaptability and the area's long history of mining activity. The 1985 EIR/EIS further reflected that the desert bighorn

sheep is not federally listed as threatened or endangered, and its presence in the broader Clark Mountain area is not a protected-species impact at the mine site. According to the documents, the 1987 access road route was selected specifically to avoid the known bighorn migration corridor, and I have personally observed that current operations continue to be conducted consistent with that route selection.

54.    Based on my own observations during site visits, I have not seen desert tortoise present in the discrete areas disturbed or planned for near-term work. No live desert tortoise has been observed at the mine site. The only evidence of the species anywhere in the broader area was a reference in the EIR/EIS of a partial shell recovered at approximately 3,500 feet elevation on the east side of Shadow Valley, well below the mine site's elevation of roughly 5,000 to 6,000 feet, which lies above the tortoise's habitat. For that reason, all of the desert tortoise mitigation measures set out in the 1987 Environmental Assessment a 25-mile-per-hour speed limit for the life of the mine, twice-daily road sweeps preceding shift changes by a trained employee, a desert tortoise awareness program incorporated into contractor agreements, burial of the waterline where recommended, and elevated pipeline risers at ravines and gullies were directed exclusively at the first 6.5 miles of the lower-elevation access road corridor through Ivanpah Valley, and not at the mine site. These measures remain in force under my direction and are unaffected by the road maintenance plaintiff seeks to enjoin.

55.    The site's water-quality and financial-assurance obligations are subject to state and county oversight, and CRM remains in compliance with them. Groundwater quality is governed by Lahontan Regional Water Quality Control Board Order No. 6-96-11, which was transferred to CRM in 2021, and a $735,000 irrevocable letter of credit was accepted as the required financial assurance. Attached hereto as **Exhibit H** is a true and correct copy of the Water Board letter accepting transfer of Board Order No. 6-96-11 to CRM and accepting the related financial assurance. Attached hereto as **Exhibit I** is a true and correct copy of the irrevocable

letter of credit for the Lahontan financial assurance, dated September 28, 2021. San Bernardino County conducts site inspections and maintains a separate reclamation bond for the site as well.

56.     In the ordinary course of bringing the site into full operation, CRM will obtain additional environmental approvals as required, including but not limited to the Mojave Desert Air Quality Management District's Authority to Construct and Permit to Operate and a County Hazardous Materials Handling Permit.

## **OPERATIONAL HARM FROM AN INJUNCTION**

57.     From my perspective as Chief Operating Officer of Dateline and in my direct oversight of CRM's operations, an injunction halting CRM's current activities would cause serious operational harm that goes beyond financial harm.

58.     The injunction would halt active, ongoing operations that are within the Approved PoO and that are proceeding on a schedule tied to long-lead equipment orders, contractor commitments, and regulatory timelines. CRM will be prevented from constructing the processing facility and supporting infrastructure needed to resume full operations. Halting this work  would not simply pause progress; it would disrupt construction sequences, expose partially completed work to weather and deterioration, and require costly remobilization and rework when work resumes.

59.     The injunction would also interrupt concurrent reclamation work that is actively protecting the site. CRM's current operations include ongoing reclamation activities, including topsoil replacement over drill pads and related work areas, erosion control berm maintenance, and dust suppression. Halting these activities would leave disturbed areas without the protective measures currently in place.

60.     An injunction would also directly jeopardize CRM's drilling program and the personnel and equipment supporting it. CRM has retained Major Drilling to conduct drilling operations at the Mine in direct support of mine development activities. Drill rigs of the type deployed at the Colosseum Mine are specialized, high-demand equipment; they cannot remain idle on site indefinitely. If operations are

80688035

halted, Major Drilling would be required to demobilize its equipment and redeploy its rigs and crews to other projects.

61.    CRM's own drilling crew members are employed under contracts that cannot be held open during an extended work stoppage. If CRM is forced to release those crews, it would face significant difficulty reconstituting them. Experienced drill rig crews for the type of reverse circulation and diamond drilling conducted at the Colosseum Mine are in high demand across the mining industry, and there is no assurance that the same crews, or crews of comparable experience and availability, could be secured again on the same timeline or at the same cost. Combined with the loss of Major Drilling's mobilized equipment and crews would not be a temporary inconvenience; it would set back the drilling program by months, disrupt the sequencing of the operations, and require CRM to re-mobilize at materially greater expense and on an uncertain schedule. Drill rigs and other equipment would need to be stored and in most cases, machinery that is not used will generally fall into disrepair and require to be refurbished.

62.    In addition, several contractors and crew members have relocated their families to be closer to the Mine. An injunction would severely harm the livelihood and financial security of these individuals.

63.    An injunction would also place at risk CRM's position in the Southern California Edison power-service queue. CRM currently holds an application for power allocation and queue position for the Mine. Utility interconnection queues in California are competitive and subject to strict milestone requirements. If CRM's queue position is forfeited or lapses due to an extended halt in project activity, CRM would be required to reapply and would lose the timing advantage it has secured. Reentry into the SCE queue would not restore CRM's current position, nor is reallocation guaranteed, and the delay in obtaining power service could extend the project timeline by years beyond what would otherwise be required.

64.    CRM holds various contracts to support anticipated mine operations. For

example, an injunction that halts operations would compromise water supply contracts that cannot be recovered.

65.    CRM has placed deposits on transformers and other long-lead equipment needed for the processing facility. If activity is halted for an extended period, CRM risks losing the benefit of those deposits and timing advantages. The operational harm from halting an active mining project under these circumstances would be direct and substantial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 6th day of July, 2026, at Las Vegas, Nevada.

_____
Simon Slesarewich