UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**              'O'

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

Present: The Honorable   CHRISTINA A. SNYDER

| Catherine Jeang | Not Present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Not Present                    Not Present

**Proceedings:**       (IN CHAMBERS) – PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Dkt. 20, filed June 23, 2026)

## I.    INTRODUCTION

On April 15, 2026, plaintiff National Parks Conservation Association ("NPCA" or "plaintiff") filed a complaint for declaratory and injunctive relief against defendants U.S. Department of the Interior ("DOI"), Doug Burgum in his official capacity as Secretary of DOI, National Park Service ("NPS"), Jessica Bowron in her official capacity as Comptroller for NPS and currently exercising the delegated authority of the Director of NPS, and Kevin Schluckebier in his official capacity as Acting Superintendent of the Mojave National Preserve (collectively, the "federal defendants"). Dkt. 1 ("Compl."). On July 15, 2026, the Court granted the motion of Dateline Resources Ltd. and Colosseum Rare Metals, Inc. (collectively, "CRM") to intervene as defendants, subject to limitations. Dkt. 32.

Plaintiff alleges that the federal defendants' April 2025 decision authorizing CRM to proceed with new mining operations at Colosseum Mine within the Mojave National Preserve violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), because it is not in accordance with: (1) the Mining in the Parks Act (the "MPA"); (2) the California Desert Protection Act (the "CDPA"); or (3) the National Environmental Policy Act ("NEPA"). Id. ¶¶ 78, 89, 95. Plaintiff also alleges that the federal defendants' assertion that CRM's expired plan of operations approved by U.S. Bureau and Land Management ("BLM") in 1985 "remains in effect" is arbitrary and capricious, in violation of the APA. Id. ¶ 82. Plaintiff also alleges that the federal defendants' April 3, 2025 assertion that renewed mining by CRM at Colosseum Mine "does not require a validity [determination]" is arbitrary and capricious, in violation of the APA. Id. ¶ 90.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                     **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

Plaintiff seeks an order from the Court: (1) setting aside and vacating the federal defendants' April 2025 decision authorizing CRM to proceed with operations at Colosseum Mine, as well as any subsequent agency actions relying on the April 2025 decision; (2) declaring that the federal defendants' April 2025 decision violated the MPA, the CDPA, and NEPA; (3) enjoining the federal defendants from authorizing or otherwise allowing further operations at Colosseum Mine pending compliance with all applicable laws and regulations; and (4) awarding plaintiff costs of litigation, including reasonable attorneys' fees and costs. Id. at 21.

On June 23, 2026, plaintiff filed a motion for preliminary injunction. Dkt. 20 ("Mot."). On July 6, 2026, the federal defendants filed an opposition. Dkt. 24 ("Fed. Opp."). On July 6, 2026, CRM filed an opposition. Dkt. 25-3 ("CRM Opp.").[1] On July 13, 2026, plaintiff filed a reply in support of its motion for a preliminary injunction. Dkt. 30 ("Reply").

On July 26, 2026, the Court sent a tentative order to the parties. On July 27, 2026, the Court held a hearing. At the hearing, the Court granted defendants' request for leave to submit supplemental briefing. On August 3, 2026, the federal defendants and CRM each filed supplemental briefs. Dkt. 44 ("Fed. Supp."); dkt. 45 ("CRM Supp."). On August 7, 2026, plaintiff filed a supplemental response. Dkt. 51 ("Pl. Supp."). Thereafter, the Court took the matter under submission. Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II.   BACKGROUND

### A. The Parties

Plaintiff NPCA is a non-partisan, non-profit organization headquartered in Washington, D.C. with 1,956,926 members and supporters across the nation and approximately 207,091 members and supporters in California. Compl. ¶ 9. NPCA's mission is to protect and enhance America's National Park System for present and future generations. Id. As part of that mission, NPCA also seeks to protect public lands that are

---

[1] CRM filed an *ex parte* application for leave to file an opposition to plaintiff's motion for preliminary injunction. Dkt. 25. Plaintiff filed a notice of non-opposition to the application, dkt. 27, and the Court granted the application, deeming the attached opposition brief filed. Dkt. 32.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

important to the cultural and ecological landscapes connected to National Park System units. Id.

Plaintiff alleges that defendant DOI is an executive department of the United States government responsible for the conservation and management of the nation's natural resources, including its public lands, wildlife and endangered species, resources, mineral estate, and cultural heritage. Compl. ¶ 14. According to plaintiff, in this managerial capacity, DOI is responsible for implementing and complying with federal law, including the federal laws under which this action is brought. Id. Doug Burgum is the Secretary of DOI and is sued in his official capacity. Id. ¶ 15.

Plaintiff alleges that defendant NPS is the administrative agency within DOI responsible for managing the National Park System, including the Mojave National Preserve. Id. ¶ 16. According to plaintiff, in this managerial capacity, NPS is responsible for implementing and complying with federal law. Id. Jessica Bowron is the Comptroller for NPS and is currently exercising the delegated authority of the Director of NPS. Id. ¶ 17. She is sued in her official capacity. Id. Kevin Schluckebier is the Acting Superintendent of the Mojave National Preserve and is sued in his official capacity. Id. ¶ 18.

### B. Relevant Mining Laws and Regulations

#### a. The Mining Law of 1872

"The California gold rush in 1849 took place without much law to guide it, so the miners developed their own rules and customs." United States v. Shumway, 199 F.3d 1093, 1097 (9th Cir. 1999). "Even though most of the gold in the California and other western gold rushes was found on federal land, the federal government adopted a mining law scheme late, long after the customs of ownership by discovery and extraction had been established." Id. at 1098. "When it came, in skeletal form in 1866, and in substantially its current form in the Mining Law of 1872, the federal statutory law of mining 'received' customary law in much the same way that the states had received the common law." Id. "The most important of those customs created a property right based on discovery and extraction of valuable minerals, in the absence of any title." Id. "The miners' custom, that the finder of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts, has been a powerful engine driving exploration and extraction of valuable minerals, and has been the law of the United States since 1866." Id. at 1098-99.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**            **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

"Under the General Mining Act of 1872, 30 U.S.C. §§ 21-54 (the "Mining Law"), citizens can enter and use public lands for mining exploration." R.T. Vanderbilt Co. v. Babbitt, 113 F.3d 1061, 1063 (9th Cir. 1997); see also Ctr. for Biological Diversity v. United States Fish & Wildlife Serv., 33 F.4th 1202, 1209 (9th Cir. 2022) ("[The Mining Law] allows a citizen to occupy land temporarily while prospecting for valuable minerals.").

"[The Mining Law] gives to United States citizens free of charge, except for small filing and other fees, mining rights upon discovery of 'valuable minerals' on federal land." Ctr. for Biological Diversity v. United States Fish & Wildlife Serv., 33 F.4th 1202, 1208 (9th Cir. 2022); see United States v. Coleman, 390 U.S. 599, 604 (1968) (holding that a mineral deposit is "valuable" if it can be "extracted, removed and marketed at a profit").

"After minerals are discovered, the claimant may file a 'mining claim' with the Bureau of Land Management (BLM), which if approved, entitles the claimant to the right of exclusive possession of that claim, as long as the requirements of the [Mining Law] are met." Swanson v. Babbitt, 3 F.3d 1348, 1350 (9th Cir. 1993). "A mining 'claim' is not a claim in the ordinary sense of the word-a mere assertion of a right-but rather is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property." Shumway, 199 F.3d at 1100.

1.    Unpatented Mining Claims

"A miner who finds valuable minerals may 'locate' (or 'stake') a claim and thereby obtain an 'unpatented mining claim.'" Ctr. for Biological Diversity, 33 F.4th at 1209 (citing 30 U.S.C. § 22). "A valid unpatented claim gives the miner the right to 'occupy' the claim and to mine the minerals free of charge." Id.; see 30 U.S.C. § 26 (conferring on "[t]he locators of all mining locations . . . situated on the public domain . . . where no adverse claim existed [upon passage of the Mining Law] . . . so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title . . . the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth . . ."). In other words, "[t]he claimant has the exclusive right to possession and enjoyment of all the surface included within the lines of the locations, but the United States retains title to the land." Indep. Min. Co. v. Babbitt, 105 F.3d 502, 506 (9th Cir. 1997)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**           **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

An unpatented mining claim "is invalid and confers no right without a 'discovery' of 'valuable minerals' on the claim." Ctr. for Biological Diversity, 33 F.4th at 1210 (citing Cole v. Ralph, 252 U.S. 286, 296 (1920) (mere location of the mining claim "confers no right in the absence of discovery")).

In 1876, the Supreme Court found that valid unpatented mining claims "are property in the fullest sense of the word . . . and are recognized by the States and the Federal government." Forbes v. Gracey, 94 U.S. 762, 767 (1876). Thus, valid unpatented mining claims "may be sold, transferred, mortgaged, and inherited, without infringing the title of the United States." Id.; see also Bradford v. Morrison, 212 U.S. 389, 395 (1909) (holding the same). "Possessory interest in a claim can be held indefinitely upon discovery of valuable mineral deposits provided that annual assessment work is performed, all necessary filings and fee payments are made, and the valuable mineral deposit continues to exist." R.T. Vanderbilt Co., 113 F.3d at 1063 (citing Indep. Min. Co., 105 F.3d at 506).

### 2.     Patented Mining Claims

"An individual who possesses a valid [unpatented] mining claim may go through an additional process to obtain a patent, 'thereby purchasing from the Federal Government the land and minerals and obtaining ultimate title to them.'" Swanson, 3 F.3d at 1350 (quoting United States v. Locke, 471 U.S. 84, 86 (1985)) (citing 30 U.S.C. § 29). "A patented mining claim is one in which the government has passed its title to the claimant, giving him exclusive title to the locatable minerals, and, in most cases, the surface and all resources." Swanson, 3 F.3d at 1350; see also Indep. Min. Co. v. Babbitt, 105 F.3d 502, 506 ("The holder of a mining claim may apply to the DOI to obtain a patent which, if issued, conveys fee title.").

"But, a patent is not issued until there has been a determination that the claim is valid. Before a determination of validity can be made, a mineral examiner must do a field examination; collect and analyze samples; estimate the value of the mineral deposit and the cost of extracting, processing and marketing the minerals, including the costs of complying with any environmental and reclamation laws. Upon completion of the mineral report, all patent applications undergo legal and secretarial review, and if approved, the patents will issue." Indep. Min. Co. v. Babbitt, 105 F.3d at 506–07; see also Cameron v. United States, 252 U.S. 450, 459–60 (1920) ("By general statutory provisions the execution of the laws regulating the acquisition of rights in the public lands and the general care of these lands is confided to the Land Department, as a special

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

tribunal; and the Secretary of the Interior, as the head of the department, is charged with seeing that this authority is rightly exercised to the end that valid claims may be recognized, invalid ones eliminated, and the rights of the public preserved.").

> b. *The Surface Resources and Multiple Use Act of 1955*

"By 1955, Congress had become increasingly aware of 'abuses under the general mining laws by those persons who locate[d] mining claims on public lands for purposes other than that of legitimate mining activity.'" Bohmker v. Oregon, 903 F.3d 1029, 1035 (9th Cir. 2018) (quoting H.R. Rep. No. 84-730, 1955 U.S.C.C.A.N. 2474, 2478). "Sham claims could be used for selling timber from national forests, or obtaining free residential or agricultural land." Shumway, 199 F.3d at 1101 (citing United States v. Curtis-Nev. Mines, Inc., 611 F.2d 1277, 1282 (9th Cir. 1980)). "Congress was also concerned that according the holders of unpatented mining claims exclusive surface rights prevented the 'efficient management and administration of the surface resources of the public lands.'" Bohmker, 903 F.3d at 1035 (quoting H.R. Rep. No. 84-730, 1955 U.S.C.C.A.N. at 2474). "To address these concerns, Congress adopted the Surface Resources and Multiple Use Act of 1955, Pub. L. No. 84-167, 69 Stat. 367 (1955)." Id.

"Mining claims located after the effective date of the 1955 [Surface Resources and Multiple Use] Act are subject, prior to issuance of patent, to a right of the United States to manage surface resources and for the government and whomever it permits to do so to use the surface, so long as they do not endanger or materially interfere with prospecting, mining, or processing." Shumway, 199 F.3d at 1101 (citing 30 U.S.C. § 612(b)).

> c. *Federal Land Policy and Management Act of 1976*

The Federal Land Policy and Management Act (the "FLPMA") was enacted by Congress in 1976 to "establish public land policy; to establish guidelines for its administration; to provide for the management, protection, development, and enhancement of the public lands; and for other purposes." Pub. L. No. 94-579, 90 Stat. 2743 (1976). The FLPMA mandates BLM to "manage the public lands under principles of multiple use and sustained yield," and "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

With specified limited exceptions,[2] the FLPMA does not "amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress." Id.

Section 601 of the FLPMA established a "California Desert Conservation Area," and required BLM "to prepare and implement a comprehensive, long-range plan for the management, use, development, and protection of the public lands within" this area before September 30, 1980. 43 U.S.C. § 1781(d). "Such plan shall take into account the principles of multiple use and sustained yield in providing for resource use and development, including, but not limited to, maintenance of environmental quality, rights-of-way, and mineral development." Id. Section 601 provides for the applicability of mining laws as follows:

> Subject to valid existing rights, nothing in this Act shall affect the applicability of the United States mining laws on the public lands within the California Desert Conservation Area, except that all mining claims located on public lands within the California Desert Conservation Area shall be subject to such reasonable regulations as the Secretary may prescribe to effectuate the purposes of this section. Any patent issued on any such mining claim shall recite this limitation and continue to be subject to such regulations. Such regulations shall provide for such measures as may be reasonable to protect the scenic, scientific, and environmental values of the public lands of the California Desert Conservation Area against undue impairment, and to assure against pollution of the streams and waters within the California Desert Conservation Area.

43 U.S.C. § 1781(f).

In 1980, BLM promulgated two regulations under the authority of the FLPMA for mineral exploration and mining operations on public lands under BLM administration, including the California Desert Conservation Area: (1) Exploration and Mining,

---

[2] Section 314 of the FLPMA creates an annual recording requirement for the owners of unpatented mining claims on public lands, and failure to record constitutes an abandonment of the mining claim. 43 U.S.C. § 1744; see 36 C.F.R. § 9.5(b) (requiring any unpatented mining claim to be recorded with BLM in accordance with the FLPMA); see also Bolt v. United States, 944 F.2d 603, 609 (9th Cir. 1991) (finding that the FLPMA recording requirements also apply to mining claims on NPS lands).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    'O'

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

Wilderness Review Program, 45 Fed. Reg. 13974 (Mar. 3, 1980) (to be codified at 43 C.F.R. § 3802); and (2) Surface Management of Public Lands Under U.S. Mining Laws, 45 Fed. Reg. 78902 (November 26, 1980) (to be codified at 43 C.F.R. § 3809).

The first regulation "establish[es] procedures to prevent impairment of the suitability of lands under wilderness review for inclusion in the wilderness system and to prevent unnecessary or undue degradation by activities authorized by the U.S. Mining Laws and provide for environmental protection of the public lands and resources." 43 C.F.R. § 3802.0-1. One express objective of the regulation is to "[a]llow mining claim location, prospecting, and mining operations in lands under wilderness review pursuant to the U.S Mining Laws, but only in a manner that will not impair the suitability of an area for inclusion in the wilderness system unless otherwise permitted by law." Id. at § 3802.0-2. The regulation sets forth when a BLM-approved plan of operations is required for mining operations within lands under wilderness review, what a plan of operations must include, and the approval and modification process for a plan of operations. Id. at §§ 3802.1-1 – 3802.1-6. In this regulation, "*Valid existing right* means a valid discovery had been made on a mining claim on October 21, 1976, and continues to be valid at the time of exercise." Id. at § 3802.0-5(k) (emphasis in original). Under this regulation, a new plan of operations was not required for "existing operations" at the time the FLPMA was enacted, "unless the operation is undergoing changes that exceed the manner and degree of operations on [the date FLPMA was enacted]" or if an authorized officer "determines that operations in the same manner and degree are causing undue or unnecessary degradation of lands and resources or adverse environmental effects." Id. at § 3802.1-3.

The second regulation "establish[es] procedures to prevent unnecessary or undue degradation of federal lands which may result from operations authorized by the mining laws." 45 Fed. Reg. 78902, 78909-10 (to be codified at 43 C.F.R. § 3809.0-1). The three stated objectives of the regulation were to:

(a) Provide for mineral entry, exploration, location, operations, and purchase pursuant to the mining laws in a manner that will not unduly hinder such activities but will assure that these activities are conducted in a manner that will prevent unnecessary or undue degradation and provide protection of nonmineral resources of the federal lands;

(b) Provide for reclamation of disturbed areas; and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**　　　　　'O'

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

> (c) Coordinate, to the greatest extent possible, with appropriate State agencies, procedures for prevention of unnecessary or undue degradation with respect to mineral operations.

Id. at 78910.

The second regulation similarly sets forth when a BLM-approved plan of operations is required for mining operations on public land under BLM jurisdiction, what a plan of operations must include, and the approval and modification process for a plan of operations. Id. at 78911-12. Unlike the first regulation, the second regulation requires any person conducting operations on the effective date of the regulations to submit a new plan of operations within 120 days, regardless of whether there are any changes to the existing operations. Id. at 78912-13. The second regulation does not define "valid existing rights," but the supplementary information in the notice of final rulemaking explains:

> One comment pointed out that operations existing prior to October 21, 1976, may have valid existing rights under Section 701(h) of the Federal Land Policy and Management Act and should not be regulated at all. The existence of a valid existing right or lack thereof, however, is immaterial to the exercise of the Secretary of the Interior's regulatory authority. This rulemaking does not extinguish any possessory rights that an individual may have under the mining laws. Those rights, however, are subject to the reasonable regulations mandated by the [FLPMA].

Id. at 78907.

### d.  The Mining in the Parks Act of 1976

"In an attempt to preserve the natural beauty of our National Park System, Congress in 1976 enacted the Mining in the Parks Act." Nequoia Ass'n, Inc. v. Dep't of Interior of U.S., 626 F. Supp. 827, 829 (D. Utah 1985). The MPA was enacted "[t]o provide for the regulation of mining activity within, and to repeal the application of mining laws to, areas of the National Park System, and for other purposes." Pub. L. No. 94-429, 90 Stat. 1342 (1976).

"[The MPA] prohibits, subject to valid existing rights, the exploration, mining and purchase of all mineral deposits within the National Park System." Nequoia Ass'n, Inc., 626 F. Supp. at 829. Thus, the MPA closed all units of the National Park System to new

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

mining claims, effectively limiting the Mining Law of 1872. "As a means of identifying valid existing claims, Congress included a requirement that all mining claims within the boundaries of units of the National Park System be recorded with the Secretary of the Interior within one year from enactment of the Act." Id. Any mining claim under the Mining Law of 1872 that was not recorded with the Secretary of the Interior within one year of the MPA "shall be conclusively presumed to be abandoned and shall be void." 54 U.S.C. § 100733.

For those mining claims that pre-dated the MPA, Congress declared that "all mining in [National Park] System units should be conducted so as to prevent or minimize damage to the environment and other values." 54 U.S.C. § 100731. To this end, the MPA requires that "all activities resulting from the exercise of mineral rights on patented or unpatented mining claims within any [National Park] System unit shall be subject to such regulations prescribed by the Secretary [of the Interior] as the Secretary considers necessary or desirable for the preservation and management of the System units." 54 U.S.C. § 100732.

In accordance with this mandate, DOI promulgated regulations, which can be found at 36 C.F.R. Part 9, Subpart A.

> These regulations control all activities within units of the National Park System resulting from the exercise of valid existing mineral rights on patented or unpatented mining claims without regard to the means or route by which the operator gains access to the claim. The purpose of these regulations is to insure that such activities are conducted in a manner consistent with the purposes for which the National Park System and each unit thereof were created, to prevent or minimize damage to the environment or other resource values, and to insure that the pristine beauty of the units is preserved for the benefit of present and future generations. These regulations apply to all operations, as defined herein, conducted within the boundaries of any unit of the National Park System.

36 C.F.R. § 9.1.

With respect to operations at mining claims in the National Park System, the regulations provide that "No operations shall be conducted within any unit until a plan of operations has been submitted by the operator to the Superintendent and approved by the Regional Director [of the NPS region containing the claim]. All operations within any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|----------|------------------------|------|------------------|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

unit shall be conducted in accordance with an approved plan of operations." 36 C.F.R. § 9.9(a).

The next subsection sets forth the requirements for a proposed plan of operations. 36 C.F.R. § 9.9(b). Within 60 days of the receipt of a proposed plan of operations, the Regional Director is required to make an environmental analysis of the plan and notify the operator that he has approved the plan, conditionally approved the plan, rejected the plan, or that he needs additional time to complete review, such as for completion of an environmental impact statement. See 36 C.F.R. § 9.10(b). "An approved plan of operations may require reasonable revision or supplementation to adjust the plan to changed conditions or to correct oversights." 36 C.F.R. § 9.12(a).

With respect to existing mining operations on the date the MPA regulations were promulgated (January 26, 1977), the regulations provide:

> Any person conducting operations on January 26, 1977, shall be required to submit a plan of operations to the Superintendent. If otherwise authorized, operations in progress on January 26, 1977, may continue for 120 days from that date without having an approved plan. After 120 days from January 26, 1977, no such operations shall be conducted without a plan approved by the Regional Director, unless access is extended under the existing permit by the Regional Director. (See § 9.10(g).)

36 C.F.R. § 9.9(d). Section 9.10(g) provides for temporary authorization of the continuation of existing operations:

> Pending approval of the plan of operations, the Regional Director may approve, on a temporary basis, the continuation of existing operations if necessary to enable timely compliance with these regulations and with Federal, State, or local laws, or if a halt to existing operations would result in an unreasonable economic burden or injury to the operator. Such work must be conducted in accordance with all applicable laws, and in a manner prescribed by the Regional Director and designed to minimize or prevent significant environmental effects.

36 C.F.R. § 9.10(g).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

*e. The California Desert Protection Act of 1994*

The CDPA was enacted by Congress in 1994 "to designate certain lands in the California Desert as wilderness, to establish the Death Valley and Joshua Tree National Parks, to establish the Mojave National Preserve, and for other purposes." Pub. L. No. 103–433, 108 Stat. 4471 (1994). Congress found and declared, among other findings, that:

(1) the federally owned desert lands of southern California constitute a public wildland resource of extraordinary and inestimable value for this and future generations;

(2) these desert wildlands display unique scenic, historical, archeological, environmental, ecological, wildlife, cultural, scientific, educational, and recreational values used and enjoyed by millions of Americans for hiking and camping, scientific study and scenic appreciation;

(3) the public land resources of the California desert now face and are increasingly threatened by adverse pressures which would impair, dilute, and destroy their public and natural values;

(4) the California desert, embracing wilderness lands, units of the National Park System, other Federal lands, State parks and other State lands, and private lands, constitutes a cohesive unit posing unique and difficult resource protection and management challenges

Id. at § 2.

The CDPA established the Mojave National Preserve and transferred the lands within the newly established Mojave National Preserve that were under the jurisdiction of BLM to the administrative jurisdiction of the Director of NPS. 16 U.S.C. §§ 410aaa-42, 43.

The CDPA withdrew, "[s]ubject to valid existing rights," all federal lands within the Mojave National Preserve "from location, entry, and patent under the United States mining laws." 16 U.S.C. § 410aaa-47.

The CDPA provides that "[s]ubject to valid existing rights, all mining claims located within the preserve shall be subject to all applicable laws and regulations

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                'O'

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

applicable to mining within units of the National Park System, including the Mining in the Parks Act." 16 U.S.C. § 410aaa-48.

Further, the CDPA provides that any patent issued on a mining claim after the enactment of the CDPA "shall convey title only to the minerals together with the right to use the surface of lands for mining purposes, subject to such laws and regulations." Id. In other words, patenting an unpatented mining claim within Mojave National Preserve would no longer transfer the surface in fee title from the government to the holder of the mining claim. Rather, the holder of a mining claim patented after the enactment of the CDPA is only conveyed possessory rights to the surface.

The CDPA prohibits the Secretary of the Interior from approving "any plan of operation prior to determining the validity of the unpatented mining claims, mill sites, and tunnel sites affected by such plan within the [Mojave National Preserve]." 16 U.S.C. § 410aaa-49.

The CDPA carves out an exception for the holders of ten specified mining claims "to continue exploration and development activities on such [invalid, unpatented] claims for a period of two years after the date of enactment of [the CDPA], subject to the same regulations as applied to such activities on such claims on the day before such date of enactment." Id. At the end of the two-year period, the Secretary of the Interior "shall determine whether there has been a discovery of valuable minerals on such claims and whether, if such discovery had been made on or before July 1, 1994, such claims would have been valid as of such date under the mining laws of the United States in effect on such date." Id. If the Secretary makes an affirmative determination concerning the claims, the "holders of such claims shall be permitted to continue to operate such claims subject only to such regulations as applied on July 1, 1994 to the exercise of valid existing rights on patented mining claims within a unit of the National Park System." Id.

### C. Mining Operations at Colosseum

Colosseum Mine is located in the Clark Mountains in San Bernardino County, California. CRM Opp. at 10.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                           **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

The gold ores at Colosseum Mine were discovered and first developed in the 1860s. Dkt. 24-2 ("BLM Plan") at 11.[3] Some three to four million dollars' worth of precious metals were produced from the area in and around Colosseum Mine in the late 1800s. Id. Colosseum Mine operated intermittently as a gold-producing mine until 1939. Id. at 16. The mine was inactive through the 1960s. Id. In the 1970s, Draco Mines and their partners performed intermittent exploration drilling at Colosseum Mine. Dkt. 24-3 ("EPA Report") at 7.

In January of 1982, Colosseum Gold Properties submitted a plan of operations and reclamation plan to BLM which was approved in February 1982. Id. at 2. In 1983, Amselco Exploration, Inc. ("Amselco") submitted a request for modification of the plan of operations submitted by its predecessor for the purpose of notifying BLM of the change of operator and clarifying the plan of operations. Id. at 72. In 1984 and 1985, Amselco submitted additional modifications to clarify the plan and propose exploratory drilling. Id. at 2. All modifications were pursuant to and intended to be in compliance with BLM's Surface Management Regulations, 43 CFR § 3809 et seq., under the FLPMA. Id. at 72-73, 91.

In September 1985, BLM approved Amselco's plan of operations and related amendments. Id. at 160. An environmental impact report was completed in 1985, at which time Amselco shelved the project. Id. at 186-87. On October 31, 1986, BLM approved Colosseum California Inc. ("Colosseum California") as the new operator of Amselco's plan of operations and related three amendments. Id. at 168. Colosseum California accepted and agreed to the conditions of the 1985 environmental impact report except for the access road, water pipeline, and powerline provisions. Id. at 187. Colosseum California commenced operations under the 1985 environmental impact assessment guidelines pending approval of its exceptions. Id. In 1987, a new environmental assessment was completed regarding the aforementioned exceptions, and BLM issued a decision letter approving Colosseum California's amendments. Id. at 185-86, 200. The 1982 approved plan of operations and all subsequent approved amendments (the "BLM Plan") stated that the approval would not "serve as a determination of the ownership or the validity of any mining claim to which it may relate." Id. at 181; See also id. at 47, 69, 84, 169, 203.

---

[3] The BLM Plan is also included as Exhibit A to plaintiff's motion. See dkt. 20-2 at 21-222. All citations to the BLM Plan in this order refer to the CM/ECF pagination in Dkt. 24-2.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

### 1.    The BLM Plan

The property subject to the BLM Plan consists of 40 acres of patented mining claims and 3,520 acres of unpatented claims.  Id. at 12.  Except for the patented claims, the Colosseum Mine site is public land.  Id.  The BLM Plan approved the conversion of the existing, inactive underground workings at Colosseum Mine into a modern open pit mining operation.  Id. at 11.  The BLM Plan consists of five operational phases: phase I—initial pit development and test leach sites; phase II—full operational startup and processing only of oxide ores, to end upon completion of construction of the Ivanpah mill complex; phase III—full operation of the open pit and the milling complex, to end with the depletion of oxide ores; phase IV—pit deepening and the milling and processing of sulfide ores and assessment of potential for underground mining, to end with the exhaustion of economically recoverable sulfide ores; phase V—reclamation and salvage operations and exploration drilling.  Id. at 23-26.  The 1982 portion of this plan was approved by the San Bernardino County planning commission "for nine (9) years, with a termination date of January 14, 1991" and complied with the reclamation requirements of both the San Bernardino Development Code and the California Surface Mining and Reclamation Act of 1975.  Id. at 9, 33.

Dallhold Resources, Inc., purchased the Colosseum property in September 1986.  EPA Report at 7.  Mine and mill construction began in 1987, and the mill began operation in January 1988.  Id.  In November 1989, LAC Minerals, Ltd. ("LAC Minerals") acquired the mine and Colosseum, Inc., a subsidiary of LAC Minerals, operated Colosseum Mine until July 10, 1993.  Id.  Mining operations ceased on July 10, 1992, while milling operations continued until May 1993.  Id. at 7.

In 1994, the CDPA was enacted, creating the Mojave National Preserve.  Colosseum Mine is within the Mojave National Preserve.

### 2.    1995 NPS Temporary Approval

On July 14, 1995, NPS sent a letter to Colosseum, Inc. informing the mine operator that it "[is] operating under a BLM-approved plan of operations on lands that are now within the Mojave National Preserve, a National Park System unit."  Dkt. 24-4 ("1995 Temporary Approval") at 2.  The letter stated as follows:

Your operation is nearing the completion of reclamation and beginning of the monitoring phase. . . . This letter constitutes authorization from the National Park Service (NPS) to continue existing operations until the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

completion of your reclamation, as specified in existing BLM and County
approved plans, and in accordance with the closure order of the Lahontan
Regional Water Quality Control Board. . . . This notice does not change or·
alter, in any way, the existing BLM approved plan under which you are now
completing reclamation.

. . .

For the monitoring phase of your operation, that extends over several years,
the NPS will require a new proposed plan of operations. . . . Carefully
review the plan of operations you submitted to the BLM for monitoring and
simply update and submit it to the NPS. It is very likely that such a plan will
satisfy NPS regulatory requirements. Please do so by December 31, 1995.

Id. at 2-3.

On January 6, 1999, LAC Minerals wrote a letter to NPS submitting comments on
a draft environmental impact statement and general management plan for the Mojave
National Preserve. Dkt. 24-5 at 2. In that letter, LAC Minerals requested that the final
environmental impact statement issued by NPS clarify that LAC Minerals may conduct
future mining activities at Colosseum Mine since the draft environmental impact
statement provided that "[t]he lack of available unclaimed land and the regulatory
constraints for exploration and development seem to preclude the discovery and
development of any low-grade, high-tonnage open-pit gold mines in the preserve." Id. at
3.

On August 28, 2000, NPS wrote to LAC Minerals responding to an August 18,
2000 letter from LAC Minerals in which LAC Minerals requested permission from NPS
to move ahead with reclamation plans for closure of Colosseum Mine. Dkt. 24-6 at 2. In
its response letter, NPS stated that the NPS Water Resources Division needed to conclude
its detailed review of the hydraulic data in the BLM Plan and conduct a site visit before
approving LAC Mineral's request. Id.

In 2021, defendant CRM acquired LAC Minerals' Colosseum Mine mining claims.
See dkt. 20-2 at 240-43. NPS sent a letter to CRM on June 6, 2022 ("NPS 2022 Letter"),
after a park ranger noticed drilling equipment at Colosseum Mine. Id. at 241. The NPS
2022 Letter states that "[CRM] [is] advised to cease and desist activities in Mojave
National Preserve until [a] plan of operations has been approved by the NPS." Id. at 242.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**              **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

### 3.    2023 NPS Rescission of 1995 Temporary Approval

On February 8, 2023, NPS sent a letter to CRM's counsel rescinding the 1995 Temporary Approval and clarifying NPS's position on the scope of that approval. Dkt. 20-2 at 244-46 ("NPS 2023 Rescission"). NPS stated that the 1995 Temporary Approval "was exclusively for the completion of reclamation and closure in accordance with the Bureau of Land Management (BLM) plan of operations and the order from the Lahontan Regional Water Quality Control Board." Id. The NPS 2023 Rescission further requested that CRM submit a proposed plan of operations to NPS's Acting Superintendent for review. Id. at 246.

On March 10, 2023, CRM appealed NPS's February 2023 recission of the 1995 Temporary Approval. Dkt. 25-42 at 2.

On June 9, 2023, NPS sent a letter to CRM's counsel and the San Bernardino County Board of Supervisors outlining the steps necessary for CRM to come into compliance with federal laws and regulations that govern mining operations in NPS units (the "June 2023 NPS Letter"). Dkt. 24-13 ("June 2023 NPS Letter") at 2. In that letter, NPS communicated its position that 36 C.F.R. § 9.9 requires CRM to submit a proposed plan of operations to NPS before commencing any mining operations within Mojave National Preserve. Id. The letter rejected CRM's contentions that "the BLM-approved plan of operation conferred 'valid existing rights' status on CRM's mining claims, and that the NPS's requirement for a plan of operations has somehow taken away CRM's valid existing rights." Id. at 5. In the letter, NPS communicated its position that "valid existing rights" refers to the property rights of valid mining claims. Id. NPS directed CRM to "cease its current operations and remove its equipment from Mojave National Preserve until it receives NPS approval of its proposed plan of operations and registers its commercial vehicles." Id. at 6.

In November 2023, BLM sent a letter notifying CRM that BLM "will be conducting a valid existing rights determination (validity exam) on your unpatented mining claims and mill sites located in . . . San Bernardino County." Dkt. 24-14 at 2.

On January 30, 2025, CRM's counsel sent a letter to Secretary of the Interior Doug Burgum requesting that DOI recognize and acknowledge that, among other things, the BLM Plan is valid, that all the unpatented claims encompassed in the BLM Plan are valid, and that the CDPA protects CRM's "valid existing rights"—which include both the BLM Plan and mining claims—from unconstitutional takings. Dkt. 25-38 at 5-9.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

    4.    <u>2025 NPS Letter Recognizing the Validity of the BLM Plan and Allowing CRM to Operate</u>

On April 3, 2025, NPS sent a letter responding to CRM's letter, stating:

This letter supersedes and replaces any other letter or communication you may have received in reply. . . . The National Park Service (NPS) recognizes your client's valid existing rights as stated in the [BLM Plan] approved September 10, 1985, . . . and that these rights remain valid subsequent to passage of the California Desert Protection Act.

Consistent with this continued recognition of the valid existing rights of your client, the plan of operations approved by BLM remains in effect. Also consistent with this recognition, the NPS does not require a validity examination or further approval of exploration and other activities encompassed by the plan in the absence of your client submitting a new plan of operations, which would only be required for a new mining operation not encompassed within the existing, approved plan. Any statement or communication from, or actions taken by, the NPS to the contrary, whether made to the company or any other party, are invalid and of no force or effect.

Dkt. 24-16 ("NPS 2025 Letter") at 2.

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20; <u>accord</u> <u>Am. Trucking Ass'n, Inc. v. City of Los Angeles</u>, 559 F.3d 1046, 1052 (9th Cir. 2009). Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the <u>Winter</u> test are also met." <u>All. for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1132 (9th Cir. 2011) (interpreting <u>Winter</u> and explaining that the "sliding scale" test for preliminary injunctive relief remains valid). Serious questions are those "which cannot be resolved one way or the other at the hearing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**              **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

on the injunction." Bernhardt v. Los Angeles Cty., 339 F.3d 920, 926 (9th Cir. 2003) (quoting Republic of the Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988)).

A plaintiff seeking a preliminary injunction must show more than the "possibility" of irreparable injury; he must demonstrate that irreparable injury is "likely" in the absence of preliminary relief. Winter, 555 U.S. at 22; Am. Trucking, 559 F.3d at 1052. It is not enough that the claimed harm be irreparable—it also must be imminent. Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988). Conclusory affidavits are insufficient to demonstrate irreparable harm. Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985).

## IV.    DISCUSSION

### A. Likelihood of Success on the Merits

#### a. Final Agency Action

Plaintiff argues that the NPS 2025 Letter authorizing CRM to proceed with renewed operations at Colosseum Mine constitutes a final agency action. Mot. at 12. Plaintiff argues that the NPS 2025 Letter is definitive and explicitly states that CRM does not need any further approval from NPS. Id. at 13. Further, plaintiff argues that the letter transmits a decision from which legal consequences flow because it recognizes CRM's "valid existing rights" under the BLM Plan and allows CRM to renew mining operations without adhering to the procedural requirements of the MPA. Id. at 14.

In opposition, defendants argue that the NPS 2025 Letter is not a final agency action. Fed. Opp. at 10; CRM Opp. at 22. The federal defendants argue that the letter merely expresses NPS's view of what the law requires and does not put NPS's declared position—that CRM possesses valid existing rights pursuant to the BLM Plan—into action. Fed. Opp. at 10. CRM further argues that the NPS 2025 Letter is not a final agency action because it reverses a non-final agency decision—the 2023 NPS Rescission of the 1995 Temporary Approval—that is pending appeal. CRM Opp. at 23.

"'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). "[R]elief," in turn, includes the "recognition of a claim, right, immunity, privilege, exemption, or exception." 5 U.S.C. § 551(11)(B). "An agency action is 'final' only if it both (1) 'mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature,' and (2) is 'one by which rights or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

obligations have been determined, or from which legal consequences will flow.'" Ctr. for Biological Diversity v. Haaland, 58 F.4th 412, 417 (9th Cir. 2023) (quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)). "The requirement of finality is interpreted pragmatically." State of Cal., Dep't of Educ. v. Bennett, 833 F.2d 827, 833 (9th Cir. 1987).

Here, the Court finds that NPS's decision in the NPS 2025 Letter meets the Bennett criteria for a final agency action. Following the 2023 NPS Rescission of the 1995 Temporary Approval, CRM lacked authorization from NPS to operate at Colosseum Mine. The NPS 2025 Letter reversed NPS's positions that the BLM Plan was no longer valid and that CRM would need to seek NPS's approval of a plan of operations. See June 2023 NPS Letter. The NPS 2025 Letter communicated a definitive statement of NPS's position that "submitting a new plan of operations . . . would only be required for a new mining operation not encompassed within the [BLM Plan]." NPS 2025 Letter. Thus, NPS effectively recognized an exemption from the federal regulation requiring NPS authorization or approval of a plan of operations for mining within Mojave National Preserve. See 36 C.F.R. § 9.9.

Based on this new NPS position, CRM could thereafter commence mining operations at Colosseum Mine, where it previously lacked recognized NPS-approval to do so. "In determining whether an agency's action is final, we look to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party, or if immediate compliance with the terms is expected." Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006) (cleaned up). "In so doing, courts generally distinguish between 'informational' documents that merely provide the agency's interpretation of a statute, and agency 'decisions' that determine how a statute or regulation applies to facts for enforcement purposes." Kapa'a v. Trump, 794 F. Supp. 3d 793, 814 (D. Haw. 2025) (cleaned up). Focusing "on the practical and legal effects of the agency action," Oregon Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006), the Court finds that the NPS 2025 Letter reflects NPS's final decision to allow CRM to operate at Colosseum Mine pursuant to the BLM Plan. Accordingly, it is a final agency action subject to judicial review under the APA. 5 U.S.C. § 704.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

### b.  Violates the APA

#### 1.  Contrary to Law

Plaintiff argues that the NPS 2025 Letter authorizing operations under the BLM Plan violates the MPA.  Mot. at 11.  Plaintiff argues that the BLM Plan is not a valid plan of operations under the MPA.  Id.  Plaintiff argues that, pursuant to the MPA's implementing regulations, CRM is required to submit a plan of operations for NPS approval and has not done so.  Id. at 15 (citing 36 C.F.R. § 9.9(a)).  Moreover, plaintiff argues that this requirement for an NPS-approved plan of operations contains no exemption for prior approved plans of operation issued by other agencies.  Id.

The federal defendants argue that the CDPA's savings clause exempts "valid existing rights" from being subject to all federal laws and regulations applicable to mining in the National Park System, including MPA regulations.  Fed. Opp. at 11 (citing 16 U.S.C. § 410aaa-48).  The federal defendants argue that "valid existing rights" encompasses BLM's authorization to operate at Colosseum Mine pursuant to the BLM Plan.  Id. at 11-12.

CRM also argues that the approved BLM Plan was a "valid existing right," and CRM argues that, in 1995, NPS confirmed that CRM's predecessor had an "existing BLM approved plan" and could proceed under it.  CRM Opp. at 14 (citing 1995 Temporary Approval).

In reply, plaintiff argues that NPS has previously interpreted the CDPA's savings clause as merely recognizing that private inholdings within Mojave National Preserve "had 'valid existing rights' to continue to conduct mining operations free of federal regulation after the inclusion of the surrounding lands in the Preserve, just as they had before the CDPA."  Reply at 11-12 (quoting Def.'s Cross-Mot. Summ. J. at 28, Rayco v. Bernhardt, Dkt. 54-1, No. 2:21-CV-00512-SVW-GJS (C.D. Cal. Feb. 3, 2023).[4]  Plaintiff

---

[4] Plaintiff requested that the Court judicially notice this document.  See Dkt. 30-1.  Pursuant to the Federal Rules of Evidence, the Court may take judicial notice of a fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  "[U]nder Federal Rule of Evidence 201, a court may take judicial notice of matters of public record."  Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).  Accordingly, the Court may take judicial notice of this court filing.  See Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**       **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

argues that section 508 of the CDPA must be interpreted as subjecting all mining activities not on private inholdings to the MPA and its regulations. Id. at 12. Plaintiff argues that since section 507 of the CDPA prohibits new mining claims in Mojave National Preserve, defendants' interpretation of section 508 as exempting pre-existing approved operations would essentially exempt all mining claims in Mojave National Preserve from regulation. Id. at 13. Further, plaintiff argues that such a reading of the savings clause contradicts the goals of the CDPA. Id. Plaintiff contends that an approved mining plan of operations does not grant "rights" and therefore cannot be construed to provide "valid existing rights." Id. Plaintiff argues that the "right" to mine on federal land is conferred by the General Mining Act of 1872 and that any plan of operation only authorizes the mine operator to exercise their mining rights in accordance with applicable regulations. Id.

At its core, this APA challenge turns on the meaning of the phrase "subject to valid existing rights" in section 508 of the CDPA. Section 508, entitled "Regulation of Mining," provides:

> Subject to valid existing rights, all mining claims located within the preserve shall be subject to all applicable laws and regulations applicable to mining within units of the National Park System, including the Mining in the Parks Act (16 U.S.C. 1901 et seq.), and any patent issued after the date of enactment of this title shall convey title only to the minerals together with the right to use the surface of lands for mining purposes, subject to such laws and regulations.

16 U.S.C. § 410aaa-48.

Defendants contend that the phrase "subject to valid existing rights," grandfathers or exempts from additional regulation any plans of operation approved by BLM prior to the CDPA. Therefore, according to defendants, despite regulatory language requiring that "[a]ll operations within any unit [of the National Park System] shall be conducted in accordance with an [NPS-]approved plan of operations," 36 C.F.R. § 9.9(a), CRM does not need to seek NPS approval for mining operations that are within the scope of the

---

take judicial notice of court filings and other matters of public record."). However, the Court only judicially notices the existence of the document and the stated positions of the federal defendants in that case, but the Court does not accept the factual assertions or statutory interpretation asserted therein.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**               **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

BLM Plan. On the other hand, plaintiff contends that "subject to valid existing rights" does not create such a broad exemption from NPS regulation for mining operations on NPS lands. The Court "must exercise [its] independent judgment" in deciding whether NPS acted within its statutory authority in deciding, based on defendants' current reading of the CDPA, that CRM need not seek NPS approval for mining operations within the scope of the BLM Plan. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024).

"Our task is to construe what Congress has enacted. We begin, as always, with the language of the statute." Duncan v. Walker, 533 U.S. 167, 172 (2001). Congress used the phrase "valid existing rights" sixteen times in the CDPA, including three times in Title V, the title that established the Mojave National Preserve. See generally Pub. L. No. 103–433, 108 Stat. 4471 (1994).

Congress defined "valid existing rights" only once in the CDPA, in Title X, also known as the Bodie Protection Act of 1994. Id. at §§ 1001-1007. While Title V transferred jurisdiction of the public lands within the newly established Mojave National Preserve from BLM to NPS, the historic Bodie gold mining district in California— "a preserved authentic ghost town"—was a National Historic Landmark and California State Historic Park. Id. at § 1002. NPS "listed Bodie as a priority one endangered National Historic Landmark in its fiscal year 1990 and 1991 report[s] to Congress . . . and recommended protection of the Bodie area." Id.

In an effort to protect Bodie, Congress passed as Title X of the statute enacting the CDPA the Bodie Protection Act of 1994, which, "[s]ubject to valid existing rights," withdrew the Bodie area from being available for any mineral mining, leasing, or disposal activities; directed the Secretary of the Interior to undertake an expedited validity review of all unpatented mining claims located within Bodie; and prescribed limitations for the issuance of patents for mining and mill site claims on such lands. Id. at § 1004. In Title X, Congress specifically defines "valid existing rights":

> VALID EXISTING RIGHTS.—As used in this section, the term "valid existing rights" in reference to the general mining laws means that a mining claim located on lands within the Bodie Bowl was properly located and maintained under the general mining laws prior to the date of enactment of this title, was supported by a discovery of a valuable mineral deposit within the meaning of the general mining laws on the date of enactment of this title, and that such claim continues to be valid.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

Id. at § 1004(b).

This definition of "valid existing rights" refers to the property and possessory rights conferred by the United States under the federal mining laws to the holders of unpatented and patented mining claims, e.g., mineral rights, surface use rights, and possibly title.  See 30 U.S.C. §§ 22, 26, 29.  This definition does not encompass a "right" to be exempt from new regulations merely because a holder of an existing mining claim is complying with applicable regulations at the time the law is enacted.  In fact, the definition makes no reference to regulations or agency authorizations.  The exercise of these property and possessory rights conferred to the holders of mining claims under the federal mining laws has always been subject to "regulations prescribed by law."  30 U.S.C. § 22; see also id. at § 26 (" . . . so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title").

The Court "interpret[s] the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" Abramski v. United States, 573 U.S. 169, 179 (2014) (citation omitted).  First, the context of the CDPA supports the Court's finding that Congress intended the phrase "valid existing rights" in Title V to have the same definition as it provided in Title X of the same statute, Public Law No: 103-433.  Both Titles have the purpose and effect of withdrawing specific federal lands from new mining claims and regulating existing mining claims on those lands.  Section 508 regulates existing mining claims in Mojave National Preserve by incorporating the MPA and its regulations to existing mining claims in the preserve.  16 U.S.C. § 410aaa-48.  With respect to Bodie—a National Historic Landmark not subject to the MPA's mining regulations—Congress directed the Secretary of the Interior to promulgate rules "no less stringent than the rules promulgated pursuant to [the MPA]" to implement the Bodie Protection Act.  Pub. L. No. 103–433, 108 Stat. 4471 at § 1005(d).[5]  Thus, the Court finds that Congress intended to recognize and protect the same "valid existing rights"—the property and possessory rights of the holders of valid existing mining

---

[5] BLM ultimately withdrew its proposed rule because the state of California and the Nature Conservancy acquired all existing unpatented mining claims and mill sites in order to reconvey them to BLM.  See Surface Management of Mineral Activities Within the Bodie Bowl Under the Bodie Protection Act of 1994, 62 Fed. Reg. 67602 (Dec. 29, 1997).  Thus, according to BLM, "regulations are no longer necessary to carry out the provisions of the Act" because "the development of locatable minerals will not occur on Federal lands within the Bodie Bowl." Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

claims, still subject to regulation—in the two titles, even if Congress only expressly defined the phrase in the latter title.

Applying this same definition of "valid existing rights" to section 508 of the CDPA, the Court finds that NPS's decision to recognize the continuing validity of the BLM Plan and to not require NPS approval of CRM's post-CDPA operations within Mojave National Preserve is not in accordance with the CDPA. Defendants' reading of "valid existing rights" to include an indefinite "right" to operate pursuant to the BLM Plan is plainly incorrect.

The federal defendants argue that the phrase "subject to valid existing rights" in section 507, which withdraws lands in Mojave National Preserve "from all forms of location, entry, and patent under the United States mining laws," 16 U.S.C. § 410aaa-47, preserves the right of the holder of an unpatented mining claim to obtain a patent while the same savings clause in section 508 protects a different right—the right to operate on an unpatented mining claim under existing regulations. Fed. Opp. at 13-14. The federal defendants argue that Congress's use of multiple savings clauses requires an interpretation that each has a different meaning. Id. To the extent that the federal defendants contend that each time Congress uses the phrase "valid existing rights" Congress must be referring to a different set of rights in order to avoid redundancy, the Court fundamentally disagrees with such a premise. The Court's interpretation that the phrase "valid existing rights" in sections 507 and 508 refer to the same property and possessory rights of the holders of valid mining claims as defined in Title X of the same statute creates no redundancy because the savings clauses in section 507 and section 508 serve distinct purposes: section 507 recognizes that the withdrawal of land in Mojave National Preserve from new mining claims does not deprive the holders of valid existing mining claims in the preserve of their property or possessory rights under the mining laws; section 508 then recognizes that all mining claims in the preserve are subject to regulation so long as those regulations do not deprive the holders of valid existing mining claims of their property or possessory rights under the mining laws.

Second, the Court's interpretation of "valid existing rights" in section 508 of the CDPA as referring only to property and possessory rights under the mining laws—which remain subject to regulation—and not to agency authorizations under various regulations, is consistent with Congress's intended meaning of "valid existing rights" in the MPA in 1976. In section 3 of the MPA, Congress uses the phrase "subject to valid existing rights" before withdrawing national parks from entry, exploration, and mining claims under the Mining Law of 1872. See Pub. L. No. 94-429, 90 Stat. 1342 at § 3. In the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

preceding section, Congress empowers the Secretary of the Interior to prescribe regulations for "all activities resulting from the exercise of valid existing mineral rights on patented or unpatented mining claims within any area of the National Park System." Id. at § 2 (codified at 54 U.S.C. § 100732). It follows that "valid existing rights" in section 3 refers to those mineral rights on patented or unpatented mining claims. Similarly, in the CDPA, section 509 refers to "the exercise of valid existing rights on patented mining claims." 16 U.S.C. 410aaa-49. Defendants' reading of "valid existing rights" to include a "right" to operate on a valid mining claim pursuant to an agency authorization regardless of whether the mining claim remains under that agency's jurisdiction is not a plausible interpretation. Indeed, the MPA's implementing regulations contemplated how existing operations coming under the jurisdiction of the NPS would be treated, and the regulations specifically provide for a grace period of 120 days, see 36 C.F.R. § 9.9(d), and a temporary approval process, see id. at § 9.10(g). Furthermore, until April 2025, NPS consistently interpreted the CDPA as incorporating MPA regulations for all valid mining claims in Mojave National Preserve. See 1995 Temporary Approval (granting temporary approval to the operator of Colosseum Mine pursuant to 36 C.F.R. § 9.10(g)); NPS 2023 Rescission (requesting CRM to submit a proposed plan of operations to NPS's Acting Superintendent for review); June 2023 NPS Letter (communicating NPS's position that CRM requires an NPS-approved plan of operations). While the judiciary is not bound to adopt an agency interpretation, "exercising independent judgment often include[s] according due respect to Executive Branch interpretations of federal statutes." Loper Bright, 603 U.S. at 386. "Such respect [may be] especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." Id. (citations omitted). "The longstanding practice of the government can inform [a court's] determination of what the law is." N.L.R.B. v. Noel Canning, 573 U.S. 513, 514 (2014) (cleaned up).

Third, the Court finds further support for its interpretation of "valid existing rights" in section 508 of the CDPA from agency and court interpretations of the same phrase as used by Congress in the context of other statutes.

For example, in the two mining regulations promulgated under the FLPMA in 1980, BLM directly addressed the meaning of "valid existing rights" in the FLPMA and its interaction with BLM's regulatory authority. See 43 C.F.R. § 3802.0-5(k) ("*Valid existing right* means a valid discovery had been made on a mining claim on October 21, 1976, and continues to be valid at the time of exercise."); 45 Fed. Reg. 78902, 78907

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

("The existence of a valid existing right or lack thereof, however, is immaterial to the exercise of the Secretary of the Interior's regulatory authority. This rulemaking does not extinguish any possessory rights that an individual may have under the mining laws. Those rights, however, are subject to the reasonable regulations mandated by the [FLPMA].").

In the context of finding that "subject to valid existing rights" in the Michigan Wilderness Act protects property owners' state-law riparian and littoral rights, the Sixth Circuit's analysis focused on the property owners' rights at law. Herr v. United States Forest Serv., 865 F.3d 351, 357 (6th Cir. 2017) ("When the statute refers to 'valid existing rights,' it asks whether the property owners have such rights under state law.").

In a lawsuit brought by the United States seeking an order to enjoin the lessee of state school trust lands, encircled by federal land, from engaging in any construction, road building, leveling land, or destroying primitive, scenic and wildlife characteristics on the federal land, a district court applied a takings standard to the FLPMA's "subject to valid existing rights" clause to conclude that valid existing rights of access cannot be taken under the FLPMA but can be regulated since Congress had the constitutional authority and responsibility to manage federal land. State of Utah v. Andrus, 486 F. Supp. 995, 1011 (D. Utah 1979) ("The court recognizes that a government can regulate without engaging in a taking."). Other courts have applied a similar "takings standard" to the same "subject to valid existing rights" language in other statutes. See, e.g., Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 750 (D.C. Cir. 1988) (finding that the "statutory language" and "legislative history" of section 522(e) of the Surface Mining Control and Reclamation Act of 1977 "suggest that Congress did not intend to infringe on valid property rights or effect takings through § 522(e)."); see also Stupak-Thrall v. United States, 89 F.3d 1269, 1270 (6th Cir. 1996) (Moore, J, concurring) ("All authorities are in agreement that the 'subject to valid existing rights' language was essentially designed to restrain agencies from effecting a taking.") (citing Andrus, 486 F. Supp. 995).

Here, the Court's interpretation of section 508 in the CDPA is consistent with a "rights under law" approach. The property and possessory rights of holders of valid mining claims are rights under federal law—the Mining Law of 1872. By contrast, defendants' proposed "right" to operate under the BLM Plan is not a right under law. It was merely an authorization under the then-controlling FLPMA regulations of operations on mining claims. Congress's recognition of mining claim rights did not mean that Congress intended to recognize BLM's approval of a plan of operations on such claims under FLPMA regulations as satisfying or exempting the claims from any other

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|----------|----------------------|------|-----------------|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

regulations. In fact, the BLM Plan itself incorporates the Court's "rights under law" interpretation of "valid existing rights." See BLM Plan at 141 (stating that "Amselco qualifies as having valid existing rights" because it owns patented mining claims and valid unpatented mining claims) (citing Solicitor's Opinion on Valid Existing Rights, 88 I.D. 909 (1981)); see also BLM Plan at 174 ("Under the various mining laws . . . a person has a statutory right, consistent with Departmental regulations (e.g., Code of Federal Regulations, Title 43, Subpart 3809, Surface Management), . . . to go upon the unappropriated and unreserved federal lands for the purpose of mineral prospecting, exploration, development, extraction, and other uses reasonably incident thereto. This statutory right carries with it the responsibility to assure that operations include adequate and reasonable measures to prevent undue and unnecessary degradation of the environment and to provide for reasonable reclamation.").

The Court's interpretation is also consistent with the "takings standard" applied by courts to the same "subject to existing rights" language. Defendants' overly broad reading of section 508 as recognizing a right to operate pursuant to the BLM Plan is not necessary to ensure that valid existing mining claims are protected from being taken by the government. See United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 126 (1985) ("[T]he mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking."). The Court's narrower interpretation offers the same protection from a regulatory taking. Moreover, the specific regulatory requirement at issue here—the requirement that all mining operations within units of the National Park System seek approval by NPS, 36 C.F.R. § 9.9—does not constitute a regulatory taking because it (1) does not authorize a "permanent physical occupation" of private property, Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982); (2) does not "deprive[] land of all economically beneficial use," Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027 (1992); and (3) does not necessarily[6] result in substantial "economic

---

[6] The Court need not address whether, or under what circumstances, a refusal by NPS to approve a plan of operations pursuant to 36 C.F.R. § 9.9 would constitute a taking of the valid mining claim owner's rights under the federal mining laws because that is beyond the scope of the statutory interpretation question at issue. The Court simply finds that interpreting section 508 as preserving the possessory and property rights accorded to the owners of valid mining claims under the federal mining laws is sufficient to protect mining claim owners from regulatory takings. The "takings standard" does not require reading section 508 as exempting mining claims from applicable MPA regulations, including the regulation requiring NPS approval for any operations.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

impact" or "interference with reasonable investment-backed expectations." PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 83 (1980).

In conclusion, BLM did not confer "valid existing rights" by approving a plan of operations. According to Congress in a similar context, "valid existing rights" are only the property and possessory rights conferred by the United States to the holders of valid mining claims under the federal mining laws. Pub. L. No. 103–433, 108 Stat. 4471 at § 1004(b). The exercise of those rights conferred to the holders of valid mining claims is and always has been subject to federal, state, and local regulations. See 30 U.S.C. §§ 22, 26. Thus, the Court reads the CDPA to subject "all mining claims" within Mojave National Preserve to MPA regulations, saving valid existing mineral and property rights from regulatory takings. 16 U.S.C. § 410aaa-48. MPA regulations include the requirement that "[a]ll operations" within units of the National Park System be approved by NPS, without grandfathering BLM-approved plans. 36 C.F.R. § 9.9. Furthermore, those same regulations specifically contemplate application to existing operations. See 36 C.F.R. § 9.9(d) (providing a grace period of 120 days for existing operations to continue without an NPS-approved plan); Id. § 9.10(g) (allowing NPS to grant limited temporary approval). Applying such regulations to mining operations previously approved by BLM does not constitute a per se regulatory taking. Accordingly, the decision to allow CRM to operate within Mojave National Preserve without an approval by NPS is contrary to law. [7]

---

[7] In their supplemental briefing, federal defendants and CRM contend that Title X is not part of the CDPA, and therefore, the Court's analysis is fundamentally flawed. Fed. Supp. at 4; CRM Supp. at 1-3. Whether Title X is formally a part of the CDPA or instead is a separate act within the same statute is irrelevant to the Court's analysis because the Court is not applying the definition Congress provided in section 1004 to section 508 merely because the two provisions are nominally in the same act. The Court recognizes that Congress limited the definition of "valid existing rights" in Title X to that section, and the Court is mindful that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972). Nonetheless, the Court finds that the statutory context, structure, history, and purpose of Title V of the CDPA, as well as agency and court interpretations of similar savings clauses in other statutes, support interpreting "valid existing rights" in Title V in a manner consistent with the definition that Congress provided in Title X of the same statute. See Dolan v. U.S.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

2.    Expiration and Scope of the BLM Plan

Plaintiff argues in the alternative that mining approval under the BLM Plan was no longer effective by the CDPA's enactment in 1994. Mot. at 15. Plaintiff asserts that, in 1994, mining at Colosseum Mine had ended, and it was in the final stages of reclamation. Id. Plaintiff argues that the BLM Plan did not encompass or contemplate further mining after the final stages of reclamation and that the BLM Plan was to remain effective for, at most, 12 years from commencement of mining operations, which began in 1987. Id. (citing BLM Plan at 30, 80, 108). Plaintiff further argues that the BLM Plan acknowledged that an additional amendment would be required to pursue underground mining operations after pit mining concluded, and the BLM plan stated that no extended periods of nonoperation are contemplated within the scope of the plan. Id. Plaintiff asserts that when CRM acquired the mine in 2021, pit mining had concluded and extraction operations at Colosseum Mine had not occurred for nearly 30 years. Id.

The defendants argue that the BLM Plan did not expire and that it encompasses the current activities by CRM. Fed. Opp. at 14; CRM Opp. at 12. The federal defendants argue that the BLM Plan did not become ineffective simply because mining operations ceased at Colosseum Mine. Fed. Opp. at 14. The federal defendants assert that the BLM Plan was never revoked or nullified by BLM. Id. at 15. The defendants further argue that no federal agency, including NPS, ever terminated the BLM Plan. Id.; CRM Opp. at 14. The federal defendants argue that the language of the BLM Plan sets out a mining timeframe anchored in the economic output of the mine rather than an explicit expiration date. Fed. Opp. at 16 (citing BLM Plan at 7, 22, 107, 141). The federal defendants and CRM also argue that the BLM Plan specifically contemplated indefinite suspension of the

---

Postal Serv., 546 U.S. 481 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."). Thus, the definition of "valid existing rights" in section 1004 is not dispositive but is helpful in illuminating Congress's intent for the meaning of the same phrase in section 508 because the two acts share a similar purpose. Furthermore, if Congress indeed intended to exempt existing approved mining operations from compliance with the MPA's regulatory regime, the Court "would expect it to speak with the requisite clarity to place that intent beyond dispute." United States Forest Serv. v. Cowpasture River Pres. Ass'n, 590 U.S. 604, 621 (2020); see e.g., 30 U.S.C. § 1272(e) ("After August 3, 1977, and subject to valid existing rights *no surface coal mining operations except those which exist on August 3, 1977, shall be permitted . . .*") (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

mine due to market fluctuations, which the federal defendants argue is what occurred in 1993, prior to CRM's acquisition of Colosseum Mine. Id. (citing BLM Plan at 22); CRM Opp. at 13.

CRM argues that the BLM Plan authorizes its current mining operations and asserts that CRM is conducting drilling, roadwork, and other activity within the BLM Plan's approved disturbance areas. CRM Opp. at 14.

In reply, plaintiff argues that the defendants' arguments that neither NPS nor BLM had nullified the BLM Plan are irrelevant because, following the enactment of the CDPA, mining within Mojave National Preserve can only occur subject to regulations under the MPA. Reply at 16.

In light of the Court's conclusion that the CDPA does not exempt the holders of mining claims who have BLM-approved plans of operation from the MPA regulation requiring that all mining operations within Mojave National Preserve require a NPS-approved of a plan of operations, the parties' arguments regarding the scope of the BLM Plan are immaterial to the disposition of the instant motion.

3.      Temporary Authorization Under 36 C.F.R. § 9.10(g)

Plaintiff argues that NPS's 1995 Temporary Approval was expressly limited to reclamation and did not permit any mining operations. Mot at 16. Plaintiff asserts that the 1995 Temporary Approval did not make the BLM Plan valid in perpetuity and expressly required CRM to submit a proposed plan of operations to NPS. Id. Plaintiff further argues that a temporary authorization under section 9.10(g) cannot substitute for, or eliminate, the requirement to submit and obtain approval of a plan of operations. Id. Plaintiff argues that following the rescission of temporary approval in February 2023, no mining-related activity could lawfully occur absent submission and approval of a new plan of operations in accordance with the MPA. Reply at 16.

Defendants do not directly address the 1995 Temporary Approval in their arguments but rather assert that, notwithstanding the issuance and subsequent rescission of the 1995 Temporary Approval by NPS, the BLM Plan has been, at all times since its issuance, the operative and controlling authorization of CRM and its predecessors' activities. See generally Fed. Opp. at 10-11; CRM Opp. at 24.

The Court finds that the scope of NPS's temporary authorization of operations at Colosseum Mine in the 1995 Temporary Approval is immaterial to the disposition of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|----------|----------------------|------|-----------------|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

instant motion because the temporary authorization was rescinded. See NPS 2023 Rescission. Accordingly, CRM lacks valid present authorization by NPS to engage in mining operations at Colosseum Mine.

4.      Arbitrary and Capricious

Plaintiff argues that the NPS 2025 Letter is arbitrary and capricious because it reverses prior NPS findings without a reasoned explanation. Mot. at 17-18. Plaintiff asserts that between 1995 and 2023, NPS had consistently found that neither its 1995 Temporary Approval nor the BLM Plan encompassed renewed mining at Colosseum Mine without a new, NPS-approved plan of operations. Id. Plaintiff argues that, in the NPS 2025 Letter, NPS fails to articulate a satisfactory explanation as to why prior findings of law and fact were incorrect or articulate their reasoning for their new position that the BLM Plan is operative. Id.

The federal defendants argue that the NPS 2025 Letter is not arbitrary or capricious because the letter "is not based on findings of fact." Fed. Opp. at 16. The federal defendants argue that the 2023 communications from NPS to CRM were also not based on factual findings and that, therefore, the April 2025 letter does not reverse any prior findings of fact. Id. at 17 (citing June 2023 NPS Letter; dkt. 24-16 at 2). The federal defendants argue that Loper Bright extinguished agency change-of-position challenges, and, therefore, NPS was not required in its April 2025 letter to explain the legal interpretation underlying its determination that CRM had "valid existing rights" since statutory interpretation is ultimately the province of the courts. Id. at 18.

CRM argues that NPS did not need to explain its change in position in the NPS 2025 Letter any more than it did. CRM Opp. at 24. CRM argues that the position NPS took in the NPS 2025 Letter—that the BLM Plan remains in effect and governs—has been NPS's view since at least 1995. Id. CRM asserts that it timely appealed the rescission of the 1995 Temporary Approval and that the April 2025 letter merely reaffirmed CRM's rights consistent with the 1995 Temporary Approval while the appeal is pending. Id. (citing Shapiro Decl., Ex. E).

In reply, plaintiff argues that NPS's authorization of CRM's activities in the NPS 2025 Letter is contrary to previous findings of fact. Reply at 17. Plaintiff argues that NPS made factual findings about the BLM Plan in its prior communications with owners of Colosseum Mine, including: that the BLM Plan no longer applied to current mining operations and did not authorize renewed exploration or extraction without additional NPS approval. Id. at 17 (citing Wilcox Decl., Exs. C, D, E). Plaintiff also argues that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

even if the NPS 2025 Letter was merely a change in the agency's legal position, NPS is still required to provide a reasoned explanation for the change. Id. at 18-19.

In sum, the Court has determined that plaintiff is likely to succeed on the merits of its claim that NPS's decision to allow CRM to operate at Colosseum Mine without an approved plan of operations (or temporary authorization) by NPS is not in accordance with law because it is contrary to the CDPA's provision requiring all mining claims under NPS jurisdiction to be subject to regulations promulgated under the MPA. Thus, NPS's decision to effectively exempt CRM from compliance with 36 C.F.R. § 9.9(a) is not in accordance with the CDPA. Given that NPS's decision is based on a legal interpretation of the CDPA—which the Court finds to be incorrect— and, as the federal defendants concede, the legal interpretation is "not based on findings of fact," Fed. Opp. at 16, it cannot be arbitrary and capricious.

### B. Likelihood of Irreparable Harm

In its motion, plaintiff argues that the resumption of mining activities within Mojave National Preserve has and will cause irreparable environmental harm. Mot. at 19. Plaintiff argues that between September 2025 and March 2026, CRM significantly widened the Colosseum access road, erected a six-foot earthen berm in the process, cleared vegetation to make way for road-widening and new roads, and graded the land in preparation for activities beyond mere exploratory drilling. Id. Plaintiff submits that these activities and further mining activities that are likely to ensue will damage the desert ecosystem which is slow-growing and highly sensitive to disturbance. Id. at 20 (citing declarations). Further, plaintiff argues that CRM's blocking of public access to Colosseum Road with "no entry" signs constitutes irreparable harm in that it limits the public's access to use and enjoy the Mojave National Preserve and it limits NCPA's ability to monitor CRM's activities. Id. at 20-21.

In opposition, the federal defendants argue that plaintiff fails to identify imminent, irreparable harm. Fed. Opp. at 19-24. The federal defendants argue that plaintiff has been aware of CRM's intent to conduct mining-related operations since no later than the April 2025 NPS press release recognizing that CRM could continue mining operations at Colosseum Mine. Id. at 19. The federal defendants and CRM argue that plaintiff's fourteen-month delay, between April 2025 and its filing of a motion for a preliminary injunction, undercuts plaintiff's claims of irreparable harm. Id.; CRM Opp. at 29. Further, the federal defendants argue that, since mining operations have already begun, plaintiff's motion is at odds with a preliminary injunction's purpose of preserving the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

status quo. Fed. Opp. at 20. The federal defendants argue that plaintiff's alleged irreparable harm is speculative because CRM is only permitted to operate within the scope of the BLM Plan on a site that has been mined for decades. Id. at 22. The federal defendants assert that if and when CRM commences extraction, it can use the two pits used for gold mining in the 1980s and 1990s that were maintained after mining ceased. Id. at 23 (citing BLM Plan at 27; Ex. 2 at 26). The federal defendants argue that plaintiff's assertion that the environmental harm from mining activity is not easily repaired is defeated by the fact that prior disturbances at Colosseum Mine were mitigated after mining ceased and the site remains subject to a reclamation plan. Id. at 23. The federal defendants further argue that the environment can be restored because the reclamation plan within the BLM Plan states that reclamation should return recreational activities and habitat productivity to pre-mining levels. Id. Both CRM and the federal defendants argue in opposition that the segment of road that is closed to the public is small compared to the overall size of the Mojave National Preserve. Id. at 21; CRM Opp. at 29. CRM further argues that the BLM Plan authorizes the blockage of certain roads and portions of the Mojave National Preserve for the safety of the public. CRM Opp. at 29.

In reply, plaintiff argues that it filed the preliminary injunction as soon as it became clear that preliminary relief was necessary to preserve the status quo. Reply at 19. Further, plaintiff argues that while the April 2025 decision made it possible for CRM to resume operations, CRM did not begin operations until much later and plaintiff filed its motion only three months after discovering substantial roadwork and less than one month after discovering road closures. Id. at 24. Plaintiff argues that the harm it asserts is not speculative as CRM has stated unequivocally that it intends to proceed with additional mining operations at Colosseum Mine. Id. at 20. Plaintiff further argues that prior mining at Colosseum Mine does not excuse new and greater irreparable harm to the landscape in and around the mine. Id. at 21. Plaintiff argues that it cannot be said that because there is other, unaffected land within Mojave National Preserve that harm to this particular area is not irreparable. Id. Plaintiff contends that the BLM Plan's for reclamation do not suffice to demonstrate that reclamation is possible because reclamation of the previous mining activity remains incomplete more than thirty years later and that NPS rejected prior requests to close Colosseum Mine because of continuing water-quality concerns. Id. Plaintiff argues that the complete closure of a public access road and major thoroughfare within Mojave National Preserve is not negligible harm and is distinguishable from the cases defendants cite where the road closures were temporary. Id. at 22-23.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

The Court finds that plaintiff has demonstrated a likelihood of irreparable injury absent an injunction. The defendants do not dispute that the mining operations at Colosseum Mine are resuming. See Fed. Opp. at 20. Mining operations on protected federal land without an approved plan of operations that satisfies the environmental standards under current laws and regulations is likely to cause irreparable harm. See S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior, 588 F.3d 718, 728 (9th Cir. 2009) (finding that the likelihood of irreparable environmental injury without adequate environmental studies is high). The BLM Plan's incorporation of an environmental impact study is not necessarily sufficient because, as the Court found above, the BLM Plan, including any incorporated environmental impact studies, remains subject to review by the NPS Superintendent and Regional Director under 36 CFR § 9.9. Moreover, defendants' arguments about the potential for reclamation to progress as described in the BLM Plan are undermined by the issues encountered by previous operators of Colosseum Mine in providing satisfactory mitigation of certain pollutants in the groundwater. See dkt. 24-6; dkt. 24-7; dkt. 24-8.[8]

---

[8] CRM argued at oral argument that the Court must make factual findings specific to Colosseum Mine. CRM further argued that the Court needs to consider its declarations directly rebutting plaintiff's environmental experts' declarations. See dkt. 25-24 ("Slesarewich Decl."); dkt. 25-34 ("Quillman Decl."). The Court's finding of irreparable harm is based on factual findings specific to Colosseum Mine and the challenged mining operations. The Court finds that the parties do not dispute that the mining operations disturb the land's natural state and that the land cannot always recover. For example, CRM's expert's declaration states that the Colosseum Mine site "ha[s] been disturbed by gold mining and the associated processing support facilities and equipment." Quillman Decl. ¶ 11. Further, on the potential for reclamation, CRM's expert states that "revegetation areas typically do not initially support the same diversity of plant species as the adjacent undisturbed areas" and "may" eventually, with the help of wind or wildlife, have more meaningful revegetation. Quillman Decl. ¶ 17. In light of Congress's declarations that the Mojave National Preserve is of "inestimable value," deserving of preservation, CDPA at § 2, and absent an NPS-approved plan of operations that "consider[s] and discuss[es] the [National Park System] unit's Statement for Management and other planning documents, and activities to control, minimize or prevent damage to the recreational, biological, scientific, cultural, and scenic resources of the unit," 36 U.S.C. § 9.9(e), the Court finds that there is a significant risk of irreparable harm from the undisputed disturbances to the lands in and around Colosseum Mine. In sum, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

"The [mining activities—including removal of vegetation and other disturbances to the ecosystem], if indeed incorrect in law, cannot be remedied easily if at all." League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 764 (9th Cir. 2014). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 545 (1987). Accordingly, here, the Court finds that monetary damages cannot remedy mining activities' disruptions to the natural state of the "extremely fragile, easily scarred, and slowly healed" California desert. 43 U.S.C. § 1781.

Additionally, the Court is not persuaded by defendants' argument that plaintiff's delay undercuts plaintiff's claims of irreparable harm. The Ninth Circuit held that a plaintiff can "challenge the harm that it views as the most serious." League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 765 (9th Cir. 2014). Here, plaintiff contends that the instant motion came only a few months after discovering actual harm to the environment. Reply at 24. Alleged future or ongoing irreparable harm can be enjoined even where harm has already occurred and even when plaintiff was aware of the prior harm. See Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1382 (9th Cir. 1998) (enjoining further logging where 30 percent of the logging project had already been completed).

Accordingly, the Court finds that plaintiff has demonstrated a likelihood of irreparable harm.

### C. Balance of the Hardships and Public Interest

The last two Winter factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

Plaintiff argues that there is significant public interest in preserving nature and avoiding irreparable environmental injury, such as the disturbance of the ecosystem through clearing, dust, and drilling by CRM. Mot. at 21. Plaintiff further argues that NPS will not be harmed by being compelled to comply with federal law and regulations.

---

Court finds that any disturbances to NPS land absent NPS oversight in accordance with its regulations are sufficient to raise a likelihood of irreparable harm. See N. Alaska Env't Ctr. v. Hodel, 803 F.2d 466, 471 (9th Cir. 1986) ("[I]t was entirely proper for the court to enjoin further mining until proper environmental analyses are conducted [pursuant to NEPA and NPS regulations].").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

Id. at 22.  Plaintiff argues that any economic harm to CRM caused by a short-term, temporary delay in mining operations during the preliminary injunction does not override the need to ensure that NPS follows the law and that environmental and public resources are protected.  Id.

The federal defendants argue that the requested injunction does not serve the public interest because it would interfere with the uniform and effective operation of federal law.  Fed. Opp. at 24.  The federal defendants and CRM argue that the BLM Plan created valid existing rights that Congress intended to exempt from additional regulation under the MPA.  Id.; CRM Opp. at 31-32.  Therefore, the federal defendants argue that any injunction of mining operations at Colosseum Mine would interfere with the BLM Plan and Congress's scheme to allow existing mines within Mojave National Preserve to continue operating under prior authorizations.  Fed. Opp. at 24.  The federal defendants also argue that continued operation and exploration of Colosseum Mine for potential rare earth elements is in the public interest as there is a national security crisis surrounding the nation's limited domestic supply of rare earth elements.  Id. at 25.  The federal defendants argue that an injunction would also have a negative effect on the local economy by derailing investment in the mining project.  Fed. Opp. at 24.

CRM argues that an injunction on its operations at Colosseum Mine would cause substantial, irrecoverable economic harm to CRM, its shareholders, and the twelve employees and six contractors working on projects related to Colosseum Mine.  CRM Opp. at 30.  Further, CRM argues that an injunction is unnecessary to protect the environmental interests that plaintiff invokes because there already exists a comprehensive regulatory framework which safeguards them.  Id.  CRM argues that the public has a compelling interest in domestic rare earth elements because they are irreplaceable to national defense, advanced manufacturing, and clean energy.  Id. at 32.

In reply, plaintiff argues that the relevant statutory scheme supports granting an injunction because NPS is failing to adhere to its statutory and regulatory duties under federal law.  Reply at 25.  Plaintiff argues that defendants cannot invoke national security interests to disregard constraints Congress placed on mining within Mojave National Preserve in the absence of Congress modifying the CDPA and determining new priorities.  Id. at 26.

The Court finds that the balance of hardships and public interest factors tip in favor of plaintiff.  In enacting the CDPA Congress declared the policy of the United States and the nation's public interest in the preservation and protection of the California desert.  In

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

section one of the CDPA, Congress found and declared that: "[T]he federally owned desert lands of southern California constitute a public wildland resource of extraordinary and inestimable value for this and future generations[.]"  Pub. L. No. 103–433, 108 Stat. 4471 at § 2.

Congress further provided:

In order to secure for the American people of this and future generations an enduring heritage of wilderness, national parks, and public land values in the California desert, it is hereby declared to be the policy of the Congress that— . . . [A]ppropriate public lands in the California desert shall be included within the National Park System and the National Wilderness Preservation System, in order to—(A) preserve unrivaled scenic, geologic, and wildlife values associated with these unique natural landscapes; (B) perpetuate in their natural state significant and diverse ecosystems of the California desert; . . . and (E) retain and enhance opportunities for scientific research in undisturbed ecosystems.

Id.

The CDPA clearly recognizes a public interest in preserving the landscapes and wildlife within Mojave National Preserve.  The Ninth Circuit has also held that there is a "well-established public interest in preserving nature and avoiding irreparable environmental injury." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1138 (9th Cir. 2011) (quotations omitted).  In Alliance, the court found that "while that public interest is most often noted in the context of NEPA cases, we see no reason why it does not apply equally to violations of the [Appeals Reform Act]." Id.  Here, the Court finds that the public interest in preventing irreparable environmental injury also applies in the context of requiring NPS to be faithful to the CDPA and the MPA.  See id. ("It comports with the public interest for the Forest Service to comply faithfully with [federal] procedures.").

Moreover, an administrative agency's failure to comply with the law "invokes a public interest of the highest order: the interest in having government officials act in accordance with the law." Seattle Audubon Soc. v. Evans, 771 F. Supp. 1081, 1095 (W.D. Wash.), aff'd, 952 F.2d 297 (9th Cir.1991).  In accordance with the Court's findings on the merits, the public interest here weighs in favor of an injunction to ensure NPS complies with the CDPA and the MPA.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

The federal defendants suggest a "national security" interest in allowing operations at Colosseum Mine to continue because of "the possibility of potentially establishing another rare earths mine in the future." Fed. Opp. at 25. Absent federal legislation superseding the CDPA, the Court does not consider this speculative national security interest to displace Congress's stated interest in protecting the California desert. See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 194 (1978) ("[I]t is . . . the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation."). The Court's "individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute." Id. The Court "may not consider the advantages and disadvantages of nonenforcement of [a] statute." United States v. Oakland Cannabis Buyers' Co-op., 532 U.S. 483, 498 (2001).

Finally, with respect to the economic harms that a preliminary injunction might cause to CRM, "[t]here is no [cognizable] hardship to a defendant when a permanent injunction would merely require the defendant to comply with law." Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd., No. CV 14-2307 RSWL FFMX, 2014 WL 4679001, at *13 (C.D. Cal. Sept. 18, 2014). Here, where CRM's actions are not in compliance with the law, a preliminary injunction is justified. Moreover, once CRM and NPS come into compliance with all applicable laws and regulations, mining may resume. Therefore, the loss of income CRM claims it will suffer is, ultimately, temporary and therefore does not outweigh the irreparable injuries alleged by plaintiff.

Accordingly, the Court finds that the balance of the hardships and public interest weigh in favor of an injunction.

### D. Appropriate Relief

In conclusion, the Court finds that each of the Winter factors supports granting plaintiff's motion for a preliminary injunction. CRM argues that plaintiff's requested relief, however, is not available under the APA or any other authority. CRM Opp. at 24. CRM argues that plaintiff cannot obtain an order that compels NPS enforcement or halts CRM's activities at Colosseum Mine because the CDPA and the MPA do not create freestanding private enforcement rights and, under the APA, courts may only compel agency action that is legally required. Id. at 24-25.

Here, plaintiff's request for an order enjoining "further operations at the Colosseum Mine pending the resolution of this case" is generally appropriate. See, e.g., S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior, 588 F.3d

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**　　　　　**'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

718, 728 (9th Cir. 2009) (holding that the suspension of the intervening mine operator's activities was warranted given the lack of adequate environmental studies); Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1382 (9th Cir. 1998) (enjoining the intervening defendant company that was awarded the timber contract from further logging pending environmental studies); see also United States v. Oregon, 657 F.2d 1009, 1014 (9th Cir. 1981) ("Intervenors under Fed. R. Civ. P. 24(a)(2) ... enter the suit with the status of original parties and are fully bound by all future court orders.").

However, the Court appears to lack authority to order the federal defendants "to monitor and enforce public access rights along Colosseum Road leading to and past Colosseum Mine." Dkt. 20-4 at 1-2. "[T]he only agency action that can be compelled under the APA is action legally *required*." Norton v. S. Utah Wilderness All., 542 U.S. 55, 63 (2004) (emphasis in original). Here, plaintiff does not point to any requirement for NPS "to monitor and enforce public access rights." Moreover, NPS monitoring and enforcement of public access rights is beyond the scope of the agency action that plaintiff challenges in this suit—NPS's April 2025 decision to recognize the validity of the BLM Plan and to not require NPS approval for CRM's mining operations at Colosseum Mine. Compl. ¶¶ 5, 76, 82, 89, 94.

Accordingly, the Court limits the scope of the preliminary injunction to what is necessary to remedy the alleged violation of the APA.

### E. Bond is Waived

Plaintiff argues that the Court should waive the bond requirement or impose a nominal bond as plaintiff is a non-profit organization seeking to protect the public interest in the environment. Mot. at 23. Defendants do not address these arguments or request a bond in this case. See generally Fed. Opp.; CRM Opp.

"The court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency, 766 F.2d 1319, 1325 (9th Cir.), amended, 775 F.2d 998 (9th Cir. 1985) (citations omitted). Here, given plaintiff's non-profit status, the indeterminate costs that will be incurred by defendants as a result of the injunction, and the nature of this action seeking judicial review of an agency decision alleged to threaten irreparable harm to the environment, the Court exercises its discretion to waive the security requirement pursuant to Fed. R. Civ. P. 65(c).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | Date | August 10, 2026 |
|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | |

## V.    CONCLUSION

In accordance with the foregoing, the Court **GRANTS** plaintiff's motion for a preliminary injunction.

The Court hereby **ORDERS** as follows:

(1) Defendants U.S. Department of the Interior, Doug Burgum, National Park Service, Jessica Bowron, and Kevin Schluckebier, shall set aside, pending final judicial review on the merits, NPS's April 2025 decision that the BLM Plan remains in effect and that CRM does not require NPS approval of mining operations within Mojave National Preserve;

(2) Defendants U.S. Department of the Interior, Doug Burgum, National Park Service, Jessica Bowron, and Kevin Schluckebier, as well as their employees, agents, and any other persons acting on their behalf, are enjoined from allowing mining operations within Mojave National Preserve absent compliance with all applicable laws and regulations, including 36 C.F.R. § 9.10;

(3) Intervenor-Defendants Dateline Resources Ltd. and Colosseum Rare Metals, Inc. shall halt operations within Mojave National Preserve in an orderly and safe manner, including demobilization of equipment and drill rigs, implementation of safety measures, and inspection of the site in a manner that ensures the site is safe and secure, and are enjoined from continuing operations within Mojave National Preserve absent compliance with all applicable laws and regulations, including 36 C.F.R. § 9.9, consistent with the following:

    a. Site Safety: Intervenor-Defendants may (i) restore fencing around pits, (ii) place berms on roads, pads, and areas to avoid hazardous conditions, (iii) secure any tunnels and vaults, (iv) secure all containers, (v) grout all open drill holes, (vi) reclaim any drill sites and fill sumps, and (vii) remove any barricades, signage, or other features indicating an active mine site.

    b. Demobilization: Intervenor-Defendants shall (i) notify drill rig and other equipment contractors to immediately demobilize their equipment and crew; (ii) demobilize Dateline drill rigs and other equipment; and (iii) following completion of Site Safety activities in Section (3)(a), above, demobilize any remaining equipment and personnel.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                **'O'**

| Case No. | 2:26-cv-04002-CAS-ASx | | Date | August 10, 2026 |
|---|---|---|---|---|
| Title | National Parks Conservation Association v. U.S. Dept. of the Interior, et al | | | |

   c. Intervenor-Defendants shall have up to ten (10) weeks from issuance of this order to complete said tasks listed in (a) and (b) above.

   d. Ongoing Monitoring Obligations: Intervenor-Defendants may continue to undertake quarterly water monitoring as required by Cal. Reg'l Water Quality Control Bd., Lahontan Region, Order No. 6-9611, Monitoring & Reporting Program No. 96-11, p.4 (Feb. 8, 1996).  Time required: quarterly ongoing.

   e. Intervenor-Defendants may take any other action necessary to comply with applicable laws and regulations.

(4) Defendants and Intervenor-Defendants shall file status reports within 15 days of this order and again within 15 days of the deadline set forth in Section (c), documenting and confirming compliance with the Court's preliminary injunction; and

(5) No security need be given by plaintiff to make this order effective.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |